# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

<u>**DEFENDANT OKEMO LIMITED LIABILITY COMPANY
D/B/A OKEMO MOUNTAIN RESORT'S
CROSS-DESIGNATIONS**</u>

In addition to the following cross-designations, Defendant Okemo Limited Liability

Company, d/b/a Okemo Mountain Resort reserves its right to object to Plaintiff's proposed

deposition designations.

<u>**Witness: Bruce Schmidt**</u>

| Page(s) | Lines |
|---|---|
| 26 | 4-21 |
| 28 | 12-18 |
| 45 | 8-16 |
| 58 | 15-22 |
| 59 | 3-15 |
| 61 | 19-24 |
| 62 | 1-6 |
| 70 | 19-23 |
| 71 | 8-24 |
| 72 | 1-23 |
| 81 | 22-24 |
| 82 | 1-9 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

## DEFENDANT OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT'S DEPOSITION DESIGNATIONS

**Witness: Curtis Ficklin**

| Page(s) | Lines |
|---|---|
| 7 | 5-25 |
| 8-16 | All |
| 17 | 1-11 |
| 17 | 24-25 |
| 18-59 | All |
| 60 | 1-6 |
| 66 | 8-25 |
| 67-75 | All |
| 76 | 1-15 |
| 76 | 18-25 |
| 77-85 | All |
| 86 | 1-13 |
| 87 | 3-10 |
| 87 | 19-25 |
| 88-95 | All |
| 96 | 1-4 |
| 99 | 5-25 |
| 100 | 1-15 |
| 105 | 10-25 |
| 106-109 | All |
| 110 | 1-20 |
| 113 | 3-25 |
| 114-116 | All |
| 117 | 1-20 |

| 118 | 11-25 |
|---|---|
| 119-123 | All |
| 124 | 1-4 |
| 144 | 17-25 |
| 145 | 1 |
| 146 | 5-25 |
| 147 | 1-5 |
| 147 | 12-25 |
| 148 | 1-9 |
| 150 | 3-5 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

## <u>DEFENDANT OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT'S EXHIBIT LIST</u>

| <u>Exhibit No</u> | <u>Description</u> | <u>ID(I) / Full (F)</u> | <u>Objection</u> | <u>Response</u> |
|---|---|---|---|---|
| | Okemo Mountain Resort Trail Map | F | | |
| | Photographs of Trail Signage | I | | |
| | Photographs of Trails and Jackson Gore Junction | I | | |
| | Your Responsibility Code | I | | |
| | Okemo Mountain Resort Day Ticket RFID Card | I | | |
| | Okemo Mountain Resort 2015 Employee Orientation Roster | I | | |
| | Okemo Mountain Resort Employee Handbook 2016-2017 | I | | |
| | Okemo Mountain Resort Lift Operations Department Specific Manual Effective: November 1, 2016 | I | | |
| | Curtis Ficklin's Timecard | I | | |
| | Curtis Ficklin's Employment File | I | | |
| | Curtis Ficklin's Employee Handbook Acknowledgment Signature Page dated October 31, 2015 | I | | |

| | Curtis Ficklin's Employee Handbook Acknowledgment Signature Page dated November 5, 2016 | I | | |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

## <u>DEFENDANT OKEMO LIMITED LIABILITY COMPANY<br>D/B/A OKEMO MOUNTAIN RESORT'S<br>WITNESS LIST</u>

Defendant Okemo Limited Liability Company d/b/a Okemo Mountain Resort ("Defendant"), respectfully submits the following Witness List.  Defendant reserves the right to call any and all witnesses listed by Plaintiff Stacie Rivard-Pedigo ("Plaintiff"), as well. Defendant further reserves the right to supplement its Witness List for purposes of rebuttal or as the interests of fairness and justice may require.

### Defendant's Witness List

1. **Bruce Schmidt**[1]
   *Party Witness*

2. **Chris Lancaster**
   *Party Witness*

3. **Neil Dewar**
   *Party Witness*

4. **Tesse Gohl**
   *Party Witness*

---

[1] Bruce Schmidt is unavailable on May 17, 2019, due to his daughter's college graduation ceremony.

5. **Curtis Ficklin**
   *Non-party Witness*

6. **Dr. Carrie Swigart**
   *Non-party Witness*

7. **Dr. Dieter Lindskog**
   *Non-party Witness*

8. **Dr. Denise Barajas**
   *Non-party Witness*

9. **Clay Pedigo**
   *Non-party Witness*

10. **Mark Petrozzi**
    *Expert Witness*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

## DEFENDANT OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT'S PROPOSED JURY INSTRUCTIONS

Defendant Okemo Limited Liability Company d/b/a Okemo Mountain Resort ("Okemo"), by and through its undersigned counsel, respectfully submits the following Proposed Jury Instructions.

Okemo respectfully reserves its right to amend and/or supplement these Proposed Jury Instructions, up to and including at the time of trial.[1]

## GENERAL INSTRUCTIONS

### 1.  Role of the Court, the Jury and Counsel[2]

You have listened carefully to the testimony presented to you. Now you must pass upon and decide the factual issues of this case. You are the sole and exclusive judges of the facts. You pass upon the weight of the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the evidence, and you draw such inferences as may be warranted

---

[1] Defendant submits the attached Memorandum of Law in Support of its Proposed Jury Instructions (the "Memorandum"). Said Memorandum is attached hereto as *Exhibit 1*.

[2] *See* Jury Charge in *Taylor v. Stratton Corporation*, Case No. 2:09-cv-00297-WKS (D. VT January 23, 2012), attached as *Exhibit A* to Memorandum

by the facts as you find them. I shall shortly define the word "evidence" and instruct you on how to assess it, including how to judge the credibility of the witnesses.

You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. You are not to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty as judges of the facts to base a verdict upon anything but the evidence of the case.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case, or what that opinion is. It is not my function to determine that facts. That is your function.

You are to discharge your duty as jurors with an attitude of complete fairness and impartiality. You should appraise the evidence deliberatively and without the slightest trace of sympathy, bias or prejudice for or against any party. All parties expect that you will carefully consider all of the evidence, follow the law as it is now being given to you and reach a just verdict regardless of the consequences.

**2. Jurors as Finder of Fact / Rulings of the Court[3]**

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourselves in reaching a verdict. By the rulings which I made during the course of the trial, I did not intend to indicate to you or to express my own views about this case.

**3. Sympathy / Prejudice[4]**

---

[3] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. VT Aug, 29, 2013), attached as *Exhibit A* to Memorandum..
[4] *Id.*

Neither sympathy nor prejudice, for or against the parties, or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well-reasoned and impartial.

## 4.  Important Case[5]

This is an important case to the parties and the court. You should give it serious and fair consideration.

## 5.  Business Entity as a Party[6]

Okemo is a business entity. You should consider this case, however, as an action between persons, and give Okemo the same treatment as a private individual. All persons, including business entities, stand equal before the law.

A business entity such as Okemo can act only through its officers, employees, and agents. As a business entity, Okemo is responsible for the acts and omissions of its agents and employees when its agents and employees are acting within the scope of their employment with Okemo. For purposes of your deliberations, you should consider the acts, statements, and omissions of employees of Okemo to be the acts, statements, and omissions of Okemo. Later during these instructions, I will explain to you what it means when employees are acting within the scope of their employment.

## 6.  Arguments / Statements / Objections of the Attorneys[7]

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements that they made during the course of the trial are not evidence.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

3

The attorneys have a duty to object to evidence that they believe is not admissible. You may not hold it against either side if any attorney feels it is necessary to make an objection.

### 7.  Evidence in the Case

The evidence in this case consists of the sworn testimony of the witnesses, the exhibits admitted into evidence, and any stipulated facts, regardless of which party presented the evidence. When the attorneys on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation and regard that fact as proven. You may give the stipulated fact, like any other evidence, the weight that you think it deserves.

Any evidence to which an objection was sustained or stricken by the court must be disregarded.[8]

There are two types of evidence which you may properly use in reaching your verdict. One type of evidence is direct evidence. Direct evidence is when a witness testifies about something, she or he knows by virtue of their own senses -- something she or he has seen, felt, touched, or heard. Direct evidence may also be in the form of an exhibit where the fact to be proved is the exhibit's existence or condition.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts. You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact. Circumstantial evidence is of no less value than direct evidence for it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but requires that your verdict must be based on all the evidence presented.

---

[8] *See* Jury Charge in *Erickson v. The Stratton Corporation*, Case No. 5:11-cv-00051-CR (D. VT Aug, 29, 2013).

4

For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen fresh cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field.

The law does not require a party to prove its claims or defenses by direct evidence alone, that is, by testimony of an eyewitness. One or more of the essential elements, or all of the essential elements, may be established by reasonable inference from other facts that are established by direct testimony. Circumstantial evidence may alone be sufficient to prove a claim or defense.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it such weight as you think it deserves. [9]

## 8.  Credibility of Witnesses[10]

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony, considered in light of all of the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

---

[9] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. VT January 23, 2012); *see also Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. VT Aug, 29, 2013).
[10] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. VT January 23, 2012); *see also Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. VT Aug, 29, 2013).

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can do so.

In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You may give the testimony of each witness such weight, if any, you think it deserves. You may believe all of the testimony of any witness, you may believe it in part and disbelieve it in part, or you may reject it altogether. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you will believe and what you will disbelieve.

## 9.  Number of Witnesses[11]

The fact that one party called more witnesses and introduced more evidence than the other does not mean that you should necessarily find the facts in favor of the side offering the most witnesses.

## 10. Expert Witnesses[12]

In this case, I have permitted certain witnesses to express their opinions about matters that are in issue. A witness may be permitted to testify to an opinion on those matters about which he or she has special knowledge, skill, experience, and training. Such testimony is presented to you on the theory that someone who is experienced and knowledgeable in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

---

[11] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. VT Aug, 29, 2013).

[12] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. VT January 23, 2012).

In weighing this opinion testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe witness testimony. You may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in the case. You should not, however, accept opinion testimony merely because I allowed the witness to testify concerning his or her opinion. Nor should you substitute if for your own reason, judgement and common sense. The determination of the facts in this case rests solely with you.

**11. Compensation of Expert Witnesses[13]**

The amount of the expert witness's fee is a matter that you may consider as possibly affecting the expert's credibility. However, there is nothing improper about a party compensating an expert for his or her work and time in providing an expert opinion and attending court.

**12. Video Deposition Testimony[14]**

During the trial, certain testimony was presented to you by way of a videotaped deposition. A deposition is a witness's testimony, given under oath, in response to questions asked in advance of trial by the attorneys for the parties in the case. You should give this testimony the same consideration as any other testimony and evaluate it in the same way as you would have had the witness testified from the witness stand.

**13. Prior Inconsistent Statements[15]**

You may find that a witness has made statements outside of this trial that are inconsistent with the statements that the witness gave here. You may consider the out-of-court statements not made under oath only to determine the credibility of the witness and not as evidence of any facts

---

[13] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).
[14] *Id.*
[15] *Id.*

contained in the statements. As to out-of-court statements that were made under oath, such as statements made in prior testimony, you may consider them for all purposes, including for the truth of the facts contained therein.

## 14. Personal Knowledge and Experience of Jurors[16]

In deliberating upon your verdict, you are not expected to put aside your common sense or your own observations or experience of the general affairs of life. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters which are based on special knowledge concerning an issue in the case that did not come from the evidence received in the courtroom.

## 15. Burden of Proof / Preponderance of the Evidence[17]

The burden is on the party making the claim to prove each essential element of the claim by a preponderance of the evidence. This burden applies to a plaintiff's claim against a defendant and to a defendant's affirmative defense.

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with that opposed to it, has more persuasive force, and produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. In determining whether a fact, claim, or defense has been proven by a preponderance of the evidence, you may consider the testimony of

---

[16] *Id.*
[17] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).

witnesses, regardless of who may have called them, and the exhibits in evidence, regardless of who may have produced or introduced them. No proof of absolute certainty is required.

## CASE SPECIFIC INSTRUCTIONS

Now I will turn to the law governing the specific facts of the case before you. Plaintiff alleges she was involved in a skier-skier collision while skiing at Okemo Mountain Resort, in Ludlow Vermont. Plaintiff claims that the skier who collided with her, Curtis Ficklin, was an agent of Okemo at the time of the collision, and as such, that Okemo is liable for Mr. Ficklin's negligent and reckless actions.

In a moment, I will provide you with instructions concerning the elements of a claim of negligence and recklessness. Before that, however, I need to discuss a threshold issue which concerns the application of the Vermont Sports Injury Statute. [18]

### 16. Vermont Sports Injury Statute[19]

Before considering Plaintiff's claim of negligence and recklessness, you must first decide whether a Vermont law known as the "Sports Injury Statute[20]" applies in this case. Under this law, a person who takes part in any sport, including alpine skiing, accepts as a matter of law, the dangers that are inherent in that sport so long as the dangers are obvious and necessary. [21]

You must determine whether the incident that occurred in this case was caused by a danger that was obvious and necessary as an inherent part of skiing. The operator of a ski facility has no

---

[18] *See* Jury Charges in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013; *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012); *and Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC,* 5:15-cv-175 (D. Vt. Nov 1, 2016), attached as *Exhibit A* to Memorandum; *see also Frant v. Haystack,* 162 VT 11, 18-19 (1994); *Dillworth v. Gambardela,* 970 F.2d 1113, 1119-1120. (2d Cir. 1992).

[19] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013); *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012).

[20] *See* 12 VSA §1037.

[21] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).

duty to eliminate or lessen the risk of obvious and necessary dangers or to warn a skier of those dangers, since they are by definition accepted by the skier when he or she participates in the sport.[22]

First, the term "obvious" does not mean something easily observed by a skier who looked, but rather means a risk inherent in the nature of the sport. You may find a risk to be obvious, in this context, even though Plaintiff did not personally know of, appreciate, and consent to the particular hazard. Plaintiff is deemed to consent to all hazards that are inherent in the sport and which reasonable care and maintenance may not eliminate. Second, "necessary" dangers are those that are there even when due care is exercised.  They are risks that are impossible or unreasonably difficult to eliminate.[23] You may consider the state of technology present at the time of the incident in deciding what is an obvious and necessary danger.[24]

Some ski accidents may be the result of the obvious and necessary risks inherent in the sport, and accidents might occur despite the exercise of ordinary and reasonable care and without negligence by either party.[25]

If you find that the injuries to Plaintiff were the result of dangers which are (1) inherent in the sport of skiing; (2) obvious to a reasonable person participating in the sport; and (3) necessary to the sport, then you must return a verdict for Okemo. But, if you find that the dangers that caused Plaintiff's injuries were not obvious and necessary, then the Sports Injury Statute does not apply, and you should go on to consider Plaintiff's claim of negligence and recklessness.[26]

---

[22] *Id.*

[23] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012).

[24]  *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).

[25] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012).

[26] *Id.*

**17. Mr. Ficklin's Negligence**

I will now provide you with instructions for Plaintiff's claim that Okemo by and through its alleged agent, Mr. Ficklin, was negligent. Specifically, Plaintiff alleges that Mr. Ficklin:

    a.  failed to follow Okemo rules, regulations, policies and/or procedures concerning maintaining control while skiing;

    b.  failed to follow the Okemo Skier and Rider Responsibility Code;

    c.  failed to stay in control such that he was able to stop or avoid other people, including Plaintiff;

    d.  failed to give Plaintiff the right of way;

    e.  failed to observe all posted signs and warnings;

    f.  skied in an unsafe manner;

    g.  failed to slow down in a "SLOW" zone;

    h.  failed to maintain control while skiing;

    i.  failed to keep a proper lookout for other skiers including Plaintiff while skiing on a designated Okemo trail; or

    j.  failed to brake to avoid the collision.

If and only if you find that Plaintiff was not injured by a danger inherent in the sport of skiing, then you will consider whether Mr. Ficklin was negligent and, if so, whether Okemo is vicariously liable for Mr. Ficklin's actions.

**18. Elements of Negligence[27]**

In order to prove a claim of negligence, Plaintiff must prove the following elements:

---

[27] Jury Charge in *Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov. 1, 2016).

a. The existence of a duty of care;

b. Breach or violation of that duty;

c. Damage or injury caused by the breach of duty.

I will discuss each element with you in the context of this case.

## 19. Duty of Care

The first element of negligence is duty. Duty, as it is understood in the law, means a legal obligation to do, or not do some act, depending on the particular circumstances of the case. In general, a "duty" in negligence cases may be defined as an obligation to conform to a particular standard of conduct towards another.

Here, Mr. Ficklin had a duty to act with reasonable care. Reasonable care means the care that reasonably prudent persons use in conducting their own affairs to avoid injury to themselves, their property, or the persons or property of others. A skier has a duty to exercise reasonable care for his or her own safety while participating in the sport of skiing, which includes a duty to ski in a reasonable and prudent manner in light of the conditions and circumstances that exist at the time. Reasonable care is not the greatest possible care, such as might be employed by an unusually cautious person. Rather, a person must exercise the same care a reasonable person would have exercised in the same or similar circumstances. Here, Mr. Ficklin's conduct must be measured against that of a reasonable skier skiing under the conditions as they existed on the day of the incident.

In determining whether Mr. Ficklin was negligent, you may consider the evidence concerning skiing customs or safety rules. If you find there were such customs or rules, they may indicate recognition of a hazard and the means to avoid it, which may inform what may be reasonable in a given situation. However, you may find that an industry custom or safety rule does

not reflect the level of care of a reasonably prudent person and that Mr. Ficklin was negligent even though he followed the custom or safety rule. Conversely, even if you find Mr. Ficklin failed to follow an industry custom or safety rule, such failure does not require a finding of negligence. You must consider all of the evidence in making this determination.

## 20. Breach of Duty

Next you must consider whether Plaintiff has met her burden of proving a breach by Mr. Ficklin of his duty of care. You must determine whether Mr. Ficklin created an unreasonable risk of harm to others, including Plaintiff, by failing to exercise that degree of care that a reasonably prudent person would have exercised under similar circumstances.

If you find that Mr. Ficklin did not breach the duty of care he owed to Plaintiff, then you must enter a verdict for Okemo. If, however, you find that Plaintiff has proven a breach of the duty of care by a preponderance of the evidence, you must next consider whether Plaintiff has proven that Mr. Ficklin's breach caused the injuries she suffered.[28]

## 21. Proximate Cause[29]

In order to find Mr. Ficklin liable for Plaintiff's injuries, you must conclude that Mr. Ficklin's negligence was a proximate cause of these injuries. A legal or proximate cause of an injury means that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury. An injury is proximately caused by an act or failure to act when it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury.

In order to prove proximate cause, Plaintiff must prove two elements. First, that "but for"

---

[28] *See* Jury Charge in Jury Charge in *Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov. 1, 2016).
[29] *Id.*

Mr. Ficklin's failure to act with reasonable care, her injuries would not have occurred, or if injury had occurred, it would have been less severe. Second, that Mr. Ficklin's conduct was a "proximate cause of the harm."

An act or failure to act is the "but for" cause of an injury if the injury would not have happened except for or "but for" the act or failure to act, even though the act or failure combined with other causes to produce the harm.

Any act or failure to act is the "proximate" cause of an injury if it was a substantial factor in causing the injury. Bear in mind that an event may have several causes. Some of these causes are very direct and obvious. Others are more remote. Your job in determining whether proximate cause is present is to ask yourselves this question: did negligence on the part of Mr. Ficklin lead to Plaintiff's injury in an understandable chain of cause and effect.

Plaintiff has the burden of proof by a preponderance of the evidence of these elements of her claim of negligence.

## 22. Vicarious Liability

If and only if you find that Plaintiff was not injured by a danger inherent in the sport of skiing and you find that Mr. Ficklin was negligent, then you will consider whether Okemo is vicariously liable for Mr. Ficklin's actions.

Employers or principles are vicariously liable for the tortious acts of an employee or agent committed during, or incidental to, the scope of employment or agency.[30] The parties do not dispute that Mr. Ficklin was employed as a Lift Operator by Okemo and that he was off-duty at the time of the collision. The parties dispute whether Mr. Ficklin was Okemo's agent at the time of the collision.

---

[30] *See Doe v. Forrest*, 176 Vt. 476, 483 (2004).

If you find that Mr. Ficklin negligently collided with Plaintiff, then in order to determine whether Ficklin was acting as Okemo's agent at the time of the collision, you must decide whether Mr. Ficklin was acting within the scope of his employment at the time of the collision.

To prevail on this claim, Plaintiff must prove, by a fair preponderance of the evidence that:

a.  Mr. Ficklin's conduct of skiing negligently was the type of conduct he was authorized to perform as part of his employment with Okemo;

b.  Mr. Ficklin's conduct of skiing negligently occurred substantially within Okemo's time and space; and,

c.  Mr. Ficklin's conduct of skiing negligently was motivated by a purpose to serve Okemo.[31]

If your answer to any of the above elements is "no," then you must find that Mr. Ficklin was *not* Okemo's agent at the time of the collision and, accordingly, that Okemo is not vicariously responsible for Mr. Ficklin's actions.

If you find that the Vermont Sports Injury Statute does *not* apply, that Mr. Ficklin *was* negligent and that he *was* Okemo's agent at the time of the collision, then Okemo is liable for Ficklin's alleged negligence.

## 23. Recklessness

If and only if you find that Plaintiff was not injured by a danger inherent in the sport of skiing *and* you find that Mr. Ficklin was Okemo's agent at the time of the collision then you must determine whether the actions of Mr. Ficklin were reckless under the law.  If you find that Mr. Ficklin was *not* Okemo's agent at the time of the collision, then you must enter a verdict in favor of Okemo on this count.

---

[31] *See Sweet v. Roy,* 173 Vt. 418, 431 (2002) *citing* Restatement (Second) of Agency § 229(1).

Plaintiff alleges that Okemo, through the actions of Ficklin, was reckless in the following manner:

a.  Its agent, servant, apparent agent, and/or employee skied recklessly, in the course of his employment, at an excessive rate of speed, when he knew, or should have known that such action was highly dangerous and likely to cause a collision in a "SLOW" skiing zone;

b.  Its agent, servant, apparent agent, and/or employee skied recklessly in an uncontrolled manner, when he knew, or should have known that such action was highly dangerous and likely to cause a collision in a "SLOW" skiing zone;

c.  Its agent, servant, apparent agent, and/or employee, in the course of his employment, skied with reckless disregard for the rights of the Plaintiff and others situated on the designated trail by proceeding at a highly excessive rate of speed and in an uncontrolled manner;

d.  It authorized its agent, servant, apparent agent, and/or employee to ski on its designated trails when it knew or should have known of that agent, servant, apparent agent, and/or employee's propensity to ski in a reckless, uncontrolled manner at a high rate of speed;

e.  It authorized its agent, servant, apparent agent, and/or employee to ski on its designated trails when it knew or should have known that its agent, servant, apparent agent, and/or employee was unfit to ski on the designated trail area; and,

f.  It was reckless in employing or retaining the agent, servant, apparent agent, and/or employee who collided with Plaintiff.

16

There is a wide difference between reckless behavior and mere negligence or even gross negligence. Thoughtlessness and inadvertence are not recklessness. Recklessness requires evidence that Okemo, through Mr. Ficklin, acted, or failed to act, in conscious and deliberate disregard of a known, substantial, and intolerable risk of harm to the Plaintiff, with the knowledge that the acts or omissions were substantially certain to result in the threatened harm.[32]

If Plaintiff has failed to prove that Okemo acted recklessly, then you must return a verdict in favor of Okemo on this count. If you find that Plaintiff has proven each element, then you would proceed to determine damages in accordance with my instructions as to this form of recklessness and fill out the appropriate Plaintiff's verdict form.

## 24. Comparative Negligence[33]

Okemo denies that it acted negligently or recklessly. It also asserts the defense of comparative negligence and claims that Plaintiff caused her own injuries through her own negligence. You should consider the defense of comparative negligence only if you have found in Plaintiff's favor on her negligence and / or recklessness claims.

Okemo has the burden of proof on this defense by a preponderance of the evidence. If it meets this burden of proof, a recovery by Plaintiff in this lawsuit may be defeated entirely or reduced in amount. In order to establish comparative negligence, Okemo must prove by a preponderance of the evidence:

    a.   Plaintiff failed to maintain control of her equipment;

    b.   Plaintiff was skiing beyond the limits of her ability;

---

[32] *See Lewis v. Bellows Falls Congregation of Jehovah's Witnesses,* 248 F. Supp. 3d 530, 2017 WL 1193996 (D. Vt. 2017), *appeal withdrawn,* No. 17-1269, 2017 WL 5001398 (2d Cir. Sept. 25, 2017).

[33] *See* Jury Charge in *Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov. 1, 2016); *see also Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).

    c.   Plaintiff failed to make reasonable and proper use of her senses while skiing;

    d.   Plaintiff failed to keep a proper lookout; and

    e.   Plaintiff assumed the risk of injury.

The same principles I outlined previously for Plaintiff's claim apply to Okemo's claim of comparative negligence. I will briefly review the elements again.

First, Plaintiff had a duty to act with reasonable care for her own safety and well-being. Reasonable care means the care that reasonably prudent persons use in conducting their own affairs to avoid injury to themselves, their property, or the persons or property of others. A skier has a duty to exercise reasonable care for his or her own safety while participating in the sport of skiing, which includes a duty to ski in a reasonable and prudent manner in light of the conditions and circumstances that exist at the time. Reasonable care is not the greatest possible care, such as might be employed by an unusually cautious person. Rather, a person must exercise the same care a reasonable person would have exercised in the same or similar circumstances. Here, Plaintiff's conduct must be measured against that of a reasonable skier skiing under the conditions as they existed on the day of the incident.

Again, in determining whether Plaintiff was negligent, you may consider the evidence concerning skiing customs or safety rules. If you find there were such customs or rules, they may indicate recognition of a hazard and the means to avoid it, which may inform what may be reasonable in a given situation. However, you may find that an industry custom or safety rule does not reflect the level of care of a reasonably prudent person and that Plaintiff was negligent even though Plaintiff followed the custom or safety rule. Conversely, even if you find Plaintiff failed to follow an industry custom or safety rule, such failure does not require a finding of negligence. You must consider all of the evidence in making this determination.

18

Second, Okemo must prove that but for Plaintiff's failure to act with reasonable care for her own safety and well-being, her injuries would not have occurred. Okemo must also prove that Plaintiff's negligence was a "proximate cause" of her injury. An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result of or a reasonably probable consequence of the act or failure to act. Proximate cause is a cause that results in an injury in a natural and continuous sequence, unbroken by any other intervening cause. It is a cause without which the result would not have occurred. This does not mean that the act or failure to act must be the only cause. On the contrary, many facts or things, or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage, and in such a case each may be a proximate cause.

If you find that Okemo has proven that Plaintiff was negligent herself, then you must attribute to each party their relative negligence. This means that you must compare any negligence attributed to Plaintiff with any negligence you have attributed to Okemo. To do so, you must assign a percentage of negligence to Plaintiff on one hand, and to Okemo on the other. The percentages you assign must add up to 100 percent.

Just as an example, suppose the Plaintiff's total damages were $100. If Plaintiff was 40% at fault and Okemo was 60% at fault, Plaintiff would recover 60% of the $100, or $60. Plaintiff would thus not receive payment for the part of her damages caused by her own negligence. Obviously, the numbers used are just for the sake of an example.

If you determine that Plaintiff's share of the negligence is greater than 50%, then you should return a verdict for Okemo, and you should not consider damages. If Plaintiff's share of the

negligence is 50% or less when compared to the negligence of Okemo, then you must consider damages, and the total damages award, if any, must be reduced by the percentage of Plaintiff's negligence. I will provide you with a verdict form that will help you work through these questions during your deliberations.

## 31. Damages[34]

The fact that I am about to instruct you as to the proper measure of damages does not reflect any view of mine as to which party is entitled to your verdict.

If you decide in favor of Okemo on the issue of the Sports Injury Statute, the elements of negligence or recklessness, or if you find that negligence by Plaintiff exceeds in percentage terms any negligence or recklessness on the part of Okemo, you should enter a verdict for Okemo on the verdict form and cease your deliberations. You will not consider these instructions about damages.[35]

Instructions as to the measure of damages are given for your guidance in the event you find in favor of Plaintiff by a preponderance of the evidence in accordance with the other instructions.[36] Again, Plaintiff has the burden of proof by a preponderance of the evidence on each of her claims for damages.[37]

The rule of damages is as follows. Insofar as money can do it, Plaintiff is to receive fair, just and reasonable compensation for all injuries and losses, past and future, which are proximately caused by Okemo's negligence and / or recklessness. Under this rule, the purpose of an award of

---

[34] *See* Jury Charge in *Erickson v. The Stratton Corporation,* Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013).
[35] *See* Jury Charge in *Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov. 1, 2016).
[36] *See* Jury Charge in *Taylor v. Stratton Corporation,* Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012).
[37] *See* Jury Charge in *Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov. 1, 2016).

damages is not to punish or penalize Okemo, but to compensate Plaintiff for her resulting injuries and losses. You must attempt to put Plaintiff in the same position, as far as money can do it, that she would have been in had Okemo not acted in a negligent and / or reckless manner.

Our laws impose certain rules to govern the award of damages in any case where liability is proven. Just as Plaintiff has the burden of proving liability by a fair preponderance of the evidence, she also has the burden of proving her entitlement to recover damages by a fair preponderance of the evidence. To that end, Plaintiff must prove both the nature and extent of each particular loss or injury for which she seeks to recover damages and that the loss or injury in question was proximately caused by Okemo's negligence and / or recklessness. You may not guess or speculate as to the nature or extent of Plaintiff's losses or injuries. Your decision must be based on reasonable probabilities in light of the evidence presented at trial. Injuries and losses for which Plaintiff should be compensated include those she has suffered up to and including the present time and those she is reasonably likely to suffer in the future as a proximate result of Okemo's negligence and / or recklessness. Okemo's conduct, as I previously instructed you, is a proximate cause of a loss or injury if it is a substantial factor in bringing that loss or injury about.

Once Plaintiff has proved the nature and extent of her compensable injuries and losses, it becomes your job to determine what is fair, just and reasonable compensation for those injuries and losses. There is often no mathematical formula in making this determination. Instead, you must use human experience and apply sound common sense in determining the amount of your verdict.

In a personal injury action, there are two general types of damages with which you must be concerned: economic and noneconomic damages. Economic damages are monies awarded as compensation for monetary losses and expenses which Plaintiff has incurred, or is reasonably

likely to incur in the future, as a result of Okemo's negligence and / or recklessness. They are awarded for such things as the cost of reasonable and necessary medical care and lost earnings. Noneconomic damages are monies awarded as compensation for nonmonetary losses and injuries which Plaintiff has suffered, or is reasonably likely to suffer in the future, as a result of Okemo's negligence and / or recklessness. They are awarded for such things as physical pain and suffering, mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures.

If you award damages to Plaintiff for future pain and suffering, disability and impairment, loss of enjoyment of life, future medical expenses, and loss of future earnings, you should consider the probable length of Plaintiff's life.[38]

## DELIBERATION INSTRUCTIONS

### 32. Unanimous Verdict[39]

I remind you that Plaintiff, in order to prevail on her claims, must prove all of the elements by a fair preponderance of the evidence as I have already explained in these instructions. If Plaintiff succeeds on a claim, your verdict should be for Plaintiff for that particular claim; if Plaintiff fails, your verdict should be for Okemo. In order to return a verdict, it is necessary that each juror agree with it. Your verdict, in other words, must be unanimous and represent the considered judgment of each juror.

Your function is to weigh the evidence in the case and determine whether Plaintiff has proven her claims solely upon the evidence. Each of you must make your own decision, but you must consider impartially all of the evidence and the views of your fellow jurors. It is your duty to consult with one another and to deliberate with a view toward reaching an agreement, if you can

---

[38] *See* Jury Charge in Fredrick v. Deco Salon Furniture, Inc, 3:16-cv-00060-VLB (D. Ct. Oct. 12, 2018).
[39] *Id.*

do so consistent with the individual judgment of each juror. That is the very purpose of jury deliberations – to discuss and consider the evidence; to listen to the views of other jurors; to present your individual views; to consult with one another and to reach an agreement based solely and wholly on the evidence if you can do so without violence to your own individual judgment. Until a verdict is agreed to by each juror, it is not a unanimous verdict.

In the course of your discussion, do not hesitate to re-examine your own individual views, or to change your opinions, if the deliberations and the views of your fellow jurors convince you to do so. However, you should not surrender your honest convictions about the facts or about the weight or effect of the evidence solely because of the opinion of your fellow jurors or merely to bring an end to deliberations. If after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others, you are not to change your views simply because you are outnumbered or merely to bring an end to the deliberations. Your final vote must reflect your conscientious conviction as to how the issues should be decided. Remember at all times that you are not a partisan; rather, you are the judges of the facts and your sole interest is to seek the truth from the evidence in this case.

### 33. Note Taking[40]

You were permitted to take notes during the course of the trial. Any notes that you have taken should only be used as memory aids; do not give your notes more importance than your independent recollection of the evidence. If you did not take notes, you should rely on your own memory of the proceedings and should not be unduly influenced by the notes of the other jurors. Your notes are not evidence and should not be shared. Any difference between a juror's recollection and another juror's notes should be settled by asking to have the Court reporter read

---

[40] *Id.*

back the transcript, for it is the court record, rather than any juror's notes, upon which the jury must base its determination of the facts and its verdict.

**34. Additional Instructions[41]**

When you return to the jury room, you should first elect one person to act as your foreperson. The foreperson does not have any more power or authority than any other juror, and his or her opinion does not count for any more than any other juror's vote or opinion. The foreperson merely presides over your deliberations and is your spokesperson to the Court. He or she will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict and you will come out into open court and give the verdict.

After you have retired to begin your deliberations, you are not to leave your jury room without first notifying the marshal, who will escort you. No deliberations may take place without all jurors being present. If you bring your cell phones into the jury room, you must turn them off during deliberations. Further, if at any time a juror is in the bathroom facilities or on a cell phone, the other jurors must cease deliberations and not recommence deliberations until all jurors are present. It is your duty to discuss the case with your fellow jurors for the purpose of reaching agreement if you can do so. Each of you must decide the case for yourself, but should do so only after considering all the evidence, listening to the views of your fellow jurors, and discussing the case fully with the other jurors.

Remember that your verdict must be unanimous as to each claim. That does not mean that if the jury takes a vote and it is not unanimous, the jury has reached a final decision one way or

---

[41] *Id.*

another. If at any time the jury does take an inconclusive vote – a vote that is not unanimous – the jury's vote is just that: inconclusive.

Remember also that your verdict must be based solely on the evidence in the case and the law as I have given it to you, not on anything else. Closing arguments or other statements or arguments of counsel are not evidence. If your recollection differs from the way counsel has stated the facts, then your recollection controls.

A Verdict Form has been prepared for your convenience. Focusing on the Verdict Form will assist you in your deliberations. You must complete and return the Verdict Form in court when you have reached a unanimous agreement as to your verdict. You will be asked to answer the questions in the order in which they appear on the form, and each answer must be unanimous. When you have reached unanimous agreement as to your verdict, you will have your foreperson fill in your answers and date and sign the Verdict Form. If the foreperson makes any error in completing the Verdict Forms, please do not strike out the error and add a correct response. Instead, please request a new Verdict Form, so that the Verdict Form that is submitted is error-free. Then inform the court marshal or clerk that you have reached a verdict. The Verdict Form must be used only in connection with the charge I have just given to you. The terms used in the Verdict Form are discussed in my instructions, and these instructions must govern your deliberations.

I want to caution you now to take your time when completing the Verdict Form. As you will see when you retire to the jury room, the forms consist of a series of questions. Each question calls for a check mark or an "X." Answer each question as it appears and only those questions. Please read all instructions and follow them carefully.

When you go into the jury room to begin your deliberations, you will have all the exhibits with you. You will not have a transcript of the testimony. If you need to have testimony read back

25

to you, we will arrange for that to happen. If you require a read-back, please be as specific as possible about the portions of the testimony you want to hear.

Your requests for a read-back of testimony and any communication with the Court must be made to me in writing, signed by your foreperson, and given to the marshal or clerk. I will respond to your request as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally. Please be patient, as it may take us some time to locate the portion of testimony that you would like read back.

I also must caution you that in your communications with the Court you should never reveal the numerical division of your votes at any time.

It is proper to add a final caution. Nothing that I have said in these instructions – and nothing that I have said or done during the trial – has been said or done to suggest to you what I think your verdict should be. What the verdict shall be is your exclusive duty and responsibility. Take as long as you think necessary to fairly and impartially reach your verdict. Do not hurry your deliberations – render your verdict fairly, uprightly, and without an ounce of prejudice.

Members of the jury, that concludes my instructions to you. Thank you for your patience and attention. I will ask you to remain seated while I confer with the attorneys to see if there are any additional instructions that they would like me to give to you. In this regard, I will ask you not to discuss the case while seated in the jury box because the case has not yet been formally submitted to you.

* * * * * *

Members of the jury, the marshal will now escort you to the jury room where you will begin your deliberations.

26

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

**DEFENDANT OKEMO LIMITED LIABILITY COMPANY**
**D/B/A OKEMO MOUNTAIN RESORT'S**
**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED JURY INSTRUCTIONS**

Defendant Okemo Limited Liability Company d/b/a Okemo Mountain Resort ("Okemo"), by and through its undersigned counsel, respectfully submits the following Memorandum of Law in Support of its Proposed Jury Instructions submitted in the Joint Trial Memorandum.

## INTRODUCTION

This suit arises from a skier-skier collision involving Plaintiff Stacie Rivard-Pedigo ("Plaintiff") and Curtis Ficklin ("Ficklin") while both individuals were skiing in the vicinity of the Jackson Gore Junction at Okemo Mountain in Ludlow, Vermont.

Specifically, In the operative Amended Complaint dated April 17, 2018, Plaintiff, alleges she was skiing down the Mountain Road trail in the vicinity of the Jackson Gore Junction, when an "agent, servant, apparent agent, and / or employee of Okemo, named 'Curtis,'" violently collided with her at a "high and excessive rate of speed." *See* Amended Complaint, Count 1, at ¶ 8. Plaintiff alleges that *after* the collision "Curtis" informed her that he was an Okemo employee and that he also acknowledged that he should not have been skiing in such a dangerous manner. *Id.,* at ¶ 9.

Plaintiff alleges Okemo is vicariously liable for the negligent actions of its agent, servant, apparent agent, and / or employee, "Curtis." Plaintiff further alleges Okemo was negligent in that it "failed to supply staff adequate and appropriate at the busy trail junction to monitor and supervise skiers and provide omnipresence to enhance the safety of the skiers on the mountain." *Id.,* at ¶ 10. Plaintiff further alleges Okemo vicariously liable for its agent, servant, apparent agent, and / or employee's recklessness. *Id.* Count 2.

Okemo submits this Memorandum of Law in support of its Proposed Jury Instructions to further support Okemo's position that: (1) Vermont substantive law governs the issues in this matter; (2) the applicability of the Vermont Sports Injury Statute is a threshold issue of fact for the jury to determine; and (3) the jury should not be charged on the doctrine of apparent agency.

## ARGUMENT

### I.    Vermont Substantive Law Governs the Matter

In a diversity of citizenship action, "the choice-of-law rules of the forum state apply." *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *see also Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204 (D. Conn. 1999) ("A federal court sitting in diversity must follow the choice-of-law rules of the forum state").

Until recently, Connecticut choice-of-law principles adopted the old rule of *lex loci delicti* ("place of injury"), which provided that the law of the state in which a tort was committed governed the parties' claims. *See Turner v. Boyle*, 116 F. Supp. 3d 58, 75 (D. Conn. 2015) (*citing Gibson v. Fullin,* 172 Conn. 407, 411, 374 A.2d 1061 (1977)).  However, for tort claims, Connecticut now applies the "most significant relationship" analysis set forth in the Restatement (Second) of Conflict of Laws. *See Macomber v. Travelers Prop. & Cas. Corp.,* 277 Conn. 617 (2006).

2

The factors for determining which state has the most significant relationship to a tort claim include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered. *See Turner v. Boyle*, 116 F. Supp. 3d 58, 75 (D. Conn. 2015) *citing Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 801–02 (2003); *see also* Restatement (Second) of Conflict of Laws § 145 (1971)).

Here, factors one, two, and four of the Restatement clearly weight in favor of applying Vermont substantive law. Specifically, the injury occurred in Vermont; the primary conduct giving rise to the injury, namely skiing, occurred in Vermont, and the primary relationship between the parties, which is Okemo's providing a facility for recreational skiing, is centered in Vermont. The third factor under the Restatement is neutral, as Plaintiff is domiciled in Connecticut and Okemo is domiciled in Vermont.  Accordingly, Vermont substantive law should govern the issues in this matter.

## II.      The Vermont Sports Injury Statute is a Threshold Issue for the Jury to Consider

Prior to considering whether Okemo is vicariously liable for Mr. Ficklin's actions, or whether Okemo negligently failed to supervise and / or monitor the trail crossing where the collision occurred, the jury must determine the threshold issue of whether Plaintiff's injuries were caused by a risk inherent in the sport of skiing.

Vermont is one of numerous jurisdictions which has preserved the doctrine of assumption of the risk for skiing and / or sport related injuries. Specifically, Vermont Statute Title 12, §1037, commonly referred to as the "Vermont Sports Injury Statute," provides:

Notwithstanding the provisions of section 1036 [comparative negligence], a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary.

*Id.*

The Sports Injury Statute was enacted in 1978, and its purpose was to "state the policy of th[e] state [of Vermont] ... [as to] the liability of operators of ski areas with respect to skiing injury cases ... by affirming the principles of law set forth in [prior cases], which established that there are inherent dangers to be accepted by skiers as a matter of law. *See Frant v. Haystack Group, Inc.,* 641 A.2d 765, 767 (Vt. 1994) (quoting legislative history of statute).

In *Frant,* the first Vermont Supreme Court case to interpret the Sports Injury Statue, the Court explained that the term "assumption of the risk" incorporated two concepts – primary and secondary assumption of the risk. *Id.,* at 768. The Court went onto explain that primary assumption of the risk is a claim that the defendant, "was not negligent, i.e., either owed no duty or did not breach the duty owed." While secondary assumption of the risk, "is an affirmative defense to an established breach of duty." *Id., citing Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44 (1959).

The Court in *Frant* concluded that the Sports Injury Statute retained the doctrine of primary assumption of the risk in Vermont. *Id.,* at 769. As such, if a risk is assumed, the defendant owes no duty of care. *Id.; see also Dillworth v. Gambardella*, 970 F.2d 1113, 1118-9 (2d Cir. 1992) ("In the case of injury resulting from such a risk [inherent in a sport], one is denied a recovery, not because he has assumed the risk, but because the defendant has not been guilty of a breach of duty").

As in any negligence case, the plaintiff bears the burden of proof on the issue of duty. *See O'Connell v. Killington, Ltd.,* 164 Vt. 73 (1995). Framing primary assumption of risk as a question

4

of duty means that inherent risk is a threshold issue to be determined by the jury. *See Frant*, 641 A.2d at 770 (the inherent risk obvious and necessary issue is "a threshold question of fact decided by the jury"); *Mahdessian v. Stratton Corp.*, 210 F.3d 355 (2d Cir. 2000) (whether the Sports Injury Statute applies is a threshold issue); *Sklar v. Okemo Mountain, Inc.*, 877 F.Supp. 85 (D. Conn. 1995) (applying Vermont law, and noting the burden of proving the existence of a legal duty properly falls on plaintiffs, the burden of proving that the risk is not inherent in the sport also falls on plaintiffs).

Since the enactment of the Sports Injury Statute, Courts in the District of Vermont have routinely issued jury instructions providing a charge on the Sports Injury Statute prior to charges on plaintiff's claims of negligence. *See Mejia-Haffner et. al. v. Killington/PICO Ski Resort Partners, LLC*, 5:15-cv-175 (D. Vt. Nov 1, 2016); *Erickson v. The Stratton Corporation*, Case No. 5:11-cv-00051-CR (D. Vt. Aug, 29, 2013; *Taylor v. Stratton Corporation*, Case No. 2:09-cv-00297-WKS (D. Vt. Jan. 23, 2012)[1].

## A. Skier-Skier Collisions are an Inherent Risk in the Sport of Skiing Under Vermont Law

Although the issue of whether a skier-skier collision is an inherent risk is a question of fact for the jury to determine, in the case of *Dillworth v. Gambardella*, 970 F.2d 1113, 1118-9 (2d Cir. 1992), the Second Circuit Court of Appeals affirmed a lower court decision, and recognized that collisions between skiers are an inherent risk of the sport as defined by the Sports Injury Statute. *Id.*

The plaintiff in *Dillworth*, filed suit against a skier who allegedly collided with him while they were skiing at Stratton Mountain in Vermont. The jury returned a verdict in favor of the defendant skier. On appeal, the plaintiff argued that Vermont's Sports Injury Statute did not apply

---

[1] All jury instructions are attached hereto as *Exhibit A*.

to claims against fellow skiers and that, even if it was applicable, a collision between skiers necessarily involved negligence by at least one of the two skiers and, thus, a collision could not be an inherent, obvious and necessary danger of skiing. *Id.,* at 1116. The Second Circuit Court of Appeals disagreed with both arguments.  First, the Court ruled that the Sports Injury Statute is applicable to claims against fellow skiers. Second, the Court observed that a collision between two skiers does not necessarily mean that at least one of the skiers was negligent. Specifically, the Court stated:

> Collisions between skiers are not always and inevitably the product of at least one party's failure to use reasonable care. Unlike the proverbial barrel of flour that fell from a warehouse window ledge, *Byrne v. Boadle,* 159 Eng.Rep. 299 (1863), a presumption of negligence is not justified in every accidental encounter on a ski slope. *See* W. Prosser, The Law of Torts S 39, at 213-16 (4th ed. 1971). Instead, the trial court correctly noted a jury might conclude that some collisions between skiers may be as a result of the obvious and necessary risks inherent in skiing, and accidents might occur despite the exercise of ordinary and reasonable care and without negligence by either skier.

*Id.* at 1122.

Thus, in concluding that the Sports Injury Statute barred plaintiff's claims, the Court explained that "[o]ne skier is not the insurer of another skier's safety nor, absent negligence, is one skier liable to another for inadvertent or accidental contact." *Id.* Indeed, the Court noted that even a skier who loses control "may pose a danger which is inherent, obvious and necessary" to participating in the sport of skiing. *Id.*

Accordingly, whether Okemo owed Plaintiff a duty of care in light of the Sports Injury Statue is a threshold question of fact for the jury.

**B.  Whether Okemo is Vicariously Liable for Ficklin is a Secondary Issue to be Charged after the Sports Injury Statute**

Although Vermont Courts have not specifically addressed the issue of whether a ski area operator is liable for damages arising from a skier-skier collision involving on-duty or off-duty employees, this issue has been addressed by various Federal and State Courts. Notably, the courts deciding this issue, have uniformly held *as a matter of law* that that ski area operators are not liable for collisions between customers and employees. In so holding, the courts note that skier-skier collisions are an inherent risk of the sport, and whether the skier causing the collision is an on-duty or off-duty employee of a ski area, is irrelevant to the analysis of whether a duty of care was owed.

The case *Glover v. Vail Corp.*, 955 F. Supp. 105 (D. Colo. 1997), *aff'd,* 137 F.3d 1444, (10th Cir. 1998), is directly on point with the issues in the present matter. In *Glover,* a skier sued Vail Ski Resort ("Vail") for injuries sustained in a collision with an off-duty employee of Vail. The court held that under the Colorado Ski Safety Act, the skier's collision was an inherent danger and risk of skiing such that he could not recover from the ski area operator (Vail) for injuries sustained in the collision.

The off-duty employee in *Glover* was employed by Vail as a ticket seller. On the date of the incident, he clocked in for his shift at approximately 7:30 a.m., and *s*hortly after 1:00 p.m., his supervisor asked him if he wanted to clock out to go skiing. *Id.,* at 106. The employee agreed, and he was told to be back by 3:00 p.m. The off-duty employee was skiing with a Vail employee ski pass. *Id.* Just prior to the collision, another Vail employee, a snow making foreman, saw the off-duty employee skiing "faster than [he] had ever seen anyone before." *Id.* The foreman recognized the off-duty employee and admitted that he had the authority to admonish him or take the employee's ski pass away for reckless skiing. *Id.*

7

The court held that the Colorado Ski Safety Act of 1979 (the Act), Colo.Rev.Stat. § 33–44–101 *et seq.,* precluded recovery as section 112 of the Act states: "Notwithstanding any judicial decision or any other law or statute to the contrary, ... no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing." In its decision the court also noted that it had "serious doubts whether the off-duty employee was acting as an agent or employee of Vail at the time of the accident as he was skiing on his own time and for his own pleasure." *Id.*

In another case from the District of Colorado, *Johnson ex rel. Johnson v. Bodenhausen*, 835 F. Supp. 2d 1092 (D. Colo. 2011), the court reached a holding similar to that of the *Glover* court. In *Johnson,* the plaintiffs filed suit against Breckenridge Ski Resort ("Breckenridge"), after its *on-duty employee*, a ski instructor, collided with plaintiffs' minor son. The court granted Breckenridge's motion to dismiss on grounds that Colorado Revised Statute § 33–44–122, which provides "notwithstanding any judicial decision or any other law or statute to the contrary, ... no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing" barred plaintiffs' claims. *Id.*, at 1095. The court rejected plaintiffs' policy argument that maintaining ski area operator liability based on the negligent acts of its employees was sound public policy because ski area employees are often low-paid and would not be able to satisfy judgments against them. *Id.*, at 1096. Specifically, the court noted that other skier-skier collisions involve skiers who do not have the financial capability to compensate injured skiers; however, this "is the risk that skiers take by participating in what can at times be a dangerous sport." *Id., citing* Colo.Rev.Stat. § 33–44–109(1) ("Each skier expressly accepts and assumes the risk of and all legal responsibility for any injury to person or property resulting from any of the inherent dangers and risks of skiing").

8

The District of New Hampshire has also concluded that as a matter of law, a skier-skier collision constitutes an inherent risk of skiing for which a plaintiff cannot recover against a ski area operator, even if the collision occurred with an employee of the ski area operator. *See Hanus v. Loon Mountain Recreation Corp.*, 2014 DNH 075, 2014 WL 1513232, at *2 (D. N.H. Apr. 16, 2014).[2] The Court in *Hanus* noted that the mere fact that the plaintiff "collided with a ski area employee who was behaving negligently or recklessly does not remove the collision from the realm of skiing's inherent risks." *Id.,* at *3.

In addition to Federal Courts, various State Courts have also addressed the issue. One such court is the North Carolina Court of Appeals in the case *Haltiwanger v. Phoenix Ski Corp.*, 219 N.C. App. 650, 2012 WL 1115978 (2012). In *Haltiwanger,* the plaintiff filed suit against Phoenix Ski Corporation d/b/a Cataloochee Ski Area ("Cataloochee"), after she collided with an off-duty lift operator. *Id.,* at * 1. Plaintiff alleged Cataloochee was negligent in its training and supervision of employees. *Id.* Cataloochee moved for summary judgment on grounds that it was not vicariously liable for its off-duty employee. *Id.* The trial court granted Cataloochee's motion and plaintiff appealed. *Id.* The Appellate Court affirmed the lower court decision. On appeal, the court noted that at the time of the collision, the off-duty lift operator was skiing pursuant to a complimentary ski pass provided by Cataloochee to employees. The off-duty employee had worked for Cataloochee earlier in the day, but had finished performing his duties at the time of the collision. The court further noted although Cataloochee had a policy allowing employees to ski on the premises from Sunday–Friday (non-holidays) and nights, its employees were not required to utilize this policy. *Id.,* at *4.

The appellate court ultimately held that Cataloochee was not vicariously liable for its off-duty employee, as the off-duty employee was not under its control at the time of the collision, and has such, "his status was the same as any other individual enjoying the use of the slopes." *Id.* The court further

---

[2] All unreported decisions are attached hereto as *Exhibit B.*

noted that the plaintiff failed to provide any evidence to show how the off-duty employee's actions could be considered in furtherance of Cataloochee' business. He was a ski lift operator, and skiing was neither required nor necessary as part of his job. *Id.* Indeed, the court aptly noted his "actions were clearly some private matter of his own or outside the legitimate scope of his employment." *Id.*

In the California Appellate decision, *Towns v. Davidson*, 147 Cal. App. 4th 461 (2007), the plaintiff filed suit after a collision with and *on-duty employee*, Herbert Davidson ("Davidson"). Davidson was employed by defendant Mammoth Mountain Ski Area ("Mammoth") as a ski host manager. Part of his job duties included skiing the slopes, checking with other ski hosts on the hill, and talking to the guests. He also was allowed to ski one or two runs during the day, and on occasion could do so with a spouse, relative or friend. At those times, he would still be on duty as a ski host and would be wearing a Mammoth uniform. Mammoth's policy manual for hosts, the Host Manual, required him to "always ski as a Host" when in uniform, and "to look out for the safety of our fellow employees and guests on and off the Hill." *Id.,* at 465.

The plaintiff filed suit against both Davidson and Mammoth. She alleged Davidson was skiing in a negligent and reckless manner. She also alleged Mammoth negligently failed to train and supervise Davidson. The defendants moved for summary judgment. They claimed the doctrine of primary assumption of risk excused them from liability for negligence and that there were no facts establishing recklessness. *Id.,* at 466. The trial court agreed and granted summary judgment in defendants' favor. Plaintiff appealed from the judgment, claiming primary assumption of risk does not apply because disputed issues of material fact existed on whether Davidson was a coparticipant in the sport when skiing while on duty, and whether Davidson was reckless in his skiing. *Id.*

On appeal, the Court of Appeal affirmed the lower court decision, holding that the doctrine of primary assumption of the risk applied, and that Davidson's employment was irrelevant. The court specifically noted, that **"whether or not Davidson was employed by Mammoth, the inherent risks of injury from skiing down a snow-covered mountain include accidentally careless conduct by**

**other skiers resulting in collisions. This risk is so inherent and obvious it goes without saying plaintiff assumed that risk no matter who the other skiers may be."** *Id.,* at 469. The court further noted that **"Mammoth's act of employing Davidson and requiring him to be on the slope did not increase the risk of injury inherent in skiing. Davidson was just another coparticipant in a dangerous activity who could accidentally cause injury. That he was also an employee subject to an employment policy to ski safely did not increase the risk of injury inherent in an already dangerous sport."** *Id.,* at 470.

The *Towns* court also made a public policy argument, noting that holding Davidson and Mammoth liable would "fundamentally alter the nature of the sport. Davidson would no longer be able to ski as aggressively as the sport allows, and Mammoth would no longer hire persons to perform any type of skiing as part of their job, no matter the benefit and safety they can provide to Mammoth's guests. This is the very outcome primary assumption of risk is designed to prevent. Davidson's status as an employee of Mammoth did not bar operation of primary assumption of risk." *Id.*

Finally, in *Camire v. Gunstock Area Comm'n*, 166 N.H. 374 (2014), a plaintiff filed suit against Gunstock Mountain, after a collision with a Gunstock employee. At the time of the collision, the off-duty employee, a ski instructor, was snowboarding prior to conducting a lesson. *Id.,* at 375. The trial court granted Gunstock's motion for summary judgment on all of the claims. The Appellate Court affirmed.

On appeal, the Appellate Court noted that New Hampshire's ski statue provides "each person who participates in the sport of skiing, snowboarding … accepts as a matter of law, the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards. The categories of such risks, hazards, or dangers which the skier or passenger assumes as a matter of law include but are not limited to the following: … *collisions with other skiers or other persons* ...." *Id.,* at 377.  The Appellate Court held that the ski statute barred plaintiff's vicarious liability claims. In light of this holding, the court did not decide

whether the instructor was acting within the scope of his employment at the time of the collision or whether the claims were also barred by Gunstock's liability releases. *Id.,* at 379. The only issue that needed to be address was inherent risk. The agency issue was never even reached.

Although the State and Federal Courts in Vermont have not addressed the specific issue of whether a ski area operator owes a duty of care to a plaintiff who was involved in a skier-skier collision with an on-duty or off-duty employee, Vermont Courts which have addressed the issue, have held that the issue of inherent risk is a threshold issue, and vicarious liability is a secondary issue to be decided only if a court or jury determines the collision was not an inherent risk of the sport.

In addition to the case law on the issue, a majority of states with ski statues specifically enumerate that a skier-skier collision is an inherent risk assumed in the sport of skiing. *See* Me. Rev. Stat. tit. 32, § 15217 ("each person who participates in the sport of skiing accepts, as a matter of law, the risks inherent in the sport … The responsibility for a collision between any skier while skiing and any person or object is solely that of the skier or skiers involved in the collision and not the responsibility of the ski area operator or its agents, representatives or employees"); Massachusetts G.L. c. 143, §§ 71H–71S ("A skier skiing downhill shall have the duty to avoid any collision with any other skier, person or object on the hill below him, and, except as otherwise provided in this chapter, the responsibility for collisions by any skier with any other skier or person shall be solely that of the skier or person involved and not that of the operator"); N.H. Rev. Stat. Ann. § 225-A:24 ("Each person who participates in the sport of skiing … accepts as a matter of law, the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards. The categories of such risks, hazards, or dangers which the skier or passenger assumes as a matter of law include… collisions with other skiers); N.J. Stat. Ann. § 5:13-5 ("A skier is deemed to have knowledge of and to assume the inherent risks of skiing … created by other skiers, and all other inherent conditions."); Wis. Stat. Ann.

167.33(2)(f) (stating a "ski operator is not liable for any injury or death that occurs as a result of any condition or risk accepted by the participant including the risk of collision with other participants in alpine sports, employees of a ski area operator, or ski area infrastructure"); Idaho Code Ann. § 6-1106 ("The responsibility for collisions by any skier while actually skiing, with any person, shall be solely that of the individual or individuals involved in such collision and not that of the ski area operator"); W. Va. Code Ann. § 20-3A-5 ("If while actually skiing, any skier collides with any object or person, except an obviously intoxicated person of whom the ski area operator is aware, the responsibility for such collision shall be solely that of the skier or skiers involved and not that of the ski area operator."); Mich. Compiled Law 408.342(2) ("Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to … collisions with…other skiers").

Indeed, Connecticut is, to some extent, in the minority of jurisdictions regarding this issue. While Connecticut law specifically recognizes that skier-skier collisions are an inherent risk of skiing, Conn. Gen. Stat. Ann. § 29-212, enumerates that a ski area operator can be liable for collisions involving on-duty employees *acting within the scope of their employment*. *Id.,* ("Each skier shall assume the risk of and legal responsibility for any injury to his or her person or property caused by the hazards inherent in the sport of skiing. Such hazards include, but are not limited to… (6) collisions with any other person by any skier while skiing, except that collisions with on-duty employees of the ski area operator who are skiing and are within the scope of their employment at the time of the collision shall not be a hazard inherent in the sport of skiing).  Here, there is no question that Ficklin was not acting within the scope of his employment – he was off the clock and specifically prohibited from skiing as part of his job as a lift operator.

Given the overwhelming authority, it is clear that the issue of inherent risk is a threshold issue of fact for the jury to determine prior to considering Plaintiff's claims of negligence and / or recklessness.

### III.    A Charge on Apparent Agency is Unwarrnated

As stated above, Plaintiff is alleging Okemo is vicariously liable for Mr. Ficklin's actions. The parties do not dispute that Mr. Ficklin was employed as a Lift Operator by Okemo and that he was off-duty at the time of the collision. The parties dispute whether Mr. Ficklin was Okemo's agent at the time of the collision. Okemo has taken the position that the correct jury instruction regarding agency is the scope of employment test adopted by the Vermont Supreme Court in *Sweet v. Roy,* 173 Vt. 418, 430-31 (2002).

Specifically, in *Sweet,* the Court stated that Vermont follows the scope of employment test set out in the Restatement (Second) of Agency § 229(1), which provides:

> To be within the scope of employment, conduct must be of the same general nature as, or incidental to, the authorized conduct. Conduct of the servant falls within the scope of employment if: (a) it is of the kind the servant is employed to perform; (b)  it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally used by the servant against another, it is not unexpectable by the master. Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

*Id.*, at 430–31 *citing* Restatement (Second) of Agency § 229(1).

Plaintiff seeks a jury instruction on apparent agency. However, such an instruction is completely unwarranted and inappropriate in this case.  Under Vermont law, in order to demonstrate an apparent agency relationship, the plaintiff must be able to prove that *prior* to the incident, the principal manifested to the plaintiff that the supposed agent had authority to act for the principal, and that the plaintiff, reasonably believed, based on the agent's conduct, that he possessed that authority.

*See Lewis v. Bellows Falls Congregation of Jehovah's Witnesses*, 248 F. Supp. 3d 530, 542–43, (D. Vt. 2017), *appeal withdrawn,* No. 17-1269, 2017 WL 5001398 (2d Cir. Sept. 25, 2017).

In *Blair v. FairPoint Commc'ns, Inc.*, No. 2:14-CV-158, 2016 WL 7799311, at *3 (D. Vt. Jan. 4, 2016), *reconsideration denied,* No. 2:14-CV-158, 2016 WL 7799312 (D. Vt. Apr. 4, 2016), the United States District Court for the District of Vermont, decided a case, which was factually analogous case to the present matter. The plaintiff, in *Blair,* filed suit against FairPoint Communications, Inc. ("FairPoint"), alleging FairPoint was vicariously liable for its employee, who was driving a truck which collided with plaintiff's vehicle. *Id.,* at * 1. FairPoint filed a motion for summary judgment arguing that the driver of the truck which collided with plaintiff was not FairPoint's employee, agent, or apparent agent. *Id.*

At the time of the alleged collision, the driver of the FairPoint truck was employed by Northern New England Telephone Operations, LLC. Plaintiff nevertheless claimed that the driver was FairPoint's agent, noting that there was a "FairPoint" logo on the truck, the police report listed FairPoint as the owner of the truck, and the driver testified in traffic court that he was FairPoint's employee. *Id.* These facts are analogous to the facts of the instant matter in that Plaintiff will attempt to show at trial that Ficklin may have been wearing a jacket with an "Okemo" logo on it at the time of the collision.

The *Blair* court held that there was no evidence of actual agency, leading the plaintiff to pursue a theory of apparent agency. The court noted that an "apparent agency relationship may exist if the principal has manifested by its conduct to a third party that the agent has authority to act for [it], and the third party reasonably believes that the other individual is the agent." *Id.,* at *2 *citing RLI Ins. Co. v. Klonsky*, 771 F. Supp. 2d 314, 326–27 (D. Vt. 2011).

The court went on to note that the doctrine of apparent agency was a "poor fit," as "[t]ort liability based on apparent agency is typically limited to cases where the agent is 'dealing or communicating with a third party on or purportedly on behalf of the principal.'" *Id.,* at *3; *citing*

15

Restatement (Third) of Agency § 7:08 (2006). Specifically, in *Blair,* there was no allegation of a "dealing or communication" *prior* to the collision, and the only suggestion of an agency relationship at the time of the accident was the logo on the side of the truck. *Id.* The court noted that even if it accepted plaintiff's assertion that the logo was a manifestation of an agency relationship between the driver and FairPoint, "there was **no reliance** that could conceivably have had any bearing on the events leading up to the accident." (emphasis added). *Id.* As such, the court granted summary judgment in favor of FairPoint.

Similar to the Plaintiff in *Blair,* the Plaintiff in this matter did not know Mr. Ficklin was Okemo's employee until *after* the alleged collision. In fact, Plaintiff testified that she did not even see Mr. Ficklin prior to the collision. *See* Depo. Tr. S. Rivard-Pedigo, at 78:5-15;81:9-11, attached hereto as *Exhibit C.* Indeed, there is no evidence that Plaintiff relied on any statements or actions of Mr. Ficklin prior to the collision to establish an apparent agency relationship between Okemo and Mr. Ficklin. As was the case in *Blair,* any instruction on apparent agency in this case would be a "poor fit" as well.

DEFENDANT,
OKEMO LIMITED LIABILITY
COMPANY D/B/A OKEMO
MOUNTAIN RESORT.

By /s/ Charles F. Gfeller
    Charles F. Gfeller (ct18119)
    Shrina B. Faldu (ct29581)
    Seiger Gfeller Laurie LLP
    West Hartford Center
    977 Farmington Avenue, Suite 200
    West Hartford, CT 06107
    Tel. 860-760-8400
    Fax. 860-760-8401
    cgfeller@sgllawgroup.com
    sfaldu@sgllawgroup.com

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 NOV -1 AM 11: 33

CLERK

BY_____
DEPUTY CLERK

CLAUDIA MEJIA-HAFFNER and )
STEVEN R. HAFFNER, )
   Plaintiffs, )
                     )
   v. )    Case No. 5:15-CV-175
                     )
KILLINGTON/PICO SKI RESORT )
PARTNERS, LLC, )
   Defendant. )

## JURY CHARGE

Members of the Jury:

Now that you have heard the evidence and the arguments, it is my duty to instruct you on

the law. It is your duty to accept these instructions of law and to apply them to the facts as you

determine them.

My instructions come in two parts. The first part consists of general instructions about

the task of the jury and about the rules and principles which should guide you in your

deliberations. The second part consists of instructions which apply to the specific claims and

defenses in this case. I ask that you pay equal attention to both parts.

## ROLE OF THE COURT

My duty at this point is to instruct you as to the law. It is your duty to accept these

instructions of law and to apply them to the facts as you determine them, just as it has been my

duty to preside over the trial and decide what testimony and evidence is relevant under the law

for your consideration.

On these legal matters, you must take the law as I give it to you. If any attorney has stated a legal principle different from any that I state to you in my instructions, you must follow my instructions.

You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not be concerned about the wisdom of any rule that I state. Regardless of any opinion that you may have as to what the law should be, it would violate your sworn duty to base a verdict upon any other view of the law than that which I give you.

## ROLE OF THE JURY

As members of the jury, you are the sole and exclusive judges of the facts. You make decisions based upon the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence. You are to perform the duty of finding the facts without bias towards any party.

In deciding the facts, no one may invade your function as jurors. In order for you to determine the facts, you must rely upon your own recollection of the evidence. What the lawyers have said in their opening statements, in their closing arguments, in the objections, or in their questions is not evidence. Nor should you consider as evidence anything I may have said—or what I may say in these instructions—about a fact in issue.

Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be. The rulings I have made during the trial are not any indication of my views of what your decision should be as to whether or not the plaintiff has proven her case.

You should reach your judgment impartially and fairly, without prejudice or sympathy, solely upon the evidence in the case and without regard to the consequences of your decision.  If you let sympathy or prejudice interfere with your clear thinking, there is a risk that you will not arrive at a just verdict.  All parties to a civil lawsuit are entitled to a fair trial.  You must make a fair and impartial decision so that you will arrive at a just verdict.

## JURORS' EXPERIENCE OR SPECIALIZED KNOWLEDGE

Anything you have seen or heard outside the courtroom is not evidence and must be disregarded entirely.  It would be a violation of your oath as jurors to consider anything outside the courtroom in your deliberations.  But in your consideration of the evidence, you do not leave behind your common sense and life experiences.  In other words, you are not limited solely to what you see and hear as the witnesses testify.  You are permitted to draw, from facts which you find have been proved, such reasonable inferences as you feel are justified in light of the evidence.  However, if any juror has specialized knowledge, expertise, or information with regard to the facts and circumstances of this case, he or she may not rely upon it in deliberations or communicate it to other jurors.

## CORPORATION ACTS THROUGH ITS EMPLOYEES

Defendant Killington/Pico Ski Resort Partners, LLC whom I will refer to as "Killington" is a corporation.   It acts through its employees.   The action of any employee which occurs while that person is on duty and acting within the scope of his or her employment duties shall be considered the action of Killington

## ALL PERSONS EQUAL BEFORE THE LAW

The fact that Killington is a corporation and the plaintiffs are individuals must not enter into or affect your verdict.  This case should be considered and decided by you as a dispute

between parties of equal standing in the community. All persons – both corporations and individuals – stand equal before the law and are to be treated as equals in a court of justice.

## EVIDENCE

The evidence in this case consists of the sworn testimony of the witnesses, the exhibits admitted into evidence, any stipulations submitted by the parties, and judicially noted facts. Testimony that has been stricken or excluded is not evidence and you may not consider it in rendering your verdict.

There are two types of evidence that you may properly use in reaching your verdict. One type of evidence is direct evidence. Direct evidence is when a witness testifies about something she or he knows by virtue of her or his own senses—something she or he has seen, felt, touched or heard. Direct evidence may also be in the form of an exhibit such as a document or photograph.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts. You may infer on the basis of reason, experience, and common sense from one established fact, the existence or non-existence of some other fact. For example, if your friend enters your home with a wet umbrella, that would be circumstantial evidence that the weather was rainy.

Circumstantial evidence is of no less value than direct evidence; generally, the law makes no distinction between direct evidence and circumstantial evidence but simply requires that your verdict be based on a preponderance of all the evidence presented.

## OBJECTIONS

From time to time the Court has been called upon to determine the admissibility of certain evidence following objections from the attorneys. It is part of the attorneys' duty to make objections, and you should not draw any conclusions or make any judgment from the fact that an

4

attorney has objected to evidence. In the same fashion, you should not concern yourself with the reason for any rulings on objections by the Court.

Whether offered evidence is admissible is purely a question of law for the Court and outside the province or concerns of the jury. In admitting evidence to which objections have been made, the Court does not determine what weight should be given to such evidence, nor does it assess the credibility of the evidence. Of course, you will dismiss from your mind completely and entirely any offered evidence which has been ruled out of the case by the Court, and you will refrain from speculation about the nature of any exchange between the Court and counsel held out of your hearing.

## CREDIBILITY OF WITNESSES

You have had the opportunity to observe all the witnesses. It is now your job to decide how believable each witness was in his or her testimony. You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You are being called upon to resolve various factual issues raised by the parties in the face of different pictures painted by both sides. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence which may help you decide the truth and importance of each witness' testimony.

How do you determine where the truth lies? You watched each witness testify. Everything each witness said or did on the witness stand counts in your determination. How did the witness impress you? Did he or she appear to be frank, forthright and candid or evasive? How did the witness appear; what was his or her demeanor—that is, his or her behavior, manner

5

and appearance while testifying?  Often it is not what a person says but how he says it that indicates whether it is true.

You should use all the tests for truthfulness that you would use in determining matters of importance to you in your everyday life.  You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case.  You should consider the opportunity the witness had to see, hear, and know the things about which he or she testified, the accuracy of his or her memory, his or her candor or lack of candor, his or her intelligence, the reasonableness and probability of his or her testimony and its consistency or lack of consistency, and its corroboration or lack of corroboration with other credible testimony.

In other words, what you must try to do in deciding credibility is to size a witness in light or his or her demeanor, the explanations given and all of the other evidence in the case.  Always remember that you should use your common sense, your good judgment and your own life experience.

## <u>IMPEACHMENT OF A WITNESS</u>

A witness may be discredited or "impeached" by contradictory evidence, by a showing that the witness testified falsely concerning a matter, or by evidence that at some other time the witness said or did something inconsistent with the witness's present testimony.  It is your exclusive province to give the testimony of each witness such credibility or weight that you think it deserves.

If you find that a witness testified untruthfully in some respect, you may consider that fact in deciding what credence you will attach to that witness's testimony.  Considering that fact

and all other relevant evidence, you may accept or reject the testimony of such a witness, in whole or in part.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; and whether the witness had an explanation for the inconsistency, and whether that explanation made sense to you.

### BURDEN OF PROOF:  PREPONDERANCE OF THE EVIDENCE

This is a civil case and as such the plaintiffs have the burden of proving the allegations of the complaint by a preponderance of the evidence.  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and the persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proven by a preponderance of the evidence, you may consider the relevant testimony of all the witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties, then you must decide that issue against the party having the burden of proof.  That rule follows from the fact that the party bearing this burden most prove more than simple equality of evidence—he or she must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this burden of proof need prove no more than preponderance.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof—that what the party claims is more likely true than not true—then that element will have been proven by a preponderance of the evidence.

7

If after considering all of the testimony you are satisfied that the plaintiffs have carried their burden on each essential point as to which they have the burden of proof, then you must find for the plaintiffs on their claims. If after such consideration, you find the evidence to be in balance or equally probable—or if you find that the evidence tips in favor of the defendant—then the plaintiffs have failed to sustain their burden and you must find for the defendant.

In this case there are two exceptions to this rule that the plaintiffs bear the burden of proof. The defendant (Killington) has the burden of proof on two issues: its assertion that the Vermont Sports Injury statute bars this claim entirely and its claim that plaintiff Claudia Mejia-Haffner was herself negligent and that her negligence was a cause of her injury. In a few minutes, I will provide you with specific instructions concerning these aspects of the case.

## MS. MEJIA-HAFFNER'S CLAIM – NEGLIGENCE

Ms. Mejia-Haffner claims that Killington was negligent in two respects. She claims that Killington acting through its employee was negligent in instructing her to unbuckle her ski boots during her ski instruction. She also claims Killington was negligent in holding that portion of the ski lesson in an area of the mountain with heavy skier traffic and merging trails. In a moment, I will provide you with instructions concerning the elements of a claim of negligence. Before that, however, I need to discuss a threshold issue which concerns the application of the Vermont Sports Injury Statute.

## SPORTS INJURY STATUTE

Before considering the plaintiffs' claim of negligence, you must first decide whether a Vermont law known as the "Sports Injury statute" applies in this case. Under this law, a person who takes part in any sport, including alpine skiing, accepts as a matter of law the dangers that are inherent in that sport so long as the dangers are obvious and necessary. You must determine

8

whether Ms. Mejia-Haffner's injury was the result of dangers which are (1) inherent in the sport of skiing; (2) obvious to a reasonable person participating in the sport; and (3) necessary to the sport.

The parties agree that Ms. Mejia-Haffner fell because an unknown skier or snowboarder passed over the tails of her skis.   They disagree about whether her injury was also caused by an instruction from her teacher to unbuckle her boots as well as the location of the ski class in an area traversed by other skiers and snowboarders.   The plaintiffs attribute these additional causes to Killington.  Killington denies that these factors caused injury to Ms.  Mejia-Haffner.

The issue for you to determine under the Sports Injury statute is whether skiing with unbuckled boots at the direction of a ski instructor in an area shared with other skiers is a danger which is inherent, obvious and necessary to the sport of skiing.   If you answer this question "yes",  then you have decided that the Sports Injury statute bars further consideration of plaintiffs' claims and your verdict will be for the defendant.   If you answer this question "no" with respect to one or both issues,  then you should go on to consider the plaintiffs' claim of negligence.

## ELEMENTS OF NEGLIGENCE

In order to prove a claim of negligence, plaintiffs must prove the following elements:

1.   A duty of care;

2.   Breach or violation of that duty;

3.   Damage or injury caused by the breach of duty.

I will discuss each element with you in the context of this case.

**DUTY OF CARE**

As a ski area which provides ski instruction, Killington owes a duty to exercise reasonable care to provide the ski lesson participants safe and suitable conditions for their instruction and to avoid unnecessary and unreasonable exposure to injury.  This duty of reasonable care includes a duty to ensure that the lesson is taught in a reasonably safe manner.

Reasonable care means the care that reasonably prudent people use in conducting their own affairs to avoid injury to themselves, their property, or the persons or property of others. Reasonable care is not the greatest possible care, such as might be employed by an unusually cautious person.  Rather, a person must exercise the same amount of care a reasonable person would have exercised in the same or similar circumstances.   Keep in mind that under Vermont law the duty of care increases proportionately with the foreseeable risks of the activities involved.  As the risk of harm increases, the duty of care to prevent injury is correspondingly increased.

**BREACH OF DUTY**

Next you must consider whether the plaintiffs have met their burden of proving a breach by Killington of its duty of care.  You must determine whether Killington created an unreasonable risk of harm to others, including Ms. Mejia-Haffner, by failing to exercise that degree of care that a reasonably prudent person would have exercised under similar circumstances.

If you find that Killington did not breach the duty of care it owed Ms. Mejia-Haffner, then you must enter a verdict for Killington.  If, however, you find that Ms. Mejia-Haffner has proven a breach of a duty of care by a preponderance of the evidence, you must next consider whether plaintiffs have proven that Killington's breach caused the injuries she suffered.

10

## PROXIMATE CAUSE

In order to find Killington liable for plaintiffs' injuries, you must conclude that Killington's negligence was a proximate cause of these injuries. A legal or proximate cause of an injury means that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury. An injury is proximately caused by an act or failure to act when it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury.

In order to prove proximate cause, Plaintiff must prove two elements. First, that "but for" Killington's failure to act with reasonable care, her injuries would not have occurred or, if injury had occurred, it would have been less severe. Second, that Killington's conduct was a "proximate cause" of the harm.

An act or failure to act is the "but for" cause of an injury if the injury would not have happened except for or "but for" the act or failure to act, even though the act or failure combined with other causes to produce the harm. Killington may be liable for causing harm even if there were other causes for Ms. Mejia-Haffner's injuries, but Killington is only liable if the incident would not have occurred in the absence of its fault.

An act or failure to act is the "proximate" cause of an injury if it was a substantial factor in causing injury. Bear in mind that an event may have several causes. Some of these causes are very direct and obvious. Others are more remote. Your job in determining whether proximate cause is present is to ask yourselves this question: did negligence on the part of Killington lead to Ms. Mejia-Haffner's injury in an understandable chain of cause and effect.

The plaintiffs have the burden of proof by a preponderance of the evidence of these elements of their claim of negligence.

11

## COMPARATIVE NEGLIGENCE

Killington denies that it acted negligently.  It also asserts the defense of comparative negligence and claims that Ms. Mejia-Haffner caused her own injury through her own negligence.  You should consider the defense of comparative negligence only if you have found in plaintiffs' favor on their negligence claim.

Killington has the burden of proof on this defense by a preponderance of the evidence.  If it meets this burden of proof, a recovery by plaintiffs in this lawsuit may be defeated entirely or reduced in amount.   In order to establish comparative negligence, Killington must prove by a preponderance of the evidence:

1. Ms. Mejia-Haffner was herself negligent by failing to act with reasonable care for her own safety and well-being at the time and place in question; and

2. Ms. Mejia-Haffner's negligence was a "but for" and a proximate cause of her injuries.

The same principles I outlined previously for Ms. Mejia-Haffner's claim apply to Killington's claim of comparative negligence.   These may be summarized are as follows:

## DUTY OF CARE AND BREACH

In the same way that Killington had a duty to act with reasonable care in conducting the ski class, Ms. Mejia-Haffner had a duty to act with reasonable care for her own safety and well-being. She had a duty to ski in a reasonable and prudent manner in light of the conditions and circumstances that existed at the time.   Her conduct must be measured against that of a reasonable skier skiing under similar conditions.  In order to establish the defense of comparative negligence, Killington must prove by a preponderance of the evidence that Ms. Mejia-Haffner breached her duty of reasonable care.

12

## CAUSATION

In order to establish comparative negligence, Killington must also prove by a preponderance of the evidence that the alleged breach of duty by Ms. Mejia-Haffner was a cause of her injury.   The same principles of causation which applied to the plaintiff's claim of negligence apply to the defense of comparative negligence.   These are that an event may have multiple causes.   Some may be very direct; others may be remote.   In order to serve as a defense, negligence on the part of Ms. Mejia-Haffner must be a "but for" cause of the injury.   It must also be a proximate cause which means that negligence on the part of Ms. Mejia-Haffner must be a substantial cause of any injury.

## COMPARISON OF NEGLIGENCE BY BOTH PARTIES

If you find that both Ms. Meija-Haffner and Killington acted negligently and that the negligence of both sides was a cause of the injury as I have defined that term for you, you will be asked to apportion their negligence in percentage terms.

If Ms. Meija-Haffner's negligence was equal to or less than the negligence of Killington, the court will reduce any damage award to Ms. Meija-Haffner by that percentage.   If Ms. Meija-Haffner's negligence was greater than any negligence which you attribute to Killington, the plaintiffs will recover nothing on the claim of negligence.

## DAMAGES

If you decide in favor of Killington on the issue of the sports injury statute,  the  elements of negligence, or if you find that negligence by Ms. Meija-Haffner exceeds in percentage terms any negligence on the part of Killington, you should enter a verdict for the defendant on the verdict form and cease your deliberations.   You will not consider these instructions about damages.

But, if you decide in favor of Ms. Meija-Haffner on these issues, you shall award the plaintiffs an amount of money that you believe will put them as nearly as possible in the position they would have occupied if their injury had not happened.

If you decide in favor of Killington on the issue of comparative negligence, the court will reduce the damage award proportionately in the manner I have already described.

The plaintiffs have the burden of proof by a preponderance of the evidence on each element of their claim for damages.

<div align="center">

**ELEMENTS OF THE DAMAGE CLAIM**

</div>

Ms. Meija-Haffner seeks compensation for:

Medical expenses;

Physical pain and suffering;

Loss of enjoyment of life, including loss of the ability to engage in recreational activities and day-to-day living; and

Past and present pain, suffering, and mental anguish, including the effect of the injury on the normal pursuits and pleasures of life.

If you decide in favor of the Plaintiff on the issues of liability due to negligence, you should award monetary compensation for these damages for any injury you find that she suffered in this matter. There is no particular formula to calculate this compensation.

Because plaintiff Steven Haffner was Ms. Meija-Haffner's husband at the time of her injury and continues to be her husband now, he is entitled to compensation for loss of his wife's companionship and consortium due to the injuries sustained by his wife. He can recover for these injuries only if you find that she is entitled to compensation. In computing this amount, if

any, you should consider the impact of the injury on all aspects of the Plaintiffs' marital
relationship, including any loss of her services, comfort, society and attentions in the past.
Plaintiffs also seek recovery and damages resulting from their being unable to complete
Defendant's ski instruction program, including their lost program tuitions, hotel and
transportation expenses and lost vacation time.

The plaintiffs have the burden of proof by a preponderance of the evidence on each
element of their claim for damages.

Any damage award must be expressed in dollar terms.

## REMAINING DAMAGE ISSUES

This is the plaintiffs' only opportunity to recover damages from the defendant.

It is solely the province of the jury to decide the amount of any damage award. My
instructions about the scope of damages permitted by law in a case of this nature is not intended
to suggest to you whether an award is appropriate or its amount.

Any damages awarded will not be taxed by the IRS or by any state. You should not add
or subtract from any award for the effect of income taxes.

You should not add any sum for interest for damages in this case. The court will make
such award if appropriate. Similarly, you must not include in your award any sum for costs or
attorney's fees. These are matters for the court.

You should not award damages for one item that duplicates an award for another item. In
other words, a party is only entitled to one recovery for his or her damages.

You should make sure that any amount awarded the plaintiffs is fair, just and reasonable
in light of the evidence you have heard. You should base your decision on the evidence, not on
speculation or sympathy.

15

# FINAL INSTRUCTIONS

This completes my instructions to the jury. You will retire now to the jury room to deliberate in privacy about the issues in the case. I will provide a verdict form to guide you in your deliberations. You will also receive the exhibits which were admitted into evidence. I will also provide eight copies of these instructions.

I appoint Maureen Mayo as your foreperson. She shall be responsible for making sure that the deliberations occur in an orderly fashion and that every juror has an opportunity to participate.

Any verdict which you return must be unanimous. This means that you cannot answer a question on the verdict form unless and until all eight of you agree on the answer.

If you need to communicate with the Court, please do so in writing. I will confer with the lawyers about your question and send back a written response. Please advise the court officer after you reach a verdict but do not tell him or her or anyone else what the verdict is until you return to the courtroom at which time I will receive the verdict form from your foreperson.

Dated at Rutland, in the District of Vermont, this 1st day of November, 2016.

_____

Geoffrey W. Crawford, U.S. District Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 AUG 29   PM 1:45

CLERK

BY _____
DEPUTY CLERK

JEFFREY ERICKSON,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        Case No. 5:11-cv-51
                                     )
THE STRATTON CORPORATION,            )
                                     )
            Defendant.               )

## JURY CHARGE

### I.    General Instructions

Now that you have heard the evidence and arguments, it is my duty to instruct you as to the applicable law.

It is your duty as jurors to follow the law, and to apply it to the facts as you find them from the evidence presented in the courtroom.  You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole.  You are not to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the court, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers may have referred to some of the rules of law in their arguments.  If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

### Jurors as Finders of Fact/Rulings of the Court

You and you alone are the triers of the facts.  Each of you, as jurors, must

determine the facts for yourselves in reaching a verdict. By the rulings which I made during the course of the trial, I did not intend to indicate to you or to express my own views about this case.

## Sympathy/Prejudice

Neither sympathy nor prejudice, for or against the parties, or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well-reasoned and impartial.

## Important Case

This is an important case to the parties and the court. You should give it serious and fair consideration.

## Business Entity as a Party

The Stratton Corporation is a business entity. You should consider this case, however, as an action between persons and give The Stratton Corporation the same treatment as a private individual. All persons, including business entities, stand equal before the law.

## Agency

A business entity such as The Stratton Corporation can act only through its officers, employees, and agents. As a business entity, The Stratton Corporation is responsible for the acts and omissions of its agents and employees when its agents and employees are acting within the scope of their employment with The Stratton Corporation. For purposes of your deliberations, you should consider the acts, statements, and omissions of employees of The Stratton Corporation to be the acts, statements, and omissions of The Stratton Corporation.

## Arguments/Statements/Objections of the Attorneys

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements that they made during the course of the trial are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You may not hold it against either side if any attorney feels it is necessary to make an objection.

## Evidence in the Case

The evidence in this case consists of the sworn testimony of the witnesses, the

exhibits admitted into evidence, and any stipulated facts, regardless of which party presented the evidence. When the attorneys on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation and regard that fact as proven. You may give the stipulated fact, like any other evidence, the weight that you think it deserves.

Any evidence to which an objection was sustained or stricken by the court must be disregarded.

## Evidence – Direct or Circumstantial

There are two types of evidence from which you may find the facts of this case: direct and circumstantial evidence. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness or the exhibits in the trial. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case.

For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen fresh cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field.

The law does not require a party to prove its claims or defenses by direct evidence alone, that is, by testimony of an eyewitness. One or more of the essential elements, or all of the essential elements, may be established by reasonable inference from other facts that are established by direct testimony. Circumstantial evidence may alone be sufficient to prove a claim or defense.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it such weight as you think it deserves.

## Credibility of Witnesses

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony, considered in light of all of the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which, if

at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can do so.

In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You may give the testimony of each witness such weight, if any, you think it deserves. You may believe all of the testimony of any witness, you may believe it in part and disbelieve it in part, or you may reject it altogether. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you will believe and what you will disbelieve.

## Expert Witnesses

You have heard evidence from witnesses who are known as expert witnesses. An expert witness is a person who has special knowledge, experience, training, or education in his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating expert testimony, you should evaluate an expert's credibility and statements just as you would with any other witness. You should also evaluate whether the expert witness's opinion is supported by the facts that have been proved, and whether the opinion is supported by the witness's knowledge, experience, training, or education. You are not required to give the testimony of an expert witness any greater weight than you believe it deserves just because the witness has been referred to as an expert.

## Compensation of Expert Witnesses

The amount of the expert witness's fee is a matter that you may consider as possibly affecting the expert's credibility. However, there is nothing improper about a party compensating an expert for his or her work and time in providing an expert opinion and attending court.

## Number of Witnesses

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses, and to weigh all of the evidence.

4

## Video Deposition Testimony

During the trial, certain testimony was presented to you by way of a videotaped deposition. A deposition is a witness's testimony, given under oath, in response to questions asked in advance of trial by the attorneys for the parties in the case. You should give this testimony the same consideration as any other testimony and evaluate it in the same way as you would had the witness testified from the witness stand.

## Prior Inconsistent Statements

You may find that a witness has made statements outside of this trial that are inconsistent with the statements that the witness gave here. You may consider the out-of-court statements not made under oath only to determine the credibility of the witness and not as evidence of any facts contained in the statements. As to out-of-court statements that were made under oath, such as statements made in prior testimony, you may consider them for all purposes, including for the truth of the facts contained therein.

## Personal Knowledge and Experience of Jurors

In deliberating upon your verdict, you are not expected to put aside your common sense or your own observations or experience of the general affairs of life. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters which are based on special knowledge concerning an issue in the case that did not come from the evidence received in the courtroom.

## Burden of Proof/Preponderance of the Evidence

The burden is on the party making the claim to prove each essential element of the claim by a preponderance of the evidence. This burden applies to a plaintiff's claim against a defendant and to a defendant's affirmative defense.

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with that opposed to it, has more persuasive force, and produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. In determining whether a fact, claim, or defense has been proven by a preponderance of the evidence, you may consider the testimony of witnesses, regardless of who may have called them, and the exhibits in evidence, regardless of who may have produced or introduced them. No proof of absolute certainty is required.

5

**Verdict Form**

I will provide you with a verdict form that will guide you in making your determinations in this action. You must fill out the verdict form in accordance with these jury instructions. If there is any conflict between the verdict form and these instructions, you must follow these instructions.

## II.   Mr. Erickson's Claim – Negligence/Premises Liability

*which includes the snow making guns. CK*

Mr. Erickson alleges that the Defendant, The Stratton Corporation, was negligent in failing to warn, inspect, make safe, and protect the area near the "Ursa Express Lift," specifically by failing to properly pad the snow-making hydrant and to keep the area free of hazards such as hoses. Negligence is the lack of reasonable care in performing a legal duty owed by a defendant to Mr. Erickson.

### A.   Sports Injury Statute

As a threshold issue, you must first decide whether a Vermont law known as the "Sports Injury Statute" applies in this case. Under the Sports Injury Statute, a person who takes part in any sport, including alpine skiing, accepts as a matter of law the dangers that are inherent in that sport so long as the dangers are obvious and necessary.

You must determine whether the incident that occurred in this case was caused by a danger that was obvious and necessary as an inherent part of skiing. The operator of a facility has no duty to eliminate or lessen the risk of obvious and necessary dangers or to warn a skier of those dangers, since they are by definition accepted by the skier when he or she participates in the sport.

First, the term "obvious" does not mean something easily observed by a skier who looked but rather means a risk inherent in the nature of the sport. You may find a risk to be obvious, in this context, even though Mr. Erickson did not personally know of, appreciate, and consent to the particular hazard. Mr. Erickson is deemed to consent to all hazards that are inherent in the sport and which reasonable care and maintenance may not eliminate. Second, "necessary" dangers are those that are there even when due care is exercised. A person need accept only those risks that are inherent in the sport, not those increased risks that are caused by another's failure to use due care. You may consider the state of technology present at the time of the incident in deciding what is an obvious and necessary danger.

Here, Mr. Erickson alleges that The Stratton Corporation was negligent in failing to warn, inspect, make safe, and protect the area near the "Ursa Express Lift," specifically by failing to properly pad the snow-making hydrant and to keep the area free of hazards

6

such as hoses.  If you find that the injuries to Mr. Erickson resulted from an obvious and necessary risk inherent in the sport of skiing, then you must return a verdict for The Stratton Corporation.  But, if you find that the dangers that caused Mr. Erickson's injuries were not obvious and necessary, then the Sports Injury Statute does not apply.   If the Sports Injury Statute does not apply, then you must consider whether Mr. Erickson has proven his negligence claim.

**B.** **Negligence/Premises Liability**

I will now provide you with instructions for Mr. Erickson's claim that The Stratton Corporation was negligent in the performance of its duties as the entity that owns or exercises control over the premises of Stratton Mountain.  Negligence is the breach of a legal duty owed by the defendant to the plaintiff that causes the plaintiff's injuries.  In order to prove this claim, Mr. Erickson must prove by a preponderance of the evidence each of the following essential elements:

1. The Stratton Corporation knew, or had a reason to know of, a risk of harm that was not open and obvious to a reasonable person in Mr. Erickson's position;

2. The Stratton Corporation failed to exercise reasonable care to inspect the premises, make it safe, or to warn Mr. Erickson of the condition and the risk involved;

3. Mr. Erickson did not know or have reason to know of the condition and the risk involved; and

4. The risk of harm at issue directly and proximately caused Mr. Erickson's injuries.

I will now explain each of these essential elements.

**i.** **Ownership/Control, Duty of Care, and Breach**

The Stratton Corporation owned or exercised control over Stratton Mountain, the premises in question.  The law is specific as to the duty of care.

Because The Stratton Corporation has invited members of the public to come to Stratton Mountain to ski, it has a duty to exercise reasonable care to keep that premises in a safe and suitable condition for the public and to avoid unnecessary and unreasonable exposure to injury for its patrons.  This duty of reasonable care includes a duty to inspect areas open to the public and to ensure that they are in a reasonably safe condition for their

intended and foreseeable uses. Therefore, a business owner is responsible for injuries that are caused by conditions on its premises that the owner actually knew existed, unless the dangers were obvious. An owner is also responsible for injuries caused by a condition that existed long enough so that the owner should have known about it and should have known that it could be unreasonably dangerous. Once a business owner discovers a dangerous condition, the owner must either take reasonable steps to make it safe or must sufficiently warn about it until it can be fixed. An owner must not increase the risk of a danger known to it. A person has the right to expect the premises to be in a reasonably safe condition.

On the other hand, a business owner is not liable for injuries that a person sustained from something dangerous on the premises that the person either knows about or that would have been obvious to a reasonable person. In other words, The Stratton Corporation has an obligation to adequately warn of hazards that it knew or should have known existed, but that were not reasonably foreseeable to Mr. Erickson.

Reasonable care means the care that reasonably prudent persons use in conducting their own affairs to avoid injury to themselves, their property, or the persons or property of others. Reasonable care is not the greatest possible care, such as might be employed by an unusually cautious person. Rather, a person must exercise the same amount of care a reasonable person would have exercised in the same or similar circumstances. Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved, the amount of caution will vary with the nature of what is being done and the surrounding circumstances. You must therefore determine whether The Stratton Corporation created an unreasonable risk of harm to others, including Mr. Erickson, by a failure to exercise that degree of care that a reasonably prudent person would have exercised under like circumstances.

In determining whether The Stratton Corporation exercised reasonable care, you should consider whether The Stratton Corporation knew or should have known of a particular risk or danger. You may consider the following:

1.   Any evidence presented concerning the actual knowledge of The Stratton Corporation, including its supervisors, employees, or agents;

2.   Whether a reasonably prudent person would have performed inspections that would have brought the dangerous condition to The Stratton Corporation's attention or otherwise would have provided notice of the condition.

In determining whether The Stratton Corporation was negligent, you may consider the evidence concerning industry customs or safety rules. If you find there were such

customs or rules, they may indicate recognition of a hazard and the means to avoid it, which may inform what may be reasonable in a given situation. However, you may find that an industry custom or safety rule does not reflect the level of care of a reasonably prudent person and that The Stratton Corporation was negligent even though The Stratton Corporation followed the custom or safety rule. Conversely, even if you find that The Stratton Corporation failed to follow an industry custom or safety rule, such failure does not require a finding of negligence.

Before imposing liability on The Stratton Corporation, you must find that The Stratton Corporation failed to exercise reasonable care under all of the circumstances. You must consider all of the evidence in making this determination.

If you find that The Stratton Corporation did not breach the duty of care it owed Mr. Erickson, then you must enter a verdict for The Stratton Corporation. If, however, you find that Mr. Erickson has proven the first three essential elements of his negligence/premises liability claim by a preponderance of the evidence, you must next consider whether Mr. Erickson has proven that The Stratton Corporation's breach of the duty of care caused the injuries he suffered.

## ii. **Causation**

You must decide if Mr. Erickson's injuries were directly and proximately caused by The Stratton Corporation.

An act or failure to act is the "direct cause" of an injury if the injury would not have happened but for the act or failure to act, even though the act or failure to act combined with other causes. The Stratton Corporation may be liable even if there were other causes for Mr. Erickson's injuries, but The Stratton Corporation is only liable if the incident would not have occurred but for its own fault. In other words, Mr. Erickson must prove that but for The Stratton Corporation's breach of the duty of care, his injuries would not have occurred.

The act or failure to act must also be a "proximate cause" of the injury. An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result of or a reasonably probable consequence of the act or failure to act. Proximate cause is therefore a cause that results in an injury in a natural and continuous sequence, unbroken by any other intervening cause, and it is a cause without which the result would not have occurred. This does not mean that the act or failure to act must be the only cause. On the contrary, many facts or things, or the conduct of two or more persons, may

9

operate at the same time, either independently or together, to cause injury or damage, and in such a case each may be a proximate cause.

If Mr. Erickson's injuries were not caused by The Stratton Corporation, or if the injuries would have occurred regardless of whether The Stratton Corporation breached a duty of care, Mr. Erickson has failed to prove causation. If you find that Mr. Erickson has not established causation by a preponderance of the evidence, you must enter a verdict for The Stratton Corporation, and you should not consider The Stratton Corporation's affirmative defense or the issue of damages. If you find that Mr. Erickson has established causation, and all of the other essential elements of his negligence claim, then you must consider the affirmative defense raised by The Stratton Corporation, before you consider the issue of damages.

## III.   The Stratton Corporation's Affirmative Defense/Comparative Negligence

The Stratton Corporation has asserted an affirmative defense called "comparative negligence." An affirmative defense is a claim that, if true, will defeat all or part of a plaintiff's claim. The Stratton Corporation has the burden of proving its affirmative defense by a preponderance of the evidence. You must consider the affirmative defense only if you find in Mr. Erickson's favor on his negligence/premises liability claim. If you find in favor of The Stratton Corporation on Mr. Erickson's negligence/premises liability claim, the issue of an affirmative defense should not be addressed.

In this case, The Stratton Corporation asserts comparative negligence as an affirmative defense, which means that The Stratton Corporation claims that Mr. Erickson was himself negligent in his actions on the day of the incident. In order to establish comparative negligence, The Stratton Corporation must prove by a preponderance of the evidence each of the following essential elements of its comparative negligence defense:

1.   Mr. Erickson himself was negligent by failing to act with reasonable care for his own safety and well-being at the time and place in question; and

2.   Mr. Erickson's negligence was a direct and proximate cause of his injuries.

The same principles I outlined previously for Mr. Erickson's claim likewise apply to The Stratton Corporation's comparative negligence claim. I will briefly review the elements again.

First, Mr. Erickson had a duty to act with reasonable care for his own safety and well-being. Reasonable care means the care that reasonably prudent persons use in conducting their own affairs to avoid injury to themselves, their property, or the persons or property of others. A skier has a duty to exercise reasonable care for his or her own

safety while participating in the sport of skiing, which includes a duty to ski in a reasonable and prudent manner in light of the conditions and circumstances that exist at the time. Reasonable care is not the greatest possible care, such as might be employed by an unusually cautious person. Rather, a person must exercise the same care a reasonable person would have exercised in the same or similar circumstances. Here, Mr. Erickson's conduct must be measured against that of a reasonable skier skiing under the conditions as they existed on the day of the incident.

Again, in determining whether Mr. Erickson was negligent, you may consider the evidence concerning skiing customs or safety rules. If you find there were such customs or rules, they may indicate recognition of a hazard and the means to avoid it, which may inform what may be reasonable in a given situation. However, you may find that an industry custom or safety rule does not reflect the level of care of a reasonably prudent person and that Mr. Erickson was negligent even though Mr. Erickson followed the custom or safety rule. Conversely, even if you find Mr. Erickson failed to follow an industry custom or safety rule, such failure does not require a finding of negligence. You must consider all of the evidence in making this determination.

Second, The Stratton Corporation must prove that but for Mr. Erickson's failure to act with reasonable care for his own safety and well-being, his injuries would not have occurred. The Stratton Corporation must also prove that Mr. Erickson's negligence was a "proximate cause" of his injury. An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result of or a reasonably probable consequence of the act or failure to act. Proximate cause is a cause that results in an injury in a natural and continuous sequence, unbroken by any other intervening cause. It is a cause without which the result would not have occurred. This does not mean that the act or failure to act must be the only cause. On the contrary, many facts or things, or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage, and in such a case each may be a proximate cause.

If you find that The Stratton Corporation has proven that Mr. Erickson was negligent himself, then you must attribute to each party their relative negligence. This means that you must compare any negligence attributed to Mr. Erickson with any negligence you have attributed to The Stratton Corporation. To do so, you must assign a percentage of negligence to Mr. Erickson on one hand, and to The Stratton Corporation on the other. The percentages you assign must add up to 100 percent. Let me suggest two hypothetical examples:

|  | Example 1 | Example 2 |
|---|---|---|
| Mr. Erickson | 15% | 60% |
| The Stratton Corporation | 85% | 40% |

| | | |
|---|---|---|
| Total Negligence | 100% | 100% |

Of course, these examples are for illustrative purposes only. They do not indicate in any way how you should decide the case.

If you determine that Mr. Erickson's share of the negligence is greater than 50%, then you should return a verdict for The Stratton Corporation, and you should not consider damages. If Mr. Erickson's share of the negligence is 50% or less when compared to the negligence of The Stratton Corporation, then you must consider damages, and the total damages award, if any, must be reduced by the percentage of Mr. Erickson's negligence. I will provide you with a verdict form that will help you work through these questions during your deliberations.

## IV.    Damages

### General Instructions on Awarding Damages

The fact that I have instructed you on the issue of damages should not be considered as the court's opinion that any party has established any of its claims or defenses. That is solely for you to decide.

Mr. Erickson must prove by a preponderance of the evidence he actually sustained damages, and that the damages were proximately caused by The Stratton Corporation's conduct. This means that the damages were a direct or a reasonably probable consequence of The Stratton Corporation's conduct.

Mr. Erickson is seeking a damages award that has several components. Mr. Erickson is seeking damages relating to:

1.    Physical pain and suffering, including damages for the nature and extent of Mr. Erickson's injury and any disfigurement and resulting embarrassment;

2.    Economic losses of past medical bills and past wages;

3.    Loss of enjoyment of life, including loss of the ability to engage in recreational activities and day-to-day living; and

4.    Past, present, and future pain, suffering, and mental anguish, including the effect of the injury on the normal pursuits and pleasures of life.

You should further consider whether any injuries are temporary or permanent, and whether any resulting injury is partial or total. You should make sure that any amount

awarded to Mr. Erickson is fair to the parties in this case in light of the evidence you have heard, and you should award Mr. Erickson a sum in damages that you believe will fairly, adequately, and reasonably compensate him for the injuries he has suffered based upon the facts and circumstances proven by the evidence.

## Compensatory Damages

Compensatory damages mean the amount of money that you decide a person is entitled to as compensation for what has happened to him or her. The basic principle of damages is that an injured person may recover full, just, and adequate compensation for all injuries and losses caused by a defendant. The purpose of awarding damages is to put the injured party in the position he or she would have been if the wrong had not occurred.

You must be guided by the amount of loss which was or will actually be incurred by Mr. Erickson, and not by any feelings of sympathy, passion, prejudice, or a desire to help him. It is never the purpose of compensatory damages to punish a defendant or to reward a plaintiff.

## Personal Injury Damages

Mr. Erickson is entitled to recover compensation for any bodily injury and any pain and suffering, disability, disfigurement, mental anguish, and loss of enjoyment of life he has experienced in the past as a result of this incident and that he is reasonably certain to suffer in the future. There is no particular formula to calculate this compensation. Any such award should fairly compensate Mr. Erickson for the damages he has suffered and may suffer in the future for any harm you find caused by The Stratton Corporation, and any such award should be fair and just in light of the evidence.

## Medical Expenses

Mr. Erickson is entitled to recover his reasonable and necessary medical expenses, which includes the reasonable value, not exceeding the cost to him, of any expenses incurred for medical treatment made necessary by the negligence of The Stratton Corporation. These costs may cover all expenses from the date of the incident to the present time. They also include expenses that were reasonable and necessary, even if they might have been paid by someone other than Mr. Erickson. Mr. Erickson must establish all such amounts by a preponderance of the evidence.

Mr. Erickson is claiming medical expenses in the amount of $46,735.96.

The parties have agreed that the medical bills submitted by Mr. Erickson are reasonable, in terms of the amount charged for the services rendered in the community

where Mr. Erickson lives and was surgically and medically treated. While The Stratton Corporation has stipulated to Mr. Erickson's medical records and expenses, The Stratton Corporation has done so without any admission to liability and without agreeing that all of these expenses were proximately caused by the incident. In other words, because The Stratton Corporation has not objected to Mr. Erickson's medical records and expenses does not mean that you can infer The Stratton Corporation admitted to any liability or wrongdoing or admitted that all of the medical expenses were caused by the incident.

## Lost Wages

Mr. Erickson is entitled to compensation for any earnings lost in the past. Mr. Erickson is claiming lost earnings of $40,000.00. Mr. Erickson must establish all such amounts by a preponderance of the evidence.

## Proving Specific Amounts for Damages

Because some of Mr. Erickson's claims for damages are economic, Mr. Erickson must prove these economic damages to your satisfaction in dollars and cents. However, when there is no specific dollar amount, such as with pain and suffering, then Mr. Erickson does not have to prove the exact dollar amount of his injury. You may not, however, award damages that are speculative or merely possible in nature.

## Duplication of Damages Must Be Avoided

You should be careful not to award damages for one item that duplicates an award for another item. In other words, a party is only entitled to one recovery for his or her damages.

Your award in all respects must be fair and reasonable in light of all the evidence that you find worthy of belief and all the reasonable inferences to be drawn from such evidence.

## Mitigation of Damages

Under the law, a party seeking an award of damages must make reasonable attempts to minimize or eliminate those damages. In other words, a party is not entitled to recover damages to the extent he or she could have avoided or otherwise reduced those damages. If you find that Mr. Erickson has failed to mitigate his damages, your award must not compensate Mr. Erickson for his failure to mitigate his damages, and you must subtract the monetary amount of any such failure from your award.

**Life Expectancy**

In determining the amount of damages to award, you need to consider how long Mr. Erickson would have lived during a normal life. I instruct you that the normal life expectancy in this country for a male who is forty years of age is 38.7 years.

Life expectancy is merely an estimate of the probable average remaining length of life of persons in the United States of a given age and sex. The inference that may reasonably be drawn from life expectancy applies only to one who has the average health and exposure to danger of people of that age and sex. In determining the reasonably certain life expectancy of Mr. Erickson, you should also consider all other facts and circumstances in evidence in the case bearing upon the life expectancy of Mr. Erickson, including his occupation, habits, past health record, and present state of health.

**Aggravation of Preexisting Condition and Susceptible Plaintiff**

In calculating Mr. Erickson's damages, keep in mind that Mr. Erickson cannot recover for any physical ailment or disability that existed before the incident. He can only recover for damage due to enhancement or aggravation of a preexisting condition, and not the condition itself.

In this case, The Stratton Corporation contends that Mr. Erickson did suffer from a preexisting condition, and that any award to Mr. Erickson should take such condition into account. The Stratton Corporation bears the burden of proving such condition by a preponderance of the evidence. If you find that Mr. Erickson did suffer from an ailment or condition, and you further find that the incident aggravated this condition so as to cause additional suffering, then you may award Mr. Erickson a sum of damages that fairly compensates him for such additional suffering or disability resulting from such aggravation. In essence, Mr. Erickson should only be compensated to the extent you find he was further injured by the negligence of The Stratton Corporation.

Conversely, you must also consider whether Mr. Erickson is a susceptible plaintiff. Mr. Erickson contends that he is more susceptible to injury than other people, and he has the burden of proving this by a preponderance of the evidence. You must award damages based upon the injuries Mr. Erickson suffered, even if you believe others may not have been hurt like Mr. Erickson if they had gone through the incident.

**Income Taxes and Interest**

If you find for Mr. Erickson and award damages, you must not consider any effect of federal or state income tax in deciding the amount of the damages award. If you find for Mr. Erickson and award damages, you must not calculate interest as part of the

damages award.

## Court Costs and Attorney's Fees

If you find Mr. Erickson is entitled to any damages, you must not include in your award any sum for costs or attorney's fees.  These are matters for the court.

## V.    Concluding Instructions

## Jury Deliberations/Unanimous Verdict

The verdict must represent the considered judgment of each juror.  In order to return a verdict, you must all agree.  Your verdict must be unanimous.

You must consult with one another.  You must try to reach an agreement if you can do so without sacrificing your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  Do not hesitate to re-examine your views and change your opinions if you are convinced they are wrong.  But do not surrender your honest opinion as to the weight or effect of evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

If you need to communicate with me, you should send a note through the Court Officer, signed by your foreperson.  You must not discuss with the court or with any other person what is said in deliberations, and any note you send to the court must not include this information.  In other words, you may ask the court questions but, in doing so, you must not reveal what the jurors are thinking or saying.  You must not tell anyone how the jury stands numerically or otherwise until after you have reached a unanimous verdict and you have been discharged.  Even then you need not speak to anyone about this case unless you want to.

When you have reached a verdict, tell the Court Officer that you have reached a verdict, but do not tell the Officer what the verdict is.  You will then be brought in to the courtroom where I shall ask you if you have reached a verdict, and, if you have, what it is.

## Juror Note Taking

During the trial, you have been provided with pencil and paper, and some of you have taken notes.  As I explained at the beginning of the trial, all jurors should be given equal attention during the deliberations regardless of whether or not they have taken notes.  Any notes you have taken may only be used to refresh your memory during

deliberations.  You may not use your notes as authority to persuade your fellow jurors as to what a witness did or did not say.  In your deliberations you must rely upon your collective memory of the evidence in deciding the facts of the case.  If there is any difference between your memory of the evidence and your notes, you may ask that the record of the proceedings be read back.  If a difference still exists, the record must prevail over your notes.  I will now describe the process for a read back.

## Read Back of Evidence

If, during your deliberations, you are unable to recall with any degree of accuracy, a particular part of the testimony, or part of these instructions, you may do the following:

1.      Write out your question, and have the foreperson sign it;

2.      Knock on the door of the jury room; and

3.      Deliver your note to the Court Officer, to give to me.

After the attorneys have been consulted, and the record has been reviewed, I shall decide what action to take.  I will tell you my ruling.

## Selection and Duties of a Foreperson

I select ___ . _____ ___ to act as your foreperson.  The foreperson acts as a chairperson or moderator.  It is your duty to see that discussions are carried out in a sensible and orderly manner and to see that the issues submitted for the jury's decision are fully and fairly discussed, and that every juror has a chance to say what he or she thinks upon every question.  When ballots should be taken, you will see that it is done.  You will act as the jury's spokesperson in the courtroom.  In all other respects, the foreperson is the same as every other juror.  His or her vote or opinions do not count more or less than those of his or her fellow jurors.

Ladies and gentlemen of the jury, you may now take the case and retire to begin your deliberations.

Dated at Rutland, in the District of Vermont, this _29th_ day of August, 2013.

Christina Reiss, Chief Judge
United States District Court

17

## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF VERMONT

SARAH TAYLOR,                          :
                                       :
            Plaintiff,                 :
                                       :
    v.                                 :   Case No. 2:09-cv-297
                                       :
THE STRATTON CORPORATION,              :
                                       :
                                       :
            Defendant.                 :

### JURY CHARGE

Members of the Jury:

Plaintiff in this case is Sarah Taylor, who is represented by Todd D. Schlossberg. Defendant is the Stratton Corporation ("Stratton") represented by Andrew H. Maass. The claims before you arise from a skiing accident that occurred on January 6, 2009 on the Sunriser Supertrail, a trail at the Stratton Mountain Ski Resort in Vermont.

### ROLE OF THE COURT, THE JURY AND COUNSEL

You have listened carefully to the testimony presented to you. Now you must pass upon and decide the factual issues of this case. You are the sole and exclusive judges of the facts. You pass upon the weight of the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the evidence, and you draw such inferences as may be warranted by the facts as you find them. I shall shortly define

1

the word "evidence" and instruct you on how to assess it,
including how to judge the credibility of the witnesses.

You are not to single out one instruction alone as stating
the law, but must consider the instructions as a whole.  You are
not to be concerned with the wisdom of any rule of law stated by
the court.  Regardless of any opinion you may have as to what the
law ought to be, it would be a violation of your sworn duty as
judges of the facts to base a verdict upon anything but the
evidence in the case.

Nothing I say in these instructions is to be taken as an
indication that I have any opinion about the facts of the case,
or what that opinion is.  It is not my function to determine the
facts.  That is your function.

You are to discharge your duty as jurors with an attitude of
complete fairness and impartiality.  You should appraise the
evidence deliberatively and without the slightest trace of
sympathy, bias or prejudice for or against any party.  All
parties expect that you will carefully consider all of the
evidence, follow the law as it is now being given to you and
reach a just verdict regardless of the consequences.

<div align="center">EVIDENCE</div>

You have seen and heard the evidence produced in this trial
and it is the sole province of the jury to determine the facts of
this case.  The evidence consists of the sworn testimony of the

<div align="center">2</div>

witnesses, any exhibits admitted into evidence, and all the facts admitted or stipulated.  I would now like to call to your attention certain guidelines by which you are to evaluate the evidence.

There are two types of evidence which you may properly use in reaching your verdict.  One type of evidence is direct evidence.  Direct evidence is when a witness testifies about something she or he knows by virtue of their own senses -- something she or he has seen, felt, touched, or heard.  Direct evidence may also be in the form of an exhibit where the fact to be proved is the exhibit's existence or condition.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts.  You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.  Circumstantial evidence is of no less value than direct evidence for it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but requires that your verdict must be based on all the evidence presented.

### CREDIBILITY OF WITNESSES

You as jurors are the sole judges of the credibility of the witnesses and the weight of their testimony.  You do not have to accept all the evidence presented in this case as true or accurate.  Instead, it is your job to determine the credibility

3

or believability of each witness.  You do not have to give the
same weight to the testimony of each witness since you may accept
or reject the testimony of any witness in whole or in part.  In
weighing the testimony of the witnesses you have heard, you
should consider their interest, if any, in the outcome of the
case; their manner of testifying; their candor; their bias, if
any; their resentment or anger, if any; the extent to which other
evidence in the case supports or contradicts their testimony; and
the reasonableness of their testimony.  You may believe as much
or as little of the testimony of each witness as you think
proper.

The weight of the evidence is not determined by the number
of witnesses testifying.  You may find the testimony of a small
number of witnesses or a single witness about a fact more
credible than the different testimony of a larger number of
witnesses.  The fact that one party called more witnesses and
introduced more evidence than the other does not mean that you
should necessarily find the facts in favor of the side offering
the most witnesses.  Inconsistencies or discrepancies in the
testimony of a witness, or between the testimony of different
witnesses, may or may not cause you to discredit such testimony.
Two or more persons may well hear or see things differently, or
may have a different point of view regarding various occurrences.
Innocent misrecollection or failure of recollection is not an

4

uncommon experience.  It is for you to weigh the effect of any

discrepancies in testimony, considering whether they pertain to

matters of importance, or unimportant details, and whether a

discrepancy results from innocent error or intentional falsehood.

You should attempt to resolve inconsistencies if you can, but you

also are free to believe or disbelieve any part of the testimony

of any witness as you see fit.

<div align="center">EXPERT WITNESSES</div>

In this case, I have permitted certain witnesses to express

their opinions about matters that are in issue.  A witness may be

permitted to testify to an opinion on those matters about which

he or she has special knowledge, skill, experience and training.

Such testimony is presented to you on the theory that someone who

is experienced and knowledgeable in the field can assist you in

understanding the evidence or in reaching an independent decision

on the facts.

In weighing this opinion testimony, you may consider the

witness's qualifications, her or her opinions, the reasons for

testifying, as well as all of the other considerations that

ordinarily apply when you are deciding whether or not to believe

witness testimony.  You may give the opinion testimony whatever

weight, if any, you find it deserves in light of all the evidence

in the case.  You should not, however, accept opinion testimony

merely because I allowed the witness to testify concerning her or

<div align="center">5</div>

her opinion.  Nor should you substitute it for your own reason, judgment and common sense.  The determination of the facts in this case rests solely with you.

<div align="center">TESTIMONY AND ARGUMENTS EXCLUDED</div>

I caution you that you should entirely disregard any testimony that has been excluded or stricken from the record. Likewise, the arguments of the attorneys and the questions asked by the attorneys are not evidence in the case.  The evidence that you will consider in reaching your verdict consists only of the sworn testimony of witnesses, the stipulations made by the parties and all exhibits admitted into evidence.  When the attorneys for the plaintiff and the defendants stipulate or agree as to the existence of a fact, you must accept the stipulation as evidence and regard that fact as proved.

Anything you have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.  You are to consider only the evidence in the case.  But in your consideration of the evidence, you are not limited merely to the statements of the witnesses.  In other words, you are not limited solely to what you see and hear as the witnesses testify.  You are permitted to draw, from facts which you find have been proved, such reasonable inferences as you feel are justified in light of your experiences.

## BURDEN OF PROOF

This is a civil case and as such Plaintiff has the burden of proving every element of her claim by a "preponderance of the evidence."  The phrase "preponderance of the evidence" means the evidence of greater weight, logic, or persuasive force.  It does not mean the greater number of witnesses or documents.  It is a matter of quality, not quantity.  Preponderance of the evidence is evidence that is more convincing and produces in your minds a belief that what is sought to be proved is more likely true than not.  In other words, to establish a claim or a defense by a "preponderance of the evidence" means proof that the claim or defense is more likely so than not so. In determining whether any fact at issue has been proved by a preponderance of the evidence, you may consider the testimony of all the witnesses, regardless of who called them, and all the exhibits received in evidence, regardless of who may have produced them.

## CORPORATION ENTITLED TO TREATMENT AS A PERSON

Defendant in this case is a corporation.  The fact that a corporation is involved must not affect your decision in any way. A corporation and all other persons are equal before the law and must be dealt with as equals in a court.  You should consider and decide this case as an action between persons.

## OBVIOUS AND NECESSARY DANGERS

As a threshold matter, you must determine whether the

7

accident at issue occurred as a result of an obvious and

necessary danger inherent in the sport of skiing.  Vermont law

imposes a duty on the people who participate in sports.  In

recognition of the dangers that exist in virtually every sport,

the Vermont legislature passed a law stating that every person

who participates in a sport, including skiing, accepts as a

matter of law all the dangers that are inherent in that sport, to

the extent that such dangers are obvious and necessary to the

sport.  Since a skier accepts the obvious and necessary risks of

skiing, a ski operator owes no duty of care to him or her with

respect to those risks.

Plaintiff must prove by a preponderance of the evidence that

the risk involved in her accident was not an obvious and

necessary risk inherent to skiing.  When making your

determination of what constitutes an "obvious or necessary

danger," you should consider whether, given contemporary

practices and technology, the risk of injury at issue was

reasonably avoidable.  A risk of danger which is "inherent" in a

sport is one which is a part of the essential character of that

sport and intrinsic to it.  An "obvious danger" does not

necessarily refer to things that are easily observed.  Rather, it

is a risk or hazard which a reasonable participant in the sport

would know of or appreciate. An obvious danger is one that is

widely recognized and known by a reasonable skier under similar

8

circumstances.

A "necessary danger" is one that exists even when due care is exercised. It is a risk that is impossible or unreasonably difficult or expensive to eliminate. A person need only accept those risks that are inherent in the sport, not those increased risks that are caused by a ski area's failure to use due care. Skiers should be deemed to assume only those skiing risks which the ski area cannot be reasonably required to prevent or warn against.

In sum, ski accidents are not always and inevitably the product of a party's failure to use reasonable care. Some accidents may be the result of the obvious and necessary risks inherent in the sport, and accidents might occur despite the exercise of ordinary and reasonable care and without negligence by either party.

If you find the accident at issue was the result of an obvious and necessary risk of skiing, you must return a verdict in favor of the Defendant. On the other hand, if you find that the accident was the result of an obvious or necessary part of skiing, you must proceed to consider whether Defendant was negligent.

## NEGLIGENCE

In their complaint, Plaintiff alleges that Defendant's negligence caused her injury. Negligence is the failure to use

9

ordinary care under the circumstances of the case. Ordinary care
is that care which reasonably careful persons or businesses use
in conducting their own affairs, to avoid injury to themselves or
their property, or the persons or property of others. When
deciding whether ordinary care was exercised in a given case, the
conduct in question must be viewed in the light of all the
surrounding circumstances as shown by the evidence in the case.
When the defendant is a corporation, they are liable for the
negligent acts or omission of their employees and agents acting
in the course of their duties.

In order to prove that Defendant was negligent, Plaintiff
must prove by a preponderance of the evidence each of the
following elements:

1. Defendant owed Plaintiff a duty;

2. Defendant breached that duty;

3. Defendant's breach of duty was a proximate cause of

Ms. Taylor's injury.

The first element of negligence is duty. Duty, as it is
understood in the law, means a legal obligation to do or not do
some act, depending on the particular circumstances of the case.
In general, a "duty" in negligence cases may be defined as an
obligation to conform to a particular standard of conduct towards
another. Here, Defendant, acting through its agents and
employees, had a duty to conform to a standard of conduct of a

10

reasonable entity of like experience and knowledge of the
situation and its dangers.  In light of this standard of conduct,
Stratton had a duty to use reasonable care to keep its premises
in a reasonably safe and suitable condition, and to warn of or
correct dangers which in the exercise of reasonable prudence
could be foreseen and corrected, so that a skier would not be
unreasonably or unnecessarily exposed to an injury.

        Keep in mind that under Vermont law the duty of care
increases proportionately with the foreseeable risks of the
operations involved.  Thus, as the risk of harm increases, the
duty of care to prevent injury is correspondingly increased.

    The second element is breach of duty.  In order to decide
whether Defendant breached their duty to Plaintiff, you must
determine from the evidence presented whether Defendant failed to
use ordinary care, as I have defined that term, in their
maintenance of the Sunriser Supertrail, either by failing to
eliminate those hazards or to properly alert skiers to those
hazards.

    The last element is proximate cause.  In order to find
Defendant liable for Ms. Taylor's injury, you must conclude that
Defendant's negligence was a proximate cause of her injuries.  A
legal or proximate cause of an injury means that cause which, in
natural and continuous sequence, unbroken by any efficient
intervening cause, produces the injury.  An injury is proximately

11

caused by an act or a failure to act when it appears from the
evidence in the case that the act or omission played a
substantial part in bringing about or actually causing the
injury.

The law recognizes that there may be more than one proximate
cause of an injury. Multiple factors may operate at the same
time, or independently, to cause the injury and each may be a
proximate cause. Plaintiff is required to show that Defendant's
negligence was a proximate cause of Ms. Taylor's injury, but is
not required to show that it was the only proximate cause.

## COMPARATIVE NEGLIGENCE

As part of their defense to the suit brought by Plaintiff,
the Defendant has raised the defense of comparative negligence.
Defendant claims that Plaintiff was herself negligent and that
her own negligence was the cause of her injuries.

Just as Plaintiff bears the burden of proving by a
preponderance of the evidence that Defendant is negligent,
Defendant must prove by a preponderance of the evidence that
Plaintiff was herself negligent. The elements of Defendant's
negligence claim are the same as those I have already described
in the section entitled NEGLIGENCE above. Thus, to prove that
Plaintiff was negligent, Defendant must prove by a preponderance
of the evidence that:

12

1.   Plaintiff owed herself a duty to exercise ordinary
     care;

2.   Plaintiff breached that duty; and

3.   Plaintiff's breach was a proximate cause of the
     injuries that she suffered.

The first element of negligence is duty.  Duty, as it is
understood in the law, means a legal obligation to do or not do
some act, depending on the particular circumstances of the case.
In general, a "duty" in negligence cases may be defined as an
obligation not to engage in conduct which unreasonably and
unnecessarily exposes one to injury.  Keep in mind that under
Vermont law the duty of care increases proportionately with the
foreseeable risks of the operations involved.  Thus, as the risk
of harm increases, the duty of care to prevent injury is
correspondingly increased.

The second element is breach of duty.  In order to decide
whether Plaintiff breached her duty to herself, you must
determine from the evidence presented whether Plaintiff failed to
use ordinary care, as I have defined that term.

The last element is proximate cause.  In order to find
Plaintiff liable, you must conclude that Plaintiff's negligence
was a proximate cause of her injuries.  A legal or proximate
cause of an injury means that cause which, in natural and
continuous sequence, unbroken by any efficient intervening cause,

13

produces the injury.  An injury is proximately caused by an act
or a failure to act when it appears from the evidence in the case
that the act or omission played a substantial part in bringing
about or actually causing the injury.

The law recognizes that there may be more than one proximate
cause of an injury.  Multiple factors may operate at the same
time, or independently, to cause the injury and each may be a
proximate cause.  Defendant is required to show that Plaintiff's
negligence was a proximate cause of Ms. Taylor's injury, but is
not required to show that it was the only proximate cause.

Should you find by a preponderance of the evidence that
Defendant and Plaintiff were negligent, and that the negligence
of each of them proximately caused the injury suffered by
Plaintiff, then it will be your job to assign a percentage of
responsibility to Defendant and the Plaintiff.  Those percentages
must add up to 100 percent.  If you find that Plaintiff's
comparative negligence is greater than 50%, then Plaintiff cannot
recover anything, and you must enter a verdict for Defendant.
However, if Plaintiff's negligence is 50% or less, then Plaintiff
is entitled to recover from Defendant.

## INSTRUCTION ON DAMAGES

The fact that I am about to instruct you as to the proper
measure of damages does not reflect any view of mine as to which
party is entitled to your verdict.  Instructions as to the

14

measure of damages are given for your guidance in the event you find in favor of the Plaintiff by a preponderance of the evidence in accordance with the other instructions.

In reaching your verdict, carefully consider the evidence presented against Defendant.  You may assess damages against Defendant only if you find they are liable for claims outlined above.

Please keep in mind the following general principles as you make your deliberations.  In making any award of damages, it is not necessary that the Plaintiff prove the exact amount of her damages with absolute certainty.  Nevertheless, any damages you award may not be based on sympathy, speculation, or guesswork because only actual damages are recoverable.  Remember that the Plaintiff has the burden of proving damages by a preponderance of the evidence.  In determining the amount of any damages that you decide to award, you should be guided by dispassionate common sense.  You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts in evidence.

<div align="center">COMPENSATORY DAMAGES</div>

In an ordinary case such as the one before you, damages are awarded on a theory of compensation.  An award of compensatory damages is intended to put Plaintiff in the same position she was in prior to the accident at issue here.  Thus, Ms. Taylor is

<div align="center">15</div>

entitled to recover for all damages that are a natural

consequence of Defendant's conduct, including items such as past

and future pain and suffering and lost enjoyment, lost wages, and

past and future medical expenses.

As with the other elements of her claim, Ms. Taylor has the

burden of proving by a preponderance of the evidence the amount

of damages that she has suffered. Where the amount of her

damages are capable of being calculated in dollars and cents,

such as lost wages, Ms. Taylor must demonstrate the amount of her

losses in dollars and cents. However, where her claimed damages

may not be reduced to dollars and cents, such as with assertions

of lost enjoyment and pain and suffering, Ms. Taylor need not

demonstrate the exact dollar and cent value of her injuries.

Nevertheless, she is still required to submit to the jury

evidence of such a quality that the jury is capable of reasonably

estimating the extent of her loss. Under no circumstances may

you award damages that are speculative or conjectural. You are

further instructed that any natural feelings of sympathy for

Plaintiff must be set aside during your deliberations. Such

feelings are not properly a factor for consideration in this

matter.

In determining the damages, if any, that Ms. Taylor has

suffered as a result of her injuries, you should consider the

following items:

16

### Lost Enjoyment, Mental Anguish, and Pain and Suffering

In this case, Ms. Taylor alleges that she suffered lost enjoyment, mental anguish and pain and suffering as a result of Defendant's conduct.  If Ms. Taylor has proved such injury by a preponderance of the evidence, then you may make an award of damages to compensate Ms. Taylor for this element.

The measure of damages to be awarded Ms. Taylor should be equivalent to reasonably compensate her for any pain, discomfort, fears, anxiety, humiliation, lost enjoyment of life's activities, and any other mental and emotional distress suffered by her which was proximately caused by Defendant.  No definite standard is prescribed by law to fix reasonable compensation for lost enjoyment and emotional distress.  In making an award for lost enjoyment and emotional distress you shall exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in light of the evidence.

If you find Ms. Taylor has proven any such damages by a preponderance of the evidence, you must award her a sum you deem appropriate to compensate her for any of these damages she has endured as a result of her injuries, including any: (1) disability, (2) disfigurement, (3) and physical impairment.  You may also include an amount to compensate Ms. Taylor for any such damages in the future which you find she is reasonably likely to experience.

17

Whatever Ms. Taylor is entitled to recover in the future due to her injuries must be included in the amount she recovers now. You must determine the total amount of Ms. Taylor's damages and place this amount on the Special Verdict Form.

<u>Lost Wages</u>

Plaintiff is entitled to be compensated for all lost earnings to date that you find were caused by the injuries resulting from Defendant's negligence. As with the other elements of her case, Ms. Taylor must prove such lost wages by a preponderance of the evidence. Such damages are limited to what you find to be reasonably probable from Plaintiff's injuries.

<u>Past and Future Medical Expenses</u>

Plaintiff claims that she has incurred and will continue to incur expenses for medical care. If you find by a preponderance of the evidence that Defendant is liable to Ms. Taylor for such damages, then you should award her the reasonable and necessary medical expenses she has incurred, including any reasonable and necessary medical expenses which she is reasonably certain to incur in the future. These include all doctor's bills, hospital bills, and other bills of a medical nature which are a proximate result of the accident.

<u>LIFE EXPECTANCY</u>

According to the *Census Bureau Vital Statistics of the United States,* a person 33 years of age has a remaining life

18

expectancy of 49 years.  This is merely an estimate of the
probable average remaining length of life of all persons of this
age.  You may consider this estimate in determining the amount of
damages for any future losses that you award Ms. Taylor.

<div align="center">TAXATION</div>

If you award Ms. Taylor damages, these damages will not be
subject to federal or state income taxation.  Ms. Taylor will
have the full use of whatever amount the jury awards.
Consequently, you should not add any sum to your award of damages
to compensate for income taxes.

<div align="center">UNANIMOUS VERDICT</div>

The verdict must represent the considered judgment of each
juror.  In order to return a verdict, it is necessary that each
juror agree.

It is your duty as jurors to consult with one another, and
to deliberate with a view toward reaching an agreement, if you
can do so without violence to your individual judgment.  You must
each decide the case for yourself, but only after an impartial
consideration of the evidence in the case with your fellow
jurors.  In the course of your deliberations, do not hesitate to
reexamine your own views and change your opinion if convinced it
is erroneous.  But do not surrender your honest conviction as to
the weight or effect of evidence solely because of the opinion of
your fellow jurors or for the mere purpose of returning a

<div align="center">19</div>

verdict.

Remember at all times that you are not partisans.  You are judges -- the judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

### NOTES

You may have taken notes during the trial for use in your deliberations.  These notes may be used to assist your recollection of the evidence, but your memory, as jurors, controls.  Your notes are not evidence, and should not take precedence over your independent recollections of the evidence.  The notes that you took are strictly confidential.  Do not disclose your notes to anyone other than your fellow jurors.  Your notes should remain in the jury room and will be collected at the end of the case.

### CLOSING INSTRUCTIONS

I have selected _____ to act as your foreperson.  The foreperson will preside over your deliberations, and will be your spokesperson here in Court.

A copy of this charge will go with you into the jury room for your use.

A verdict form has been prepared for your convenience.  You will take this form to the jury room.  Each of the interrogatories or questions on the verdict form requires the unanimous answer of the jury.  Your foreperson will write the

unanimous answer of the jury in the space provided opposite each question, and will date and sign the special verdict, when completed.

If it becomes necessary during your deliberations to communicate with the Court, you may send a note through the Courtroom Security Officer signed by your foreperson. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing, and the Court will never communicate with any member of the jury on any subject related to the merits of the case other than in writing, or orally here in open Court.

You will note that all other persons are also forbidden to communicate in any way or manner with any member of the jury on any subject related to the merits of the case.

Dated at Burlington, Vermont this 13th day of January, 2012.

/s/ William K. Sessions III
William K. Sessions III
United States District Court

# Exhibit B

2014 WL 1513232
United States District Court, D. New Hampshire.

Susan HANUS and Michael Hanus, individually and
as the Parents and Next Friends of M.H. and J.H.
v.
LOON MOUNTAIN RECREATION CORP.,
Boyne USA, Inc., and Scott Patterson.

Civil No. 13–cv–44–JL.
|
Signed April 16, 2014.

### *MEMORANDUM ORDER*

JOSEPH N. LAPLANTE, District Judge.

**\*1** Every winter, thousands of skiers and snowboarders journey to the slopes of New Hampshire's ski areas from locations both far and near. Like many states with a robust ski industry, New Hampshire has enacted a statute —the "Skiers, Ski Area and Passenger Tramway Safety" law, N.H.Rev.Stat. Ann. § 225–A:1 et seq. (the "Ski Statute") that limits those areas' liability to their visitors. In particular, the Ski Statute provides that "[e]ach person who participates in the sport of skiing ... accepts as a matter of law, the dangers inherent in the sport, and to that extent may not maintain an action against [a ski area] operator for any injuries which result from such inherent risks, dangers, or hazards." N.H.Rev.Stat. Ann. § 225–A:24, I. The question presented in this case is the extent to which this provision immunizes ski areas from liability for skier-to-skier collisions caused by their employees.

Plaintiffs Susan and Michael Hanus have sued Loon Mountain Recreation Corporation ("LMRC") and Boyne USA, Inc., the operators of one of New Hampshire's ski areas, Loon Mountain Resort, for injuries the plaintiffs' minor son suffered while skiing. Those injuries arose from an on-trail collision between the boy and a Loon Mountain employee who, the plaintiffs allege, "ducked under a rope marking a permanently closed section of the trail" immediately before the collision. LMRC and Boyne have moved to dismiss the plaintiffs' claims against them, arguing that § 225–A:24, I-which expressly identifies "collisions with other skiers or other persons" as one of

the "inherent risks, dangers, or hazards" of skiing—bars those claims. See Fed.R.Civ.P. 12(c). [1]

This court has jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity), because the plaintiffs are Massachusetts citizens, the defendants are citizens of New Hampshire and Michigan, and the amount in controversy exceeds $75,000. After careful consideration, the court grants the defendants' motion. The plaintiffs have gamely attempted to pry this suit from the clutches of the Ski Statute's ski area immunity provision by arguing that the provision does not apply where, as here, the suit arises out of injuries caused by a ski area employee who fails to observe the responsibilities the Ski Statute imposes on skiers. This argument, however, cannot be reconciled with the broad language of the statute itself, nor with the case law interpreting it. Plaintiffs' claims against LMRC and Boyne must be dismissed.

### I. *Applicable legal standard*

A motion for judgment on the pleadings under Rule 12(c) is evaluated under essentially the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. See Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir.2009). To survive such a motion, the complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor. See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir.2010). The court "may consider not only the complaint but also "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir.2009). With the facts so construed, "questions of law [are] ripe for resolution at the pleadings stage." Simmons, 575 F.3d at 30. The following background summary is consistent with that approach.

### II. *Background*

**\*2** On February 3, 2011, the plaintiffs' thirteen-year-old son, "M.H .", was participating in a ski racing program at Loon Mountain. Accompanied by his younger sister, "J.H.", and the head coach for the program, M.H. had skied down the Rampasture trail and was headed, via

a crossing trail, to the Coolidge Street trail, where he had helped set up a race course. At the same time, Scott Patterson, a ski instructor employed at Loon Mountain, was snowboarding down the Upper Northstar trail, which intersects with the crossing trail on which M.H. was skiing.

As he approached the area where the two trails intersect, Patterson, without stopping, ducked under a rope closing off a section of the Upper Northstar trail [2] and jumped a lip between the trails. While Susan Hanus watched from her seat on a chair lift above, Patterson struck M.H. in close proximity to J.H. As a result of the collision, M.H. suffered severe injuries, including a concussion and fractured bones in his right arm and leg.

The plaintiffs filed this action against LMRC and Patterson, and shortly thereafter, amended their complaint to add Boyne as a defendant. As amended, the complaint alleges claims against LMRC and Boyne for negligent supervision, negligent operation of a ski area, gross negligence, and respondeat superior; claims against Patterson for negligence and gross negligence; and a claim against all three defendants for negligent infliction of emotional distress. LMRC and Boyne, after answering the complaint, filed the motion at bar. (Patterson has not yet filed any motion seeking to dispose of the claims against him.)

### III. *Analysis*

The Ski Statute "recogniz[es] that the sport of skiing and other ski area activities involve risks and hazards which must be assumed as a matter of law by those engaging in such activities, regardless of all safety measures taken by the ski area operators." N.H.Rev.Stat. Ann. § 225–A:1. Accordingly, the statute—as noted at the outset-contains an immunity provision for ski area operators, providing that:

> Each person who participates in the sport of skiing ... accepts as a matter of law, the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards. The categories of such risks, hazards, or dangers

> which the skier or passenger assumes as a matter of law include but are not limited to ... collisions with other skiers or other persons....

*Id.* § 225–A:24, I. As interpreted by the New Hampshire Supreme Court, this provision "mean[s] that a ski area operator owes its patrons no duty to protect them from inherent risks of skiing," and, "[t]o the extent that a skier's injury is caused by an inherent risk of skiing, the skier may not recover from the ski area operator." *Nutbrown v. Mount Cranmore, Inc.,* 140 N.H. 675, 680 (1996).

The question presented by the defendants' motion concerns the scope of this provision, which "supersede[s] and replace[s] a skier's common law remedies for risks inherent in the sport of skiing." *Cecere v. Loon Mtn. Rec. Corp.,* 155 N.H. 289, 291 (2007) (quoting *Sweeney v. Ragged Mtn. Ski Area,* 151 N.H. 239, 242 (2004)). LMRC and Boyne argue that, because the plaintiffs seek to recover for injuries resulting from a collision with another "skier," [3] specifically identified by the statute as one of the inherent risks of skiing, this action falls squarely within the provision—irrespective of Patterson's status as a Loon Mountain employee-and is therefore barred. The plaintiffs, for their part, concede that "under ordinary circumstances," a skier-to-skier collision would constitute an inherent risk of skiing for which they could not recover. Opp. to Mot. to Dismiss (document no. 30) at 7. They argue, however, that Patterson's collision with M.H. "was not an inherent risk of skiing because Patterson violated the Ski Statute by ducking under a rope and traversing across a delineated, closed-off trail boundary." *Id.* at 2; *see also id.* at 5. LMRC and Boyne have the better argument.

**\*3** Insofar as the Ski Statute provides ski area operators with an immunity limiting plaintiffs' common-law rights, it must be "strictly construed." *Cecere,* 155 N.H. at 291 (recognizing the canons of statutory interpretation requiring narrow construction of immunity provisions and statutes in derogation of the common law). Nonetheless, in interpreting the Ski Statute, this court applies the ordinary tools of statutory construction, "first examin[ing] the language of the statute, and, where possible, ... ascrib[ing] the plain and ordinary meanings to the words used." *Id.* Here, the "plain and ordinary meaning" of the ski area immunity provision could hardly be clearer: it identifies "collisions with other skiers or

other persons" as one of the "risks, dangers, or hazards which the skier ... assumes as a matter of law." It makes no exception for collisions with skiers who are violating the Ski Statute, nor does it except collisions with ski area employees, even when those employees are themselves violating the Ski Statute or otherwise conducting themselves in a negligent or reckless fashion.

There may well be good reasons for the New Hampshire General Court to exclude those types of collisions from the inherent risks of skiing identified in the statute. But, though the General Court undoubtedly could have done so, it did not, and "where, as here, a statute's language is plain and unambiguous, the court ... will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Dennis v. Town of Loudon,* 2012 DNH 165, 25 (quoting *Cloutier v. City of Berlin,* 154 N.H. 13, 17 (2006)) (internal quotation marks and alterations omitted). And, in any event, it is entirely unsurprising that such exceptions are absent from the statute. As the California Court of Appeal observed in a similar case when concluding that the plaintiff's claims were barred by the common-law doctrine of primary assumption of the risk (upon which the Ski Statute's ski area immunity provision is based, *see Nutbrown,* 140 N.H. at 680):

> [T]he inherent risks of injury from skiing down a snow covered mountain include accidentally careless conduct by other skiers resulting in collisions. This risk is so inherent and obvious it goes without saying plaintiff assumed the risk no matter who the other skiers may be.... [The defendant ski area's] act of employing [the employee who caused the injury] and requiring him to be on the slope did not increase the risk of injury inherent in skiing.

*Towns v. Davidson,* 147 Cal.App. 4th 461, 469–70 (2007). So too here. The mere fact that M.H. collided with a ski area employee who was behaving negligently or recklessly does not remove the collision from the realm of skiing's inherent risks, at least as far as the statutory language is concerned.

In an effort to escape this conclusion, the plaintiffs point to case law holding that the Ski Statute does not grant immunity "to ski area operators who breach a statutorily imposed safety responsibility." *Rayeski v. Gunstock Area,* 146 N.H. 495, 498 (2001) (citing *Nutbrown,* 140 N.H. at 683). Section 225–A:24, the plaintiffs note, imposes several safety responsibilities on skiers, which, they say, Patterson breached by his conduct:

**\*4** • § 225–A:24, III provides that "[e]ach skier ... shall conduct himself or herself, within the limits of his or her own ability, maintain control of his or her speed and course at all times both on the ground and in the air, while skiing, snowboarding, snow tubing, and snowshoeing heed all posted warnings, and refrain from acting in a manner which may cause or contribute to the injury of himself, herself, or others";

• § 225–A:24, V(c) provides that no skier shall "[e]ngage in any type of conduct which will contribute to cause injury to any other person"; and

• § 225–A:24, V(g) provides that no skier shall "[s]ki or otherwise access terrain outside open and designated ski trails and slopes or beyond ski area boundaries without written permission of said operator or designee."

The plaintiffs maintain that because (in their view) Patterson breached these responsibilities during the scope of his employment at Loon Mountain, LMRC and Boyne may be held vicariously liable for his breaches under the rule noted in the *Nutbrown* line of cases.

The plaintiffs, however, misread those cases. As the New Hampshire Supreme Court explained nearly 50 years ago, the Ski Statute "confers a right of action if the operator is in violation of the statute which imposes *duties by way of classifying slopes and trails and notices of closed trails and trails on which maintenance crews are working.*" *Adie v. Temple Mtn. Ski Area, Inc.,* 108 N.H. 480, 483 (1968) (emphasis added). It is those duties, which are found in N.H.Rev.Stat. Ann. § 225–A:23, to which the court in *Nutbrown* was referring when it held that a ski area operator could be held liable for a breach of its statutory duties—not to the duties imposed on individual skiers by § 225–A:24. *See Nutbrown,* 140 N.H. at 681, 683. In the words of another judge of this court, "the legislature

has specified the responsibilities of ski area operators in N.H.Rev.Stat. Ann. § 225–A:23 and the responsibilities of skiers ... in N.H.Rev.Stat. Ann. § 225–A:24," and the immunity provision in § 225–A:24, I "does not relieve ski area operators of liability for injuries caused by a violation of their statutory duties *under N.H.Rev.Stat. Ann. § 225– A:23.*"[4] *Gwyn v. Loon Mtn. Corp.,* 2002 DNH 100, 9– 11 (Barbadoro, J.) (emphasis added). Plaintiffs have cited, and this court has found, no case law holding that a ski area operator may be held liable for its employees' breach of the responsibilities set forth in § 225–A:24.

In arguing that LMRC and Boyne may be held liable for Patterson's breach of those responsibilities, then, the plaintiffs are inviting the court to recognize a basis for liability that finds no footing in either the language of the Ski Statute or the case law interpreting it-and which is, in fact, contrary to the plain language of the statute. As another judge of this court observed when urged to recognize a novel exception to the Ski Statute's ski area immunity provision, "plaintiffs who select a federal forum in preference to an available state forum may not expect the federal court to steer state law into unprecedented configurations." *Payzant v. Loon Mtn. Rec. Corp.,* No. 94–cv–164, slip op. at 4 n .2 (D.N.H. Nov. 15, 1995) (Barbadoro, J.) (quoting *Federico v. Order of Saint Benedict in R.I.,* 64 F.3d 1, 4 (1st Cir.1995)).

**\*5** Even if this court had license to do that, though, it is doubtful that it could exercise that power in this case. As LMRC and Boyne point out in their reply memorandum, our Court of Appeals has specifically declined to hold a ski area operator liable for its employees' alleged violation of the duties imposed by § 225–A:24. *Berninger v. Meadow Green–Wildcat Corp.,* 945 F.2d 4, 8–9 (1st Cir.1991). While the decision in *Berninger* was based primarily upon the court's interpretation of a single phrase in a subsection of § 225–A:24, its admonition that the class of individuals governed by § 225–A:24 "does not include a ski operator or its employees," *id.* at 9, sweeps substantially more broadly than that. "[U]nless and until" the New Hampshire Supreme Court "has addressed a pertinent state law issue, a federal district court is bound

by First Circuit precedent" on that issue. *Vertex Surgical, Inc. v. Paradigm Biodevices, Inc.,* 648 F.Supp.2d 226, 231 n. 3 (D.Mass.2009) (citing *Esquire, Inc. v. Esquire Slipper Mfg. Co.,* 243 F.2d 540, 544 (1st Cir.1957)). This court, then, cannot simply disregard *Berninger,* unless an intervening decision of the New Hampshire Supreme Court has reached a contrary conclusion—and, as just noted, plaintiffs have identified, and the court has located, no such decision. (Indeed, although LMRC and Boyne discuss *Berninger* in their reply memorandum— and although the court granted the plaintiffs leave to file a surreply, *see* Order of Oct. 30, 2013—the plaintiffs made no attempt to reconcile their position with that case until oral argument.)

For the foregoing reasons, the court concludes that M.H.'s collision with Patterson was an "inherent risk, danger, or hazard" of skiing, despite Patterson's alleged violation of the responsibilities set forth in § 225–A:24. The court is sympathetic to the plaintiffs and their son; the collision was unfortunate and undoubtedly frustrating in that it was caused by a Loon Mountain employee. Because the plaintiffs' injuries resulted from an inherent risk of skiing, however, they "may not maintain an action against" LMRC or Boyne to recover for those injuries. N.H.Rev.Stat. Ann. § 225–A:24, I; *see also Nutbrown,* 140 N.H. at 680; *Cecere,* 155 N.H. at 296.[5]

### IV. *Conclusion*

For the reasons set forth above, the defendants' motion to dismiss the plaintiffs' claims against them[6] is GRANTED. The plaintiffs' claims against Patterson remain pending, as do the counterclaims against the plaintiffs by LMRC and Boyne.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1513232, 2014 DNH 075

Footnotes

1    The defendants' motion relies upon Federal Rule of Civil Procedure 12(b)(6), but, because the defendants answered
     the complaint before moving to dismiss it, the court treats the motion as one for judgment on the pleadings under Rule

Case 3:17-cv-00568-KAD   Document 63-2   Filed 04/17/19   Page 112 of 170

12(c)—a "largely academic" distinction since Rules 12(b)(6) and 12(c) "impose identical standards." *Holder v. Town of Newton,* 638 F.Supp.2d 150, 152 n. 1 (D.N.H.2009); *see also* Part I, *infra.*

2   The plaintiffs allege that this section of the Upper Northstar trail had been "permanently closed" since at least 2003. The defendants take issue with this characterization, arguing in their memorandum that "[t]here is no such thing as a 'permanently closed' ski trail under New Hampshire law." Memo. in Supp. of Mot. to Dismiss (document no. 28–1) at 3. Instead, the defendants assert, Loon Mountain had simply "put up a rope to delineate the intersections area" between the trails. *Id.* While that may in fact be the case, this court is bound to accept as true the facts pleaded by the plaintiffs, *see Martino,* 609 F.3d at 2, and the plaintiffs have at the very least pleaded that the section of trail in question was closed at the time. Whether the closure was temporary or permanent (and whether a trail can be "permanently closed" under the law of this state) is immaterial to the court's analysis of the defendants' motion.

3   It is true that, at the time of the collision, Patterson was snowboarding, and there are some differences between skiers and snowboarders: in general, "[s]kiers view snowboarders as a menace," while "snowboarders view skiers as Elmer Fudd." Dave Barry, *Snow Immobile,* Wash. Post, Feb. 12, 1995, at W40. Despite his preferred mode of descent, Patterson is considered a "skier" under the Ski Statute. *See* N.H.Rev.Stat. Ann. § 225–A:2, IX (defining "skier" as "a person utilizing the ski area ... for ski, snowboard, and snow tube recreation and competition"); *Cecere,* 155 N.H. at 292–93.

4   Tellingly, although the plaintiffs quote this sentence from *Gwyn* in their memorandum, they have chosen to omit the emphasized segment. *See* Opp. to Mot. to Dismiss (document no. 30) at 6.

5   As a final aside, the court notes that the plaintiffs rely upon several extrajurisdictional cases in opposing the motion to dismiss. *See* Opp. to Mot. to Dismiss (document no. 30) at 9–10) (citing *Rusnak v. Walker,* 273 Mich.App. 299 (2006); *Jagger v. Mohawk Mtn. Ski Area, Inc.,* 269 Conn. 672 (2004); *Clover v. Snowbird Ski Resort,* 808 P.2d 1037 (Utah 1991)). Those cases do not affect this court's ruling, for the following reasons:

- In the *Rusnak* case, the plaintiff did not seek to recover from a ski area, but from a fellow skier, so the court never had occasion to discuss the scope of ski area liability under Michigan's version of the Ski Statute (which, in any event, differs from the New Hampshire law).

- The result in the *Jagger* case was based upon an exemption from the Connecticut Ski Statute's ski area immunity provision that does not exist in the New Hampshire law. That exemption denies ski area operators immunity for injuries "proximately caused by the negligent operation of the ski area by the ski area operator, his agents, or employees." *See Jagger,* 269 Conn. at 674 n. 4 (quoting Conn. Gen.Stat. § 29–212). Indeed, the *Jagger* court itself noted this critical difference in rendering its opinion. *See id.* at 696 n. 20 (distinguishing N.H.Rev.Stat. Ann. § 225–A).

- While the *Clover* case is arguably more apposite than either of the other cases upon which the plaintiffs rely, the court finds it unpersuasive for the reasons discussed in *Glover v. Vail Corp.,* 955 F.Supp. 105, 108–09 (D.Colo.1997) (Babcock, J.), *aff'd,* 137 F.3d 1444. This court cannot improve upon the analysis of the district court in that case, and adopts it wholesale.

6   Document no. 28.

---

**End of Document**                                                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

219 N.C.App. 650
Unpublished Disposition
NOTE: THIS OPINION WILL NOT APPEAR
IN A PRINTED VOLUME. THE DISPOSITION
WILL APPEAR IN THE REPORTER.
Court of Appeals of North Carolina.

Julie HALTIWANGER, Plaintiff

v.

PHOENIX SKI CORPORATION, d/
b/a, Cataloochee Ski Area, Defendant.

No. COA11–1075.
|
April 3, 2012.

**\*1** Appeal by plaintiff from order entered 27 May 2011 by Judge Gary Gavenus in Haywood County Superior Court. Heard in the Court of Appeals 23 January 2012.

**Attorneys and Law Firms**

The Exum Law Office, by Mary March Exum and Law Office of Todd Ellis, P.A., by Todd R. Ellis, for plaintiff-appellant.

Roberts & Stevens, P.A., by Wyatt S. Stevens and Ann–Patton Hornthal, for defendant-appellee.

**Opinion**

CALABRIA, Judge.

Julie Haltiwanger ("plaintiff") appeals from an order granting summary judgment in favor of Phoenix Ski Corporation d/b/a Cataloochee Ski Area ("defendant"). We affirm.

*I. Background*

At approximately 4:45 p.m. on Saturday, 13 February 2010, plaintiff was skiing at defendant's resort when she collided with a snowboarder, Luis Venegas ("Venegas"). Since 1985, plaintiff skied for one day almost every year, had never taken formal ski lessons, and considered her skill level intermediate. Although she and her family typically skied in North Carolina, she had never skied at defendant's ski resort prior to the accident. As a result of

the accident, plaintiff sustained injuries requiring medical care and treatment.

Venegas was employed as a lift operator at defendant's resort. One of the benefits defendant offered its employees was complimentary skiing when they were off duty. At the time of the accident, Venegas was off duty.

On 16 August 2010, plaintiff filed an amended complaint against defendant only and sought damages for defendant's negligence. Plaintiff alleges defendant owed her a duty of protection and had a duty to train and supervise its employees. Defendant answered the complaint and alleged the affirmative defenses of contributory negligence and assumption of the risk, since plaintiff's lift ticket included a specific warning and an assumption of risk notice as a condition of skiing at defendant's resort.

Defendant moved for summary judgment on 29 April 2011. On 27 May 2011, the trial court granted defendant's motion for summary judgment. Plaintiff appeals.

*II. Standard of Review*

The standard of review for an appeal from summary judgment is *de novo. Hewett v. Weisser,* 201 N.C.App. 425, 427, 689 S.E.2d 408, 410 (2009). Summary judgment is "based on two underlying questions of law: (1) whether there is a genuine issue of material fact and (2) whether the moving party is entitled to judgment" as a matter of law. *Id.* at 427, 689 S.E.2d at 409–10.

Plaintiff's claims against defendant were each based upon plaintiff's alleged negligence. To recover damages for negligence a plaintiff must show that each element of negligence is present: "legal duty or obligation, breach of that duty, proximate cause and actual loss or damage." *Little v. Omega Meats I, Inc.,* 171 N.C.App. 583, 586, 615 S.E.2d 45, 48, *aff'd,* 360 N.C. 164, 622 S.E.2d 494 (2005) (citation omitted).

*III. Premises Liability*

Plaintiff argues that the trial court erred in granting summary judgment to defendant because there was a genuine issue of material fact as to whether defendant was

723 S.E.2d 173

negligent in creating or failing to cure an unreasonably dangerous condition. We disagree.

**\*2** In general, a landowner owes a duty of "reasonable care toward all lawful visitors." *Nelson v. Freeland,* 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998). To prevail on a claim for negligence in a premises liability action, a plaintiff must prove that the owner either negligently created a hidden peril or otherwise unsafe condition or that the owner negligently failed to correct the unsafe condition after actual or constructive knowledge of its existence. *Roumillat v. Simplistic Enterprises, Inc.,* 331 N.C. 57, 64, 414 S.E.2d 339, 343 (1992).

However, we note that defendant is a ski area operator. North Carolina's Skier Safety Act ("Act") has modified the traditional premises liability duty of care owed to skiers by ski area operators. N.C. Gen.Stat. § 99C–2 (2011). The Act outlines the specific responsibilities for ski area operators, including:

(4) To post at or near the top of or entrance to, any designated slope or trail, signs giving reasonable notice of unusual conditions on the slope or trail;

(6) To mark clearly any hidden rock, hidden stump, or any other hidden hazard known by the ski area operator to exist;

(7) Not to engage willfully or negligently in any type conduct that contributes to or causes injury to another person or his properties.

N.C. Gen.Stat. § 99C–2(c) (2011).

In the instant case, there is no dispute that plaintiff sustained injuries requiring medical care and treatment. The issue is whether plaintiff's injuries resulted from a breach of defendant's duty of care owed to skiers who used its slopes.

Plaintiff contends that the area where the accident occurred was dangerous, thereby triggering defendant's duty to plaintiff. Plaintiff supports her argument with two pieces of evidence. First, plaintiff relies on the deposition testimony of Chris Hill ("Hill"), a volunteer ski patroller. Hill indicated that there was a spot on the Upper Turkey Trot where the slope levels off a bit and skiers would rest. Second, plaintiff cites the incident report completed by Venegas. However, plaintiff only included this incident

report as an appendix to her brief; it was not included in the record on appeal. Consequently, we will not consider this report. *See N.C. Concrete Finishers, Inc. v. N.C. Farm Bureau Mut. Ins. Co.,* 202 N.C.App. 334, 337–38, 688 S.E.2d 534, 536 (2010) (Items included as an appendix to a brief are not part of the record on appeal and will not be considered by this Court).

Hill's testimony, that the Upper Turkey Trot contains a "dip" that levels off and where skiers rest, fails to establish that this "dip" constituted a hidden or dangerous condition. Variations in terrain are common on ski slopes, and skiers are statutorily required to be aware of these variations when skiing. *See N.C. Gen.Stat. § 99C–2 (b) (2)* (2011)(Skiers are required to *inter alia,* "maintain a proper lookout so as to be able to avoid other skiers and obvious hazards and inherent risks, including variations in terrain ...."). Furthermore, defendant does statistical analysis of the locations of incidents and a study of more than 300 incidents on the mountain during the prior year was considered at the summary judgment hearing. Hill and Chris Bates ("Bates"), the general manager of defendant's resort, both indicated that the Upper Turkey Trot slope is not an area where accidents usually occur.

**\*3** Thus, plaintiff's evidence of a change in terrain on the Upper Turkey Trot is not sufficient, standing alone, to demonstrate a dangerous condition or "hidden hazard." Defendant's duty to plaintiff did not extend beyond its responsibility for marking such "hidden hazard[s]." N.C. Gen.Stat. § 99C–2 (c)(6) (2011). Therefore, plaintiff failed to forecast evidence that defendant breached its duty of care to plaintiff. Since there was no breach of duty, the trial court did not err in granting defendant's motion for summary judgment. This argument is overruled.

*IV. Respondeat Superior*

Plaintiff argues that the trial court erred in granting summary judgment to defendant because there was a genuine issue of material fact as to whether defendant was liable for Venegas's acts under a theory of *respondeat superior.*

Under the doctrine of *respondeat superior,* "employers are liable for torts committed by their employees who are acting within the scope of their employment." *Matthews v. Food Lion, LLC,* 205 N.C.App. 279, 281, 695 S.E.2d

723 S.E.2d 173

828, 830 (2010). However, it is "elementary that the master is not responsible if the negligence of the servant which caused the injury occurred while the servant was engaged in some private matter of his own or outside the legitimate scope of his employment." *Estes v. Comstock Homebuilding Companies, Inc.,* 195 N.C.App. 536, 540, 673 S.E.2d 399, 402 (2009) (citation omitted).

In *Estes,* the defendant's employee was outside smoking a cigarette when the telephone began to ring. *Id.* at 538, 673 S.E .2d at 401. The employee hastily put out her cigarette and ran inside. *Id.* The cigarette started a fire which damaged the plaintiff's house. *Id.* at 537–38, 673 S.E.2d at 400–01. The Court held that the doctrine of *respondeat superior* applied, even though the employee was outside smoking, because "(1) [the employee] was on the premises of her employer where she was required to be, able and willing to perform her duties; and (2) the negligence occurred when she went to perform one of those duties, answering the telephone." *Id.* at 541, 673 S.E.2d at 402.

In *Matthews,* the defendant's employee entered a bathroom on the defendant's premises after she had clocked out of work. 205 N.C.App. at 280, 695 S.E.2d at 829. The employee entered the bathroom "at a brisk pace" and injured the plaintiff. *Id.* Noting that "the evidence establishe[d] that Defendant has no control over the actions of its employees once they have 'clocked out' of work" and that defendant's employee "was not on duty, was not required to be on the premises at the time of the incident, and was not going to the bathroom in furtherance of Defendant's business," this Court concluded that the defendant's employee "was not acting within the scope of her employment at the time of the incident" and thus the doctrine of *respondeat superior* did not apply. *Id.* at 283–84, 695 S.E.2d at 831–32.

**\*4** The instant case is analogous to *Matthews* rather than *Estes* . Plaintiff's forecasted evidence showed that although Venegas had been working for defendant on the day of the accident, he had completely finished performing his duties for the day when the accident occurred. While defendant had a policy allowing its employees to ski on the premises from Sunday–Friday (non-holidays) and nights, its employees were not required to utilize this policy. At the time of the accident, Venegas was off duty, not required to be on defendant's premises, and not under defendant's control. When he was skiing under

these circumstances, his status was the same as any other individual enjoying the use of the slopes.

Furthermore, plaintiff has not provided any evidence to show how Venegas's actions could be considered in furtherance of defendant's business. Venegas was a ski lift operator. Skiing was neither required nor necessary as part of his job. There is no evidence that Venegas's recreational snowboarding, after he had completed his shift, furthered defendant's business in any way. Venegas's actions were clearly "some private matter of his own or outside the legitimate scope of his employment." *See Estes,* 195 N.C.App. at 540, 673 S.E.2d at 402 (citations omitted). Therefore, we find the doctrine of *respondeat superior* does not apply in the instant case. See Matthews, 205 N.C.App. at 283–84, 695 S.E.2d at 831–32. This argument is overruled.

*V. Failure to Orient, Train and/or Supervise*

Plaintiff also argues that defendant was negligent in failing to orient, train and/or supervise Venegas. We disagree.

In her brief, plaintiff fails to cite to any authority to support this argument. Instead, plaintiff "incorporates herein by reference her Argument from Section (C)(2) of [her] Brief." However, plaintiff's brief does not actually contain a section (C)(2), and the remainder of the brief does not include any law which would support this argument. As a result, we deem this argument abandoned pursuant to N.C.R.App. P. 28(b)(6) (2011).

*VI. Negligent Entrustment*

Plaintiff also contends there was a genuine issue of material fact as to whether defendant negligently entrusted Venegas with equipment. However, plaintiff failed to raise this claim in her amended complaint. Therefore, it is inappropriate for us to consider the issue on appeal. *See Higgins v. Simmons,* 324 N.C. 100, 103, 376 S.E.2d 449, 452 (1989) (a party cannot raise an issue for the first time on appeal). This argument is overruled.

*VII. Conclusion*

723 S.E.2d 173

While we agree this is an unfortunate accident, plaintiff has failed to forecast any genuine issue of material fact or any evidence showing that defendant was negligent. Defendant is entitled to judgment as a matter of law. The trial court did not err by granting summary judgment to defendant. We affirm.

Affirmed.

Chief Judge MARTIN and Judge McGEE concur. Report per Rule 30(e).

**All Citations**

219 N.C.App. 650, 723 S.E.2d 173 (Table), 2012 WL 1115978

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-00568-KAD   Document 63-2   Filed 04/17/19   Page 117 of 170

Blair v. Fairpoint Communications, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7799311
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Yolanda BLAIR, Plaintiff,
v.
FAIRPOINT COMMUNICATIONS,
INC., Northern New England Telephone
Operations, LLC and Telephone Operating
Company of Vermont, LLC, Defendants.

Case No. 2:14–cv–158
|
Signed 01/04/2016

**Attorneys and Law Firms**

William L. Durrell, Esq., Benjamin, Bookchin & Durrell, P.C., Montpelier, VT, for Plaintiff.

Eric J. Morgan, Esq., Harry R. Ryan, III, Esq., Ryan Smith & Carbine, Ltd., Rutland, VT, for Defendants.

### OPINION AND ORDER

William K. Sessions III, District Court Judge

 **\*1** Plaintiff Yolanda Blair brings this action claiming injuries resulting from a 2011 automobile accident. The accident occurred when the sedan in which Blair was a passenger collided with a utility truck. Blair claims that the driver of the truck was at fault.

The utility truck had the words "FairPoint Communications" printed on the side, and Blair has named FairPoint Communications, Inc. ("FairPoint") as a defendant. FairPoint now moves for summary judgment, arguing that it has no liability because the driver of the truck was not a FairPoint agent or employee. For the reasons set forth below, FairPoint's summary judgment motion is **granted**.

### Factual Background

On August 2, 2011, Blair was a passenger in a 2000 Mitsubishi sedan driven by Schatzilein Buck. Buck and Blair were traveling on Route 5 in Irasville, Vermont when a 2008 Ford bucket truck driven by James Baker reportedly pulled out in front of them at an intersection. Baker's alleged negligence caused Buck to crash into the side of the truck.

The question posed by FairPoint's motion for summary judgment is whether it can be held liable for Baker's actions. Although the truck bore a "FairPoint Communications" logo, Baker was employed by Northern New England Telephone Operating Company. FairPoint has offered undisputed evidence that Baker was never documented in its records as an employee, never received a W–2 tax form from FairPoint, and for the year 2011 received his only W–2 form from Northern New England Telephone Operations LLC.

Blair nonetheless claims that Baker was an agent of FairPoint. In support, Blair contends that defense counsel made representations in the course of settlement negotiations indicating that FairPoint was a liable party. For example, a letter from defense counsel to Blair's attorney stated that "[b]efore meeting you and [co-counsel] I had met with FairPoint's driver, James Baker." ECF No. 38–2 at 1. In that same letter, counsel referred to FairPoint as a potential party to a settlement. *Id.* at 2. Blair further cites the police report identifying "Fairpoint Communications" as the owner of the truck; a certificate of liability insurance naming "Fairpoint Communications" as the insured; a "Release of Property Damage" listing both FairPoint and Baker as releasees; and a letter referencing FairPoint as the insured. ECF Nos. 38–4, 38–5, 38 at 4. Finally, Plaintiff cites Baker's traffic court testimony in which he concurred with the statement that he was a "Fairpoint" employee. ECF No. 38–6 at 2.

FairPoint responds that none of these facts prove either an employment or agency relationship. In its reply memorandum, FairPoint explains that "FairPoint Communications NNE" is a trade name registered in Maine and used by Northern New England Telephone Operating Company. ECF No. 45 at 3–4; ECF No. 45–2. Defense counsel represents that Northern New England Telephone Operating Company is a FairPoint subsidiary. ECF No. 45 at 4. In his deposition, Baker testified that he was never a FairPoint employee. ECF No. 37–5 at 5–6. Furthermore, Baker's Department of Motor Vehicles accident report identified the truck's insured as Northern New England Telephone Operating Company.

ECF No. 45–1 at 2–3. FairPoint also argues that much of Blair's argument relies upon inadmissible settlement communications and/or hearsay.

## Discussion

**\*2** A party is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists and must "identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–325 (1986) (citation and internal quotation marks omitted).

"A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.' " *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004) (internal quotation marks omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Here, the issue is whether FairPoint may be held liable for Baker's alleged negligence. Blair submits that while Baker may not have been a FairPoint employee, he was nonetheless an agent of FairPoint. As discussed above, Blair claims support from the logo on the truck, representations by defense counsel in the course of settlement negotiations, the police report, insurance and release documents, and Baker's own traffic court testimony.

Under Vermont law, "[a]n agency relationship results when one party consents to another party acting as its agent." *Kimco Leasing Co. v. Lake Hortonia Prop.*, 161 Vt. 425, 429 (1993); *see also* Restatement (Second) of Agency § 1 (1958). "The agent must also acquiesce to the arrangement and be subject to the principal's control." *Id.* Here, there are no allegations or record evidence to suggest that FairPoint consented to Baker acting as its agent, or that Baker acquiesced to an agency relationship. Furthermore, there is no allegation that Baker was under FairPoint's control.

With no evidence of an actual agency relationship, Blair turns to the doctrine of apparent agency, arguing that certain representations by the parties and counsel suggested an agency relationship. "An apparent agency relationship may exist if the principal has manifested by [its] conduct to a third party that the agent has authority to act for [it], and the third party reasonably believes that the other individual is the agent." *RLI Ins. Co. v. Klonsky*, 771 F. Supp. 2d 314, 326–27 (D. Vt. 2011) (citing *Kimco Leasing Co.*, 161 Vt. 425 at 429–30). "Apparent authority 'derives from conduct of the principal, communicated or manifested to the third party, which reasonably leads the third party to rely on the agent's authority.' " *Lakeside Equip. Corp. v. Town of Chester*, 173 Vt. 317, 325 (2002) (quoting *New England Educ. Training Serv., Inc. v. Silver Street P'ship*, 148 Vt. 99, 105 (1987)). "Liability under the doctrine 'exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized.' " *Doe v. Forrest*, 2004 VT 37, ¶ 23 (quoting Restatement (Second) of Agency § 8 cmt. c).

**\*3** The doctrine of apparent agency is a poor fit with the facts of this case. Tort liability based on apparent agency is typically limited to cases where the agent is "dealing or communicating with a third party on or purportedly on behalf of the principal." Restatement (Third) of Agency § 7:08 (2006). This case is a negligence action centering on a car accident. There is no allegation of a "dealing or communicat[ion]" prior to the collision, and the only suggestion of an agency relationship at the time of the accident was the logo on the side of the truck. Even if the Court accepts the assertion that such logo was a manifestation of an agency relationship between Baker and FairPoint, there was no reliance that could conceivably have had any bearing on the events leading up to the accident. *Id.*

Blair v. Fairpoint Communications, Inc., Not Reported in Fed. Supp. (2016)

Case 3:17-cv-00568-KAD   Document 63-2   Filed 04/17/19   Page 119 of 170

The thrust of Blair's agency argument pertains to facts that occurred or were discovered after the accident. First, she cites the police accident report, on which the officer noted that the owner of the vehicle was FairPoint. An insurance certificate was also produced in discovery, naming FairPoint as an insured. However, ownership of the vehicle does not determine liability. "With few exceptions, the owner of a motor vehicle is not liable at common law for the negligent operation of the vehicle by a person to whom he or she has loaned it, so long as the latter is not operating the vehicle as an agent or employee of the owner." 8 Am. Jur. 2d *Automobiles* § 640 (collecting cases). Therefore, under common law, FairPoint's ownership of the truck does not render it liable for Baker's actions in the absence of an agency or employment relationship.

Blair also submits that communications from defense counsel led both her and her attorneys to believe that FairPoint was a liable party. Blair contends that given those representations, FairPoint should be estopped from denying an agency relationship at this stage in the proceedings. Counsel's representations, however, have little bearing on the actual relationship between FairPoint and Baker. References in settlement negotiations to "FairPoint" do not mean that, in the event of a settlement, money would be forthcoming from either FairPoint Communications, Inc. or its insurer. As indicated by Baker in his accident report and subsequent deposition testimony, his employer was Northern New England Telephone Operating Company, a FairPoint subsidiary. Given the apparent corporate relationship between Baker's employer and FairPoint, it is understandable that defense attorneys might refer to the defendant as FairPoint. For liability purposes, however, the undisputed facts demonstrate that Baker was not either an employee or an agent of FairPoint Communications, Inc. FairPoint's motion for summary judgment is therefore **granted**.

## Conclusion

For the reasons set forth above, FairPoint Communications Inc.'s motion for summary judgment (ECF No. 37) is **granted**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7799311

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

```
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3

 4

 5    CIVIL ACTION NO:  3:17-CV-00568-WWE

 6    -------------------------------x

 7    STACIE RIVARD-PEDIGO,

 8                   Plaintiff,

 9       -versus-

10    OKEMO LIMITED LIABILITY COMPANY
      D/B/A OKEMO MOUNTAIN RESORT,
11
                     Defendant.
12    -------------------------------x

13

14

15            DEPOSITION OF STACIE RIVARD-PEDIGO

16

17    Taken pursuant to the Federal Rules of Civil Procedure,

18    at the law offices of Faxon Law Group, 59 Elm Street,

19    New Haven, Connecticut, before Vicki S. McManus, a

20    Licensed Shorthand Reporter and a Notary Public in and

21    for the State of Connecticut, Shorthand Reporter

22    License No. 00152, on Wednesday, December 6, 2017,

23    at 1:53 p.m.

24

25
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                          Stacie Rivard-Pedigo

Page 2

```
1   A P P E A R A N C E S:
2
    For the Plaintiff:
3
         Faxon Law Group, LLC
4        59 Elm Street
         New Haven, Connecticut 06510
5        203-624-9500
         jfaxon@faxonlawgroup.com
6        By:  JOEL T. FAXON, Esquire
7
    For the Defendant:
8
         Seiger Gfeller Laurie, LLP
9        977 Farmington Avenue
         Suite 200
10       West Hartford, Connecticut 06107
         860-760-8400
11       cgfeller@sgllawgroup.com
         By:  CHARLES F. GFELLER, Esquire
12            OLIVIA TAWA, Esquire
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                    WITNESS INDEX
2   STACIE RIVARD-PEDIGO                          PAGE
3      Direct Examination by Attorney Gfeller       5
4
5
6
7                    EXHIBIT INDEX
8   DEFENDANT          DESCRIPTION                 PAGE
9
    Exhibit 1      Handwritten summary,
10                 two pages                          9
11  Exhibit 2      Interrogatories                   15
12  Exhibit 3      Pamphlet                          47
13  Exhibit 4      Photograph                        93
14  Exhibit 5      Photograph                        94
15  Exhibit 6      Photograph                        97
16  Exhibit 7      Photograph                       100
17  Exhibit 8      Photograph                       102
18  Exhibit 9      Photograph                       102
19  Exhibit 10     Photograph                       106
20  Exhibit 11     Report                           110
21
22          *Exhibits retained by Attorney Gfeller*
23
24
25
```

Page 4

```
1                   S T I P U L A T I O N S
2
3
4        IT IS HEREBY STIPULATED AND AGREED by and between
5   counsel for the respective parties hereto that all
6   technicalities as to proof of the official character
7   before whom the deposition is to be taken are waived.
8
9
10       IT IS FURTHER STIPULATED AND AGREED by and
11  between counsel for the respective parties hereto that
12  the reading and signing of the deposition by the
13  deponent are required.
14
15
16       IT IS FURTHER STIPULATED AND AGREED by and
17  between counsel for the respective parties hereto that
18  all objections, except as to form, are reserved to the
19  time of trial.
20
21
22                    *    *    *    *    *
23
24
25
```

Page 5

```
1                  STACIE RIVARD-PEDIGO,
2        called as a witness, having been first duly
3        sworn by Vicki McManus, a Notary Public in and
4        for the State of Connecticut, was examined and
5        testified as follows:
6   DIRECT EXAMINATION
7   BY MR. GFELLER:
8        Q   Good afternoon.
9        A   Good afternoon.
10       Q   My name is Charles Gfeller.  I'm the attorney for
11  Okemo Mountain and I'm here today to take your
12  deposition in connection with a lawsuit that you've
13  filed against it.
14           I take it you are aware that there is a lawsuit
15  proceeding.
16       A   Yes.
17       Q   Have you ever had your deposition taken before?
18       A   No.
19       Q   I'm going to give you some ground rules, that
20  will hopefully make the process go smoothly.
21           The court reporter, who is sitting to your left,
22  takes down everything we say while we are on the
23  record.  You can see as I'm speaking, she is typing.
24  Because of that, there are two things you need to keep
25  in mind.
```

First of all, you need to keep your voice up so she can hear you. We have got a little air conditioning going, which is good for us typically, but it's going to make it more difficult for her to hear us. So you need to keep your voice up so she can her you.

You need to answer my questions verbally with yes or no or whatever verbal response you want to provide. She cannot transcribe a nod of the head or a shrug of the shoulder or an answer of "uh-huh" or "nuh-uh."

Do you understand?

A Yes.

Q Along those lines, it's important that we don't talk over one another. At least we try and minimize that. In normal conversation, we can both speak at the same time and walk out of the room understanding what just transpired. Here, the court reporter can only do one voice at a time.

So there may be moments where you understand the gist of a question I'm in the process of asking you. I would just ask that you do your best to let me finish the question before you start responding to it.

A Of course.

Q I'll do my best not to follow up with a question while you are still speaking.

At some point, we are both going to break this rule. But if you can do your best to try to adhere to it, and I'll do the same, and it will be all right. Okay?

A All right.

Q I'm going to assume that if you answer the question, you understand the question. So it will be up to you to tell me if you don't understand a question.

A Okay.

Q The implication will be that if you answer my question, you understand the question you are answering. Do you understand?

A Yes.

Q All right. You understand you've been placed under oath?

A Yes.

Q The oath requires you to tell the truth?

A Yes.

Q That's what you're going to do today?

A Yes.

Q I see you have a document with you. Is that related to this case?

A Yes.

Q What is that?

A It's just various ways that I've been impacted by the accident, the injury, the surgery, from the date of the accident up until now.

Q And is that a document that you prepared?

A I prepared it.

Q Did you do it at anybody's direction?

A No, it's just -- these are things that I've been kind of thinking about and mulling over in my head really since -- since February 20th.

Q Does that document in any way refresh your memory of either what happened at Okemo on February 20th, 2017, or the things that you've gone through since?

A It's what I've gone through. It's really the ways that I've been impacted by it.

Q Did you prepare that in anticipation of today's deposition or is that something you've been keeping all along?

A I haven't been keeping it all along. It's been in my mind all along. But I just -- when I knew this was coming, I thought it would be a good idea for me get this down.

Q To help you so that you don't forget anything when it comes time for me to ask you about how this has impacted your life, or do you think you would have

remembered --

A Oh, yes, I will.

Q Can I take a look at that?

A Yes.

THE WITNESS: Joel, am I allowed to --

MR. FAXON: Sure. No problem.

(Discussion off the record.)

(Defendant's Exhibit 1 marked for identification.)

BY MR. GFELLER:

Q Ma'am, thank you for bringing this. I have marked it as Exhibit 1 for today's deposition so that when the times comes that we discuss it, we can refer to it, and later on when we all come back and look at the deposition transcript, we will know the document we were referring to. All right?

A Yes.

Q What is your date of birth?

A [redacted].

Q Where were you born?

A Waterbury, Connecticut.

Q And is your current address [redacted]?

A [redacted].

Q I'm sorry. [redacted]?

Page 10

```
 1    A    ███.
 2    Q    I was missing a 1.
 3    A    Yeah.  Everybody does.
 4    Q    How long have you lived there?
 5    A    Eleven years.
 6    Q    Is it a single-family home?
 7    A    Yes.
 8    Q    And who lives there with you?
 9    A    My husband and three children.
10    Q    What is your husband's name?
11    A    Clay, C-L-A-Y.
12    Q    And what is his last name?
13    A    Pedigo.
14    Q    Is your maiden name --
15    A    Rivard.
16    Q    Rivard?  I want to make sure I pronounce it
17  right.
18    A    Rivard.
19    Q    And what are your children's names?
20    A    ██████████████
21    Q    How old is ███?
22    A    ██.
23    Q    And ████?
24    A    ██.
25    Q    How about ████?
```

Page 11

```
 1    A    ██.
 2    Q    When did you marry Mr. Pedigo?
 3    A    July 22nd, 2000.
 4    Q    Have you ever been married to anybody else?
 5    A    No.
 6    Q    Do you have any other children besides the three
 7  you just identified?
 8    A    No.
 9    Q    Has Mr. Pedigo ever been married to anybody else?
10    A    No.
11    Q    Does he have any other children?
12    A    No.
13    Q    Other than your husband and your three kids, does
14  anybody else reside with you at ██████████████?
15    A    No.
16    Q    Has anybody at any point in time in the last two
17  years resided with you other than your family?
18    A    No.
19    Q    What school does ███ go to?
20    A    Amity Middle School, Bethany.
21    Q    And how about ███?
22    A    Beecher Road School.
23    Q    That's an elementary school?
24    A    Elementary school.  And ███ as well.
25    Q    What grade is ███ in?
```

Page 12

```
 1    A    Eighth.
 2    Q    And how about the other two?
 3    A    Sixth, third.
 4    Q    Do all three of your children ski?
 5    A    Yes.
 6    Q    How about Mr. Pedigo?
 7    A    Yes.
 8    Q    How old was ███ when she started skiing?
 9    A    We started skiing when she was six.
10    Q    And how about ███?
11    A    I have to think about this for a minute.  So he's
12  12.  He probably started skiing when he was four.
13    Q    And how about ███?
14    A    And then ████, he started when he was four.
15  Maybe three, but we will call it four.
16    Q    Other than the document that we marked as
17  Exhibit 1 for today's deposition, have you kept any
18  type of notes or journal, either electronically or
19  handwritten or by any other means, that refers or
20  relates to either the collision that you had at Okemo
21  on February 20th, 2017, or its impact on your
22  day-to-day life, either through medical treatment or
23  other things?
24    A    No.  The only thing I do have, but it's on my
25  husband's phone:  A few days after the surgery -- no, a
```

Page 13

```
 1  few days before the surgery, I basically told him the
 2  story as to everything that happened and he taped it on
 3  his phone.
 4    Q    When you say "he taped it," you mean he recorded?
 5    A    He recorded it.  Thank you.  Yes, he recorded it.
 6    Q    So he has a recording of you verbally reciting
 7  what happened?
 8    A    Yes.
 9    Q    And does he still have that, to the best of your
10  knowledge?
11    A    We talked about it not too long ago.  I know he
12  has it.
13    Q    And was it your idea to do that or his or
14  somebody else's?
15    A    It was in one of my highly emotional moments, and
16  he -- he was not with me at the time.  He was at the
17  mountain, but he was not physically with me at the time
18  of the collision.  So he wanted to really know exactly
19  what happened -- how it happened, how I fell.  You
20  know, it was a -- so that's the reason why.
21    Q    And other than him wanting to know what happened,
22  whose idea was it to record your recitation of the
23  event?
24    A    His.
25    Q    And do you have any understanding as to why he
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                        Stacie Rivard-Pedigo

Page 14

1  decided to do that?

2     A   No.

3     Q   Your husband's not a party to the lawsuit.  But I

4  would ask that you ask him to make sure that he

5  preserves that recording and doesn't destroy it while

6  this lawsuit's pending.  Okay?

7     A   Uh-huh.

8     Q   Do you understand?

9     A   Yes.  Yes.  Sorry.

10    Q   That's all right.  Thank you.

11        Other than the recording on your husband's phone

12  that you just described and the document that's been

13  marked as Exhibit 1, do you have any other notes or

14  journals or diaries relating to either the incident or

15  the aftermath of the incident?

16    A   No.

17    Q   Is it your practice to keep any type of diary or

18  journal?

19    A   No.

20    Q   I don't want to know what you talked about with

21  your attorney or anybody that works at your attorney's

22  office.  But other than that -- so separate that out --

23  have you done anything to prepare for today's

24  deposition?

25    A   No.

Page 15

1     Q   Other than -- and I assume you reviewed

2  Exhibit 1.

3     A   Yes.

4     Q   Other than reviewing Exhibit 1, did you look at

5  any other documents or photographs or anything like

6  that to get ready for today's deposition?

7     A   No.  The only thing that I reviewed was the map.

8     Q   The trail map?

9     A   The trail map online.

10    Q   And why did you do that?

11    A   Just to kind of -- not that I need it to be any

12  more fresh in my mind.  But just to kind of look to

13  see -- you know, just to refresh my memory as to

14  where -- where I was coming from, where he was coming

15  from, and where the collision happened.

16    Q   Did reviewing the trail map refresh your

17  recollection of what happened or did you already

18  independently remember the details, such as where you

19  were coming from and where he was coming from?

20    A   Oh, yes.  Yes.

21    Q   It did refresh your recollection?

22    A   No, no, it did not refresh.  It just -- I kind of

23  wanted to get another look at that bridge.

24        (Defendant's Exhibit 2 marked for

25        identification.)

Page 16

1  BY MR. GFELLER:

2     Q   Ma'am, I'm going to show you what's just been

3  marked as Defendant's Exhibit 2.  This, you'll see, has

4  a caption about a third of the way down the page that

5  says "Plaintiff's Responses to Defendant Okemo Limited

6  Liability Company D/B/A Okemo Mountain Resorts First

7  Set of Interrogatories."

8     A   Yes.

9     Q   Have you seen that document before?  Take your

10  time.

11    A   This is what I -- this is what I filled out.  I

12  have not seen it since.

13    Q   And when you say you filled it out, you remember

14  that it's a set of questions?

15    A   Oh, yes.

16    Q   You filled out the answers?

17    A   Yes.

18    Q   Did you do that in handwriting and then somebody

19  typed in the answers?

20    A   It was all emails back and forth.

21    Q   And then at some point, if you look at the very

22  last page, page 10, which is the verification page, did

23  you sign off on this document?

24    A   Yes.

25    Q   So that on page 10 where it shows a signature

Page 17

1  block with your name printed and a signature above it,

2  is that your signature?

3     A   You are speaking about this signature right here?

4     Q   Yes.

5     A   Yes, that's my signature.

6     Q   And you remember signing this document?

7     A   Yes.

8     Q   When you signed it, were you verifying that the

9  responses to these questions were truthful and accurate

10  to the best of your knowledge?

11    A   Yes.

12    Q   Thank you.

13        What is the highest level of education you've

14  attained?

15    A   I have a master's in education.

16    Q   Where did you get that?

17    A   The University of New England.

18    Q   What year did you graduate?

19    A   From college?

20    Q   From the University of New England.

21    A   Oh.  2003.

22    Q   Where did you go to college?

23    A   Wittenberg University.

24    Q   Where is that located?

25    A   Springfield, Ohio.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                      Stacie Rivard-Pedigo

Page 18

1   Q   What year did you graduate?
2   A   1998.
3   Q   And what was your degree in?
4   A   Bachelor's in education.
5   Q   Where did you graduate from high school?
6   A   Pomperaug High School in Southbury.
7   Q   And what year was that?
8   A   1994.
9   Q   Have you pursued any formal education or training
10  other than the three --
11  A   No.
12  Q   -- primary degrees that we just talked about?
13  A   No.
14  Q   Are you currently employed?
15  A   Yes.
16  Q   Where do you work?
17  A   Trinity Community Preschool in Woodbridge.
18  Q   And what do you do there?
19  A   I'm a preschool teacher.  I teach four- and
20  five-year-olds.
21  Q   How long have you been employed there?
22  A   This is my fourth year.
23  Q   Do you work on a full-time basis?
24  A   I work Monday -- Monday through Friday, 9 to 1.
25  Q   Is that by choice or would you prefer to work

Page 19

1   more hours?
2   A   No, that's -- in order for me to be a full-time
3   mom as well, that's all I can handle.
4   Q   Do you consider yourself a full-time mom as well
5   as somebody who's working?
6   A   I'm a full-time mom and a part-time
7   schoolteacher.
8   Q   The reason I ask that is because there's a
9   reference in one of your medical records to the fact
10  that you are a -- I think it says "stay-at-home mom" or
11  something along those lines.  And this is providing me,
12  I think -- if you agree -- with an explanation for why
13  one of your medical records might say that.  Is that
14  fair to say?
15  A   I've always said that my primary job in life is
16  to be a great mom.  And I was a stay-at-home mom for
17  years, until my youngest one went to kindergarten;
18  that's when I chose to go back to work.
19  Q   My understanding is that you missed time from
20  work and are claiming lost wages as a result of the
21  injury, correct?
22  A   Correct.
23  Q   So when you were working at Trinity Community
24  Preschool during the last school year, so the 2016-'17
25  school year --

Page 20

1   A   Yes.
2   Q   -- were you also working Monday to Friday, 9
3   to 1?
4   A   Yes.  That's all I've done at that school.
5   Q   Are you paid on an hourly basis or salary?
6   A   An hourly.
7   Q   During the school year 2016 to '17, what was your
8   hourly rate?
9   A   I don't know.  It's on my pay stub, but I don't
10  happen to know that off the top of my head.
11  Q   If I told you that according to the time sheets
12  that we have been provided your hourly rate is $16.32,
13  does that sound about right?
14  A   Probably, yes.
15  Q   And based upon some documentation that we have
16  received from your attorneys, it looks like you were
17  out of work for essentially the remainder of the school
18  year; is that fair to say?
19  A   Yes.
20  Q   And do you work there during the summers
21  typically?
22  A   No.
23  Q   So it is a school year type of job?
24  A   It's a school year, yes.
25  Q   Summers off?

Page 21

1   A   Correct.
2   Q   So the period -- and you're back to work now,
3   correct?
4   A   Yes.
5   Q   And you started at the start of the school year?
6   A   Yes.
7   Q   So the period of time for which you are claiming
8   to have lost income as a result of the ski injury would
9   be from the date of the injury, February 20th, 2017,
10  through the end of the prior -- this last school year,
11  correct?
12  A   Through June 9th I believe.
13  Q   Of 2017?
14  A   Yes.
15  Q   And June 9th is the day that school let out for
16  the summer?
17  A   Yes.
18  Q   If you miss time at work for any reason, do you
19  typically get paid?
20  A   We get paid for five sick days.  And beyond that,
21  it's unpaid.
22  Q   And with respect to your schedule, which is full
23  time in that it's five days a week, but it's part-time
24  in that it's not a full day -- would you agree with
25  that?

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                                Stacie Rivard-Pedigo

Page 22

```
1      A   Correct.  Yes.
2      Q   Do you get five full sick days -- so, in other
3  words, two of your workweeks -- or do you get five
4  partial days that equate to five of your work days?
5      A   We get five -- five days, 9 to 1.
6      Q   Okay.  So for your schedule, you get five
7  essentially half days?
8      A   Correct.
9      Q   Because that's what you work?
10     A   Yes.
11     Q   And after that, you are just not paid?
12     A   Correct.
13     Q   In this instance, were you paid for those five
14  sick days at the start of your time out of work?
15     A   I would have to look back at the time sheets.
16  But I believe that I had two days that I had taken off
17  prior to the accident and then I was paid for three
18  days after the accident.  Everything else was unpaid.
19     Q   Are you able to accrue days from one year to the
20  next?
21     A   No.
22     Q   So in order to figure out exactly what the lost
23  wages are that you are claiming in this case, we would
24  basically need to look at how many weeks of school you
25  missed, separating out school vacation weeks, things
```

Page 23

```
1  like that, and multiply your hourly rate times the
2  number of hours you would work five days per week and
3  take off the three sick days you used?
4      A   Yes.
5      Q   And that would be how much time you missed and
6  how much income you did not earn, correct?
7      A   Yes.
8      Q   Since you've gone back to your job at school, are
9  you able to do your job the same way that you used to?
10     A   No.
11     Q   How is it different?
12     A   Well, you know, I work with four- and
13  five-year-olds.  They are fast.  They are active.
14         One of the major problems I have is I can no
15  longer physically get on to the floor with them to do
16  puzzles and games and things that you do with a four-
17  and five-year-old.
18         It's difficult for me to bend over and tie their
19  shoes.
20         We have a large flight of stairs that goes down
21  to the bottom floor of the school.  And that's a
22  challenge.  To get up and down those stairs with the
23  kids at their speed, it's fairly impossible.  I always
24  have to be at the back of the line so I can somewhat
25  take my time to get down there.
```

Page 24

```
1      So no, I can't do my job the way that I did prior
2  to the accident.
3      Q   Have any of your supervisors complained to you
4  that you are not doing as good a job as you used to do?
5      A   No.
6      Q   Are they able to accommodate for your diminished
7  physical ability and still have you be able to do your
8  job?
9      A   Yes.  I have a very wonderful, understanding
10  director.
11         I do my job well.  But it's the -- it's the
12  things that I used to be able to do no problem that --
13  you know, now I have to pull up a chair to sit and tie
14  someone's shoe.  I have to sit on -- sit in a chair to
15  reach down to do the puzzle with the kids.
16     Q   So if I'm hearing what you're saying, it's harder
17  for you to do your job, but you still can go to work
18  and do a job that your employer is happy with you doing
19  and get paid what you got paid?
20     A   Yes.
21     Q   Other than the missed time from work that we
22  discussed a couple minutes ago, did you lose any other
23  income because of your injury?
24     A   No.
25     Q   Have you ever been involved in any other
```

Page 25

```
1  lawsuits?
2      A   No.
3      Q   Have you ever sued anybody?
4      A   No.
5      Q   Have you ever been sued by anybody?
6      A   No.
7      Q   Have you ever had to testify under oath in any
8  setting, not just in a setting like this?
9      A   No.
10     Q   When did you first start skiing?
11     A   I started skiing when I was four.
12     Q   Where did you learn how to ski?
13     A   Mount Southington.
14     Q   Have you skied regularly since you were four
15  years old?
16     A   Yes.
17     Q   There haven't been any significant breaks in time
18  where you went away from skiing for years?
19     A   No.
20     Q   Where else have you skied besides
21  Mount Southington and Okemo?
22     A   Mount Snow, Wildcat, Stratton, Killington.  What
23  is that one?  Butternut.  I'm sure there are a few more
24  that I can't recall at the moment.  Oh, Woodbury Ski
25  and Racquet.
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                                Stacie Rivard-Pedigo

Page 26

1        There is one I went to in high school.  Stowe.
2    Q   Have you skied at Mohawk Mountain?
3    A   Yes.
4    Q   Have you skied at Ski Sundown?
5    A   No.
6    Q   Have you skied at Powder Ridge?
7    A   Nope.
8    Q   Have you ever skied out west?
9    A   No.
10   Q   Have you ever skied outside of the United States?
11   A   No.
12   Q   Have you ever competitively ski raced?
13   A   No.
14   Q   Have you ever participated in NASTAR?
15   A   No.
16   Q   Do you and/or your family own a residence at any
17   particular -- or that you would affiliate with any
18   particular ski resort?
19   A   No.
20   Q   Have you ever?
21   A   No.
22   Q   In a typical season as an adult, how many days
23   would you go out skiing as of February of this year?
24   A   We would go five weekends, roughly.
25   Q   And would that be somewhere up north?

Page 27

1    A   Yes.
2    Q   So you would take the family up north, stay at a
3    hotel or rent a condo or something, and ski for a
4    couple days?
5    A   Yes.
6    Q   Had you skied at Okemo prior to
7    February 20th, 2017?
8    A   Yes.  Multiple times.
9    Q   Can you approximate how many times?
10   A   I would say 12-plus times.
11   Q   When was the most recent time as of
12   February 20th that you had skied at Okemo?
13   A   We were there two weeks prior to February 20th.
14   So, you know, first -- first weekend of February.
15   Q   And you skied for two days?
16   A   Yes.
17   Q   Both days at Okemo?
18   A   Yes.
19   Q   And on the day that you were injured, what day of
20   the week was that?
21   A   A Monday.  President's Day.
22   Q   Was it President's Day?
23   A   Yes.
24   Q   Had you been skiing Saturday, Sunday, and Monday?
25   A   We skied Saturday, Sunday, and Monday.

Page 28

1    Q   So the date that you were injured, was that -- is
2    it fair to say -- your fifth day skiing at Okemo last
3    ski season?
4    A   Can you repeat that?
5    Q   Sure.  You had skied -- withdrawn.
6        The weekend that you were injured --
7    A   Yes.
8    Q   -- it was a long weekend?
9    A   Yes.
10   Q   You had skied Saturday, Sunday, and you were
11   skiing on Monday when you were injured?
12   A   Yes.
13   Q   You had also skied two prior days a couple
14   weekends before that?
15   A   Yes, I understand what you're saying.
16   Q   So all in last season, you were on your fifth day
17   of skiing at Okemo on the date that you got hurt,
18   correct?
19   A   Yes.  We were at Okemo one time in January also.
20   So I would say that was our seventh day there.
21   Q   Did you ski anyplace else last season?
22   A   Mount Snow and Stratton.
23   Q   How many days did you ski at Mount Snow?
24   A   Two.
25   Q   And how about at Stratton?

Page 29

1    A   That was three.
2    Q   So as of the day you were injured, which was your
3    seventh day at Okemo last season, you had also skied
4    two days at Mount Snow and three days at Stratton last
5    season, right?
6    A   Mount Snow and Stratton.
7        I take the Stratton one back.  I remember I went
8    there for my 40th birthday, which was the previous
9    season.  So you could take the Stratton one -- but the
10   Mount Snow, yes.
11   Q   All right.  So last ski season up until the day
12   that you were injured, you were on your seventh day at
13   Okemo plus you had two days at Mount Snow?
14   A   Yes.
15   Q   Had you skied anyplace else last season prior to
16   your injury?
17   A   We went to -- what is that one?  Butternut.
18   Q   How many days did you ski there?
19   A   Just for a day.
20   Q   Did you take any lessons on any of those days?
21   A   No.
22   Q   How would you describe your skiing ability as of
23   February 20th, 2017?
24   A   I'm a -- I'm a good skier.  You know, I go out to
25   ski to have fun.  You know, I'm not racing down hills

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 30

1    or doing anything like that. I just -- I'm out with my
2    family having a good time.
3        Q    I take it, as somebody who's been skiing for a
4    long time, you are familiar with the way that ski areas
5    differentiate the relative degree of difficulty among
6    the various trails that they have.
7        A    Yes.
8        Q    Green circle, blue square, black diamond and
9    beyond, right?
10       A    Yes.
11       Q    Green circle being the easiest terrain that they
12   might have in a particular area, right?
13       A    Yes.
14       Q    Blue square being the middle ground, intermediate
15   terrain?
16       A    Yes.
17       Q    And black diamond or double or triple black
18   diamond being the most advanced terrain they have,
19   correct?
20       A    Yes.
21       Q    You understand that that's a degree of difficulty
22   that's relative to the particular area that you're at,
23   correct?
24       A    Yes.
25       Q    A blank diamond trail at Okemo is going to be

Page 31

1    different than a black diamond trail at Mount Snow,
2    right?
3        A    Correct.
4        Q    In skiing at Okemo, I take it you were capable of
5    skiing green circle trails.
6        A    Yes.
7        Q    Were you capable of skiing blue square trails?
8        A    Yes.
9        Q    How about black diamond trails?
10       A    Yes.
11       Q    And did you in fact, as of February 20th, 2017,
12   routinely ski any of those types of trails?
13       A    Yes. I stop at a black diamond. I don't do the
14   double blacks.
15       Q    As somebody capable of skiing the type of terrain
16   that we just discussed at Okemo in particular, is it
17   fair to say that you, as a skier, are able to control
18   your speed?
19       A    Yes.
20       Q    And your direction?
21       A    Yes.
22       Q    You are able to stop if you need to stop?
23       A    Yes.
24       Q    Do you know what a hockey stop is?
25       A    Yes.

Page 32

1        Q    What is it?
2        A    When you take your skis and go like that.
3        Q    Make them so that they are horizontal to the fall
4    line of the mountain?
5        A    Yes.
6        Q    And you are able to do that?
7        A    Yes.
8        Q    And when you stop, is that typically how you stop
9    as a skier?
10       A    Yes.
11       Q    And I take it that you are able to use the lifts
12   without assistance.
13       A    Yes.
14       Q    As somebody who has been skiing since you were
15   four, is it fair to say that you understand that there
16   are risks that are inherent to skiing?
17       A    Never in my mind wildest dreams would I have ever
18   suspected that I would have been injured that severely
19   at that location at that weekend, that day, on a
20   busy -- a very busy area of the mountain where people
21   are crossing each other.
22            You are not supposed to be skiing wildly through
23   this there. You come down, you kind of come to this
24   flat-ish area, and you go about your business.
25            So I would have never suspected that that would

Page 33

1    be possible at that junction.
2        Q    Okay. I appreciate what you're saying, but you
3    didn't really answer my question. So let me go back
4    and ask the question again.
5            As somebody who's been skiing since you were four
6    years old, is it fair to say that you understand that
7    there are certain risks that are inherent to the sport?
8            MR. FAXON:  Before you answer that, she
9            did answer your question, under oath,
10           truthfully. You can ask whatever question
11           you want. It may not have been the answer
12           that you anticipated.
13           Go ahead.
14       A    I'm going to repeat exactly what I just said.
15   Never, ever, would I suspect that I would be injured
16   the way I was injured at that particular part of the
17   mountain.
18           I was skiing in control, slowly, doing everything
19   I was supposed to be doing, the entire time. I came
20   down to meet my children. And I was violently collided
21   with.
22   BY MR. GFELLER:
23       Q    You understand that skiing is an active outdoor
24   sport, correct?
25       A    Yes.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                                    Stacie Rivard-Pedigo

Page 34

1    Q   And you understand that when you go skiing, you
2  can encounter variations in the terrain, correct?
3    A   Yes.
4    Q   You can encounter variations in the conditions of
5  the surface -- snow, ice, powder, things like that --
6  correct?
7    A   Yes.
8    Q   You understand that you could encounter things
9  like bumps or moguls?
10   A   Yes.
11   Q   You understand that, as a skier, you can fall?
12   A   Yes.
13   Q   I take it, as a skier skiing since you were four
14  years old, you have fallen while skiing, correct?
15   A   Yes, I've fallen, but I've never been collided
16  with.
17   Q   I'm asking if you've fallen.
18   A   Sure.
19   Q   And you understand that skiing is a sport where
20  there is risk of injury, correct?  You understood that
21  prior to February 20th, 2017?
22       I'm not asking about your collision.  We will get
23  to that.  I'm asking about the skiing generally.
24       As of the time that you went skiing on
25  February 20th, 2017, am I correct that you understood

Page 35

1  that there was a risk of physical injury that went
2  along with skiing?
3    A   There is --
4        THE WITNESS:  Joel, I -- I'm
5        uncomfortable with that question.  I feel
6        like I answered what he's asking me.
7        MR. FAXON:  Then you can tell him that.
8        Just as long as whatever you say -- if you
9        want to take a break, we can.  But just as
10       long as whatever you say to him is truthful,
11       it's your answer.  You don't have to say it
12       any special way.
13   A   Okay.  So can you repeat your question?
14  BY MR. GFELLER:
15   Q   Sure.  Have you ever been injured skiing before
16  February 20th, 2017?
17   A   Never.
18   Q   Do you know anybody who has?
19   A   Yes.
20   Q   Have you seen people --
21   A   Not to my degree, but...
22   Q   But you know people who have been injured skiing?
23   A   Yes.
24   Q   You've seen people down and being attended to by
25  ski patrol at various ski areas, correct?

Page 36

1    A   Yes.
2    Q   You know that there is ski patrol at every ski
3  area, right?
4    A   Yes.
5    Q   And you know that the purpose of ski patrol,
6  among other things, is to tend to people who have
7  injuries, correct?
8    A   Yes.
9    Q   You know, as a skier, that injuries can happen
10  when people go skiing, correct?
11   A   Yes.
12   Q   It's part of the sport, right?
13   A   Yes, injury is part of any sport.
14   Q   You can't ski in the absence of risk, correct?
15   A   I believe that where I was --
16   Q   I'm not asking about where you were.
17       MR. FAXON:  Hold on.  You cannot
18       interrupt her.  You know that.
19       MR. GFELLER:  Well, I can if she is not
20       answering my question.
21       MR. FAXON:  Well, then the answer to her
22       question is completed.  No, you can't,
23       actually.  That's not true.  You cannot
24       interrupt anybody.  You cannot like the
25       answer.  You can ask her the same question 15

Page 37

1  times -- well, maybe not 15, but we will shut
2       it off at some point.  But you can't
3       interrupt her.  She didn't interrupt you.
4       Part of the introductory statement that
5       you gave was:  You wouldn't interrupt her,
6       she shouldn't interrupt you.
7       MR. GFELLER:  Fair enough.
8       MR. FAXON:  So let's --
9       MR. GFELLER:  Go ahead, why don't you
10       read back the question.
11       (Testimony read back.)
12       MR. FAXON:  Why don't you answer that
13       question, picking up wherever you left off or
14       whatever you want to say.
15   A   Can you repeat the question please one more time?
16       (Question read back.)
17   A   I believe there is risk.  But the way I was
18  collided with in that particular area absolutely should
19  not have happened.  That's not an area where I would
20  ever suspect that that kind of injury would happen to
21  anyone.
22  BY MR. GFELLER:
23   Q   And that's partially because you believe that
24  skiers have to be responsible for being aware of their
25  surroundings, correct?

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 38

1    A    Absolutely.

2    Q    And that would apply to the person that collided
3    with you as well as you, correct?

4    A    Absolutely.

5    Q    And the reason that they have to be aware of
6    their surroundings, among other things, is to avoid
7    collision, correct?

8    A    Yes.

9    Q    Because collision is a risk of skiing; am I
10   right?

11   A    Collision is a risk of skiing.  But, again, in
12   the area that -- where I was hit, I should not have
13   been collided with.

14   Q    And that's because you feel that the other skier
15   wasn't skiing within control, correct?

16   A    He was skiing recklessly, dangerously, too fast.

17   Q    And you believe that that enhanced the risk of a
18   collision with somebody else like yourself, right?

19   A    Yes.

20   Q    But the risk of collision was there whether
21   somebody was skiing recklessly or not, correct?  It's
22   part of skiing.

23   A    I don't believe that that area where I was should
24   have a risk of collision.

25   Q    I understand that you don't believe that that

Page 39

1    area should have a risk of collision.

2         But my question to you is:  Am I correct that one
3    of the risks that is part of skiing, that you can't
4    take out of skiing, is the risk of colliding with
5    another skier?

6    A    Where I was collided with should have never been
7    that type of collision.

8    Q    I understand that you want to answer the question
9    that you want to answer.  But I need you to try to
10   answer the question that I'm actually asking, because I
11   don't feel that you are doing that.

12        So I'm going to have the court reporter read back
13   my question again and ask you to listen to it and
14   provide an answer that's actually responsive.

15        Go ahead.

16        MR. FAXON:  If the response was in fact
17        the response that you gave, you can let us
18        know that, so that we don't have to keep
19        doing this over and over and over again.

20        THE WITNESS:  That is my response.

21        MR. FAXON:  Let her read it back, and
22        you can answer it any way you want, as long
23        as it's truthful in accordance with the oath
24        that you took.

25        (Question read back.)

Page 40

1    BY MR. GFELLER:

2    Q    It's a yes-or-no question.

3         MR. FAXON:  No, that is not true.

4         MR. GFELLER:  Yeah, it is.

5         MR. FAXON:  There is no rule, case,
6         Federal Rule of Civil Procedure, rule of
7         evidence, or otherwise, that contains any
8         such requirement.  The truth is all we are
9         looking for here.

10        MR. GFELLER:  All I'm looking for is the
11        truth too, but I have a right to have answers
12        to the questions that I'm asking.  And when a
13        witness wants to answer the questions that
14        they want to answer, that's all great, but
15        they also have to actually answer the
16        questions that are being asked.  I am
17        entitled to that.  That's the process.

18        So I'm asking very specific questions,
19        and I'm not getting answers that are
20        responsive to those questions.  I'm getting
21        the answers that are responsive to the
22        question that the witness wants to answer.

23        So I'm asking a very specific question
24        that has nothing to do with -- I haven't
25        asked about the specific area that there was

Page 41

1    a collision.  I haven't asked about the
2    collision itself.  I'm asking about certain
3    risks that are inherent to the sport, which
4    are very relevant given the law that is going
5    to be in play in this case, and I have a
6    right to get an answer to the question I'm
7    asking.

8         You can tell me it's truthful.  I don't
9    doubt that what the witness is saying is
10   truthful.  I'm sure it is.  I'm not
11   questioning that.  But it's not responsive to
12   the questions that are being asked.

13        MR. FAXON:  You get what you get.  And
14   you don't get upset.  That's what you are
15   getting.  Okay?  What can I tell you?

16        MR. GFELLER:  You can't tell me
17   anything.  Your witness can.

18        So I'm asking questions and she needs to
19   answer them.

20        MR. FAXON:  She's answering them.  I
21   think she is being very detailed,
22   appropriate, thoughtful, complete in her
23   answers.  And there is nothing wrong with
24   that.

25

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                   Stacie Rivard-Pedigo

Page 42

```
 1   BY MR. GFELLER:
 2      Q   Prior to February 20th, 2017, as a very
 3   experienced skier and one who knew that injuries could
 4   occur while people ski, am I correct that you
 5   understood that a ski area could not guarantee your
 6   safety as a skier?
 7      A   Every time I go out to ski, I ski knowing that,
 8   you know, I'm doing everything that I should be doing
 9   while on the mountain, dressed appropriately, skiing
10   appropriately, in control, slowly.
11          You know, I'm not out to -- when I go skiing, I'm
12   not out to break any records, I'm out there to have
13   fun, something that I really enjoy with my family.
14          So yes, I would hope at the end of the day that
15   there would be no injuries.
16      Q   My question is:  Do you understand when you go
17   skiing that the ski area that you are skiing at cannot
18   guarantee your safety?
19      A   The ski area can't guarantee my safety.  But
20   other people and the way they ski certainly can
21   guarantee my safety.
22      Q   Because there is an expectation that skiers will
23   ski responsibly?
24      A   Yes.
25      Q   And you understand as a skier that not only do
```

Page 43

```
 1   skiers need to ski responsibly, but you are going to
 2   encounter different ability levels of skiers while you
 3   are out on the mountain, correct?
 4      A   Yes.
 5      Q   You are going to see people who maybe it's the
 6   first time they have ever been on skis and are out of
 7   control?
 8      A   Yes.
 9      Q   It happens.  It's part of skiing, right?
10      A   To ski out of control?
11      Q   To see -- to encounter people who are not skiing
12   in control.  You've experienced that, I assume, prior
13   to February 20th, 2017; am I right?
14      A   Yes, I've witnessed people skiing out of control.
15      Q   It's something that happens.  Whether it's right
16   or wrong, it does happen, correct?
17      A   Unfortunately.
18      Q   And when things like that happen, collisions can
19   occur, right?
20      A   Yes.
21      Q   And that's something you knew prior to skiing on
22   February 20th, 2017, right?
23      A   Again, I -- I feel like you are asking me the
24   same question over and over and over again.  I feel
25   like I've answered that question.
```

Page 44

```
 1      I don't know -- I don't --
 2          THE WITNESS:  I mean he keeps asking me
 3      the same thing over and over again.
 4          MR. FAXON:  I get that sense myself.
 5      However, at some point we will stop that, but
 6      if you want to answer it, however way --
 7      whatever way you decide is appropriate is
 8      certainly within your right as a witness.
 9      A   Can you repeat it one more time.
10          (Testimony read back.)
11      A   Collisions can occur, but I would, again, restate
12   that the collision that I experienced should not have
13   happened.
14   BY MR. GFELLER:
15      Q   And I'm not asking whether it should or should
16   not have happened.  I'm just asking you whether you
17   understood when you skied on February 20th, 2017, that
18   collisions could happen.
19      A   Yes.
20      Q   Were you skiing on your own equipment on
21   February 20th, 2017, or were you skiing on rented
22   equipment?
23      A   My own.
24      Q   And do you still have the equipment?
25      A   Yes.
```

Page 45

```
 1      Q   What brand of boots do you have?
 2      A   They were -- they were a rent-to-own boot.  I
 3   didn't like them.  They were -- I don't remember.
 4      Q   Do you still have them?
 5      A   No, we returned them.
 6      Q   So they were a seasonal rental that you could
 7   have purchased?
 8      A   Yes.
 9      Q   Did you return the skis?
10      A   The skis are in my basement.  And I haven't
11   looked at them since February 20th.
12      Q   Do you know what brand they are?
13      A   Begins with a V.
14      Q   Volkl?
15      A   Yes.
16      Q   Do you know what length they are?
17      A   I don't know.
18      Q   Do you know what type of bindings are on them?
19      A   No.
20      Q   What ski shop did you get the skis and boots
21   from?
22      A   Leisuretime in Southbury.
23      Q   Do you remember approximately when you rented the
24   equipment?
25      A   Right after the first of the year.  So first
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                             Stacie Rivard-Pedigo

Page 46

1  weekend of January 2017.
2  Q   2017?
3  A   Yes.
4  Q   Did you pay by credit card?
5  A   I believe it was a debit card.
6  Q   Visa or Mastercard or something else?
7  A   Visa.
8  Q   Would it have been in your name or your husband's
9  name?
10  A   I believe it was my husband's.
11  Q   Did you have to fill out paperwork for them to
12  set the bindings on the skis?
13  A   I don't recall.
14  Q   I would ask that you keep the skis while
15  litigation's pending as well.  Okay?
16  A   Uh-huh.  Yes.
17  Q   Thank you.
18      Prior to February 20th, 2017, were you ever
19  involved in a ski or skier collision?
20  A   No.
21  Q   Do you know anybody who was?
22  A   No.
23  Q   Did you ever see one?
24  A   People bumping into each other or a true
25  collision like mine?

Page 47

1  Q   Any type of situation where there is contact
2  between two skiers.  And I'm including snowboarders in
3  that.
4  A   No.
5  Q   Did you ever have any close calls?
6  A   No.
7  Q   Do you know anybody who did?
8  A   Nope.
9      (Defendant's Exhibit 3 marked for
10      identification.)
11  BY MR. GFELLER:
12  Q   Ma'am, I'm going to show you what I just marked
13  as Exhibit 3 for today's deposition.
14      Have you seen one of those before?
15      MR. FAXON:  You mean this actual one or
16      an exemplar?
17  BY MR. GFELLER:
18  Q   Have you seen something that looks similar to
19  this before?  I don't mean the exact one in your hand.
20      MR. FAXON:  What I meant by that was, is
21      this a 2017 -- oh, it's 2016-2017.  Okay.
22      MR. GFELLER:  Correct.
23      MR. FAXON:  I just didn't see the date
24      on it.
25      MR. GFELLER:  I'll identify it for the

Page 48

1      record.  But...
2  A   So my husband always has a trail map in his
3  jacket.  I've seen this.  I've never seen the back.
4  BY MR. GFELLER:
5  Q   So when you said you've seen this, you mean the
6  map of the trail system at Okemo?
7  A   Oh, yes.
8  Q   Have you ever taken -- let's just first identify
9  this for the record.
10      So would you agree that what I've just handed you
11  is an Okemo trail map from 2016-2017?  And if you look
12  at the front of the document that I handed you, you'll
13  see the date.
14  A   Yes.
15  Q   All right.  When you skied at Okemo last season,
16  did you ever take one of these?
17  A   I don't take one.
18  Q   But you know that they are available for skiers,
19  correct?
20  A   Yes.
21  Q   They are usually at the ticket counter and other
22  places?
23  A   Yes.
24  Q   And one of the purposes of these trail maps is to
25  allow skiers to look at the actual system of trails at

Page 49

1  the given ski area --
2  A   Correct.
3  Q   -- so they can figure out where they want to go?
4  A   To figure out where they want to go.
5  Q   And the trails are identified by degree of
6  difficulty, like we talked about earlier?
7  A   Yes.
8  Q   You can also see the various lifts that are at
9  the ski area?
10  A   Yes.
11  Q   And plan your way accordingly?
12  A   Yes.
13  Q   Have you taken a trail map from any ski area that
14  you've skied at?
15  A   I particularly don't like them.  They -- when I
16  ski with my family, my husband always -- he kind of
17  decides where we are going to go.  I can't -- I don't
18  do this well.  So I just follow where we are going to
19  go.
20  Q   If we are considering, while we have the map
21  open --
22      You've got the map open right now in front of you
23  to the actual map of the mountain?
24  A   Correct.  Correct.
25  Q   I would ask that you turn the document over.  And

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 50

1   you'll see on the far right in the middle of the page
2   something that says "Your Responsibility Code."
3       A   Yes.
4       Q   Have you seen something called "Your
5   Responsibility Code" at ski areas?
6       A   Yes, they are -- the signs are posted.
7       Q   And you've seen that at Okemo?
8       A   Yes.
9       Q   And you see that, in looking at "Your
10  Responsibility Code," point number 1 is:  "Always stay
11  in control and be able to stop or avoid other people or
12  objects."
13          Do you agree with that point of responsibility
14  for skiers?
15      A   Absolutely.
16      Q   Point number 2:  "People ahead of you have the
17  right of way.  It is your responsibility to avoid
18  them."
19          You understand that that's something that applies
20  to when you are overtaking a skier or there is a trail
21  merge, something like that?
22      A   Yes, but in my case --
23      Q   I'm not asking about your accident.  I'm just
24  asking generally with skiing.
25      A   Because there is something I want to say about my

Page 51

1   case.
2       Q   Okay.  Go ahead.  I don't mean to interrupt you,
3   I just want to clarify.  Go ahead.
4       A   You know, people ahead of you have the right of
5   way.
6           This person was coming toward me and hit me
7   head-on, so essentially he was in front of me.  So yes
8   in theory, people ahead -- yes, that is true.  But
9   in -- if someone would consider him to be ahead of me,
10  I...
11      Q   You wouldn't feel that point number 2 would apply
12  to your collision?
13      A   Correct.
14      Q   Would you agree that it's more of a situation
15  where if you are skiing down a trail and there is a
16  skier below you and you want to overtake that skier,
17  that skier has the right of way and you need to make
18  sure you stay out of their way?
19      A   Yes.
20      Q   Because they can't see you; they don't have eyes
21  in the back of their head?
22      A   Correct.
23      Q   Point number 3:  "You must not stop where you
24  obstruct a trail or are not visible from above."
25          Are you familiar with that concept?

Page 52

1       A   Yes.
2       Q   You agree with that?
3       A   Yes.
4       Q   Number 4:  "Whenever starting downhill or merging
5   onto a trail, look uphill and yield to others."
6           You agree with that?
7       A   Yes.
8       Q   Number 5:  "Always use devices to help prevent
9   runaway equipment."
10          They are talking about ski brakes, like seeing
11  that your skis have ski brakes.  You understand why
12  they're on there?
13      A   Yes.
14      Q   Number 6:  "Observe all posted signs and
15  warnings.  Keep off closed trails and out of closed
16  areas."
17          Do you agree that, as a skier, that's your
18  responsibility?
19      A   Yes.
20      Q   Number 7:  "Prior to using any lift, you must
21  have the knowledge and ability to load, ride, and
22  unload safely."
23          You agree with that?
24      A   Yes.
25      Q   Lastly, although we can both agree this doesn't

Page 53

1   apply to your situation --
2       A   Correct.
3       Q   -- "When show-shoeing, be sure to stay on the
4   side of the trail at all times and avoid snow-shoeing
5   alone."
6           I think what they are really talking about is not
7   posing a risk to skiers coming down the hill.  But that
8   doesn't apply to you, because you weren't snow-shoeing?
9       A   No.  No.
10      Q   Is there anything about "Your Responsibility
11  Code" that you disagree with conceptually?
12      A   No.
13      Q   What day of the week was February 20th, 2017?
14  You told me it was a Monday, correct?
15      A   Monday, President's Day.
16      Q   Where were you staying that weekend?
17      A   We were staying at a friend's condo, right at
18  the -- right at the base.  The condo complex does have
19  a name, but I don't recall the name.
20      Q   If you look at the map, can you show me where
21  that would have been?
22          And just to give you some perspective, if you are
23  looking at the map --
24      A   Yes.
25      Q   -- you see the Clock Tower Base Area towards the

Page 54

1  left side of the map?
2     A   Yes.
3     Q   That would be the area that most people who come
4  to Okemo would arrive at and enter the ski area from.
5  Are you familiar with that area?
6     A   Yes.
7     Q   I don't know if that helps you with context.
8     A   I believe their condo is in Okemo Village.
9     Q   All right.  So sort of on the left side bottom of
10  the map?
11     A   Yes.  I mean it's very close walking distance.
12  You walk with your boots down there.  I mean it's that
13  close.
14     Q   And what is the name of your friend or the names
15  of your friends?
16     A   The people that own?
17     Q   Right.
18     A   Carrie.
19     Q   With a C or a K?
20     A   C.  Her last name is Swigart, S-W-I-G-A-R-T.
21  Dieter, D-I-E-T-E-R, Lindskog, L-I-N-D-S-K-O-G.
22  Mike Dillon, D-I-L-L-O-N.  And Denise Barajas,
23  B-A-R-A-J-A-S.
24     Q   Those three people own the condo together?
25     A   I gave you four.

Page 55

1     Q   I'm sorry, Carrie Swigart and Dieter Lindskog are
2  two people.  Sorry, I wrote it down as one.
3     A   That's okay.
4     Q   Those four people all own the condo?
5     A   They own the condo, yes.
6     Q   You and your family were staying with them that
7  weekend?
8     A   Yes.
9     Q   Were all four of those people also staying there
10  that weekend?
11     A   Yes.
12     Q   Was anybody else staying at the condo that
13  weekend?
14     A   My three children, and each of them have two
15  children each.  So there were seven children.
16     Q   Are Carrie and Dieter husband and wife?
17     A   Carrie and Dieter are husband and wife, and Mike
18  and Denise are husband and wife.
19     Q   What are Carrie and Dieter's kids' names?
20     A   ███████████.
21     Q   How old are they, if you know?
22     A   They are twins.  ███
23     Q   And Mike and Denise, what are their kids' names?
24     A   █████ she is going to be -- she is still █.
25  █████ and she is █.

Page 56

1     Q   All right.  So Dieter and Carrie had their two
2  daughters, Mike and Denise had their two daughters, and
3  you and your husband had your three children?
4     A   Correct.
5     Q   Nobody else was staying at the condo that
6  weekend?
7     A   No.
8     Q   It's a full house.
9     A   It was a full house.
10     Q   On February 20th, 2017, what time of day did you
11  head out to go skiing?
12     A   Eight o'clock in the morning.
13     Q   Is that what time you left the house or is that
14  what time you think you got on the lift?
15     A   No.  We left the house at 8.
16     Q   Did you have a three-day pass or did you go
17  purchase the ticket first?
18     A   So we had -- we were only planning on skiing for
19  two days, of course.  So we skied Saturday, Sunday, and
20  we were unsure if we were going to ski on Monday.
21        So those two, those -- the Saturday and Sunday,
22  we had pre-purchased those tickets online and loaded
23  them onto the, you know, cards that you put in your
24  pocket.  And then Monday morning, we decided that we
25  wanted to ski, so my husband went to purchase tickets

Page 57

1  for all of us at the ticket window and he used a --
2  like a coupon that one of our friends gave us at the
3  ticket window that morning.
4     Q   And did he buy full-day lift tickets for all five
5  of you?
6     A   Yes.
7     Q   Was your plan to ski the full day?
8     A   Yes.
9     Q   Which would have been about 8 to 4?
10     A   Yes.
11     Q   What was the weather like?
12     A   Beautiful.
13     Q   Blue sky?
14     A   Blue skies.  It was a -- it was a nice day.
15     Q   No visibility problems at all?
16     A   No.
17     Q   Including at the time of the collision, the
18  visibility was not an issue, correct?
19     A   Not at all.
20     Q   What was the snow like?
21     A   It was -- it was good first thing in the morning.
22     Q   Packed powder?
23     A   Yes.
24     Q   And then as the day wore on, I take it the snow
25  got skied off a little bit, it got a little icier?

**STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY**

12/06/2017                                                                 Stacie Rivard-Pedigo

Page 58

1    A   I can't speak for the rest of the day.  I was
2   injured at 10:00.  So from 8:30 to 10:00 ski conditions
3   were fine.
4    Q   Do you wear eyeglasses?
5    A   Goggles, yes.
6    Q   Do you wear prescription glasses?
7    A   Oh, I wear contacts.
8    Q   And do you wear those for distance?
9    A   Yes, I wear them -- I wear them for everything.
10    Q   You are wearing them now?
11    A   Yes.
12    Q   I assume you were wearing them at the time of the
13   collision.
14    A   Yes.
15    Q   But you had goggles on as well?
16    A   Yes.
17    Q   And did you -- as soon as you got out, you know,
18   you left the condo around 8, got out, got on the lift,
19   and skied continuously until the time of the accident
20   around 10, correct?
21    A   Yes.
22    Q   Do you recall what trails you had skied that day
23   prior to the collision?
24    A   So that day, we -- our goal was -- because we
25   were staying over here on the Okemo side, our goal was

Page 59

1   to come over to the Jackson Gore side, because my
2   favorite trail is over here.
3    Q   Which one is that?
4    A   Tuckered Out.  That's my absolute favorite trail.
5   That's what I wanted to do.
6    Q   How come that's your favorite trail?
7    A   I just love it.  It's -- it's not -- it's just --
8   it's just fun.  I think it's one of the most -- I don't
9   really have a great reason for that.  It's just a --
10   it's just a fun trail.  And my youngest son really
11   enjoys it too.
12        So the goal was for us to come from the Okemo
13   side to go over to the Jackson Gore side to do a little
14   bit of skiing over here and come back in time for
15   lunch.
16    Q   So in order to accomplish that, am I correct you
17   pretty much had to get up to the top of Okemo --
18    A   Yes.
19    Q   -- and make your way toward Jackson Gore?
20    A   That's exactly what we did.
21    Q   When you first got out that morning, which lift
22   did you take?
23    A   This is where my map skills -- if my husband were
24   here, he could --
25    Q   Just go on what you remember.

Page 60

1        MR. FAXON:  If you don't remember, don't
2   guess.
3        THE WITNESS:  Okay.  You know what --
4        MR. FAXON:  Just say "I don't know" if
5   you don't know.
6   BY MR. GFELLER:
7    Q   That's fine if you don't know.
8    A   I really don't know, because I don't know the
9   lifts all that well.
10        I just know that we started here, and however we
11   got there, we got here.
12    Q   Are you familiar with the bubble lift at Okemo?
13    A   Yes.
14    Q   And that if you're looking at the map, would you
15   agree that that's the Sunburst Six lift that you'll see
16   there?
17    A   Yes.  That's -- yes.
18    Q   All right.  Do you remember at the start of the
19   day, maybe not the very first use of a lift, because
20   you need to get -- you need to take one of those lower
21   lifts.  But did you then take the bubble lift, the
22   Sunburst Six, up to the top or toward the top of the
23   mountain, or did you take a different lift, if you
24   remember?
25    A   I really don't remember.

Page 61

1    Q   Do you remember what trail was the first trail
2   you skied that morning?
3    A   I don't know.
4    Q   At some point you had to get up towards the top
5   of the Okemo mountain part of the ski area, correct?
6    A   Correct.
7    Q   In order to make your way towards the
8   Jackson Gore area?
9    A   Right.
10    Q   So do you remember what trail or trails you skied
11   to get down towards the Jackson Gore side of the
12   resort?
13    A   Well, I know this is where we were.
14    Q   You are pointing to something.  Can you tell me
15   what that is?
16    A   Yeah.  So this Quantum Four.  Because I'm looking
17   at the map and figuring out where the junction is and
18   where the site of the collision was, which would only
19   mean...
20    Q   At some point you were at the top of the
21   Quantum Four lift?
22    A   Yes.
23    Q   Okay.  So just for efficiency purposes, is it
24   fair to say that when got out that morning around
25   eight o'clock, you used whatever lifts or trails you

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY
12/06/2017                                                      Stacie Rivard-Pedigo

Page 62

1  needed to use to make your way over to the bottom of
2  the Jackson Gore area?
3      A   Yes.
4      Q   At which point you then used the Quantum Four
5  lift to get to the top of the Jackson Gore side of the
6  hill?
7      A   Yes.
8      Q   I think what you told me a couple minutes ago was
9  you were making every effort to get over to the
10 Jackson Gore side as quickly and efficiently as
11 possible.
12     A   Correct.
13     Q   So you didn't take any extra runs over on the
14 Okemo side?
15     A   We did not.
16     Q   You made your way over to the bottom of the
17 Quantum Four lift.  You got to the top of the
18 Quantum Four lift.
19         Did you take any runs at the Jackson Gore side of
20 the resort before the run that you had your collision
21 on?
22     A   No.
23     Q   Did you ski Tuckered Out that day?
24     A   I did not.
25     Q   So am I correct that when your collision

Page 63

1  happened, you were -- you had skied down the
2  Sunset Strip trail?
3      A   Correct.
4      Q   And you were at the Jackson Gore Junction area?
5      A   Exactly.
6      Q   Had you skied in that area on either of the two
7  days prior to February 20th?
8      A   Yes, we spent -- we did kind of the same thing on
9  Saturday.  And we -- we did -- and I did Tuckered Out
10 that day, and we all wanted to go back that other day.
11         So Saturday we did the exact thing:  We skied
12 over here, we spent multiple hours over here, and made
13 our way back.
14     Q   As somebody who had skied at Okemo -- you were on
15 your seventh day last season, and said you had skied
16 there at least twelve days over the course of time --
17 were you pretty familiar with the trail system at
18 Okemo?
19     A   Yes.
20     Q   In other words, if your husband hadn't been with
21 you to navigate and you didn't use a map, do you feel
22 comfortable that you would have been able to find your
23 way around based upon prior experience there?
24     A   Yes, I do.  But I have to say that I always
25 prefer to ski with someone that really knows what --

Page 64

1  because I'm not there every weekend, so -- and I do ski
2  at different places.  So I do enjoy going with someone
3  who really knows where we are going, to kind of --
4  especially when I'm with the kids, to make sure that we
5  are going, you know, in areas especially that my
6  youngest son can do.
7      Q   You do not want to end up on a trail that's above
8  your ability level?
9      A   No.
10     Q   Or there's --
11     A   And I certainly don't want my children to do
12 that.
13     Q   So you had skied in the Jackson Gore Junction
14 area on the Saturday --
15     A   Yes.
16     Q   -- before your incident, so that would have been
17 the 18th of February?
18     A   Correct.
19     Q   And had you skied in the Jackson Gore Junction
20 area on your prior visits to Okemo last season?
21     A   Yes.  Because those same people that own the
22 condo over here, they also own something on this side
23 too.  So on occasion when we go visit them, sometimes
24 we stay on this side with them and sometimes we stay on
25 this side.

Page 65

1      Q   When you say "this side," you are talking about
2  the Jackson Gore area?
3      A   The Jackson Gore side.  They have a home in
4  the -- it's yellow.  It's a huge yellow building.  I
5  can't remember the name of it.
6      Q   As somebody who was familiar with the
7  Jackson Gore Junction area, am I correct that you
8  understood that it was an area where multiple trails
9  merged?
10     A   Yes.
11     Q   And those multiple trails would include
12 Sunset Strip, correct?
13     A   Yes.
14     Q   Roundhouse Run?
15     A   Yes.
16     Q   And Easy Rider, or what some people refer to as
17 Upper Mountain Road?
18     A   Yes.
19     Q   Had you skied through the Jackson Gore Junction
20 area from all three of those trails at some point --
21     A   Yes.
22     Q   -- prior to your collision?
23     A   Yes.
24     Q   And were you familiar with how each of those
25 trails ran into the Jackson Gore Junction area?

Page 66

1    A   Yes.
2    Q   And you were aware that there was signage on
3  those trails about indicating that skiers should slow
4  down?
5    A   Yes.
6    Q   You had seen that signage?
7    A   Oh, yes.  It's -- you can't miss it.
8    Q   It's very prominent, right?
9    A   It's bright and tall and big.
10   Q   On the Sunset Strip trail, there is a trail -- or
11 there's a sign planted right in the middle of the trail
12 on the snow, correct?
13   A   Yes, I believe it's orange and black, and you
14 can't miss it.
15   Q   On the Roundhouse Run, there is a banner that
16 extends across the trail, correct?
17   A   Yes.
18   Q   You can't miss it?
19   A   No.
20   Q   And if a skier is skiing responsibly and adhering
21 to the signage, then a skier is informed that they are
22 entering an area where they need to slow down, correct?
23   A   Yes.
24   Q   On February 20th, 2017, how would you describe
25 the crowd level?

Page 67

1    A   It was a busy day.
2    Q   It was President's Day?
3    A   It was President's Day.  There were -- there were
4  a lot of people.  I wouldn't call it the most packed
5  day I've ever seen at a ski resort, but there were lots
6  and lots of people skiing.
7    Q   And I take it you've skied on other long weekends
8  as a skier over the years, right?
9    A   Yes.
10   Q   You know when you are going to a ski area,
11 particularly a destination resort like Okemo, days like
12 that are going to be busy days on the mountain,
13 correct?
14   A   Yes.
15   Q   And given the fact that the Jackson Gore Junction
16 area had these multiple trails all merging into one
17 area, am I also correct that knowing you were there on
18 a busy day, you knew that you should expect there to be
19 quite a bit of traffic in that area?
20   A   Oh, yes.
21   Q   And am I correct that with a higher level of
22 traffic, there is a higher level of collision -- risk
23 of collision?
24   A   I actually don't agree with that.
25   Q   So I guess my question is -- and you can tell me

Page 68

1  if you agree or not -- when you have an area at a ski
2  resort that is a junction for multiple trails and it's
3  a busy day at the ski resort, would you agree that as a
4  skier, you have to know -- that you have to be
5  particularly aware of your surroundings because there
6  is a greater risk of collision due to the heavy
7  traffic?
8    A   Well, I would say because of the -- you know, the
9  volume of people, you need to be very aware that --
10 what's going on around you.
11   Q   It's like being in heavy traffic on the highway
12 as a driver of a car:  The heavier level of traffic,
13 the more the risk of collision, right?  As opposed to
14 being on a road all by yourself.
15   A   Yes.
16   Q   At the time of your collision, were you moving or
17 were you stopped?
18   A   I was moving, but I was -- I was -- do you want
19 me to tell you where I was coming from?
20   Q   Sure.  Go ahead.
21   A   So we were supposed to go to Tuckered Out and
22 didn't.
23   Q   Why not?  I don't mean to interrupt you, but why
24 didn't you?
25   A   My youngest son really wanted to go on it, and I

Page 69

1  really wanted to go on it too.  But the everyone else
2  wanted to come down and make our way back to -- you
3  know, get back by lunchtime and ski a little bit.
4         He really wanted to do that.  My husband said, "I
5  think I'm going to go do that with him.  I'll go do a
6  couple things here and we will meet you back."
7    Q   Your youngest son and your husband skied
8  Tuckered Out and some other trails over to the right,
9  while you and the rest of the group headed back toward
10 the condo?
11   A   Yes.  Then they made their way over to kind of
12 meet -- they met at some hot chocolate place, which I
13 can never find where it is, but...
14   Q   So at the start of the run that you had your
15 collision on --
16   A   So I started --
17   Q   -- that's when you separated from your husband
18 and your youngest son?
19   A   Yes.  We all made our way over together, and then
20 they -- they were the only two out of the 13 of us that
21 went off on their own.
22        So we started up here on Sunset Strip.  Carrie
23 went first, my middle son ███ went second, and came
24 down Sunset Strip.  And you see where that kind of like
25 is a triangle at the junction?

Page 70

1    Q   Uh-huh.
2    A   So if you come down straight this way to go to
3  Blue Moon, you are actually not going through the
4  junction.
5         So we went down that little strip right there to
6  go through the junction.  And I was -- you know, I was
7  doing everything I was supposed to be doing.  I was
8  skiing responsibly.  I was skiing at the speed that you
9  should be skiing at going through that junction, which
10  is you're moving but you are -- you know, you are to
11  the point where you are really working to get yourself
12  through there to get to where you need to be.
13         So I skied all the way -- it's a -- I'm sure you
14  are away, it's a large snow-covered bridge.  So I had
15  gotten to the very edge of the -- like the very end of
16  the bridge coming from the direction I was coming.  And
17  the person that hit me was coming from either
18  Roundhouse Run or that Upper Mountain Road/Easy Rider,
19  and that's where we hit, right at the...
20    Q   Where were you heading to?
21    A   We were going to go down to this Mountain Road.
22    Q   So your plan was to go down the Jackson Gore
23  Junction area, and then turn left and down onto
24  Mountain Road?
25    A   Yes.  Because I'm just making sure that -- yes,

Page 71

1  because when you come here, that's your only option, is
2  to go down Mountain Road and head back.
3    Q   You could make a real hard left and go down
4  Blue Moon, correct?
5    A   You actually can't, because then you would be
6  going -- well, I see.
7         At the beginning of that junction, you can make a
8  hard left to go down Blue Moon.  I went all the way
9  through the junction to go down to Mountain Road.
10    Q   So if you look closely at this map --
11    A   Yes.
12    Q   -- do you see -- you see the Blue Moon trail?
13    A   Yes.
14    Q   And you see that it has the blue line on the left
15  and the right of the words "Blue Moon"?
16    A   Yes.
17    Q   And if you look at the left side of that, that
18  line starts kind of at the end of a treeline.
19    A   Yes.
20    Q   Is that approximately where you were when you had
21  the collision --
22    A   Yes.
23    Q   -- kind of right where that line ends?
24    A   Exactly.
25    Q   Right where there is a break between the

Page 72

1  Roundhouse Run line and the Blue Moon line?
2    A   That's exactly the spot.
3         MR. FAXON:  Can we take a five-minute
4    break?
5         MR. GFELLER:  Let's do that just in one
6    minute, because I just want -- I have no
7    problem with a break, but while we are on
8    this, I just want to have the witness just
9    highlight where we are talking about, just --
10         MR. FAXON:  Okay.
11         MR. GFELLER:  -- since we are in the
12    middle of it.
13         MR. FAXON:  Go ahead.
14  BY MR. GFELLER:
15    Q   I am going to ask you to take a highlighter and
16  highlight the -- and this is -- you are not -- I'm not
17  asking you to be an engineer or do anything with
18  tremendous specificity.  But can you highlight the
19  approximate area that you are talking about where the
20  collision occurred?
21    A   Sure.
22    Q   Thank you.
23    A   Just -- just -- you don't want me to do the
24  trails, just right where it occurred?
25    Q   How about you do this:  How about you highlight

Page 73

1  the path you took, and then I'll give you a red pen and
2  you can circle the spot where the accident occurred.
3    A   It doesn't really show up very well, but right
4  there.
5    Q   All right.  Thank you.
6         MR. GFELLER:  Take a five-minute break.
7         MR. FAXON:  All right.
8         (Brief recess taken.)
9  BY MR. GFELLER:
10    Q   You gave me some description of the order that
11  your group went down on Sunset strip --
12    A   Yes.
13    Q   -- immediately prior to the collision.  You said
14  Carrie went first --
15    A   Yes.
16    Q   -- followed by ▇▇▇.  Were you in the third
17  position?
18    A   Yes.
19    Q   And everybody else was behind you?
20    A   Correct.
21    Q   Who of your group has told you or are you aware
22  of that saw the collision?
23    A   So Carrie and ▇▇▇ saw it from the front.  You
24  know, because they were -- if you can imagine that
25  junction, that bridge, they were kind of waiting.  You

Page 74

1  know, they were stopped, waiting at like a treeline,
2  just not 20 feet from where I was hit.
3       Immediately following me was Dieter, followed by
4  Mike, followed by the kids.  Actually Mike and Denise
5  were -- were right there, followed by the kids.  But
6  they were kind of all in a clump.
7  Q   Have any of those people told you that they saw
8  the collision?
9  A   So Dieter, Mike, and Denise witnessed it from --
10  you know, from the back.  Carrie and ██ witnessed it
11  from the front.  And the kids, when they came down,
12  they -- I was already on the ground at that point.
13  Q   So as you understand it, did any of the kids see
14  the collision?
15  A   Just ██.
16  Q   How close were Carrie -- Carrie and ██ were
17  standing next to each other when the collision
18  occurred?
19  A   Yes.
20  Q   How close were they to the collision point?
21  A   20 feet.  Right there.
22  Q   How about Dieter, Mike, and Denise, were they
23  moving when the collision occurred, as you understand
24  it?
25  A   Yes.  They were -- they were moving, they saw it,

Page 75

1  and basically when they came, they stopped their --
2  right there.  So they witnessed it from behind.
3  Q   They were skiing behind you, saw the collision,
4  and skied to your location?
5  A   Correct.
6  Q   Do you know how far behind you they were?
7  A   I don't know.
8  Q   So you had come down Sunset Strip, you had taken
9  that -- that sort of high route where the fork is --
10  A   Yes.
11  Q   -- and were in the area of the Jackson Gore
12  Junction that you showed me earlier, that's sort of
13  right at the end of the blue line of the Blue Moon
14  trail on the map?
15  A   Correct.
16  Q   You were moving, and your intention was to head
17  towards Mountain Road?
18  A   Yes.
19  Q   Were you moving in a direction that was more
20  across mountain or downhill or both at the time the
21  collision occurred?
22  A   So as I was going through, you know, the bridge
23  area, the junction, which is sizeable, I was, you know,
24  skiing -- skiing directly through.
25       Right about where the collision happened, I just

Page 76

1  started to turn my body just a little bit, because I
2  saw Carrie and ██ kind of over there.  I needed to
3  get there.  So I turned my body just a little bit.
4       And the next thing I knew, I just kind of turned
5  my head and he was right here.
6  Q   You turned your body just a little bit towards
7  your left?
8  A   Towards -- yes, towards the left, because I was
9  going to the left to meet them.
10  Q   So they were ahead and slightly downhill from
11  your position; is that right?
12  A   Not downhill yet, because it's not -- it doesn't
13  get to be steep again until you get to Mountain Road.
14  And it's not really all that steep through there
15  anyway.  So I mean I guess they were a little lower
16  than I was.
17  Q   That's really what I'm asking.
18  A   Because they would have to be.
19  Q   I understand it's not a steep area.
20       My point is:  You were starting to turn left
21  because you needed to not only continue through the
22  junction, but head down slightly to get to their
23  position.  In other words, they weren't uphill of you?
24  A   No, no, no.
25  Q   If anything, they were slightly downhill of you;

Page 77

1  is that fair to say?
2  A   Slightly.
3  Q   So just as you started to take that slight turn
4  towards the left, you were struck, correct?
5  A   Yes.
6  Q   What part of your body was impacted?
7  A   Everything from my -- from my shoulder -- so if
8  you can imagine, everything from my shoulder.
9  Q   Right shoulder?
10  A   Yes.  So from my right shoulder -- I mean I
11  remember his body hitting my body.  So this half of my
12  body hit that half of his body.  So we hit head on, but
13  half bodies.
14       And I believe that's because I was slightly
15  turned to the left, that the brunt of the injuries was
16  on half of my right side.
17  Q   Were you wearing a helmet?
18  A   Yes.
19  Q   Do you still have that?
20  A   Yes.
21  Q   What brand is it?
22  A   I don't know.
23  Q   Did your head and his head collide?
24  A   No.
25  Q   Did you hit your head on the ground, the surface,

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                      Stacie Rivard-Pedigo

Page 78

```
 1   when you fell?
 2      A   Not that I recall.
 3      Q   Am I correct that you did not lose consciousness?
 4      A   No, I did not.
 5      Q   Did you see him before the collision occurred?
 6      A   No.  The only --
 7      Q   Go ahead.
 8      A   The only -- you know, as I'm going through -- as
 9   I kind of have gone over this in my head and kind of
10   reflected as to what happened, I believe I heard him.
11   I did not see him.  But I believe that I heard
12   something that seemed out of the ordinary, considering
13   you're essentially not skiing.
14          And so I heard it, and so I turned my head, and
15   he was literally right there.
16      Q   You turned your head to the right?
17      A   I turned my head to the right.  And he was -- he
18   was right there.
19      Q   So there was no opportunity to evade the
20   collision at that point?
21      A   Absolutely not.
22      Q   Were you wearing any kind of earbuds or anything
23   like that?
24      A   No.
25      Q   As you skied through the Jackson Gore Junction
```

Page 79

```
 1   area, did you look uphill towards the
 2   Upper Mountain Road or Easy Rider trail?
 3      A   As I was coming through here?
 4      Q   Yes.
 5      A   I mean I was -- you know, I was skiing, doing
 6   what I was supposed to be doing.  I was looking at my
 7   surroundings.  I was looking more towards where I was
 8   headed, but I knew what was happening.
 9          And I was actually -- if you can imagine the
10   direction that I was going, I was at the -- it's
11   literally a bridge.  So it's got the wooden rails.  So
12   I was close enough to those -- that -- that side of the
13   wooden rails.
14      Q   Which side?
15      A   So if I'm coming down, to the right.  To the
16   right side.
17      Q   They were -- the rail was on your right?
18      A   Yes.  There are two rails, you know, one far off
19   to the left and one -- I was closer to the right one.
20      Q   Approximately how far was your right side from
21   that rail as you went through that area?
22      A   Couple of feet.  You know, it's kind of a -- you
23   kind of treat that area as the way you would drive a
24   car.  You know, you come down, and you are on the
25   right, and the people coming the other way are --
```

Page 80

```
 1          You know, it doesn't always, obviously, work that
 2   way, but you kind of just come and go.  You are coming
 3   towards each other, but I wouldn't ever go -- I
 4   wouldn't cross to have that closest to my left.
 5      Q   In other words, you are going through an area in
 6   the Jackson Gore Junction where there is traffic coming
 7   from multiple directions?
 8      A   Yes.
 9      Q   And so you, as a skier, stay to the right, like
10   you would if you were driving a car?
11      A   Yes.
12      Q   You know that there is going to be traffic coming
13   towards you from Roundhouse Run and/or Easy Rider, and
14   if they are heading towards Blue Moon, you would expect
15   them to stay on their right side, which would be your
16   left?
17      A   Exactly.
18      Q   At the time of the collision, was the person who
19   collided with you doing that?
20      A   No.  The person that collided with me was doing
21   what he shouldn't have been doing, which was:  He was
22   trying to go through that junction on -- he was coming
23   through the junction attempting to cross it going on
24   his left side.
25      Q   He took, in your view, too high of a line?
```

Page 81

```
 1      A   Yes.  I mean the only option for him was to hug
 2   that corner with that railing that I'm talking about
 3   that was on my right.  That railing would have been on
 4   his left going through.
 5      Q   In order to get between the railing and you, he
 6   really only had a couple feet of space to get between
 7   the two of you, correct?  You and the rail, that is.
 8      A   If that, yes.  Just a couple feet.
 9      Q   So when you had the collision -- you didn't see
10   him before the collision --
11      A   No.
12      Q   -- correct?  You only heard him.
13          Did you hear a voice or did you hear his skis?
14      A   I did not hear a voice.  I heard, the way that I
15   recall, more of like a fast skis, thinking --
16      Q   Sound?
17      A   Thinking "Why am I hearing this fast sound?"
18      Q   Am I correct that, given the fact that you did
19   not see him, you are not able to estimate his speed at
20   the time of the collision?
21      A   I am not able to, you are correct.  I did not see
22   him.  But based on the severity of my injuries, he was
23   flying.
24      Q   Once the collision occurred, I take it you fell
25   to the surface?
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY
12/06/2017                                                          Stacie Rivard-Pedigo

Page 82

1    A    I not only fell, it was -- according to the
2    witnesses, because of course I -- I felt this, but I
3    didn't see it.  He hit me with such an impact, that I
4    went flying in the air, my skis popped off, my poles
5    went all over, and I was kind of like moving in the
6    air, in a way, before I hit the surface.
7    Q    Both bindings released?
8    A    Yes.
9    Q    And both of your poles went out of your hands?
10   A    Yes.
11   Q    Did you have wrist straps for the poles?
12   A    I did have wrist straps.  At the time, I -- well,
13   clearly they weren't wrapped around my hand at that
14   moment.  I did lose my poles.
15   Q    That's what I'm asking.  So the straps were not
16   wrapped around your wrist when the collision occurred;
17   is that right?
18   A    I can't be certain of that, because I really
19   don't remember.  I don't remember.
20   Q    Is it your normal practice to ski with the wrist
21   straps around your wrists or not?
22   A    I do.  I would say 90 percent of the time, I do.
23   But sometimes, you know, if you are helping a kid with
24   a glove or, you know, doing something, I mean...
25        90 percent of the time.

Page 83

1    Q    But in this instance, you are not sure one way or
2    the other?
3    A    I'm really not sure.
4    Q    Once the collision occurred and your bindings
5    released, you said you were in the air, what part of
6    your body hit the surface?  Describe how you fell.
7    A    So I know I hit with -- I actually think I hit
8    with my back first.
9    Q    You landed on your back?
10   A    Yes.
11   Q    Flat on your back?
12   A    I don't know.  At that point, I was in so much
13   pain, that I can't really be sure how.
14   Q    Once you were down on the snow, did you sort of
15   take an inventory of your surroundings and location?
16   A    When I hit -- the moment that I was hit to the
17   moment I hit the ground, I knew I was terribly injured.
18        So my head was -- not that I had hit my head, but
19   everything was spinning.  Just I remember just looking
20   up and thinking, "What just happened?"  Just because I
21   was just in so much pain and confused as to how this
22   happened.
23   Q    Once you were down, were you able to take a look
24   around and see where you were in relation to your
25   location when the collision occurred?

Page 84

1    A    The only thing I remember is being on the ground
2    and having people look up at me.  I knew where I was.
3    And I wasn't far from where the collision -- you know.
4    You know, several feet away, but it was -- it was right
5    there.
6    Q    No more than five feet away from where the
7    collision had occurred; is that fair to say?  Or would
8    you estimate it some other way, if you can?
9    A    I would suspect it would be somewhere five feet.
10   Five to ten feet at the most.
11   Q    Did the other skier stop?
12   A    He did.
13   Q    Did he come to your aid?
14   A    No.
15   Q    How do you know he stopped?
16   A    Because he -- so yes, actually, I did take
17   inventory.  Because I looked up at one point, and he
18   was where she is, sitting on that bridge.
19   Q    So he was a few feet away -- when you are talking
20   about "she," you are talking about my colleague, who is
21   sitting across the table from you?
22   A    Yes.  He was farther away than that.  But I was
23   laying on the ground, and when I looked up, he was...
24   Q    A few feet away sitting on the bridge?
25   A    Yes.

Page 85

1    Q    Sitting on the railing?
2    A    Yes.
3    Q    Were his skis still on, or were his skis off?
4    A    His, I don't know.
5    Q    Do you know whether as part of the collision he
6    also went down?
7    A    Yes, he went down.
8    Q    Do you know whether he was injured?
9    A    By the looks of his hand, it looked like he broke
10   his hand.
11   Q    What did his hand look like?
12   A    It was pointing in the opposite direction.
13   Q    His left hand or his right hand?
14   A    I'm just -- I'm thinking of him, so it was his --
15   had to be -- yeah, it was his left hand.
16   Q    So when you sat up and gathered yourself, you saw
17   the other skier a few feet away sitting on the bridge,
18   you knew you had been injured.
19   A    Oh, yes.
20   Q    What is the next thing you remember?
21   A    So someone immediately called -- and I don't know
22   who it was -- the ski patrol.  And two sleds came up,
23   one for me and one for him.  He refused first aid on
24   the mountain.
25        He did stay, to be, you know -- I was not

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 86

1  concerned about him at that point, but I do know from
2  what people said, he did stay to be questioned.  He
3  refused it, but he didn't leave or anything.  So he was
4  there.
5      Q   He refused what?
6      A   He refused for them to take him down.
7      Q   In other words, he didn't want to be taken down
8  in the sled?
9      A   Correct.
10     Q   But he let them check him out and he talked to
11 whoever he had to talk to?
12     A   I don't know if he let them check him out.  He
13 talked.
14     Q   And I take it the ski patrol came to your
15 attention.
16     A   Yes.  So there were two sleds that came up, one
17 dealt with him and one dealt with me.
18     Q   How many ski patrollers do you remember taking
19 care of you?
20     A   There was one main guy.  He was the one that was
21 really doing the assessment and checking my neck and
22 checking my head and figuring out what was the problem.
23         And then once he got me -- you know, got my leg
24 all splinted or tied or whatever they did, got me in
25 the sled, and then three other men came and they

Page 87

1  brought me down.  So he was guiding the sled, and the
2  other ones were kind of in a triangular position.
3      Q   Do you know or recall that patroller's name that
4  was your primary --
5      A   Neil.  I don't know his last name, but his name
6  was Neil.
7      Q   Did he take good care of you?
8      A   Excellent.
9      Q   At any point in time, did you speak with the
10 other skier?
11     A   I did not.
12     Q   You didn't say anything to him?
13     A   No.
14     Q   And he didn't say anything to you?
15     A   He did not say anything to me.  However, my
16 friend questioned him.
17     Q   What friend?
18     A   Carrie.
19     Q   When you say she questioned him, can you describe
20 what you mean?
21     A   She said to him, you know, "What on earth were
22 you thinking?"
23         And he said, "I can't believe that I just did
24 that.  I should have known better.  I am an employee."
25     Q   Did you hear the other skier say that to Carrie

Page 88

1  or did Carrie recount that to you?
2      A   I heard them.  I heard them talking.  And I do
3  remember hearing those words.
4      Q   And do you know that those words that you heard
5  were from the other skier, or is it possible they were
6  from somebody else?
7      A   Oh, no, they were from him.
8      Q   So you remember overhearing him telling either
9  Carrie or somebody else those words?
10     A   Yes.  And, you know, people were very angry.
11 "Why did you do this?"  "How did you do this?"
12         My daughter was furious, as 13-year-olds get when
13 their mother is injured.  You know, she was -- she was
14 just really upset and crying, and she -- because she
15 was so upset, she had a bloody nose, and it was just a
16 mess.
17     Q   At any point in time since the collision, have
18 you had any direct communication with the other skier?
19     A   No.
20     Q   Do you know his name?
21     A   Yes.
22     Q   What is his name?
23     A   Curtis Ficklin.
24     Q   How do you know that?
25     A   I know --

Page 89

1          MR. FAXON:  Just as long as it's not
2          from anything I told you, you can answer the
3          question.
4      A   I know his name is Curtis Ficklin based on what I
5  was told his name was at the mountain.
6  BY MR. GFELLER:
7      Q   So someone --
8      A   Someone asked him what his name was.
9      Q   And you heard him say his name?
10     A   I heard him say "Curtis," I didn't hear the last
11 name.  One of them knew that it was -- his last name
12 was Ficklin.
13     Q   So at some point in time while you were there
14 that day after the collision, you became aware of his
15 name?
16     A   Oh, yes.
17     Q   What was he wearing at the time of the collision?
18     A   So I have three very -- three recollections of
19 what he was not wearing.  He was not wearing a helmet,
20 he was carrying a backpack, and he was skiing with no
21 poles.
22     Q   Do you remember what color jacket he was wearing?
23     A   I do not.
24     Q   Do you remember what color pants he was wearing?
25     A   I do not.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                        Stacie Rivard-Pedigo

Page 90

1    Q   Did he have a hat on?
2    A   No.
3    Q   So it was just his open head, like naked head?
4    A   It was just -- yes.
5    Q   Was he wearing goggles or sunglasses?
6    A   I -- I don't know.  There are -- those are the
7    three things that I remember.
8        There are certain times when I feel like yes, he
9    was wearing goggles, but I'm not sure.
10   Q   Based upon what you just told me, am I correct
11   that you don't recall him wearing any type of Okemo
12   employee uniform at the time of your collision?
13   A   I don't remember his -- the kind of clothing he
14   was wearing.  Those are the only three things that
15   really stand out in my mind, was the backpack, the no
16   poles, and no helmet.
17   Q   So specifically though you don't recall him
18   wearing any type of a uniform that identified him as an
19   Okemo employee at the time of your collision, correct?
20   A   I don't -- I don't know.
21   Q   You don't have a recollection one way or the
22   other, correct?
23   A   Correct.
24   Q   Has anybody since the accident told you that
25   Mr. Ficklin was wearing any type of uniform or

Page 91

1    indicator that he was an employee of Okemo Mountain
2    when your collision occurred?
3    A   No.
4    Q   Have you had a discussion with anybody about
5    that?
6    A   No.
7        MR. FAXON:  Other than me.
8    BY MR. GFELLER:
9    Q   Other than your attorney?
10   A   No.
11   Q   Do you think that had he been wearing an Okemo
12   uniform or a name tag, that you would have noticed it?
13   A   I don't know.  Considering how badly I was
14   injured, I -- I don't know.
15   Q   Do you have any knowledge as to what the nature
16   of his employment was with Okemo at the time?
17   A   Can you repeat that?
18   Q   Sure.  You heard Mr. Ficklin say that he was an
19   employee of Okemo, correct?
20   A   Correct.
21   Q   Do you have any knowledge as to what his
22   employment was with Okemo?  What did he do?
23   A   He's a ski lift operator.
24   Q   How do you know that?
25   A   I have --

Page 92

1        MR. FAXON:  Unless that comes from me.
2    BY MR. GFELLER:
3    Q   I don't want to know what you talked about with
4    your attorney.
5    A   I just know he's a ski lift operator.
6    Q   Do you have any specific knowledge as to what his
7    job duties or responsibilities are as a ski lift
8    operator?
9    A   No.  I would assume you operate a ski lift, but
10   beyond that, no idea.
11   Q   Do you have any knowledge as to whether he was on
12   duty at the time of your collision?
13   A   I don't.  He told us he was an employee, but he
14   did not say whether he was on or off duty.
15   Q   Am I correct that you don't have any personal
16   knowledge as to whether or not as part of his job as a
17   ski lift operator he is on skis?
18   A   Please repeat that.
19   Q   Sure.  You told me that you understand that
20   Mr. Ficklin was a ski lift operator at Okemo, correct?
21   A   Yes.
22   Q   You don't know whether he was on duty or not at
23   the time the collision occurred, correct?
24   A   Correct.
25   Q   Do you know whether as a ski lift operator he

Page 93

1    would have any reason to ski while he was on duty?
2    A   I don't know.
3    Q   Do you have any knowledge as to what
4    Mr. Ficklin's work schedule was as of
5    February 20th, 2017, with respect to his employment at
6    Okemo?
7    A   I do not.
8        (Defendant's Exhibit 4 marked for
9         identification.)
10   BY MR. GFELLER:
11   Q   Ma'am, I'm going to show you what's been marked
12   as Exhibit 4.  Does that look familiar to you?
13   A   I have to agree:  This is an awful picture.
14   Q   All right.
15   A   But if I'm -- if I'm --
16       MR. FAXON:  He just asked you if that
17       looks familiar to you.
18   BY MR. GFELLER:
19   Q   I don't want you to guess.  I'll show you
20   another picture if that doesn't look familiar.
21   A   Yes, it looks familiar, but it looks kind of odd.
22   Q   All right.
23       MR. FAXON:  Let's go off the record one
24       second.
25       (Discussion off the record.)

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                      Stacie Rivard-Pedigo

Page 94

```
 1          (Defendant's Exhibit 5 marked for
 2          identification.)
 3      A   That looks better.
 4   BY MR. GFELLER:
 5      Q   And what do you recognize that to be?
 6      A   Well, so here I can clearly see the junction.
 7   And, again, if you are -- if I'm looking at this, I
 8   believe I can tell you which direction we were both
 9   coming from.
10      Q   Is it okay if I come around, because I --
11          MR. FAXON:  Sure.
12   BY MR. GFELLER:
13      Q   Sometimes when we are talking about pictures,
14   it's complicated if we are not standing side by side.
15      A   I understand.
16      Q   We are looking at Exhibit 5.  Go ahead.
17      A   Yes.  Do you have a question?
18      Q   I guess what do you recognize Exhibit 5 to
19   depict?
20      A   What I'm seeing here is:  I believe this is that
21   Roundhouse Run.  I would say that this is
22   Roundhouse Run.  I was coming from this direction.  And
23   this is where I'm speaking.
24          So I'm coming this way.  This is the bridge that
25   is on my right.  This is where he's coming from.  And
```

Page 95

```
 1   he took exactly as what you said before how he -- I
 2   don't remember.
 3      Q   High line?
 4      A   Yes.  So in -- most people I would think would,
 5   if they are coming from this direction, hug this side
 6   to head that way.  I was hugging this side to go I
 7   believe right there, down this one.  And the point of
 8   the collision was there.
 9      Q   All right.  So just because there were a lot of
10   "theres" and "thats," let me just see if I can break
11   that down so that the record will be good for us to
12   look at down the line.
13          So the photograph that's marked as Exhibit 5, am
14   I correct, shows the perspective of the skier coming
15   down Roundhouse Run?  Right?
16      A   That's how it appears, yes.
17      Q   And you can see ahead.  You can see a trail that
18   is coming down from the opposite direction, and that
19   would be --
20      A   Sunset Strip.
21      Q   -- Sunset Strip, correct?
22      A   Yes.
23      Q   And we can see one of the two fence lines that
24   you talked about where the bridge is located in this
25   picture, correct?
```

Page 96

```
 1      A   Yes.
 2      Q   That would be the fence line that was to your
 3   left, not the one that you were a couple feet away from
 4   when the collision occurred, correct?
 5      A   So I was coming from this direction.
 6      Q   Down Sunset Strip.
 7      A   So I --
 8      Q   We can't see the fence that you were a couple
 9   feet away from, correct?
10      A   Correct.  Well, you can.  It's right there.
11      Q   Okay.  All right.  And from the perspective of
12   the photograph that's marked as Exhibit 5, it's on the
13   left side of the Roundhouse Run trail, correct?
14      A   Yes.
15      Q   And --
16      A   It would have been on my right.
17      Q   On your right?
18      A   His left.
19      Q   I understand.  And you can see there is something
20   sort of in the middle of the snow toward the junction
21   that I'm pointing at.  Do you see what I'm pointing at?
22      A   It's the sign that tells you to slow down.
23      Q   If I showed you this picture --
24      A   Yes.
25      Q   -- does it look like that sign?  It says
```

Page 97

```
 1   "Trails Merge-Look Ahead."
 2      A   Yes.  I mean that one -- -- yeah, I mean there
 3   are also, you know, multiple signs stuck in the snow.
 4   This one certainly looks like the one that's above your
 5   head.
 6      Q   We had talked about that earlier --
 7      A   Yes.
 8      Q   -- the one above the head.
 9          (Defendant's Exhibit 6 marked for
10          identification.)
11   BY MR. GFELLER:
12      Q   Okay.  So just for clarity, ma'am, the photograph
13   that we just were talking about that shows the sign
14   above the trail has now been marked as Exhibit 6,
15   correct?
16      A   Yes.
17      Q   And this would also be taken from the perspective
18   of a skier coming toward the end of Roundhouse Run,
19   correct?
20      A   Yes.  So, again, just to clarify, I'm coming this
21   way, he's coming this way.
22      Q   Right.  So Mr. Ficklin, as you remember it, would
23   have been coming down Roundhouse Run and you would have
24   been coming from the opposite direction
25   on Sunset Strip?
```

Page 98

1   A   Correct.
2   Q   And your recollection is that you were a couple
3   feet from the fence that is on the skier's left in
4   Exhibit 6, but it would have been on your right side?
5   A   Yes.
6   Q   And you were towards the end of that fence,
7   right?
8   A   I was.
9   Q   Right on the corner that's closest to the
10  photographer of Exhibit 6, correct?
11  A   Yes.
12  Q   And that's where the collision occurred?
13  A   Correct.  And just for the record, as we spoke
14  before, Carrie and ▉▉▉ were like right there.  That's
15  where -- that's where we kind of, you know, somewhat
16  said we would kind of reconvene, was like right here.
17  Q   I'm going to give you a red pen.
18  A   Yes.
19  Q   First thing I'm going to ask you to do is draw a
20  circle with your initials in the middle to show us the
21  approximate location of the collision.
22  A   Fairly large or --
23  Q   However large you think it needs to be to
24  designate that spot for us.
25  A   I mean because this is a large bridge, but --

Page 99

1   Q   Yes.
2   A   You know.  Right here.
3   Q   Would you just put your initials in that.  Thank
4   you.
5       And then this photograph also shows the area
6   where Carrie and ▉▉▉ were situated, correct?
7   A   Yes.
8   Q   Can you draw a circle and then put their names or
9   initials in it to designate their location.  You can
10  put a "C" and a "D" if you like.  All right.  Thank
11  you.
12      So just to clarify, we have Exhibit 6, and you've
13  drawn a circle with your initials in it to reflect the
14  approximate location of where the collision occurred,
15  correct?
16  A   I feel like, you know, this could be skewed later
17  on.  You know, I wasn't on Roundhouse Run.
18  Q   I understand.
19  A   I mean --
20  Q   You've said that you were basically right at the
21  end of the fence line.
22  A   Yeah.
23      THE WITNESS:  Do I correct that, Joel?
24      MR. FAXON:  Anything you want to write
25      on there or indicate on there to make clear

Page 100

1       where you are at --
2   BY MR. GFELLER:
3   Q   Do you want to take a blue pen and put more of an
4   X?
5   A   Yeah, because when I look at this, it just
6   appears that I'm --
7   Q   I don't want it to be anything other than what
8   you want it to be, so you know what's true.
9   A   I kind of want to, you know, X this part out.  It
10  was -- it was more, you know, like I was here heading
11  here.
12  Q   All right.
13  A   This looks like I'm going up the -- up this, and
14  you can't go up that.
15  Q   Okay.
16  A   Do you want me to redo that?
17  Q   Let's do take 2.
18  A   That's fine.
19  Q   Let's mark this, and I'll make the record clear.
20      (Defendant's Exhibit 7 marked for
21      identification.)
22  BY MR. GFELLER:
23  Q   My understanding from our conversation just now
24  is:  You're a little concerned about where you placed
25  the circle on Exhibit 6.

Page 101

1   A   Correct.
2   Q   So let's redo this.  Okay?
3   A   Yes.
4   Q   I'm going to give you what's now been marked
5   Exhibit 7.  It's the same exact photograph.  Agreed?
6   A   Yes.
7   Q   What I'll you ask to do is, on Exhibit 7, put a
8   circle with your initials in it to show us the
9   approximate location of the collision.  All right.
10      And then could you also put the circle with
11  Carrie and ▉▉▉ initials in it to show us the
12  approximate location they were in.  All right.
13      So looking at Exhibit 7, you've given us a circle
14  with your initials in it that shows the approximate
15  location of the collision, which is, where you've
16  described it, where the fence was a couple feet off of
17  your right shoulder when the collision occurred,
18  correct?
19  A   Yes.
20  Q   And you were towards the very end, the close end
21  of the fence from the perspective of the person who
22  took the photograph that's been marked as Exhibit 7,
23  correct?
24  A   Yes.
25  Q   And then the circle with the "C" and the "D"

1  reflect the approximate location of Carrie and ████ at
2  the time of the collision, correct?
3      A   Yes.
4      Q   Thank you.
5          MR. FAXON:  Can I just look at that real
6      quick.  Keep going.
7          (Defendant's Exhibit 8 marked for
8          identification.)
9  BY MR. GFELLER:
10     Q   All right.  I'm going to show you what we have
11 marked as Exhibit 8.
12         Does that photograph look familiar to you?  And
13 if you need more perspective, I'll show you a
14 subsequent photograph.
15     A   So if -- yes.  I believe this is the direction
16 that I am coming from, because I notice the -- the
17 "Slow" sign, that can't be missed.
18     Q   All right.
19         (Defendant's Exhibit 9 marked for
20         identification.)
21 BY MR. GFELLER:
22     Q   Okay.  So Exhibit 8, as you are understanding it,
23 shows the skier's perspective coming down Sunset Strip,
24 correct?
25     A   Yes.

1      Q   All right.  I'm showing you Exhibit 9.  Am I
2  correct --
3          Just to help speed this up, do you recognize this
4  as a photo taken also on Sunset Strip, but a little
5  closer to that sign in the middle?
6          I would compare it to Exhibit 8.
7      A   I do have to look at something here though.
8          THE WITNESS:  Joel, just --
9          MR. FAXON:  Do you want to go off the
10     record and ask me a question?  We can do
11     that.  We can take a quick break.  Let's go
12     in the other room and do that.
13         (Brief recess taken.)
14 BY MR. GFELLER:
15     Q   Ready?
16     A   Yes.
17     Q   Was there something that you were finding
18 confusing about the photo?
19     A   I find these pictures to be a little confusing, a
20 little -- like I'm a little disoriented.  So I'd like
21 you to correct me if I'm wrong.
22         But I feel that -- this is the direction I'm
23 coming from.  I feel like this is this right here to go
24 down to Blue Moon.
25     Q   So what you are saying is on Exhibit 9 it looks

1  like there is a turnoff before the sign that's the
2  "Slow Skiing" sign that would be the -- let's call it
3  the low road, as opposed to the high road you took,
4  that's part of the trail merge?
5      A   Yes.  Is that true?
6          MR. FAXON:  I think she is asking you to
7      confirm that.  Can you do that for her?
8          MR. GFELLER:  I can't confirm one way or
9      the other.
10         MR. FAXON:  You don't know where that
11     is?
12         MR. GFELLER:  I'm just not answering
13     questions.
14         MR. FAXON:  That's kind of not nice.
15     But okay.
16         MR. GFELLER:  I don't mean it to not be
17     nice.  I want to get what she remembers.
18         MR. FAXON:  It is what it is.  You gave
19     her a photo that says "Do you know what this
20     is?"  We don't know when it's taken.  And she
21     is just basically asking you, "I just want to
22     make sure this is the location."
23         MR. GFELLER:  Right.
24         MR. FAXON:  If it is -- which I think it
25     is -- you could simply say "yes" and it would

1      create more certainty.
2          But if you don't want to do that, I'm
3      not telling you how to ask your questions.
4          MR. GFELLER:  Correct.
5  BY MR. GFELLER:
6      Q   I'm not trying to be difficult.  I just really
7  want to know what you are able to tell me without me
8  giving you any information.  That's all.  It's not a
9  trick.
10     A   It feels -- I have to be honest, it feels like a
11 trick to me.
12     Q   It's not intended to be.
13     A   There's several ways you can take these photos, I
14 feel.  And, you know, if you -- if I am certain that
15 this is the way to get down -- because when you go this
16 way, you don't go through the junction.  So these
17 people, if they choose to go this way, they are not
18 going through the junction.
19         So it has to be.  I mean it just --
20         MR. FAXON:  Why don't you do this:  Why
21     don't you answer the question, "Assuming that
22     this is this location, this is what I feel."
23     Okay?
24         THE WITNESS:  That's fair.
25     A   So assuming -- like Joel just said, assuming that

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                Stacie Rivard-Pedigo

Page 106

1   this is this break to head down to Blue Moon, not going
2   through the junction, if that's the case, then I would
3   be coming from this direction with this bridge over
4   here, this fence-bridgy thing over here to my right,
5   and then the site of the collision would be right
6   there.
7   BY MR. GFELLER:
8       Q   All right.  Just to clarify what you said with
9   respect to Exhibit 9, what you're saying is if we
10  assume that what appears to be a left turn off of this
11  trail is the low road of the triangular area at the
12  bottom of Sunset Strip, then you would agree that we
13  see the "Slow Skiing" sign followed by the fence line
14  along which you were skiing at the time of the
15  collision, correct?
16      A   Correct.
17      Q   All right.
18          (Defendant's Exhibit 10 marked for
19          identification.)
20  BY MR. GFELLER:
21      Q   I'm just going to show you Exhibit 10.
22          Have you seen this trail sign before?
23      A   Yes.
24      Q   Is it your recollection or understanding that the
25  sign that's shown in close-up in Exhibit 10 is the sign

Page 107

1   that was on Sunset Strip that's shown in photographs 8
2   and 9?
3       A   I mean yes, because there is the junction.  There
4   are multiple signs like this across the mountain.
5           So, you know, again, the photo is a little
6   confusing to me, because while I don't believe this
7   sign is on the other side, I believe it's the one
8   that's above.
9           They do change those signs periodically.  So
10  there are times where there are two of these on the
11  mountain, and sometimes one.  So yes, I've seen this.
12      Q   For perspective, if you look at the very top of
13  the photograph, does that help you at all?
14      A   It certainly does.  But you -- this sign could be
15  on the other side also.
16          So what I'm saying is:  This -- this sign I have
17  seen.
18      Q   Okay.  So, in other words, what you're saying --
19  correct me if I'm wrong -- is that the sign shown in
20  Exhibit 10 you've seen on the mountain and in the area
21  of the Jackson Gore Junction?
22      A   Oh, yes.
23      Q   You are just not sure whether it was at the
24  bottom of Roundhouse Run or Sunset Strip or both?
25      A   Correct.

Page 108

1       Q   But either way, there was signage indicating
2   "Look Ahead-Trail Merge"?
3       A   Yes.
4       Q   Thank you.
5       A   Multiple.
6       Q   The photographs of the ski area that I've been
7   showing you, would you agree with me that they seem to
8   have been taken on a day that was a little more
9   overcast than the day you skied?
10      A   Well, what confuses me the most about these
11  photos is that there's no one skiing.  So where -- I
12  would agree that they are overcast, but at what point
13  are there no skiers, is my question.
14          MR. FAXON:  When you own the mountain,
15          you can go take pictures whenever you want.
16          THE WITNESS:  I know, but to have no
17          one --
18          MR. FAXON:  You don't have to say
19          anything.
20  BY MR. GFELLER:
21      Q   And I understand what you are saying about the
22  lack of skiers.
23          My question is simply relating to the lighting.
24  Would you agree that the pictures that you are looking
25  at reflect more of a flat light than what you

Page 109

1   experienced on the day that you were skiing, which you
2   described as a nice blue-sky day?
3       A   Yes, it was very -- it was a nice day.
4       Q   Thank you.
5           According to the information that you gave to the
6   ski patrol at the time of the accident, your height was
7   5'8", weight 120.  Is that accurate?
8       A   Yes.
9       Q   Do you remember filling out a collision -- or at
10  least signing off on a collision report with the ski
11  patrol?
12      A   Yes, I -- but as I'm sure you can imagine, the --
13  you know, from the moment of the collision, you know,
14  being taken down, getting into the, you know, it was --
15  it was a bit foggy, and the pain was intense.
16          MR. FAXON:  I should have objected to
17          the form of the question, because you asked
18          her if she filled it out or signing.  And I
19          don't know if you answered you were filling
20          it out or you signed it.
21          MR. GFELLER:  When I said "or," I was
22          actually correcting my own question.  Let me
23          ask it the way I intended to ask it.
24  BY MR. GFELLER:
25      Q   Do you recall signing a collision report?

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY
12/06/2017                                                          Stacie Rivard-Pedigo

Page 110

```
1    A   I recall them talking to me.  And I mean based on
2  what is in your hand, yes.
3    Q   And am I correct that whatever information you
4  gave to the ski patrol at the time would have been
5  truthful and accurate to the best of your ability?
6    A   Yes.
7           (Defendant's Exhibit 11 marked for
8            identification.)
9  BY MR. GFELLER:
10   Q   So I'm going to show you what I've marked as
11 Exhibit 11.  You'll see that's a document that says
12 "Collision Report" at the top.
13   A   Uh-huh.
14   Q   That a yes?
15   A   Yes.  Sorry.
16   Q   It's okay.  You see down -- there is a signature
17 line?
18   A   Yes.
19   Q   Is that your signature?
20   A   Yes.
21   Q   Do you remember signing this document?
22   A   Yes.
23   Q   Other than your friends that you identified and
24 one of your children that were in the vicinity of your
25 collision, are you aware of anybody else other than
```

Page 111

```
1  them and the other skier who saw any part of the
2  collision?
3    A   So yes, other people saw it, because I remember,
4  as I said before, when I looked up, there were multiple
5  people looking over me.  So they had stopped to make
6  sure, you know, was I okay, did I need any additional
7  help.
8           Once they knew -- and I don't know who the people
9  were, but I know there were people.
10          Once they knew that, you know, ski patrol's been
11 called, you got to get out of the area, it was like
12 "we're good."
13   Q   So sitting here today, am I correct that other
14 than the people in your party and Mr. Ficklin, you are
15 not able to identify anybody else who may have seen any
16 part of the collision; is that correct?
17   A   Mr. Ficklin does have a friend.  I don't know the
18 friend's name, but he -- he witnessed it.
19   Q   Other than that friend of Mr. Ficklin,
20 Mr. Ficklin, and people in your party, am I correct
21 that you are not able to identify anybody else --
22   A   No.
23   Q   -- who may have seen any part of the collision?
24   A   Yes.
25   Q   Thank you.  So when the ski patrol came to your
```

Page 112

```
1  attention, approximately how long were they with you on
2  the scene before they took you down in the sled?
3    A   I would say it was, you know, a good 20 minutes
4  to get everything -- get my leg situated in a way that
5  it was safe to get down.
6    Q   And they took you down to the ski patrol room?
7    A   Yes.  At Jackson Gore.
8    Q   At Jackson Gore?
9    A   Yes.  No --
10   Q   Are you sure about that?
11   A   No, no.  No, they took me -- not to Jackson Gore.
12 They took me back to Okemo, because I remember the ride
13 was long, so they took me to the Okemo side.
14   Q   Once you were there, I take it they continued to
15 assess and treat your injury.
16   A   Yes.
17   Q   At some point did they call an ambulance or was
18 an ambulance called?
19   A   An ambulance was not called.  No, an ambulance
20 was not called.
21   Q   Did they ask if you wanted an ambulance called?
22   A   Yes.
23   Q   Did you turn that down?
24   A   At the time, I was with Dieter, and he is an
25 orthopedic surgeon.  So he wanted me to -- he wanted me
```

Page 113

```
1  to go to the -- not a walk-in clinic.  I don't remember
2  the name.  A place that does X rays and things like
3  that, but not all the way to the hospital.
4    Q   Did he have a specific one in mind, or he was in
5  the process of trying to find one?
6    A   Oh, no, he knew of the one right there that
7  everyone goes to.  I know the name of it, but I can't
8  recall it off the top of my head.
9    Q   That's okay.  Is that in fact what you did?  Did
10 Dieter then take you to that hospital or clinic?
11   A   My husband, Clay, and Dieter took me to the
12 clinic.
13   Q   And at that point you had X rays?
14   A   Yes.
15   Q   And they diagnosed your injury?
16   A   Yes.
17   Q   Did you then return back to your home in
18 Connecticut that same day?
19   A   No, not the same day.  We went -- because that
20 whole process took a very long time.  The three kids
21 were still skiing.
22          In order for us to get back to Connecticut,
23 Dieter and Carrie -- they're both surgeons, and Denise
24 is a surgeon -- they both thought it was safer for me
25 to get the pain meds that I needed, stay there, rather
```

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 114

1   than drive home without them to come home to an empty
2   house without someone there to help.
3        So Clay packed everything up that evening and we
4   left first thing the following morning.
5   Q   And I take it that Dieter and the other
6   physicians helped take care of you and stabilize you
7   throughout that evening.
8   A   Yes.
9   Q   And then when you went home to Connecticut the
10  next day, did you then follow up with an orthopedic
11  surgeon in Connecticut?
12  A   Yes.  So Dieter and Carrie had called their
13  colleague from that -- right after it happened really,
14  to say, you know, "This is what happened, she will be
15  coming to see you."
16       So we came home on Tuesday morning, I saw my
17  surgeon on Wednesday morning, and had surgery on Friday
18  morning.
19  Q   What was the name of the surgeon that you saw?
20  A   Dr. Baumgaertner.
21  Q   You haven't skied since February 20th, 2017,
22  correct?
23  A   No.
24  Q   Do you intend to ski this season?
25  A   Well, as I have written here, I don't -- I don't

Page 115

1   know what my -- what my plan is.  It scares me.  You
2   know?
3        But I -- I hope to ski again, because it's
4   something that I truly love to do.  It's something
5   that, you know, my husband always says, is that it's
6   the one family activity that we all do.  You know?
7        We can go watch the kids play sports, but we
8   don't play the sports with them.
9        This is the one thing that we all love, we all
10  enjoy, it's just -- it's like the perfect thing to do
11  as a family.  So I hope some day that I can get back to
12  that.
13  Q   Do you anticipate that your husband and/or your
14  children will ski this season?
15  A   I hope so.
16  Q   Sitting here today, do you have any plans for any
17  trips with the family to go to a ski area?
18  A   No, not yet.  But this also has really put a fear
19  of skiing into especially my daughter, which makes me
20  angry.  You know, for someone's negligence to kind of
21  take the love out of it is -- just doesn't seem fair.
22  Q   Do your kids participate in any after-school ski
23  programs, anything like that?
24  A   No.  They are not old enough to do that.
25  Q   Did you take any photographs or video at Okemo on

Page 116

1   February 20th, 2017?
2   A   I do have one family photo from that day.
3   Q   And it was taken, obviously, before the injury?
4   A   Yes.
5   Q   Where was it taken?
6   A   At that -- at the top of --
7   Q   At the top of the Jackson Gore peak?
8   A   You know, I can't be certain if it was there or
9   at the lift that -- prior to getting to that peak.  But
10  that day, I -- I have a picture here with the five of
11  us.
12  Q   Other than that picture, did you take any
13  photographs or video at Okemo on February 20th, 2017?
14  A   No.
15  Q   Are you aware of any photographs or video that
16  depict any part of the collision that occurred that
17  day?
18  A   No.
19  Q   Are you aware of any photographs or video that
20  depict anything at Okemo Mountain that day other than
21  the one you just talked about?
22  A   No.
23  Q   In other words, as far as you know, your husband
24  doesn't have any photographs or video from that day?
25  A   I don't believe so.

Page 117

1   Q   And how about your children?
2   A   No, definitely.
3   Q   Have you ever asked any of them?
4   A   No.
5   Q   And how about your friends:  Have any of them
6   ever told you that they have photos or video of either
7   the collision or anything leading up to or following
8   the collision at Okemo that day?
9   A   No.
10  Q   Have you asked?
11  A   No.
12  Q   Have you been back to Okemo since --
13  A   No.
14  Q   -- that time?  Has anybody in your family?
15  A   No.
16  Q   Tell me, as you understand it:  What are the
17  injuries that you incurred in the collision?
18  A   So I had a tibial plateau fracture of the
19  right -- my right leg.  Partial torn meniscus, which
20  was repaired during surgery.
21  Q   Anything else?
22  A   And there was some -- you know, some ligament
23  damage, but not to the point that it -- my MCL still
24  does give me some trouble, but nothing that needed to
25  be surgically done at that time.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                              Stacie Rivard-Pedigo

Page 118

1   Q   Okay.  I'm going to walk you through your medical
2   treatment.  Okay?
3   A   Uh-huh.
4   Q   Based upon everything that we've seen in the
5   case, some of which comes from the Okemo ski patrol and
6   then some of which -- a lot of which comes from your
7   treating physicians, Ludlow Health Center would be the
8   place that you went --
9   A   Yes.
10  Q   -- correct?
11  A   Yes.  Yes.
12  Q   After being assessed and taken care of by the
13  Okemo ski patrol, both on the mountain and then in
14  their ski patrol room --
15  A   Correct.
16  Q   -- you then left with your friends and husband
17  and went to the Ludlow Health Center where you had the
18  X rays?
19  A   Yes.
20  Q   And it's at that time you were told that you had
21  the tibial plateau fracture, correct?
22  A   Yes.
23  Q   On February 22nd, 2017, which would have been two
24  days after the incident, as you explained earlier, you
25  saw Dr. Baumgaertner at Yale-New Haven Hospital,

Page 119

1   correct?
2   A   Yes.
3   Q   And at that time he told you that he recommended
4   surgery, which you consented to, and he did on that
5   Friday morning?
6   A   Yes.
7   Q   So Friday, February 24th, 2017, you had an open
8   reduction internal fixation of the tibial plateau
9   fracture, correct?
10  A   Yes.
11  Q   What is it that you understand the doctor did in
12  that surgery?
13  A   So I have a plate and six screws that are holding
14  the bone in place.
15  Q   And then at the same time, as you explained a few
16  minutes ago, he also did work on your -- he repaired
17  the partially torn meniscus?
18  A   Correct.
19  Q   And this was done at Yale-New Haven Hospital,
20  correct?
21  A   Yes.
22  Q   The next records we have come from the following
23  day, February 25th, 2017, where you had your initial
24  evaluation with physical therapy at Yale-New Haven
25  Hospital.  Do you remember that?

Page 120

1   A   Yes.  And I was unable to do anything at that
2   time.
3   Q   Do you remember seeing physical therapy again the
4   following day, February 26th?
5   A   Yes.
6   Q   And showing some improvement?
7   A   Yes.
8   Q   February 27th you also met with inpatient
9   physical therapy before being discharged from the
10  hospital, correct?
11  A   Yes.
12  Q   And at that time they told you that you would
13  utilize a rolling walker and crutches to get around
14  while you were recovering from the surgery?
15  A   Yes.
16  Q   So you were discharged from Yale-New Haven on
17  February 27th, correct?  That's three days after the
18  surgery.
19  A   Yes.
20  Q   And then you were told to follow up with
21  Dr. Baumgaertner a few days later, which would have
22  been March 1st, correct?
23  A   Yes.
24  Q   On March 1st you had your five-day post-op visit
25  with Dr. Baumgaertner and you told him that you had

Page 121

1   been ambulating well with the walker, meaning getting
2   around walking with the walker, correct?
3   A   Yes.
4   Q   And you were maintaining the restriction that he
5   had placed on weightbearing on the right leg?
6   A   Yes, nonweightbearing for 12 straight weeks.
7   Q   The next visit would have been on March 10th, so
8   ten days after your first post-op visit.  Does that
9   sound about right?
10  A   Yes.
11  Q   And at that time you were two weeks post-op and
12  you had staple removal?
13  A   Yes.
14  Q   And you were told to continue the range of motion
15  exercises for your right knee as you could tolerate it?
16  A   Yes.
17  Q   After that March 10th visit, the next visit that
18  we have a record of is March 29th.  Does that sound
19  about right?  That was with Dr. Baumgaertner.
20  A   Yes.
21  Q   That was a month post-op?
22  A   Uh-huh.  Yes.
23  Q   At that time you were maintaining 25 pounds
24  weightbearing to your right leg with a walker.  Do you
25  recall that?

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                          Stacie Rivard-Pedigo

Page 122

1      A    No.  I was nonweightbearing for 12 weeks.  I
2   mean --
3          Let me take that back.  I would put my foot -- my
4   foot -- I didn't walk with it up all the time.  I mean
5   I definitely -- you know, I don't recall that 25
6   pounds.  But my toe would touch.
7      Q    Which, in other words, if you weighed 120 pounds
8   and you were putting down about 25 pounds of weight,
9   that would be consistent with what you are describing,
10  right; that you would put down just a slight weight to
11  move around, but not full weightbearing?
12     A    No.  Yes, I mean it was more nonweightbearing
13  than that.
14     Q    Do you recall the doctor telling you on
15  March 29th to go to 25 to 50 pounds weightbearing for
16  the next four weeks and then increase it gradually; in
17  other words, over time to start putting a little bit
18  more and more weight on the leg?
19     A    He said that in people with this particular
20  injury, 12 weeks is the timeframe where you really need
21  to be very careful.  You can't do anything, you know,
22  that's going to make you injure yourself even more.
23         So for 12 -- for 12 weeks, I was
24  nonweightbearing.
25     Q    The next record we have is an April 12th visit

Page 123

1   with Dr. Gregory Vornovitsky.
2      A    Yes, that's my primary care provider.
3      Q    And at that time you were having finger numbness?
4      A    Yes.
5      Q    And then also edema in your right lower leg for a
6   week.  Do you recall that?
7      A    So I actually had a DVT.
8      Q    What is that?
9      A    A blood clot.
10     Q    And did the doctor diagnose that on April 12th or
11  sometime thereafter?
12     A    That must have been -- you know what:  That was a
13  little bit later, because I remember that was my kids'
14  April vacation, which is a bit later than April 12th.
15     Q    Did either Dr. Vornovitsky or Dr. Baumgaertner
16  indicate to you that the blood clot was associated with
17  the surgery?
18     A    Yes.  But back to the finger numbness.
19     Q    Uh-huh.
20     A    So I was having some kind of radiating numbness
21  from my neck down to my fingers.
22     Q    And you are showing me your left hand.  Was it
23  your left fingers that you were having this on?
24     A    Yes.
25     Q    That's what the records say.

Page 124

1      A    Yes.  It was -- it was the left.  So I had -- you
2   know, I went to the doctor and we discussed it.  They
3   were wondering if it was from the accident.  You know,
4   did I have some sort of a neck injury from the accident
5   that's causing this numbness?
6          And I had an MRI, which indicated that there
7   was -- and they had a name for it.  But it was really
8   from like clenching the walker so much, that you get
9   this kind of feeling.  And it did go away once I went
10  to crutches actually.
11     Q    And at some point they also told you that you
12  have a DVT?
13     A    Yeah.  So it should be --
14     Q    It was right around that time?
15     A    Yeah.
16     Q    And --
17     A    April 20th maybe.
18     Q    And when they told you about that, they had put
19  you on some anticoagulation medicine?
20     A    Eliquis for three months.
21     Q    Did they tell you that the blood clot was related
22  to the leg injury and/or surgery?
23     A    Yes.  It's just from lack of movement, lack of
24  weightbearing, lack of being active and physical, it
25  happens.

Page 125

1      Q    And did you have any other problems with respect
2   to the blood clot, or did the medication take care of
3   it?
4      A    The medication took care of it.
5      Q    After the April 12th and April 13th visits, which
6   we have essentially talked about, the next visit that
7   we show is April 24th.  It's about a week later.
8      A    Uh-huh.
9      Q    And we show that you had an MRI of your cervical
10  spine at Yale-New Haven Hospital.
11     A    Yes.
12     Q    Do you recall what they told you about the
13  findings of the MRI?
14     A    That's what I indicated before:  that it was not
15  a function of having any kind of spinal or neck injury.
16  It was whatever the word is that they --
17     Q    Degenerative?
18     A    Well, I do have some degenerative issues, not
19  pertaining to the accident.  It's just a genetic thing,
20  unfortunately.
21         So the numbness, they said, is really from the
22  clenching of the walker; it will go away when you stop
23  using it.
24     Q    And that happened?
25     A    I went to crutches because then that was getting

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY
12/06/2017                                                          Stacie Rivard-Pedigo

Page 126

1   more to the point where I could use -- do some weight.
2   So a walker was much better for me when I couldn't --
3   when I was not bearing weight.  When I was bearing some
4   more weight, crutches were better.
5       Q   So you also indicated some degenerative issues
6   that you have.
7       A   Yes.
8       Q   What part of your body are you having the
9   degenerative issues that are not related to the ski
10  accident?
11      A   In my cervical spine.
12      Q   And that's something that was occurring before
13  the accident occurred?  Or do you not know?
14      A   I don't know.  I don't know.
15      Q   But the doctors have told you that that's not
16  related to the ski accident.  Is that your
17  understanding?
18      A   Yes.
19      Q   Do you recall having an MRI back in October of
20  2016 for your cervical spine?
21      A   Yes.
22      Q   And what led you to need an MRI at that time?
23      A   I believe it was the same issues that I was
24  having on the left side.  That was happening on my
25  right side.

Page 127

1       Q   With the numbness and tingling?
2       A   With the numbness and tingling.  Obviously I
3   wasn't on a walker or crutches at that point.  So I
4   believe that's probably when they figured out that I
5   had some degenerative issues there.
6       Q   Do you recall also having some left-handed
7   numbness prior to the accident?
8       A   Back in October of 2016?
9       Q   Right.
10      A   I don't recall which hand it was.  Perhaps it was
11  my left, I don't remember.
12      Q   Were you told as far back as October of 2016 that
13  you had some degenerative changes to your cervical
14  spine?
15      A   Yes.
16      Q   And am I correct that any issues that you've
17  experienced with respect to your cervical spine you are
18  not attributing to the ski accident?
19      A   I'm not.
20      Q   With respect to the ski accident, the injuries
21  you are claiming are strictly the left tibial plateau
22  fracture -- excuse me, the right tibial plateau
23  fracture and the right meniscus?
24      A   Yes.
25      Q   And of course bumps, bruises, things like that?

Page 128

1       A   Yes.
2       Q   Following the April 24th, 2017, MRI, the next
3   record we have is from May 8th, 2017, which was with
4   Dr. Lori Cretella.
5           Do you recall seeing Dr. Cretella?
6       A   She is the neurologist.
7       Q   And that was for your hand numbness?
8       A   Yes.
9       Q   One of the notes from that visit are that
10  lifestyle modifications were discussed.
11          Do you recall that or what she may have been
12  referring to?
13      A   Repeat that please.
14      Q   Sure.  In Dr. Cretella's notes from your
15  May 8th, 2017, visit, she talks about the fact that you
16  were experiencing left-handed numbness in your fourth
17  and fifth digits in the fall of 2016, she talks about
18  the fact that you began having this in your right hand
19  following the ski accident due to the walker.
20      A   Uh-huh.
21      Q   And then she talks about lifestyle modifications
22  being discussed and that you're getting a physical
23  therapy referral.
24          Does that mean anything to you?  Do you have any
25  memory of that?

Page 129

1       A   I have no idea what that means.
2       Q   What, if anything, do you remember from your
3   visit with Dr. Cretella on May 8th?
4       A   I was supposed to have a nerve conduction study,
5   but for whatever -- I guess the nerve conduction study
6   would be able to get a little closer to pinpointing
7   what was going on.
8           But for whatever reason, the scheduling -- I was
9   under the impression I was having a nerve conduction
10  study, she was not.  She felt badly about that, I could
11  tell.
12          And so she said, "I don't have time to do the
13  nerve conduction study, but we can do kind of the fast
14  version of that."  And so she did kind of a -- you
15  know, put like sensors and things and did everything
16  and said based on that, she didn't think it was
17  anything more than the use of the walker.
18      Q   The next record we have is from May 17th, 2017,
19  with Dr. Baumgaertner, at which point he indicated that
20  you were doing well with pain, motion, and swelling.
21          Do you recall that?
22      A   At what date?
23      Q   May 17th.
24      A   Yes.
25      Q   And at that point he felt that you were ready to

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                                Stacie Rivard-Pedigo

Page 130

1  discharge the crutches and follow up in 6 to 18 weeks,
2  depending on how you were doing.
3        Do you recall that?
4     A   Yes.
5     Q   Have you seen Dr. Baumgaertner since May 17th?
6     A   I saw him the other day.
7     Q   Late November?
8     A   I actually just saw him two weeks ago.
9     Q   And why did you see him?
10    A   That was kind of the --
11       Now, I did see him after May 18th, correct?
12    Q   Well, the last record that I have with
13  Dr. Baumgaertner is May 17th of 2017.
14    A   No, so I just saw him last week.
15    Q   And was that a routine follow-up or did you make
16  the appointment because of a specific reason?
17    A   So I was having -- I saw him on
18  May 29th -- or --
19    Q   November 29th?
20    A   November 29th.  I continue to have a lot of
21  discomfort in my left inner -- now I'm getting tired.
22  My right inner knee gives me pain.
23       And so the last time I saw him, he said, you
24  know, "Come see me whenever.  If you are doing great,
25  if you are doing poorly, if that pain doesn't go away,

Page 131

1  I want you to come back to see me."
2        I just wanted to just kind of get an overall
3  feeling of how he thinks I'm doing and where I could
4  expect to go, and so I made the appointment really to
5  discuss that, that inner leg pain.
6     Q   And what was the outcome of that?
7     A   Kind of as I -- there is something I wrote in
8  here about that.
9        He really can't pinpoint the exact issue of why
10  I'm having that, that pain in that area.  It's
11  something that I've complained about since the day I
12  saw him back in February.  But he -- you know, he said
13  in the absence of it stopping your life, there's not a
14  whole lot we can do about that, other than waiting,
15  being patient, and seeing, you know, if time will make
16  that better.
17    Q   So sitting here today, do you have another
18  appointment with Dr. Baumgaertner?
19    A   Not currently, no.  He said, you know, see how
20  you're feeling and --
21       No, that's not true.  I don't have another
22  appointment, but he does want to see me around a year,
23  meaning in February.
24    Q   Just to check up on you?
25    A   Yes.

Page 132

1     Q   A year from the date of the incident?
2     A   Correct.  So that would be just a couple of
3  months from now.
4     Q   At some point you'll make an appointment to go
5  see him around February for the next checkup?
6     A   I will, yes.
7     Q   Other than that year out visit, do you understand
8  that you've essentially been released from his care
9  unless you need it?
10    A   Yes.  He says that this -- you know, this injury
11  is roughly a 12- to 15-month ordeal.  But there is
12  always that outside chance that life may not go back to
13  where I was.
14    Q   Have you seen improvement in your physical
15  abilities and tolerance for activity as time has worn
16  on?
17    A   I certainly -- I certainly see -- well, compared
18  to where I was on February 20th, with a drastically
19  terribly broken leg, yes, I've made incredible
20  improvements.
21       Am I where I want to be?  No.
22    Q   Has Dr. Baumgaertner given you hope that you will
23  eventually be, or does he feel that you've reached your
24  maximum improvement?
25    A   No, I feel like he does think that -- he does

Page 133

1  think that, you know, a full recovery is possible.  But
2  everyone's idea of a full recovery is a little
3  different than maybe someone else's.
4     Q   You did physical therapy at Amity Physical
5  Therapy.
6     A   Yes.  And I went for roughly -- roughly three-ish
7  months.
8     Q   Tell me about that, because we don't have the
9  record.  So when did you start that?
10    A   So I -- I was able to do full weightbearing and
11  start driving right around June 1st.
12       So I started right around June 1st and I ended
13  late July, late -- actually, no, into August, but
14  definitely before the kids went back to school.  So I
15  ended in August.
16    Q   And how many times a week would you go during
17  that period of time?
18    A   Two to three.
19    Q   An hour per visit?
20    A   Yes.
21    Q   And you would essentially do range of motion and
22  strengthening exercises --
23    A   Yes.
24    Q   -- during that time?
25    A   Uh-huh.  Yes.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                        Stacie Rivard-Pedigo

Page 134

1    Q   Did it help?

2    A   It did.

3    Q   Did they leave you off with a plan for -- that

4  they expected you to keep doing on your own?

5    A   Yes.

6    Q   And tell me about that.

7    A   So it's -- you know, I did the extent of physical

8  therapy with them for those months.  And then, you

9  know, you get to a point where they think you can kind

10  of do this plan on your own at home.

11       So, you know, every morning, I do leg lifts, I do

12  stretches, I push my leg, I bend my leg.  You know, the

13  basic things you would think you would need to do for

14  leg strengthening.

15    Q   Does it help?

16    A   Yes.

17    Q   I want to run you through the list of health care

18  providers that you've treated with for your leg injury.

19    A   Sure.

20    Q   And just confirm whether or not I'm missing

21  anything.  Okay?

22    A   Sure.

23    Q   As I understand it, you've treated with the

24  Okemo Mountain Ski Patrol, Ludlow Health Center,

25  Dr. Baumgaertner at Yale-New Haven Hospital,

Page 135

1  Dr. Vornovitsky --

2    A   Yes.

3    Q   -- at Northeast Medical Group, Dr. Cretella --

4    A   Yes.

5    Q   -- and Amity Physical Therapy?

6    A   Yes.

7    Q   And you have had MRIs at an MRI center?

8    A   Yes.

9    Q   Other than that, have you treated with anybody

10  else for the injuries you are claiming in this case?

11    A   The only other place that I went, but I'm

12  assuming -- I'm going to make the assumption it's kind

13  of the same as the MRI, but I did have to have an

14  ultrasound for the blood clot, that I did at a Yale

15  facility.  But other than that, those are the doctors.

16    Q   At any point in your life, have you ever had any

17  other physical injuries that have required the

18  assistance of a physician or health care provider?

19    A   No.

20    Q   Since February 20th, 2017, have you had any

21  physical injuries that have required health care or a

22  physician's assistance?

23    A   If you are -- if you go back to October 16th when

24  I had to have the MRI for that neck issue, nothing

25  other than that.

Page 136

1    Q   Okay.  So other than the treatment for the

2  degeneration of the cervical spine --

3    A   Right.

4    Q   -- and other than the injuries you're claiming in

5  this case and the treatment resulting from those

6  injuries, are you -- just correct me if I'm wrong.  But

7  what you are telling me is you have not had to have any

8  medical care for any other physical injuries or

9  physical issues either before or after the date of the

10  ski accident; is that correct?

11    A   So now you are really making me wrack my brain

12  here.

13       So I did go to physical therapy several years

14  ago.  I was lifting my bike and I -- something happened

15  in my lower back.  But it was nothing that required --

16  I just went to physical therapy a couple of times,

17  dealt with it, it was done.

18    Q   Other than that?

19    A   And I had -- when I was pregnant with my son, I

20  had kidney stones, I mean that I was admitted to the

21  hospital.

22    Q   I'm not considering kidney stones, but physical

23  injuries.

24       I just want to tie this up with a bow.  Okay?

25    A   Yes.

Page 137

1    Q   It is the holiday season.

2       So what I want to understand is:  Am I correct

3  that other than the disk degeneration that you've

4  sought treatment for, the injuries that we have talked

5  about that are attributed to the ski collision, and the

6  physical therapy you saw after you lifted your bike

7  several years ago --

8    A   Yes.

9    Q   -- you haven't had to seek medical treatment for

10  any other physical injuries either before or after the

11  ski collision; am I correct?

12    A   Correct.

13    Q   Am I correct that other than what we have talked

14  about, the only other hospitalizations that you've had

15  in your life have been related to pregnancy and/or

16  childbirth?

17    A   Yes.

18    Q   At any point in time either prior to or after the

19  February 20th ski collision, have you been on any

20  medications for anything unrelated to the injuries that

21  we have talked about?

22    A   No.

23    Q   One of the allegations in the complaint that

24  gives rise to this lawsuit talks about severe emotional

25  distress.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY
12/06/2017                                                    Stacie Rivard-Pedigo

Page 138

1      Have you ever treated with a mental health care
2   professional?
3      A   No.
4      Q   Do you have any plans to?
5      A   No.
6      Q   Did you have health insurance as of
7   February 20th, 2017?
8      A   Yes.
9      Q   Through whom did you have health insurance?
10     A   Through my husband's employment.
11     Q   And where does your husband work?
12     A   The Tradition Golf Club at Oak Lane.
13     Q   What does he do there?
14     A   He's a golf course superintendent.
15     Q   Who is your health insurer through that
16  employment?
17     A   United Healthcare-Oxford.
18     Q   Is it your understanding that, with the exception
19  of co-pays that you've paid for medication and/or for
20  treatment, United Healthcare-Oxford has paid your
21  medical bills associated with the injuries that you are
22  claiming in this case?
23     A   After our deductible.
24     Q   Right.  You have a high deductible plan, correct?
25     A   Yes.

Page 139

1      Q   What is the deductible amount?
2      A   $11,000.
3      Q   Per year?
4      A   Yes.
5      Q   For the family?
6      A   Yes.
7      Q   And I take it you used most but not all of that,
8   correct?
9      A   We used -- no, we used it all.
10     Q   So the entire $11,000 went towards your treatment
11  following the ski accident?
12     A   Actually, I take that back.  There was a little
13  bit in the beginning that was used for my son, who
14  suffered a concussion.
15     Q   If I told you that you had prescription co-pays
16  of approximately $1,900 and medical, meaning doctor,
17  co-pays of about $8,900, does that sound about right?
18     A   What -- say it again.  $8,900 and --
19     Q   It was $8,894.24.  Does that sound about right?
20     A   Plus the --
21     Q   Plus the prescription co-pays.
22     A   So yeah, you're approaching almost $11,000.
23     Q   Sounds about right?
24     A   Yeah, I would say so.
25     Q   And that $11,000, does that come out of some type

Page 140

1   of an HSA account that you keep?
2      A   We do keep an HSA account.  But because you can
3   only put $6,750 in per year, you know, our HSA account
4   didn't cover that.  That covered some, but not all.  So
5   then that came out of our -- I mean it comes out of
6   your own pocket anyway, but essentially it's $11,000
7   out of our own pocket.
8      Q   Some of it's pretax, some of it's not?
9      A   Correct.
10     Q   I take it you've always been truthful and
11  accurate with all of the health care professionals that
12  have taken care of you, starting with the
13  Okemo Mountain Ski Patrol all the way through all of
14  your treating physicians?
15     A   Yes.
16     Q   Let's turn our attention to the document that we
17  marked as Exhibit 1 that you brought with you today.
18     A   Okay.
19     Q   You created that document so that you wouldn't
20  forget some of the things that -- or some of the ways
21  that this has affected your life.  Correct?
22     A   Right.
23     Q   Why don't you walk -- I don't have a copy of it
24  in front of me, so I'm going to rely upon you.  Why
25  don't you take me through each of the points in that

Page 141

1   document and tell me about them.
2      A   Sure.  So the first 12 weeks after surgery, I was
3   nonweightbearing.  I was unable to take care of myself,
4   and I truly mean that.  I was not able to get out of
5   the shower by myself, get dressed by myself.  My
6   husband truly had to be there.  So he really took about
7   four weeks off of work to take care of me.
8         And, you know, as time went on, after those four
9   weeks, I was able to do a little bit more and be a
10  little bit more confident.  But really his assistance
11  with me for the bulk of those 12 weeks was -- if I
12  didn't have him, I would have needed an aide.
13        So, anyway, he did take the time off to organize
14  the schedules and the kids, and household stuff that we
15  both did together, then he was on his own.
16        I was out of work for the remainder of the
17  2016-2017 school year.  It did present a financial
18  hardship, since my salary -- we take my salary and we
19  pay for kids' activities, we fund our HSA account.
20  It's kind of like our extra money just that we -- we do
21  with, that I missed.
22        There were months of -- you know, it was a really
23  emotional time.  It was painful.  I always asked
24  myself, you know, "Why did this happen to me?"  I cried
25  almost daily for 12 weeks.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                    Stacie Rivard-Pedigo

Page 142

1      And trying to explain that to your kids is pretty
2  challenging.  You know, to explain -- to try to explain
3  to them why you can't do the things you want to do, why
4  you are always in this chair, why you can't cook
5  dinner.  You know, it was confusing for them.
6      You know, after, you know, just sitting there for
7  12 weeks as everyone else goes about their business,
8  you know, they go to school and you are sitting alone
9  in your house, it's pretty lonely and dark.  So I was
10  happy that once the 12 weeks were over, that I could
11  start to try to get a little bit back of myself, which
12  I did.
13      I don't have the same confidence in my leg.  And
14  what I mean by that is like, for example, when I get up
15  right now, I have to stand for a second.  Something in
16  my knee always pops.  The doctor said as long as the
17  pop doesn't hurt, don't worry about it.  But I have
18  to -- I have to think about what I'm going to do next.
19  Which, you know, if there is a curb here, which leg am
20  I going to lead with?  If there is an incline -- going
21  down the stairs is really hard.  So I have to kind
22  of -- it's not that I can't do it, but I have to --
23  it's not just like the rest of you that, I would
24  assume, just get up and go.  I have to think about my
25  next step.

Page 143

1      You know, the fear of injuring myself again is
2  overwhelming.  You know.  It's frightening to think,
3  you know, if I slip on the ice or if I fall, am I going
4  to re-injure it?  If something -- I don't want to go
5  through that again.
6      I mentioned that the stairs are very challenging.
7  It's difficult in my employment since I have to go up
8  and down those stairs.  To kind of keep up with the
9  pace of a four- and five-year-old is -- it's a
10  challenge.
11      I talked about, you know, tying kids' shoes,
12  bending, kneeling down, zipping coats, doing puzzles,
13  that stuff is hard.
14      Just daily stuff at my own house, you know, the
15  standing and doing laundry, doing the dishes, up and
16  down the stairs with the laundry, again, it's a lot
17  of -- it's work.  It's still work for me to do those
18  kinds of things.
19      I always participated in rigorous exercise all of
20  my life.  I was a runner in high school, a runner in
21  college.  And I can't -- I can't do that now.  I mean
22  it hurts.  You know, it's -- and I wonder "Is that a
23  forever hurt or within time will that go away?"  I try
24  to push myself as much as I can.  But I want to do
25  those things.  It's unnerving when I'm -- when I feel

Page 144

1  like -- like when -- I had one student in particular
2  that loves to run up to me, and the thought of him like
3  hitting me in a -- in that way is scary.
4      I can't kneel down very well at all.  One thing I
5  really -- I really do miss is I -- my two boys love to
6  play baseball.  I used to be out there hitting balls
7  off of a tee for them.  If you think about swinging a
8  bat, you need to pivot your knee.  I can't make that
9  motion anymore.  I hope to at some point.  But that's
10  been frustrating for them.  I'm always the one that
11  hits the balls to them, and I can't do it.  I can throw
12  it to them now, but I can't get out there and hit them.
13      I talked about the constant right inner knee
14  pain.  Surgeon can't pinpoint exactly what that is all
15  about.  He just stated that, you know, you suffered a
16  devastating injury, and it doesn't go away -- in 6
17  months or 9 months or 12 months or 15.  It just -- it
18  may be there forever, it might go away.
19      Oh, I talked about how -- I do have a feeling
20  that my leg and knee are kind going to give out on me.
21  I don't know that they will -- that it will.  But it
22  feels like that could happen.  So like I said, I have
23  to think about things.  Like getting in and out of
24  the shower, I still have a bar there, because I'm
25  frightened that I'm going to slip.  We have, you know,

Page 145

1  extra carpets there so I don't slip when I get out of
2  the shower.  But it's not -- it's not just like the
3  life I had, where you just get in the shower, get out
4  of the shower, and you're done.
5      I am tired at the -- I'm more tired at the end of
6  the day than I ever have been.  Just it's tiring to
7  kind of not be able to do things as quickly as I have
8  been used to.
9      And then the last one is, is that skiing has been
10  something that I've loved from when I was a little kid.
11  And it's frustrating that, you know, winter is around
12  the corner and I probably won't do it.  It makes me
13  angry.  And it makes me sad.  So...
14  Q    Thank you.
15      Was it your idea to consult with an attorney
16  after the accident?
17  A    Yes.
18  Q    Did your husband play a part in that decision
19  too?
20  A    Yeah.  I mean I think we just -- you know, we
21  talked about it.  And I do have a friend that her
22  husband is an attorney.  And just -- you know, just
23  kind of -- kind of mulling things over in conversations
24  with people.  And my husband and I decided that that's
25  what we wanted to do.

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                      Stacie Rivard-Pedigo

Page 146

1   Q   How come?

2   A   I kind of liken this to if I get into a car

3   accident on the way home.  You know?

4       This particular accident was not my fault.  I had

5   absolutely nothing to do with this collision.  It was

6   his negligence and his recklessness that put me in this

7   spot.

8       Same thing that happens in a car.  If I go out

9   right now and I'm reckless and I hurt you, that's what

10  this is all about, is that there are ways -- someone

11  needs to take responsibility, in my opinion.

12      And I was not just going to let this go.  This

13  has been an emotional time, it's stressful, the

14  financial piece, it's just -- it's not right.

15  Q   So when you decided to seek an attorney, what was

16  it that you hoped to gain from the experience?

17  A   I would like -- I would like to be made whole on

18  this.  It was not my fault.  I don't feel that someone

19  else's negligence should put me in this spot.  And I

20  hope, I sincerely hope, that something -- that somehow

21  this will be made right for me.

22  Q   And how is it that you feel you can be made whole

23  or this can be made right for you?

24  A   Well, I would think that out-of-pocket expenses.

25  The physical and emotional pain of all this, the pain

Page 147

1   and suffering.  It's -- I have a bad feeling about this

2   accident.

3   Q   Is there anything about your day-to-day life that

4   you can't do at all, can't do as often, can't do as

5   well, that you haven't already told me about, but that

6   you attribute to the injuries?

7   A   No, I think I told you everything that I can't

8   do.

9       MR. GFELLER:  I don't have any more

10      questions from you.

11      I'm going to leave this open only for

12      the limited purpose of if we have to ask any

13      more questions regarding any more treatment

14      that you receive going forward with respect

15      to the injuries that you are claiming or with

16      respect to the physical therapy records,

17      however unlikely that may be.  But other than

18      that, I have no more questions for you.

19      Thank for coming in today.

20      THE WITNESS:  Thank you.

21      MR. FAXON:  All right.  Without

22      specifically consenting to that statement, I

23      have no questions.

24      (Deposition concluded:  4:55 p.m.)

25

Page 148

1                    J U R A T

2

3   I, STACIE RIVARD-PEDIGO, do herby certify that the

4   foregoing testimony given by me on December 6, 2017, is

5   true and accurate, including any corrections noted on

6   the corrections pages, to the best of my knowledge and

7   belief.

8

9

10

11

12

13

14  At                          in said County of

15               , this          day of          ,

16  2017, personally appeared                    , and

17  made oath to the truth of the foregoing testimony.

18

19

20       Before me,                          ,

21       Notary Public.

22       My commission expires:

23

24

25

Page 149

1                TRANSCRIPT CORRECTIONS

2   WITNESS NAME:  STACIE RIVARD-PEDIGO

3   CASE STYLE:    RIVARD-PEDIGO

4       vs.  OKEMO

5

6   PAGE       LINE              REASON FOR CHANGE

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25

STACIE RIVARD-PEDIGO -vs- OKEMO LIMITED LIABILITY COMPANY

12/06/2017                                                      Stacie Rivard-Pedigo

Page 150

```
 1              C E R T I F I C A T E
 2      I hereby certify that I am a Notary Public in and for
 3   the State of Connecticut duly commissioned and
 4   qualified to administer oaths.
 5      I further certify that the deponent named in the
 6   foregoing deposition was by me duly sworn and thereupon
 7   testified as appears in the foregoing deposition; that
 8   said deposition was taken by me stenographically in the
 9   presence of counsel and transcribed by means of
10   computer-aided transcription by the undersigned, and
11   the foregoing is a true and accurate transcript of the
12   testimony.
13      I further certify that I am neither of counsel nor
14   attorney to either of the parties to said suit, nor of
15   either counsel in said suit, nor related to or employed
16   by any of the parties or counsel to said suit, nor am I
17   interested in the outcome of said cause.
18      Witness my hand and seal as Notary Public this
19   18th day of December, 2017.
20
21
22              Vicki S. McManus
                NOTARY PUBLIC
23
24   My commission expires:  July 2021
25   Shorthand Reporter License No. 00152
```

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIE RIVARD-PEDIGO | : | CIVIL ACTION NO.: |
| | : | |
| *Plaintiff*, | : | 3:17-cv-00568-WWE |
| | : | |
| v. | : | |
| | : | |
| OKEMO LIMITED LIABILITY | : | |
| COMPANY D/B/A OKEMO | : | |
| MOUNTAIN RESORT | : | |
| | : | |
| *Defendant*. | : | APRIL 17, 2019 |

### DEFENDANT OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT'S PROPOSED JURY INTERROGATORIES & VERDICT FORM

Defendant Okemo Limited Liability Company d/b/a Okemo Mountain Resort ("Okemo"),

hereby submits proposed jury interrogatories to be given to the jury at the close of the trial of this

action. Okemo respectfully requests the right to submit revised or additional jury interrogatories

based upon the evidence adduced at trial or in connection with any rulings of law the Court may

render during trial.

## QUESTION 1

Based on the evidence presented and the law as charged, was Plaintiff Stacie Rivard-Pedigo ("Plaintiff") a skier who was injured as a result of a danger inherent in the sport of skiing?

YES_____                    NO_____

If you check "YES," you are done deliberating and the foreperson should sign and date the verdict form, indicating that the jury has reached a verdict in favor of Defendant Okemo Limited Liability Company d/b/a Okemo Mountain Resort ("Okemo"). Please also notify the marshal you have reached a verdict in favor of Okemo.

If you check "NO" to Question 1, please proceed to Question 2.

**QUESTION 2**

Based on the evidence presented by Plaintiff, has Plaintiff proven that Curtis Ficklin was skiing negligently?

YES_____                    NO_____

Please proceed to Question 3.

**<u>QUESTION 3</u>**

Based on the evidence presented by Plaintiff, has Plaintiff proven that Curtis Ficklin was skiing recklessly?

YES_____                              NO_____

If your answer is "NO," to Questions 2 **and** 3, you are done deliberating and the foreperson should sign and date the verdict form, indicating that the jury has reached a verdict in favor of Okemo. Please also notify the marshal you have reached a verdict in favor of Okemo

If you check "YES" to Questions 2 **or** 3, please proceed to Question 4.

**QUESTION 4**

4(a)    Based on the evidence presented by Plaintiff, has Plaintiff proven that Curtis Ficklin's conduct of skiing negligently and / or recklessly was the type of conduct he was authorized to perform as part of his employment with Okemo?

        YES_____                NO_____

        If you check "NO," you are done deliberating and the foreperson should sign and date the verdict form, indicating that the jury has reached a verdict in favor of Okemo. Please also notify the marshal you have reached a verdict in favor of Okemo.

        If you check "YES" to Question 4(a), please proceed to Question 4(b).

4(b)    Based on the evidence presented by Plaintiff, has Plaintiff proven that Curtis Ficklin's conduct of skiing negligently and / or recklessly occurred substantially within Okemo's time and space?

        YES_____                NO_____

        If you check "NO," you are done deliberating and the foreperson should sign and date the verdict form, indicating that the jury has reached a verdict in favor of Okemo. Please also notify the marshal you have reached a verdict in favor of Okemo.

        If you check "YES" to Question 4(a) and 4(b), please proceed to Question 4(c).

4(c)    Based on the evidence presented by Plaintiff, has Plaintiff proven that Curtis Ficklin's conduct of skiing negligently and / or recklessly was motivated by a purpose to serve Okemo?

YES_____                    NO_____

If your answer is "NO," to Question 4(c) you are done deliberating and the foreperson should sign and date the verdict form, indicating that the jury has reached a verdict in favor of Okemo. Please also notify the marshal you have reached a verdict in favor of Okemo.

If you check "YES" to Question 4(a), (b), **and** (c), please proceed to Question 5.

**QUESTION 5**

Do you find that the Plaintiff was negligent in not knowing the range of her own ability to negotiate a marked trail or slope, not skiing within the limits of her own ability, not maintaining reasonable control of speed and course at all times while skiing and / or not heeding all posted warnings?

YES_____                    NO_____

If you check "YES" to Question 5, please proceed to Question 6.

If you check "NO" to Question 5, please proceed to Question 8.

**<u>QUESTION 6</u>**

Do you find that the Plaintiff's own negligence was a proximate cause of her injury?

   YES_____     NO_____

If you check "YES" to Question 6, please proceed to Question 7.

If you check "NO" to Question 6, please proceed to Question 8.

## **QUESTION 7**

This question asks you to compare the negligence of both parties with respect to the cause of the accident, which should be reflected in a percentage figure ranging from 0% to 100% for each party. The combined negligence of both parties must total 100%.

1.     Plaintiff's Negligence          _____%

2.     Okemo's Negligence          _____%


**Total**                                              **100 %**

Proceed to Question 8.

**<u>QUESTION 8</u>**

If and only if you have found that the Vermont Sports Injury Statute does not apply, that Curtis Ficklin was Okemo's agent, that Okemo was negligent and / or reckless, and that its negligence and / or recklessness was a proximate cause of Plaintiff's injury, you must now decide the issue of Plaintiff's damages.  What sum of money, if any, will fairly and reasonably compensate the Plaintiff for the damages she sustained as a proximate result of her injuries? Note that some or all of the categories below may be applicable.

A.   Pain, Suffering, Disability, Impairment and

      Loss of Enjoyment of Life?                          $_____

B.   Past Medical Expenses?                              $_____

C.   Lost Wages?                                          $_____

D.   Future Medical Expenses?                            $_____

The court will calculate the total judgment award.

Please proceed to the Verdict page.

## **VERDICT**

Based on the answers to the above interrogatories, the verdict in this case is in favor of:

**PLAINTIFF STACIE RIVARD-PEDIGO**_____

**DEFENDANT OKEMO**_____

(Please check only one).

The foreperson should sign and date below.


_____
Foreperson


_____
Date