# Exhibit E

Volume I, Page No.                    1

1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
2
   STACIE RIVARD-PEDIGO,                    )
3                                           )Case No.:
        - vs -                              )3:17-cv-00568(WWE)
4                                           )
   OKEMO LIMITED LIABILITY COMPANY          )
5  D/B/A OKEMO MOUNTAIN RESORT.             )

6

7                          VOLUME I

8                     D E P O S I T I O N

9                             of

10                      BRUCE SCHMIDT

11          taken on the 14th day of May, 2018, at 11:01 a.m.
         at the office of Costello, Valente & Gentry, 51 Putney
12       Road, Brattleboro, Vermont.

13

14  APPEARANCES:

15       JOEL T. FAXON, ESQUIRE, of the firm of Faxon Law
            Group, LLC, 59 Elm Street, New Haven, Connecticut
16          06510, on behalf of the Plaintiff.

17

18       CHARLES F. GFELLER, ESQUIRE, of the firm of Seiger
            Gfeller Laurie, West Hartford Center, 977
19          Farmington Avenue Suite 200, West Hartford,
            Connecticut 06107, on behalf of the Defendant.
20

21                   DOUBLE D REPORTING
                        P.O. Box 781
22                 Arlington, Vermont   05250
                      (802) 342-7199
23                   www.ddreporting.com

24

Volume I, Page No.                                2

1                          I N D E X

2    Witness              DIRECT    CROSS    REDIRECT   RECROSS

3    Bruce Schmidt

4      By Mr. Faxon         4
       By Mr. Gfeller                81
5

6

7                          EXHIBITS

8    Number           Description            Marked    Referenced

9    Exhibit 1     2015-2016 Handbook                      22
     Exhibit 2     2016-2017 Okemo Employee    46
10                 Handbook
     Exhibit 3     2016-2017 Okemo Employee    47
11                 Pocket Guide
     Exhibit 4A    2015-2016 Season Pass                   51
12                 Agreement
     Exhibit 4B    2017-2018 Season Pass                   52
13                 Agreement
     Exhibit 4C    2018-2019 Season Pass                   52
14                 Agreement
     Exhibit 5     2105 Website Excerpt                    54
15   Exhibit 6     Vail Blog Post                          57
     Exhibit 7     June 29, 2017 Discovery                 64
16                 Responses
     Exhibit 8     December 13, 2017, Discovery            65
17                 Responses
     Exhibit 9     June 29, 2017, Discover                 67
18                 Responses
     Exhibit 10    Curtis Ficklin Orientation  76
19                 Roster

20               (Exhibits retained by counsel.)

21

22                      REQUEST TO PRODUCE

23   Description                                    Page

24     Video                                         77
       2016-2017 Season Pass Waiver Document         81

                    Double D Reporting
              (802) 342-7199 * ddrvt@comcast.net

Volume I, Page No.                              3

1                 S T I P U L A T I O N S

2          It is hereby stipulated and agreed by and between

3     the attorneys of record for the respective parties

4     hereto as follows:

5

6          1.     THAT the testimony of BRUCE SCHMIDT may be

7     taken and treated as if taken pursuant to notice and

8     order to take depositions and that all formalities of

9     notice and order are waived by the parties, and the

10    signatures to this stipulation are in like manner

11    waived;

12         2.     THAT all objections except as to matters of

13    form are reserved until the deposition or any part

14    thereof is offered in evidence;

15         3.     THAT the deposition may be signed by the

16    said BRUCE SCHMIDT before any Notary Public;

17         4.     THAT all exhibits offered for

18    identification may be retained by counsel until the

19    time of trial.

20

21

22

23

24

1               BRUCE SCHMIDT, having been duly sworn

2    to testify to the truth, deposes and says as

3    follows:

4                    DIRECT EXAMINATION

5    BY MR. FAXON:

6         Q.    Good morning.  My name is Joel Faxon.  I

7    introduced myself before.  I'm going to be asking

8    you some questions today.  If there's anything I ask

9    you that you don't understand, just tell me.

10        A.    Okay.

11        Q.    And I'll try to make it so you understand.

12   Fair enough?

13        A.    Okay.  Fair enough.

14        Q.    And the only other thing is, for the

15   benefit of the court reporter, make sure you wait

16   until I completely finish my question, take a

17   breath, and then you can answer.  Even though you

18   will probably rightly anticipate what I'm asking you

19   and we're on the same wavelength, we just want to

20   make sure the transcript is complete.

21        A.    Sure.

22        Q.    Have you been involved in a deposition

23   before?

24        A.    I have.

1        Q.    Okay.   On how many occasions?

2        A.    A couple.

3        Q.    All right.   When was the most recent one,

4    do you recall?

5        A.    Two years ago.

6        Q.    Was it for a case involving Okemo?

7        A.    It was.

8        Q.    Okay.   What was that case, do you

9    remember?

10       A.    It was -- I do not know the name.   It was

11   a summer accident involving an airbag.

12       Q.    So tell me, just generally speaking, what

13   that case involved.

14       A.    A guest was injured jumping into an

15   airbag, and I was involved answering questions of

16   when we got the airbag and when we had purchased it.

17       Q.    Okay.   Do you recall the names of any of

18   the lawyers involved in that case?   Do you know who

19   represented the injured party?

20       A.    I don't know who represented the injured

21   party, but I believe John Zawistowski represented

22   Okemo.

23       Q.    From Rutland?

24       A.    From Rutland.

1          Q.    Does Ryan Smith usually represent Okemo in

2     Vermont, in a case in Vermont?

3          A.    They do.

4          Q.    Do you know if that case was in the state

5     or federal court?

6          A.    I do not know.

7          Q.    Do you know where the guest was from?  Was

8     it a person from Vermont or somewhere else?

9          A.    He was from Rhode Island.

10         Q.    Do you know if that case is still going

11    on?

12         A.    It is not.

13         Q.    It's resolved?

14         A.    It is.

15         Q.    Did it go to trial?

16         A.    It did not.

17         Q.    Okay.  Do you know if it settled?

18         A.    Yes, it did.

19         Q.    Okay.  So you gave one deposition in that

20    case?

21         A.    I did.

22         Q.    Approximately two years ago, ballpark

23    2016?

24         A.    I just want the record to show that I'm

 1    guessing.

 2        Q.    That's fine.  Ballpark is all I'm looking

 3    for.

 4        A.    Yeah, I would say around then.

 5        Q.    Any other depositions are other than the

 6    one two years ago involving the airbag with the

 7    person from Rhode Island?

 8        A.    I have been involved in at least one other

 9    one involved probably 15 years ago with a skiing

 10   accident.

 11       Q.    Um-hum.  And what was the nature of that

 12   case?

 13       A.    It was a guest skiing down a trail going

 14   off the edge of the groomed surface and then

 15   striking a culvert.

 16       Q.    Okay.  And the person was injured?

 17       A.    Yes, they were.

 18       Q.    Was that case filed in Vermont, do you

 19   know?

 20       A.    It was.

 21       Q.    Was -- did Ryan Smith represent Okemo in

 22   that?

 23       A.    No.  Dave Cleary did.

 24       Q.    Okay.  So he's from Rutland as well?

1        A.    Yeah.

2        Q.    Did that case go to trial?

3        A.    It did.

4        Q.    And what was the result of that trial, do

5    you remember?

6        A.    Okemo was --

7        Q.    Prevailed?

8        A.    Prevailed.

9        Q.    Okay.  Did you testify in the trial?

10       A.    I did not testify in the trial.  I was a

11   representative for Okemo so I was at the defense

12   table.  I was deposed in my job of how ski patrol, I

13   oversaw ski patrol, and what I knew about that.

14   And, yeah, I guess that was my involvement with

15   that.

16       Q.    So you testified in a deposition but you

17   did not testify ultimately at the jury trial.

18       A.    Correct.

19       Q.    Where was the jury trial, do you remember?

20       A.    Woodstock.

21       Q.    Okay.  So it was in the superior court.

22       A.    Okay.

23       Q.    That was probably the only trial they had

24   there in a very long time.

Volume I, Page No.                          9

1          Okay.  Aside from those two depositions,

2     any other depositions you've been involved in

3     related to work?  I don't care if there was a

4     divorce proceeding or a car accident that was

5     unrelated.  I only care about Okemo.

6          A.   I don't recall.  I have testified without

7     doing a deposition in a trial in New Jersey.

8          Q.   Where Okemo was sued?

9          A.   Yes.

10         Q.   So did you go down to New Jersey and

11    testify?

12         A.   I did.

13         Q.   Okay.  Do you recall where in New Jersey?

14         A.   I don't recall.

15         Q.   New Jersey all just blends together.

16         A.   I'm sorry.  I don't recall where we were.

17              MR. GFELLER:  Usually you have to ask

18    which exit.

19              MR. FAXON:  Depends on which road

20    it's on.

21         Q.   What was the nature of that case?

22         A.   It involved, I believe, without doing

23    research, it involved a downhill skiing accident.

24    And I believe I went as a last-minute replacement

Volume I, Page No.          10

1   because the other Okemo representative couldn't go.

2        Q.   I see.

3        A.   Or something like that.  But I always

4   thought it was different that I didn't get deposed

5   and I went there.

6        Q.   Um-hum.

7        A.   But in my position, I was the assistant

8   general manager at the time, so I think that was why

9   I went down to represent Okemo.

10       Q.   Okay.  Any other sworn testimony other

11  than what you've recited so far, which is two years

12  ago involving the airbag, 15 years ago where Okemo

13  was represented by Mr. Cleary, and the case in New

14  Jersey?

15       A.   I don't recall without doing, you know,

16  some research.

17       Q.   Okay.  Aside from those three cases, are

18  you aware of any cases presently pending, if

19  applicable, but are you aware of any -- strike that.

20            Are you aware of any cases presently other

21  than this case that's pending against Okemo right

22  now?

23       A.   Yes.

24       Q.   Okay.  And where are those?  Where is that

1    or where are those cases pending, do you know?

2         A.    There is one in Vermont.

3         Q.    Okay.

4         A.    And I believe that is all that we have.

5    And this one involves a tubing accident.

6         Q.    Snow tubing?

7         A.    Yes.

8         Q.    Have you been -- strike that.  Do you know

9    where that case is -- where it's pending?  Is it in

10   the state of Vermont or somewhere else?

11        A.    I believe it's in the state of Vermont.

12        Q.    And have you -- you haven't been deposed

13   in that case?

14        A.    I have not.

15        Q.    Okay.  And do you know any of the lawyers

16   that are involved in that case?

17        A.    Tom Aicher.

18        Q.    He represents you?

19        A.    Represents Okemo.

20        Q.    He's at Mr. Cleary's firm; right?

21        A.    Yes, he is.

22        Q.    All right.  Okay.  And do you know who

23   represents the plaintiff in that case?

24        A.    I do not.

1        Q.    Do you know what the status of that case

2    is?  Is it near trial?

3        A.    It is not.  We were served on that in late

4    December.

5        Q.    Okay.  So it's brand-new.

6        A.    So it's just started.

7        Q.    Understood.  Is that pending in the

8    federal or state court, do you know?

9        A.    I do not know.

10        Q.    And where is the plaintiff from, do you

11    know?

12        A.    I don't recall.

13        Q.    Okay.  And what is the nature of that

14    claim?  At least as it's been asserted to your

15    understanding.

16        A.    A design of the tubing lane.  The guest

17    had a fractured leg and felt that we were

18    responsible for the runout of the tubing lane.

19        Q.    I see.  Was there a collision with

20    somebody at the bottom?

21        A.    There was not.

22        Q.    Okay.  Any other cases that you can recall

23    that you've given testimony in other than what we've

24    talked about to this point?

Volume I, Page No.          13

1        A.     None that I can recall without doing some

2    research.

3        Q.     Fair enough.   What is your present title

4    at Okemo?

5        A.     I'm vice-president and general manager.

6        Q.     And how long have you worked for Okemo?

7        A.     I have worked for -- what I tell people is

8    I've worked for Okemo for 40 seasons.   And I have

9    just completed my 30th full-time year.

10       Q.     So you worked ten years before you became

11   full-time?

12       A.     Correct.

13       Q.     How did you start?

14       A.     I was in junior high school in the tray

15   room at Okemo in 1978.

16       Q.     Okay.   Where did you go to high school?

17       A.     Black River High School in Ludlow.

18       Q.     Yeah.   Okay.   And you just worked your way

19   up through the ranks, seniority.   And what is above

20   vice-president, general manager?   What's next?

21       A.     I guess, I mean, my boss is the owner.

22       Q.     Right.

23       A.     So, you know.

24       Q.     You're at the top of the food chain.

1        A.    Well --

2        Q.    Close to it.

3        A.    -- I'm sure there's others, yeah, but I'm

4   sure there's other.

5        Q.    Tell me what -- you testified earlier that

6   you had been involved in oversight of ski patrol so

7   obviously you've been promoted over the years at

8   Okemo.  What -- and that was related to the case

9   where you said you testified 15 years ago where you

10  oversaw ski patrol.  Do you still have oversight

11  over ski patrol presently?

12       A.    I think I should make it clear that I do

13  not have medical training --

14       Q.    Right.

15       A.    -- and when it comes to oversight of ski

16  patrol, it meant that the manager reported to me.

17       Q.    I understand.

18       A.    So presently I oversee the vice-president

19  who oversees the patrol director.

20       Q.    Okay.

21       A.    So I'm removed, but I -- but he reports to

22  me, the vice-president of mountain operations.

23       Q.    Got you.

24             So prior to being VP and general manager,

 1    what was your position?

 2         A.    I was general manager.

 3         Q.    Okay.  And did that entail the same

 4    responsibilities that you have now except you've now

 5    also been given the title vice-president?  Or is

 6    there something else that was added?

 7         A.    Well, as I have done different jobs, I've

 8    had different reporting structures.  So at the time

 9    when I was the general manager, I didn't oversee the

10    vice-president of mountain operations.  I oversaw

11    the culinary department and the facilities

12    department.  And then as changes developed in the

13    company and either I've been promoted or we made

14    some adjustments, then I may have more reports,

15    people reporting to me.

16         Q.    Got you.  Got you.

17               Okay.  So we have a list of things that I

18    wanted to talk to Okemo personnel about, and they're

19    on the notice of deposition.  Have you received the

20    notice of deposition or seen the notice of

21    deposition in this case?

22         A.    I have.

23         Q.    Okay.  And there's listed on here several

24    things, and I just want to know which ones you can

Volume I, Page No.          16

1    talk about.  And so number one is the February 16,

2    2017, incident that is the subject of plaintiff's

3    complaint.  Are you the person most knowledgeable at

4    Okemo designated by Okemo to speak about that?

5         A.   Yes.

6         Q.   Okay.  Number two is Okemo rules,

7    regulations, policies, and other procedures

8    concerning maintaining control while skiing.

9              Same question related to that item.

10        A.   Yes.

11        Q.   Number three is the Okemo skier and rider

12   responsibility code.

13        A.   Yes.

14        Q.   Number four is Okemo posted signs and

15   warnings in the area of the February 16, 2017,

16   collision.

17        A.   I'm not sure I would be the best one for

18   that.  That may be the patrol director.

19        Q.   Okay.  But you have some familiarity with

20   it?

21        A.   I've seen pictures.

22        Q.   Okay.  Probably the same pictures we've

23   seen.

24        A.   Yes.

1       Q.    Okay.   Number five is Curtis Ficklin's

2   employment with Okemo.

3       A.    Yes.

4       Q.    Number six is duties and obligations of

5   Okemo employees while skiing on employer-provided

6   ski pass as benefit of employment.

7       A.    Yes.

8       Q.    Seven is any discipline imposed on

9   Curtis Ficklin as a result of the collision or the

10  manner in which he skied while skiing on

11  employer-provided ski pass as benefit of employment.

12      A.    Yes.

13      Q.    Number eight is person most knowledgeable

14  about utilizing staff to monitor busy trail merges.

15      A.    No.   That would be Chris Lancaster.

16      Q.    Okay.   And what is his position?

17      A.    He's the ski patrol director.

18      Q.    Is he an employee of Okemo?

19      A.    He is.

20      Q.    Does he work year-round?

21      A.    He does.

22      Q.    What does he do in the summer?

23      A.    He works in our bike park.

24      Q.    Okay.   And what is Mr. Lancaster's

Volume I, Page No.          18

 1   background in terms of his tenure with Okemo?  Let's

 2   start there.

 3        A.    I would have to have him answer that.

 4        Q.    Okay.

 5        A.    I would be estimating or guessing.

 6        Q.    Right.  Do you have managerial

 7   responsibility over Mr. Lancaster's department?

 8        A.    I would say indirectly.  Again, he reports

 9   to the vice-president of mountain operations and

10   then vice-president of mountain operations reports

11   to me.

12        Q.    Who is the vice-president of mountain

13   operations?

14        A.    His name is Eb Kinney.

15        Q.    There's one level of management underneath

16   you that Mr. Lancaster would report to?

17        A.    That's correct.

18        Q.    And do you know how long he's worked at

19   Okemo?

20        A.    I do not.

21        Q.    Have you ever been a member of the ski

22   patrol at Okemo?

23        A.    I have not.

24        Q.    Would you agree with me that if a guest

1    sees an employee of Okemo wearing Okemo gear, that

2    the guest could expect that that person works for

3    Okemo?  On the mountain, I'm talking about.

4         A.    I guess I would have to ask for some

5    clarification because -- and the reason I say that

6    is because you could go into the ski shop and buy a

7    vest that has Okemo on the vest, either on the front

8    or on the back, so.

9         Q.    Right.  Let's assume that there's a skier

10   on the mountain skiing with an Okemo-provided coat

11   on.  Isn't it reasonable for the guest to expect

12   that that person works for Okemo?

13        A.    Correct.

14        Q.    Curtis worked for Okemo back in 2017;

15   correct?

16        A.    Correct.

17        Q.    Did you know him?

18        A.    I did not.

19        Q.    When was the first time you met him?

20        A.    I have not met him.

21        Q.    Okay.  Who would his direct supervisor

22   have been?  I know he worked at Okemo seasonally for

23   a period of time.  Who would his direct supervisor

24   have been back in 2017?

Volume I, Page No.          20

1      A.    Dave Thompson.

2      Q.    So do you personally know what Curtis was

3   wearing on the date that my client was injured?

4      A.    I do not.

5      Q.    Okay.  What is Dave Thompson's position?

6      A.    He's the lift operations manager.

7      Q.    Okay.  Does he still work at Okemo?

8      A.    He does.

9      Q.    Do you know when he started?

10     A.    I don't.

11     Q.    Is it fair -- so strike that.

12           I understand that employees, including

13   persons that would be considered -- let me strike

14   that.

15           What classification did Curtis Ficklin

16   have in 2017 -- during the 2016-'17 ski season?

17   What was his classification?  Because I know in your

18   handbook there's various classifications of

19   employees.  What would he have been?

20     A.    He would have been a seasonal lift

21   operator.  I don't know if he would have been -- if

22   he was considered part-time or full-time in the

23   winter.

24     Q.    How do you make that determination?

1        A.    Full-time, that you would work more than

2    32 hours.  Most likely 40 hours.  More midweek work.

3    And part-time would be mostly weekends.

4        Q.    Okay.

5        A.    And/or so holidays.

6        Q.    Have you seen his time sheets?

7        A.    I have.

8        Q.    It appears, at least from the time sheets

9    that we were provided, that he was working five, six

10   days a week.

11       A.    That is probably true.  I didn't -- I

12   could find that out, and I would have to assume that

13   he probably was working, you know, was a full-time,

14   you know, lift operator.

15       Q.    Okay.  So as a benefit of employment,

16   every employee received a season's pass; isn't that

17   true?

18       A.    That is correct.

19       Q.    Okay.  And that would have included

20   Curtis's classification, whatever it was?

21       A.    Yes.

22             I think it's important to note that

23   different classifications receive different

24   benefits.

Volume I, Page No.          22

1       Q.    Right.  And those are all listed in your

2    employee handbook; correct?

3       A.    Correct.

4       Q.    I had looked at the employee handbook and

5    I thought that he qualified, based at least on the

6    limited information that I have, as a full-time

7    winter employee.  Would that sound right to you?

8       A.    That would sound correct.

9       Q.    Okay.  And it says in here at page 21, and

10   I'll show you Exhibit 1 which was the first -- and I

11   premarked some of these.  Some of these I need

12   stickers on, but I premarked Exhibit 1 -- is the

13   2015-2016 handbook.  Let me just show you that.  I

14   subsequently received the '16-'17 handbook and I

15   looked through that and I don't see any real

16   substantial difference between the 2015-'16 and the

17   2016-'17 handbook.  Are you aware of any differences

18   between the two of them?

19      A.    I'm sure that there are some small

20   differences with dates --

21      Q.    Yeah.

22      A.    -- and but I'm not aware of any

23   substantive changes in our policies or in our

24   benefits.

Volume I, Page No.                23

 1       Q.   Okay.  That was the question that I was

 2   going to ask you.  If you could state for me, if

 3   there are any, any substantial differences between

 4   the '15-'16 handbook and the '16-'17 handbook as it

 5   would relate to someone in Curtis's position.

 6       A.   I don't believe that there are.

 7       Q.   Okay.  Because I'm going to go through

 8   this, the one that I have read.

 9       A.   Okay.

10       Q.   Because I didn't have time to read the

11   whole -- so if you look at page 21 which is Bates

12   Okemo --

13             MR. FAXON:  Let's go off the record

14   for one second.

15             (A discussion was held off the record.)

16   BY MR. FAXON:

17       Q.   Exhibit 1, which is the 2015-'16 handbook,

18   and I was looking at Bates 205.

19             So it says "Full-time winter employees."

20   And it says that basically they get a ski/snowboard

21   pass for the season; correct?

22       A.   Are you asking me?

23       Q.   Yes.

24       A.   Okay.  We're back on?  Yes.  True.

1       Q.    Okay.  And if I recall from the employment

2    records, Curtis had worked on the clock for a

3    portion of the day and clocked out, the day that my

4    client, Stacie, was injured; correct?

5       A.    Correct.

6       Q.    Let me ask you this:  While the employee

7    is on the mountain with the employer-provided pass,

8    do you consider them the eyes and ears of Okemo?

9    Meaning if they see something, they should say

10   something?

11      A.    I would say that we consider them a guest

12   skiing.  So if a guest sees something, they should

13   say something.  So we don't treat any differently

14   employees when they're not working.  They are

15   expected to adhere to the same responsibility code,

16   and, you know, just like, you know, guests, we would

17   expect them to say something.  So if someone is

18   skiing out of control, there's an issue of, you

19   know, hazard or something like that.

20      Q.    Okay.  And Curtis was considered, under

21   your documents, a guest service ambassador.

22      A.    His job title was lift operations.

23      Q.    Right.  But if you look in the lift

24   operations manual, it says "Every employee of Okemo

Volume I, Page No.                25

1   is a guest service ambassador"; isn't that true?

2        A.   Yes.   I would say we would want people to

3   be nice to guests and.

4        Q.   Right.   But that terminology, "guest

5   service ambassador," is in the document; correct?

6        A.   I have not read that, but if you say it's

7   there, I would agree with you.

8        Q.   And you designate every employee of Okemo

9   as a guest service ambassador; correct?

10       A.   We -- if it's written in there, I don't

11   know if that is in every manual that we might have,

12   but I would say that Okemo is a resort that wants to

13   provide, when you're working as an employee, a good

14   guest service.   And there's obviously times when

15   people might not be working, and we would expect

16   them to be nice to people.

17       Q.   Right.   So tell me how you define guest

18   service ambassador at Okemo.   What does that term

19   mean?

20       A.   I guess I would say guest service

21   ambassador would be that if a guest -- if anyone

22   asked how do I get someplace, you would direct them.

23   Or do you know what time something might open.   They

24   might reach out to somebody when they're riding up a

1    lift.  You know, they might not know the person's an

2    employee and they might be able to provide a little

3    bit more guest service.

4         Q.   And as part of that, you provide your

5    employees with a pocket guide; correct, which has a

6    lot of data in it?

7         A.   Yes.

8         Q.   It has opening times for ski facilities,

9    it has information about tubing, it has information

10   about summer activities, it has information about

11   the culinary program.  Everything is in there.

12   Phone numbers; right?

13        A.   Correct.

14        Q.   And those -- that pocket guide is provided

15   to each employee, based on what I've read, with the

16   expectation that they will use that presumably as

17   part of their job as guest service ambassador.

18        A.   Correct.

19             I think it's important to note that we

20   don't expect people to carry that with them when

21   they're not working.

22        Q.   Um-hum.  But you don't know if Curtis had

23   it on his person at all; right?

24        A.   I do not.

1       Q.   Okay.  But that's information that every

2    employee -- strike that.

3            That's information that every Okemo guest

4    service ambassador could use to enhance the

5    experience of the external guest; correct?

6       A.   Correct.

7       Q.   And you also have terminology called

8    "internal guest," which would be basically Okemo

9    employees; correct?

10       A.   Correct.

11       Q.   Okay.  Would you agree with the following

12    statement:  Part of Ficklin's job was to provide an

13    enjoyable skiing experience to all guests, and while

14    he was skiing, he was to watch out for any unusual

15    or dangerous conditions or people acting or skiing

16    inappropriately.  Do you agree with that statement?

17       A.   I would say that that statement is true.

18       Q.   Okay.  Has there been occasion in the past

19    where a ski pass provided to an employee was

20    revoked?

21       A.   Yes.

22       Q.   Okay.  And was Mr. Ficklin's ski pass ever

23    revoked?

24       A.   During this -- after this accident, his

Volume I, Page No.                28

1    ski pass was revoked that day.

2             Our policy is to, when there's a

3    collision, to take a person's pass if a guest is

4    injured.  Say two guests are together and there's --

5    the other person can't ski.  We take that person's

6    pass too.

7        Q.   Help me with that for a minute.  So his

8    ski pass was revoked for one day or --

9        A.   Correct.

10       Q.   -- part of a day actually.

11       A.   Correct.

12       Q.   Was there any investigation done of his

13   activity?

14       A.   I wouldn't be able to answer that.  I was

15   not involved in an investigation.

16       Q.   Okay.  Who would be the person that would

17   do that?

18       A.   Mr. Lancaster.

19       Q.   Okay.  So we can talk to him later about

20   that.

21            Was he -- how did that take place?  I

22   mean, was there -- did he actually give a document

23   to Mr. -- did he give his ski pass to Mr. Lancaster

24   and it was later given back to him?  Or what

Volume I, Page No.          29

1   happened?

2         A.    I would not be able to answer that.

3         Q.    Okay.

4         A.    I was not involved.

5         Q.    And was that ski pass revoked because it

6   was found that he was at fault for the collision?

7         A.    I cannot answer that.  I wasn't involved.

8         Q.    Okay.  But you know it was revoked but you

9   don't know the circumstances under which it was

10  revoked?

11        A.    Well, as I said before, when we have a

12  collision that's involved where someone may not be

13  able to -- so say both parties and the other party

14  doesn't -- can't ski because they were injured.  We

15  don't allow the other party to go back out and go

16  skiing.

17        Q.    Was Mr. Ficklin injured?

18        A.    I do not know that.

19        Q.    Was Stacie's pass revoked?  Or was her --

20  were her privileges to ski on the day she was

21  injured revoked after the collision?

22        A.    I never heard that they were, but she was

23  unable to ski.

24        Q.    Okay.  Are you aware of any reason that

1    her right to ski would have been revoked?

2        A.   No.

3        Q.   Okay.  And what are the circumstances

4    under which somebody's pass is revoked, an

5    employee's pass is revoked?  For misconduct?

6        A.   Well, I think it's important to note that

7    we would treat the employee and the guest similar.

8    So if a guest or employee or a skier was skiing a

9    closed trail, they would most likely have their, you

10   know, have their pass revoked.  If they were skiing

11   fast through a slow skiing area which are designated

12   on the trail map.  If they were involved, you know,

13   in some type of lift issue where they were trying to

14   cut in front of somebody or something like that.

15   There's different reasons.  And, you know,

16   Chris Lancaster deals with most of those type of

17   situations.

18       Q.   Okay.  So it sounds like the examples

19   you've given me would be based on misconduct while

20   skiing.  Is that a fair statement?

21       A.   Yeah, that's a fair statement.

22       Q.   Okay.  And is there any rule or regulation

23   or policy, because I've seen none, that deals with

24   this pass revocation that you're speaking about?  Is

1    there a procedure for that written down anywhere?

2         A.    None that I'm aware.

3         Q.    Is there an internal procedure for

4    handling complaints of misconduct of employees while

5    they're skiing?

6         A.    We would -- if we had one of those, we

7    would treat it like we would if somebody was

8    complaining about someone while they were working in

9    the cafeteria.

10        Q.    Um-hum.

11        A.    We would, you know, look into it and, you

12   know, determine what might happen.

13        Q.    Okay.  If you assume for a moment that

14   Stacie was injured on a Monday, was Curtis given his

15   pass back on a Tuesday?

16        A.    I do not know that.

17        Q.    But your understanding is that it was

18   taken for one day or the remainder of that day?

19        A.    Yes.

20        Q.    Okay.

21              (A discussion was held off the record.)

22              (The requested material was read back.)

23   BY MR. FAXON:

24        Q.    So when the employee gets the pass, are --

1    how is that -- how is that delivered to them?  Is it

2    an RFID card, or is it scanned on to their Okemo

3    card?  How do they get it?

4         A.    It's an RFID card.  So they would start --

5    the manager would send a form down to the

6    administration office and it would say Bruce Schmidt

7    is eligible for a season's pass.  I would then walk

8    into the administration office and they would look

9    my name up and say, okay, you're ready to go.  This

10   is the type of pass you get so that it would be, you

11   know, given.  So on that pass it has the ability to

12   ski, but it also has the discount for food, retail

13   discount, other types of things like that.

14        Q.    Understood.  So there's an RFID card

15   that's given to an employee that would be different

16   from, for example, the season's pass that's given to

17   the external guest?

18        A.    Correct.

19        Q.    Okay.  And, to your knowledge, Curtis was,

20   Curtis Ficklin, was skiing on that pass the day of

21   the incident; correct?

22        A.    Correct.

23        Q.    Is the employee ID separate from this RFID

24   card that we're talking about?  Or is it

Volume I, Page No.          33

1    incorporated on to it?  Is it all one?

2         A.    I guess maybe I'll try to answer.  Even if

3    you didn't ski, you would get the same type of pass.

4    So there's many people that don't ski.

5         Q.    Right.

6         A.    But they would get the same.  There's no

7    difference.  It would have the ability to ski on it.

8    It would be their employee ID.

9         Q.    Understood.  So every employee at Okemo

10   gets an employee ID and loaded on to that ID would

11   be their skiing privileges if they decided they

12   wanted to use them.

13        A.    Correct.

14        Q.    Now, you're familiar with the

15   responsibility code of skiing; correct?

16        A.    Yes.  I'm not sure I could recite it word

17   for word.

18        Q.    Look at page 35 of Exhibit 1, also known

19   as Okemo 219.

20        A.    Okay.  I have it.

21        Q.    And would you agree with me that

22   Curtis Ficklin violated that responsibility code

23   when he struck my client, Stacie?

24        A.    I would say where, you know, perhaps under

Volume I, Page No.          34

1    the stay in control or people ahead of you

2    responsibility, I would say yes, he did.

3        Q.   So he violated some portions of the skier

4    responsibility code.  I'm not saying that he

5    violated every single one because there's some

6    things that don't apply.  But at least as it relates

7    to one, always stay in control and be able to stop

8    or avoid other people or objects, Curtis violated

9    that provision of the responsibility code; correct?

10       A.   I would say yes.

11       Q.   And the skier responsibility code is a

12   nationwide safety standard for skiers.  Wouldn't you

13   agree with that?

14            MR. GFELLER:  Objection to form.

15       A.   I would say yes.

16            I do think it's important to note that it

17   is called Your Responsibility Code because it

18   includes skiers and snowboarders.

19       Q.   Okay.  I see that.  So anyone that's using

20   the skiing facilities going downhill, the

21   responsibility code would apply to them?

22       A.   Correct.

23       Q.   So let me restate it a little bit.  So the

24   responsibility code is a nationwide

1    skier/snowboarder safety standard.  Is that a fair

2    statement?

3                  MR. GFELLER:  Objection to form.

4         A.    Correct.

5         Q.    And it's adopted by what entity again that

6    promulgates it?

7         A.    National Ski Areas Association.

8         Q.    So, for example, if you go to Crested

9    Butte or if you go to Mount Sunapee, that same

10   responsibility code is going to be enforced there;

11   correct?

12        A.    Correct.

13        Q.    And similarly now, as I understand, Okemo

14   has partnered in some regard with Vail; correct?

15        A.    I don't know if I would use the word

16   "partnered."  I would say that we are sharing

17   season -- we are selling their season's pass.

18        Q.    Okay.  Some of the press release material

19   that I've seen out of Okemo uses the word "partner."

20   You wouldn't disagree with that if it's in the press

21   release?

22        A.    I wouldn't.

23        Q.    What you're talking about is the Epic

24   Pass?

Volume I, Page No.                36

1       A.   Correct.

2       Q.   So there are many, many ski areas that

3   subscribe to the Epic Pass, and that allows you to

4   ski at multiple areas under one pass; is that

5   correct?

6       A.   That's correct.

7       Q.   And you can buy either a full Epic Pass,

8   it gets you the whole buffet of ski areas, or you

9   can have a certain number of days or you can

10  probably also limit the number of ski areas that you

11  want to have available to you; correct?

12      A.   I think you know that very well.

13      Q.   Okay.  Just looking at Number 2 of the

14  responsibility code.  It says "People ahead of you

15  have the right of way.  It's your responsibility to

16  avoid them."

17           Would you agree with me, based on what you

18  know about this circumstance, that Curtis also

19  violated Number 2?

20      A.   Yes.  I think I said that previously.

21      Q.   Okay.  You're not aware of anything that

22  Stacie did wrong; correct?

23      A.   I'm not aware.

24      Q.   Okay.  For example, you don't -- Okemo,

1   you as the representative of Okemo, don't take the

2   position that Stacie violated the responsibility

3   code in any way, do you?

4       A.   I don't believe she did.  Obviously

5   there's certain aspects, and others may think

6   differently, but from what I read, she seemed to be,

7   you know, skiing along and, you know, there was a

8   collision with Mr. Ficklin.

9       Q.   Okay.  But, again, based on your review of

10  that, particularly in this slow zone, Okemo does not

11  claim that Stacie did anything wrong and violated

12  the responsibility code.  Is that a fair statement?

13      A.   That's a fair statement.

14      Q.   Okay.  Now, if you look on page 36, which

15  is Okemo 220, it says "Our safety committee meets

16  throughout the year to discuss ways to increase

17  safety awareness as well as develop safety

18  policies."

19           Do you see that?

20      A.   I do see that.

21      Q.   Tell me about the safety committee at

22  Okemo, at least as it relates to what went on in

23  2017.

24      A.   The safety committee, as it said, we do

Volume I, Page No. 38

1   meet, and I am on the safety committee.  We talk
2   about accidents that are more workplace, you know,
3   or involved an employee who is injured while
4   working.

5       Q.   Um-hum.

6       A.   So we would talk about it.  We would talk
7   about it with the department head, with the manager.
8   Is there ways to prevent it, focus on, you know,
9   more on, you know, probably slips and falls or
10  lifting injuries, things like that.

11      Q.   Understood.  Because I saw the safety
12  video that you play for everybody when they come to
13  work, and most of that is related to ergonomic
14  activities and things that would be a work-related
15  hazard as opposed to safety on the ski mountain.

16      A.   Correct.

17      Q.   And I don't mean to say that the ski
18  mountain isn't part of the work area, but I'm
19  talking about in the work environment as opposed to
20  the skiing environment.

21      A.   Right.

22      Q.   Does the safety committee also discuss
23  safety issues related to the skiing environment?

24      A.   We would for employees who are on duty.

1       Q.    Okay.  Does the safety committee get

2    involved with safe skiing practices down the

3    mountain for external guests?  Or is that a

4    discussion that takes place somewhere else?

5       A.    That -- the short answer is no.

6       Q.    Okay.  Where would those discussions take

7    place?  Would that be Mr. Lancaster?  And is there

8    any committee?

9       A.    There is no committee.  We put the Your

10   Responsibility Code on the bottoms of the lifts.

11   There's large boards.  We put Your Responsibility

12   Code in the trail maps.  So there really is no

13   committee, you know, for that.  It's more of a

14   public awareness.

15      Q.    Okay.  So Okemo doesn't have a safe skiing

16   committee; is that a fair statement?

17      A.    That's a fair statement.

18      Q.    Okay.  Is there any ongoing entity or

19   group at Okemo inside the company that focuses on

20   safe skiing practices for the external guest?

21      A.    That would be in our ski patrol.

22      Q.    Okay.  And do they have -- do they have a

23   committee as such?  Or is it -- do they have

24   anything akin to a safety committee, the ski patrol,

1    for the external guest safe skiing practices?  Is

2    there anything like that?

3         A.    No.

4         Q.    Are there any written safety policies

5    other than the -- for safe skiing related to the

6    external guest other than the responsibility code or

7    the smart style program that would relate to

8    snowboardiing?

9         A.    Not that I'm aware.

10        Q.    Okay.  Are there any industry groups that

11   focus on this that you're aware of?  Let me just

12   make the question clearer.

13             Are there any industry groups that focus

14   on safe skiing practices for external guests that

15   Okemo subscribes to or is a member of?

16        A.    Well, we receive information from the

17   National Ski Areas Association that talks about safe

18   skiing.  Okemo is part of -- there's a -- it's

19   changed through the years.  I don't know if it's a

20   month or it's a week, but there's like a safe skiing

21   week.

22        Q.    Um-hum.

23        A.    There's -- we are part of what's called,

24   you know, helmet head awareness.  Basically, it's a

1    little contest where people take pictures of

2    themselves when their hair -- after they've been

3    wearing their helmet.

4        Q.    Helmet head.

5        A.    So, you know, to promote safe use of

6    helmets.

7        Q.    Um-hum.

8        A.    Those type of things we are part of.

9        Q.    Does Okemo keep statistics for

10   skier-on-skier collisions?

11       A.    Not that I'm aware of.

12       Q.    Okay.  Is there ever a safety review at

13   the end of the year for skier-on-skier collisions?

14       A.    I've never been involved in one.

15       Q.    Okay.  So President's Weekend is one of

16   the busiest, if not the busiest, weekend at Okemo;

17   correct?

18       A.    I would say the Saturday and Sunday are --

19       Q.    Okay.

20       A.    -- of President's Weekend.

21       Q.    Okay.  Is Monday busy as well, but not as

22   busy Saturday and Sunday?

23       A.    It's definitely not as busy as Saturday

24   and Sunday.

1     Q.    Okay.  Because in some of the literature

2   that you say there are three weekends that are the

3   peak weekends, and that would be President's, Martin

4   Luther King, and Christmas.

5     A.    I think that's a fair -- that's a fair

6   assumption.

7     Q.    Okay.  Because it's in some of the

8   documents that are in this pile.  I don't know

9   exactly where it is, but we'll work our way towards

10  that.

11          But has that always been the experience at

12  Okemo?  That those two, three time periods are the

13  busiest?

14    A.    Correct.

15    Q.    Now, is there a maximum number of skiers

16  that Okemo can have on the mountain?  Is there a

17  cutoff that says we have X number of people out here

18  and we can't have any more?

19    A.    No.

20    Q.    Okay.  Do you know what the -- let me ask

21  it this way:  Has Okemo ever limited the number of

22  people that can ski on the mountain, to your

23  knowledge?

24    A.    It's limited by parking.

Volume I, Page No.          43

1       Q.    Okay.

2       A.    So we have never said we're not going to

3    sell any more tickets.

4       Q.    Um-hum.

5       A.    But by virtue of running out of parking,

6    you stop selling tickets.

7       Q.    Right.  Or people walk a lot further or

8    dropped off.

9       A.    Or I will say this town is very strong

10    about us parking on the sides of road.

11       Q.    Right.

12       A.    So we don't allow it.

13       Q.    How many cars can you handle?

14       A.    We can handle about 2800 to 2900.

15            It's important to note that in February

16    when there's more snow, it becomes a little tighter

17    because you run out of space in the parking lots,

18    but that's just a side note.

19       Q.    What is the maximum uphill capacity of

20    Okemo?  Somebody has that statistic.

21       A.    Yeah.  To be honest with you, I probably

22    should know it but I don't know it.

23       Q.    Did Mr. Lancaster respond to the

24    collision?

1       A.    I do not know.

2       Q.    Okay.  Are you aware of anybody that took

3    any photos or video of the, let's call it, the

4    aftermath of the collision or the collision?

5       A.    I don't know if I understand.

6       Q.    Right.  So there was a time where Curtis

7    struck Stacie and injured her.  My question is:  Do

8    you know if anybody that took photos right around

9    that time or video right around that time that would

10   incorporate or include any of the people involved in

11   this case?

12      A.    We would never take photos of a guest

13   being injured.

14      Q.    Right.

15      A.    It was so sad that this happened.  And so

16   we would not -- Okemo employees would not be

17   instructed to do that, and I'm not aware of any.

18      Q.    Okay.  I'm just looking also now on

19   page 233.  Actually, let's just go back to the last

20   question that was implying that I thought that you

21   guys had any pictures, but sometimes things go on

22   social media where they got photos or video that

23   weren't actually taken in-house that would depict

24   something that were germane, for example, to this

Volume I, Page No.          45

1    lawsuit.  You're not aware of anything like that?

2          A.   I am not.

3          Q.   So if you look at 233, which is page 49 on

4    Exhibit 1, it says "Employment at-will termination."

5    The fifth item down is "Unsafe conduct which may or

6    may not endanger the employee, other persons, or the

7    property of other persons."

8              Obviously -- potentially, Curtis's conduct

9    would qualify as unsafe conduct which endangered and

10   injured Stacie Rivard-Pedigo.  Was there any

11   investigation done or consideration given to

12   terminating Curtis as a result of this incident?

13         A.   I think it's important to note that this

14   is for employees who are on duty.  Mr. Ficklin was

15   off duty when that happened, so this would not

16   relate to that.

17         Q.   Right.  So is it fair to say that not

18   withstanding the fact that Curtis injured Stacie on

19   Okemo premises in a manner that we have agreed at

20   least violates two of the safe standards for skiing,

21   there was no investigation or punishment of him as

22   an employee of Okemo?  Is that a fair statement?

23         A.   Again, he was a guest who was skiing.  He

24   was off duty, so there was no investigation that was

1    done.

2           Q.    Okay.  And no punishment?

3           A.    And no punishment.

4           Q.    Okay.  Aside from potentially part of the

5    day him losing his ski pass.

6           A.    Correct.

7                 MR. FAXON:  All right.  Let's just

8    mark as 2, 2016-'17, here.  Do you mind putting a

9    sticker on that, Number 2.

10                (2016-2017 Okemo Employee Handbook was

11    marked Plaintiff's Exhibit 2 for identification.)

12    BY MR. FAXON:

13          Q.    Let me show you what's been marked as

14    Exhibit 2 and ask you if you recognize that.

15          A.    I do recognize this.

16          Q.    And Exhibit 2 is very similar to Exhibit 1

17    except it's the year '16-'17; correct?

18          A.    Correct.

19          Q.    And at least as I've looked at it, would

20    you agree with me that the content of Exhibit 2, as

21    it relates to the provision of a ski pass to a

22    full-time winter employee, would be basically the

23    same?

24          A.    I am unaware of any changes that were

Volume I, Page No.          47

1    made.

2                    MR. FAXON:   Okay.   Let's mark this as

3    Exhibit 3.

4                    (2016-2017 Okemo Employee Pocket Guide was

5    marked Plaintiff's Exhibit 3 for identification.)

6    BY MR. FAXON:

7         Q.   So let me show you what's been marked as

8    Exhibit 3.   And if you can tell me what that is,

9    please.

10        A.   Exhibit 3 is the '16-'17 pocket guide.

11        Q.   And that's a document that is provided to

12   every employee at Okemo; correct?

13        A.   It is offered to them.

14        Q.   Okay.

15        A.   I can tell you they don't all take it.

16        Q.   Okay.   So Exhibit 3 would have also

17   presumably been offered to Curtis Ficklin during the

18   winter season that he was employed at Okemo '16 to

19   '17?

20        A.   That's correct.

21        Q.   All right.   Let's turn to page 17, which

22   is Okemo 276.

23        A.   Okay.

24        Q.   Can you tell me what the ambassador

1    program is?

2         A.    So what the ambassador program is is we

3    have volunteers that work during the season, mostly

4    weekends, sometimes some holiday periods.  So they

5    would stand in the plaza area as people are coming

6    into the resort and greet guests and perhaps help

7    them with their equipment and give direction.  And

8    then there is also a location inside the base lodge

9    which is the base information desk.  They would

10   direct people mostly to the restrooms.  And then

11   there's also a building at the top of Base Quad A

12   and B which is the mountain information booth.  So

13   they stand out there and guests are coming off these

14   two chair lifts and looking for a little bit of

15   direction.  And then they will also give mountain

16   tours to guests that, okay, the mountain tour may

17   leave at 10:00 and give them an idea.  I don't know

18   how long it lasts, but it's just a quick overview of

19   where you might want to ski if you're just new to

20   Okemo.

21        Q.    Okay.  So they aren't -- the ambassadors

22   are not like safety personnel on the mountain.  Is

23   that a fair statement?

24        A.    That's a fair statement.

Volume I, Page No.          49

1        Q.    So to the extent that they're on the

2    mountain, it would be they go up with a defined

3    group of people and they'll take them down some runs

4    to try to introduce them to the mountain or one run

5    maybe.

6        A.    Or one run.  They also may ski around the

7    mountain and they may be like at the top and direct

8    people.  They may answer questions while riding the

9    lift where we just encourage them to answer

10   questions.

11       Q.    Do they wear anything in particular?  Like

12   do they have an orange coat a red coat or yellow

13   coat?

14       A.    I believe it's red.

15       Q.    So their purpose, it sounds like, is

16   principally to give people information on the

17   mountain itself.  Is that a fair statement?

18       A.    Right.  Correct.

19       Q.    Okay.  Are those ambassadors positioned on

20   the mountain ever for safety purposes?

21       A.    The only time I, you know, might -- that

22   they might be used is if they happen to come upon

23   where a patroller might be working on, you know, a

24   guest who happens to be injured and it's like a

Double D Reporting
(802) 342-7199 * ddrvt@comcast.net

Volume I, Page No.                50

1    blind knoll.  They might say, hey, can you just

2    stand above here.  But their job, I think it's

3    important to note, as Okemo employees, if you see

4    something that's unsafe, you should report it.  So

5    they would fall into that category.

6        Q.   Okay.

7        A.   But they're not going to reprimand, you

8    know, take someone's ticket or pass.

9        Q.   Okay.

10       A.   You know, but they might -- and just like

11   any guest.  You might speak to someone of, hey, you

12   almost cut me off there.  You need to be paying

13   attention to what's going on.

14       Q.   Um-hum.

15       A.   Like that.  But their role is not safety

16   oriented.

17       Q.   Okay.  So it's mostly customer service, I

18   think it sounds like.

19       A.   I think that's a good way to put it.

20       Q.   So if you look at page 20, which is Okemo

21   278, I spoke earlier about the peak periods.  So

22   there's three peak periods identified, Christmas and

23   New Year's week, Martin Luther King weekend, and

24   President's Day and week running from 2/18 to 2/24.

Volume I, Page No.          51

1      A.   Yeah.  I see that.

2      Q.   Okay.  So during the peak period, isn't

3    there a premium price on the ticket --

4      A.   Yeah.

5      Q.   -- for those three weeks?

6      A.   Yes, they would be.

7      Q.   Because I think that's listed in here

8    somewhere.  I know I saw that.

9            Let's look at Exhibit 4.  It's actually

10   4A.  Let me show you Exhibit 4A and ask you if

11   you've seen that before.

12     A.   I have.

13     Q.   What is that?

14     A.   It's the waiver season's pass agreement,

15   expressed assumption of risk, informed selection

16   agreement.

17     Q.   And would you agree with me that part of

18   that -- strike that.

19           This is a document that your season pass

20   holder signs; correct?

21     A.   That's correct.

22     Q.   As a requirement to get their season's

23   pass.

24     A.   Correct.

Volume I, Page No.       52

1      Q.    And part of the agreement defines the

2    inherent risks of skiing; correct?

3      A.    Correct.

4      Q.    And if you look through Exhibit 2, nowhere

5    does it say collision with another skier -- excuse

6    me.   Let me strike that.

7           If you look through paragraph 2 where

8    inherent risks are defined, nowhere does it say

9    anything about collision with another skier;

10    correct?   And you can take your time to read through

11    that.

12      A.    It does not.

13      Q.    Okay.   And let me show you 4B.   I wasn't

14    able to locate the '16-'17, but I'm going to assume

15    it's the same as all these other ones.

16           Let me show you 2017-2018.   And would you

17    agree with me that the definition of inherent risks

18    in Exhibit 4B does not include collision with

19    another skier?   And you can look through that.

20      A.    It does not.

21      Q.    Okay.   And, lastly, let me just show you

22    2018-2019, which we haven't gotten to yet.

23    Hopefully we'll get a lot of snow.   But that is

24    Exhibit 4C.   And that does not include collision

1    with another skier as an inherent risk of skiing?

2         A.    It does not.

3         Q.    Will you agree with me that it's very

4    likely that the 2016-2017 document, which I was not

5    able to find online, likewise does not include the

6    collision with another skier?

7         A.    I would agree with you.

8         Q.    Okay.  Because the definition of inherent

9    risk is the same from 2015 all the way to the

10   2018-2019; correct?

11        A.    It is on this, yes.

12        Q.    And this is a document that Okemo prepares

13   to have the external guest sign prior to the time

14   that they get a season's pass; correct?

15        A.    Correct.

16        Q.    Are you aware of any documents that

17   Stacie Pedigo signed in connection with acquiring a

18   ticket?

19        A.    I'm unaware of any that were signed.

20        Q.    Okay.  And you'll agree with me that she

21   had a ticket to ski on the date that she was

22   injured?

23        A.    Yes.  I have no reason -- I mean, she

24   would have to be able to ski.  She would need a

 1    ticket.

 2         Q.    Let me show you what I've marked as

 3    Exhibit 5.  And just take a quick look at that, if

 4    you would, please.  I believe Exhibit 5 is a page

 5    from the Okemo website.  It's the first one I could

 6    find that predated 2017.  And the reason I'm showing

 7    you that is two-fold.  Number one, is this document,

 8    just keep this in mind as you're reading this, this

 9    document contains the skier responsibility safety

10    rules that we discussed earlier; isn't that true?

11    And you can answer that after you've looked at it.

12         A.    Yeah.  I would say yes.

13         Q.    And it also contains a section on ski and

14    snowboard safety, use, courtesy, and common sense;

15    correct?

16         A.    Correct.

17         Q.    And part of that talks about slow skiing

18    areas; right?

19         A.    Correct.

20         Q.    Right.  And the area in the location on

21    the mountain where this collision occurred was a

22    slow skiing area; right?

23         A.    I'd have to look at a trail map.  But if

24    you're telling me it is, then I'm going to go with

1   you.

2          Q.   I believe it is.

3               And there are certain designated slow

4   skiing areas on Okemo; correct?

5          A.   That's correct.

6          Q.   And that's because presumably you have

7   congestion and a lot of people and/or a lot of

8   people who are not very accomplished skiers who are

9   going to be going more slowly who need to be looked

10  out for.  Is that a fair statement?

11         A.   I think I would define it as slower,

12  perhaps beginner skiers, but also where there may be

13  some trail crossings.

14         Q.   Okay.

15         A.   And things like that.

16         Q.   Right.  And this Exhibit 5 -- is it 5?

17  Yeah, it's 5.

18         A.   Yes, it is 5.

19         Q.   This Exhibit 5 that I'm showing you

20  defines the slow skiing areas and says that they've

21  been designed for beginner and congested areas;

22  correct?

23         A.   Yeah.  I don't know if that word is the

24  best use, but I would say that we want to make

1   people aware where there's going to be some trail

2   crossings.  We use the word "congestion" but also

3   slower skiers.

4        Q.   I'm just getting this from the website.

5        A.   Sure.

6        Q.   And you would agree with me that the

7   second page of Exhibit 5 appears to be a printout

8   from the Okemo website; correct?

9        A.   Yes, it is.

10       Q.   Okay.  And it says "Slow down and go with

11  the flow in these areas."  That's the desire of

12  Okemo, to have people go slowly in the slow skiing

13  areas; correct, obviously?

14       A.   Where do you see that?

15       Q.   Sure.  The second paragraph under "Ski and

16  Snowboard Safety Use and Courtesy."  At the end

17  there it says "Slow skiing areas have been designed

18  for beginner and congested areas."

19            Do you see that?

20       A.   Yes, I do.

21       Q.   And then it says "Slow down and go with

22  the flow in these areas"; correct?

23       A.   Correct.

24       Q.   "We reserve the right to revoke your

1     ticket for reckless or out-of-control skiing and

2     snowboarding or failure to observe rules and

3     regulations."

4             Do you see that?

5         A.    I do see that.

6         Q.    Let me ask you, was Curtis's pass revoked

7     under that clause of the rule?

8         A.    I'm not going to answer that.  I was not

9     involved in the taking of his pass.

10        Q.    Moving on.  Okay.  Let me show you

11    Exhibit 6.  We'll look at that for a minute.

12    Exhibit 6 is from Vail, the blog that they have on

13    their website.

14        A.    Okay.

15        Q.    And it says at the top "Since 1999, people

16    in yellow jackets have been skiing around Vail

17    Mountain giving information, helping guests, and

18    keeping the mountain safe.  Vail Mountain safety is

19    now an award-winning benchmark program whose staff

20    is committed to education, enforcement of the

21    Colorado Ski Safety Act, and Your Responsibility

22    Code."

23            Does Okemo have anything similar to the

24    yellow jackets?

1        A.    We do have safety ambassadors, but I don't

2    know if it's to the level of, you know, what this

3    program is.

4        Q.    Okay.  Are you familiar with this program?

5    Have you heard of this program?

6        A.    Yes, I have.

7        Q.    The yellow jackets?

8        A.    Yes, I have.

9        Q.    When did you become familiar with that?

10       A.    I've heard about it in the last couple of

11   years because there's been some -- there's been

12   comments in the industry or guest comments about

13   being more overzealous, so I was interested on how

14   they were handling that.

15       Q.    The ambassadors that you're speaking

16   about, are they the same ambassadors that we

17   discussed earlier when I asked you about the guest

18   ambassador?  Is that who you're talking about at

19   Okemo?

20       A.    No.  They were the ones -- as you recall,

21   there were three ambassadors listed there, so they

22   were the ones underneath called safety ambassadors.

23       Q.    So would there have been safety

24   ambassadors on the mountain similar in their charge

 1    to the yellow jackets that are indicated on

 2    Exhibit 6 on the day of Stacie Pedigo's injury?

 3          A.    I would have to have ask Chris Lancaster

 4    what -- how that would be similar.  I can tell you

 5    in broad terms that the safety ambassadors are

 6    skiing on the mountain.  They will help direct

 7    guests around if there happens to be, you know, some

 8    type of, you know, injury where ski patrol may be

 9    working on a guest.  Helping them into a toboggan or

10    something.  They might be in areas that are -- where

11    there might be some jumping going on or they're --

12    in broad terms what I know about the program, they

13    are used at different areas that perhaps Chris or a

14    supervisor that they report to determines where they

15    might go.

16          Q.    Do you know if there were any safety

17    ambassadors at the location where Stacie Pedigo was

18    injured at the time she was injured?

19                MR. GFELLER:  Let me just interject

20    an objection.  I think I understand where what

21    you're asking about could relate to certain of the

22    points other than paragraph 8 in your deposition

23    notice, but I also think it is going square in the

24    heart of paragraph 8 which is what Chris Lancaster

1    is going to testify about specifically.

2                   MR. FAXON:  I'm just asking factually

3    if he knows if anybody was there.

4                   MR. GFELLER:  You can answer.

5    BY MR. FAXON:

6         Q.    Do you understand the question?

7         A.    I understand the question.  I do not know.

8         Q.    Have you seen any reports from any safety

9    ambassadors relative to this incident?

10        A.    I have not.

11        Q.    Is there a formal program related to

12   safety ambassadors other than documented -- other

13   than what we talked about earlier on Exhibit 3?  I

14   think it was 3.  3.  Exhibit 3, Okemo 276,

15   ambassador program.  Is that what we're talking

16   about when you refer to a safety ambassadors?  Is

17   there anything else?

18        A.    I guess I don't quite understand the

19   question.

20        Q.    Right.  We're talking about safety

21   ambassadors.  And my question is:  Are the safety

22   ambassadors that you're talking about the same

23   ambassadors that are referenced on page 17 of

24   Exhibit 3 on Okemo 276?

1        A.    Correct.

2        Q.    Okay.  So you said that you had some

3   knowledge of the yellow jacket program for the last

4   couple of years.  Do you think that's a positive

5   program or a negative program --

6              MR. GFELLER:  Objection, form.

7        Q.    -- for ski safety?

8              MR. GFELLER:  Let me just object.

9   He's not here to testify as an expert witness, so

10  his opinion is not something that he's going to

11  provide today.

12       Q.    Okay.  You had commented earlier about

13  your understanding of the yellow jacket program, and

14  you had some thoughts about it.  Has Okemo

15  instituted a yellow jacket program or the

16  equivalent?

17       A.    I would say that our safety ambassadors is

18  as the equivalent.

19       Q.    Okay.  But I thought you said earlier that

20  the safety ambassadors do not enforce safety rules,

21  don't pull people's tickets, and things like that?

22       A.    No, that's not what I said.  I said the

23  mountain ambassadors do not do that.

24       Q.    But safety ambassadors do?

Volume I, Page No.          62

1      A.    Safety ambassadors have more leeway to do

2   that.

3      Q.    Okay.  And is there a written program for

4   safety ambassadors?

5      A.    I would want to have Mr. Lancaster answer

6   that.  I do not know.

7      Q.    Okay.  Let's put it this way:  You haven't

8   seen any written program related to safety

9   ambassadors.

10     A.    I have not.

11     Q.    Okay.  Do the safety ambassadors wear any

12   distinctive uniforms, clothing, outfit?

13     A.    I believe they are red.

14     Q.    Okay.  Similar to the --

15     A.    Mountain.

16     Q.    Strike that.

17           All of the ambassadors wear the same

18   color.  Is that a fair --

19     A.    I guess I would clarify by saying the

20   safety ambassadors and the mountain ambassadors do.

21   What was in there, where it said snow stars

22   ambassadors, do not.

23     Q.    Okay.  Let me ask you if you know this.

24   If you look at Exhibit 6 on the second page there.

1    It says "Until every skier and rider on Vail knows

2    and abides by these seven principles," that would be

3    the responsibility code, "Vail Mountain safety is

4    out there enforcing responsible behavior on Vail's

5    12 runs designated as slow zones.  We do this by

6    putting up almost 200 yellow signs every morning.

7    In addition, we engage in conversation with people

8    we see skiing or riding in a way that puts

9    themselves or others at risk."

10         Does Okemo, to your knowledge, have a

11   similar safety group like is described here, the

12   yellow jackets?

13        A.    I would say that we -- we would abide and

14   we would want -- that's a great goal, and we would

15   want to have a similar goal.  We may go about it in

16   a different way.  I don't know the number of yellow

17   jackets that they have.  And Chris would be able to

18   tell you how many safety ambassadors.  But our

19   safety -- our ski patrol and our safety ambassadors

20   all do, you know, a similar, you know, they're out

21   there.  But you can't be every place at every time.

22        Q.    Right.  They have concentrated in the slow

23   areas here.  How many slow areas are there on Okemo?

24   Do you know?

Volume I, Page No.          64

1          A.    I would have to look at a trail map to be

2     able to tell you that.

3          Q.    Would there be a roster for these

4     ambassadors?  Meaning, is there like a sign-up

5     sheet?  You're coming Saturday; you're coming

6     Sunday?  Do they have a list?

7          A.    I'm going to have to have Mr. Lancaster

8     answer that.

9          Q.    All right.  Fair enough.  Let me show you

10    what's been marked as 7.  There's only a couple of

11    things I want to talk to you about.  So Exhibit 7.

12    Do you recognize that?

13         A.    I do.

14         Q.    I think you signed that; right?

15         A.    Yep.

16         Q.    Okay.  So let's just look at page 8.

17    That's Curtis's employment list.  When was he --

18    when did he last work for Okemo?  Do you know?  I'm

19    focusing on question 13.

20         A.    I don't without having to research when he

21    last worked.

22         Q.    Is he presently an employee?

23         A.    He is not.

24         Q.    Okay.  When is it that you're aware he was

1    last an employee?  Would it have been this ski

2    season did he work there?

3         A.   Well, I would say that looking at this,

4    how we answered, he was last employee on the 27th of

5    May.

6         Q.   Okay.  The discovery answer is June 29th,

7    so I assume he would have been an employee for a

8    month in that last period.  But you don't know when

9    after that he worked?

10        A.   I do not.

11        Q.   That's it for that one.

12        A.   Okay.

13        Q.   Let me show you Exhibit 8, which is

14   answers to discovery.  I think you may have -- you

15   may not have signed this one.  I don't remember.

16   No, these are just documents.

17             Let's just go through a couple of these

18   things.  Look at Okemo 30.  There's a Bates stamp

19   down on the bottom right.

20        A.   Okay.  I have it.

21        Q.   And this one's got your signature on it.

22   It says "Approved by division manager B. Schmidt."

23   This is 10/16/2017.  Do you see that up in the right

24   corner?

1        A.    I do.

2        Q.    So he must have been employed as of last

3   fall in some regard.  Is that a fair statement?

4        A.    Well, what you're -- I'm sure you realize

5   that this is a removal form.  They're using it as a

6   removal.

7        Q.    Okay.

8        A.    So he's coming off.  I do not know if he

9   worked up to that date.

10       Q.    Okay.  Let me ask you this:  It says his

11  job description is loper.  What does that mean?

12       A.    Lift operator.

13       Q.    Okay.  And he was recommended for rehire.

14  Would that have been by you or by Chris Lancaster?

15       A.    That would have been by Chris Lancaster.

16       Q.    Okay.  Is there a reason that you signed

17  off on this document?  Because sometimes you do;

18  sometimes you don't?

19       A.    Most likely his manager isn't always in

20  the office.  And, you know, paperwork isn't

21  always -- he's a mountain ops guy, so I would go

22  into what's called payroll or -- I don't know how to

23  describe it, but it has all these payroll

24  authorizations, removal forms, their applications,

Volume I, Page No.            67

1   and things like that.  And I will go in and sign off

2   for it.

3        Q.   So that's just an administrative task that

4   you have?

5        A.   Correct.

6        Q.   I think that's it on that document.  Let

7   me show you 9, which is another discovery answer

8   that you may have seen that as well.

9             You've reviewed -- I'm just looking at

10   Okemo 1 and thereafter.  You've reviewed, I assume,

11   the incident report, the collision report, and those

12   things; correct?

13        A.   Correct.

14        Q.   Okay.  Do you take any issue with the

15   content of any of those?

16        A.   I don't.

17        Q.   Do you know Neil Dewar?

18        A.   I know of him casually.

19        Q.   And he still works as a ski patrol at

20   Okemo?

21        A.   I believe he does.

22        Q.   Well, up until the time you closed in

23   April?

24        A.   Correct.  Yeah.

Volume I, Page No.          68

 1       Q.   How are the ski patrollers treated?  Are
 2   they considered employees or volunteers?  Are they
 3   paid?  What's the arrangement that Okemo has with
 4   ski patrollers?

 5       A.   They're considered employees, volunteer
 6   employees.

 7       Q.   So they're employees, but they don't
 8   receive compensation.  They basically get in-kind
 9   compensation which is you can ski on the mountain as
10   much as you want.

11       A.   Correct.

12       Q.   Okay.  And I assume there's some vetting
13   of them to make sure they have adequate first-aid
14   training and things like that?

15       A.   There's yearly training.

16       Q.   Do you know what the weather was like on
17   the 20th of February, 2017?

18       A.   Without looking at records, I wouldn't be
19   able to tell you.

20       Q.   Who took the photos, do you know, that are
21   in Exhibit 9, approximately pages 19, 20, 21, 22?
22   These picture that you presumably looked at.  Keep
23   going.  You'll come to them.

24       A.   It doesn't say, so I do not know who took

Volume I, Page No.                69

1    the photos.

2         Q.    Okay.  Would it have been an Okemo

3    employee?

4         A.    Yes, it would have.

5         Q.    Because I'm assuming -- were those

6    pictures taken after the collision?  After the ski

7    area had closed for the day?

8         A.    I would be guessing.  I do not know.

9         Q.    Okay.  How do you determine who took those

10   pictures?

11        A.    I think Chris Lancaster will be able to

12   answer that.

13        Q.    He'll know.  Okay.

14              So the lift operations manual that's

15   attached to this discovery starting at -- it doesn't

16   have --

17        A.    I got it.

18        Q.    You got it there?

19        A.    Yeah.

20        Q.    Okay.  That's provided to every lift

21   operation employee, so it would have included

22   Curtis?

23        A.    Correct.

24        Q.    Okay.  Have you ever spoken to Curtis?

Volume I, Page No.                    70

1       A.    I don't believe I have.

2       Q.    Okay.

3       A.    But, you know, I speak to a lot of people.

4       Q.    Sure.  Did you ever speak to him in

5    connection with this incident?

6       A.    Definitely not.

7       Q.    Who at Okemo spoke to Curtis in connection

8    with this incident?  I don't mean at the mountain

9    but people who work at Okemo or as volunteers, i.e.,

10   ski patrol?

11      A.    Without looking at the paperwork, I don't

12   know who would have spoken to him.

13      Q.    Are you aware of any investigation or

14   discussion with Curtis by people at Okemo subsequent

15   in time to the collision on the mountain?  Was he

16   taken down to the bottom, interviewed, anything like

17   that?  Or was it all on-mountain activity?

18      A.    I'm not aware.  I do not know.

19      Q.    Okay.  Have you ever spoken to

20   Mr. Lancaster about this incident?

21      A.    Yes.

22      Q.    Okay.  And tell me what conversations

23   you've had with him.

24              MR. GFELLER:  Let me just make for

1    the record object to the extent that any

2    conversations occurred in my presence at my

3    direction.

4              MR. FAXON:  That's fine.

5              MR. GFELLER:  So he's asking

6    specifically about discussions you had with

7    Mr. Lancaster, just you and him, not involving me.

8         A.   He told me that there was an off-duty

9    employee that was involved in a collision with a

10   guest.  And he admitted that he was involved in the

11   collision, and, you know, he was treating it just

12   like, you know, a collision would be between two

13   guests.

14        Q.   Do you know if Mr. Lancaster saw Curtis on

15   the mountain?

16        A.   I do not know.

17        Q.   Okay.  When was this discussion that you

18   had?  Shortly after the collision?

19        A.   It was probably that afternoon.  That

20   evening.  He usually tells me if things are a little

21   bit -- might want to be aware of this.

22        Q.   Unusual?

23        A.   Yeah.

24        Q.   Okay.  Did he say anything about Curtis or

Volume I, Page No.     72

1   about who was at fault or anything like that?

2       A.   Not that I recall.

3       Q.   Did he ask you if there should be any

4   additional investigation or punishment or any kind

5   of sanction?

6       A.   No.  Because it was really clear that it

7   was an off-duty employee and they were on their own

8   time.

9       Q.   Did he tell you that he had told him he

10  can't ski anymore for the day?

11      A.   He did not.

12      Q.   How did you come to know that he lost his

13  right to ski for the rest of the day?

14      A.   Well, that was -- I guess it doesn't

15  matter.  That was during conversations with the

16  three of us.

17      Q.   Okay.  I don't want to know about that.

18          Have you ever had any conversations with

19  anyone, other than your lawyer, about what Curtis

20  was wearing at the time of this incident?

21      A.   I don't recall specifically saying he was

22  wearing -- nothing stands out to me that he was

23  wearing something specific.

24      Q.   Okay.  All right.  Can you turn to the

1    back of Exhibit 9, which is Okemo 25?  It's time

2    sheet.

3          A.    Okay.

4          Q.    Yeah.  It should be 9.  It looks like

5    that.

6          A.    Okay.  I have it.

7          Q.    So if you look at Monday, 2:20, it says

8    "6:59 to 8:11, hour and a quarter."

9               Do you have any idea why he only worked an

10   hour and a quarter on that day?

11         A.    I don't know the thought process by the

12   manager sending him home.

13         Q.    Okay.  Was he sent home, or did you ask to

14   go home?  Did he have a doctor's appointment?

15         A.    I don't.  I do not know.

16         Q.    Okay.  Who would know that at Okemo?

17         A.    I guess, you know, his manager,

18   Dave Thompson.

19         Q.    There is a reason, and I don't see this

20   anywhere else, this little icon looks like an eye.

21   Why is that icon next to the 8:11 and not anywhere

22   else on the out?  Do you see that?  I'm trying to

23   understand that.  What does that mean, that icon?

24         A.    I do not -- I don't know.

1        Q.    Okay.  Who would know that?  Somebody

2   other than you?

3        A.    I -- I don't -- I have no idea.

4        Q.    Okay.  At the end of this exhibit there

5   appears to be some kind of a ski ticket discount

6   card here.  This is separate from the season's pass;

7   right, that you have?  Keep going to the back.

8   There it is right there.

9        A.    Right here?

10       Q.    Yes.

11       A.    This would be Number 28.

12       Q.    Yeah.  27 and 28.

13       A.    Okay.  27 and 28.

14       Q.    Is that the additional benefit that the

15   employee gets of being able to invite other people

16   to ski with them?

17       A.    So perhaps I should have explained this in

18   the beginning, but I wasn't sure how I would try to

19   explain it.  But so when the employee walks in to

20   get their pass, they would have what is called --

21   and this is -- it's this color.  It's called a green

22   card.  So it's been filled out by them and the

23   manager.  So then instead of just showing up and

24   saying, hey, I'm getting my pass, they hand this to

1    the woman or whoever is there.  So then this pass,

2    what this does, it says you're an employee.  It says

3    if you have dependents, which in this situation on

4    Number 28 it's crossed out.  He didn't have any

5    dependents.  But if you have dependents, you would

6    fill them in.

7         Q.    You would fill them in.

8         A.    It also says, you know, if you have

9    consecutive years.  So what that does is the

10   consecutive years tells you if your dependents, you

11   get more.  The first year, if you're a full-time,

12   you get one for your spouse.

13        Q.    Right.  And that's all detailed in the

14   manual.

15        A.    Right.  Okay.

16        Q.    Okay.

17        A.    And then you're correct.  Where those

18   things have been punched out, it says that showed

19   that he gets free tickets or the discounted tickets

20   in which they had not used.

21        Q.    All right.  Let's mark this as an exhibit.

22              (Curtis Ficklin Orientation Roster was

23   marked Plaintiff's Exhibit 10 for identification.)

24

1   BY MR. FAXON:

2        Q.   Let me show you Exhibit 10, which looks to

3   me like sort of an employee orientation requirement.

4   And there are three videos noted there.  I think

5   I've gotten two of the videos.  I've gotten the

6   video with Inspector Clouseau and the video -- the

7   safety video, but there are three there.  Is there

8   another one that I haven't seen?  Do you know the

9   two I'm talking about?

10       A.   I do.

11       Q.   I have them there on the USB, but there's

12  only two of them.

13       A.   I guess I would say that some departments

14  might do this guest service video.  I don't know.

15  Again, I would have to probably revert to his

16  manager to see which one might have been shown

17  there.

18       Q.   Okay.  So I've received two videos.  It

19  looks, at least next to his name, he's got three

20  checked that he saw; the safety video, the guest

21  service video, and the presentation video.  Is the

22  presentation video the one with Inspector Clouseau?

23       A.   It is.

24       Q.   Okay.  And the safety video is the one

1    that talks about hazmat, fire extinguishers, and

2    things like that?

3         A.   Correct.

4         Q.   So I don't think I've seen the guest

5    service video.  Do you know what that is?

6         A.   It's -- I believe, and I'm going -- it

7    talks about guest, you know, service in a -- like an

8    office or -- it's not -- it's nothing.  It's one we

9    purchased.  It's nothing we made.

10        Q.   Okay.  I understand.  But you have it

11   somewhere in the facility.

12        A.   I would to find out what -- because what

13   we do is we allow managers, you know, they do the

14   safety ones.  Not everybody does these, but we try

15   to encourage them because in some situations it may

16   not relate to them.

17        Q.   Sure.  Understood.

18        A.   But I'm sure Charlie will help out.  We

19   could find out for Charlie.

20        Q.   That's all I would ask you to get it to

21   Charlie so I can see it.  It's probably nothing, but

22   I would just like to see what it is because he

23   checked it.

24        A.   Yeah.  Sure.

Volume I, Page No.          78

1          MR. FAXON:  I don't think I have any

2    others questions.  Let me just look through here

3    real quick.  Okay.

4    BY MR. FAXON:

5          Q.   Let me just ask you a couple of questions

6    about the documents that I asked you to bring, and

7    I'll just -- we can just look on this together.  I

8    want to make sure I've gotten everything from you

9    that Okemo has.

10          Have you produced to your lawyers all

11   rules, regulations, policies, or procedures

12   concerning maintaining control while skiing, to your

13   knowledge?

14          A.   Yes.

15          Q.   Okay.  All information that Okemo has

16   regarding the skier and rider responsibility code?

17          A.   Yes.

18          Q.   All information that -- relative to the

19   Okemo posted signs and warnings in the area of

20   February 16 -- of the February 16, 2017, collision?

21          A.   All that I was aware of.  I was not there

22   and I did not take photos.

23          Q.   Right.  But within the confines of Okemo,

24   we've received the pictures that we've talked about

Volume I, Page No.                79

1   today.   You're not aware of anything else?

2        A.   I am not.

3        Q.   Okay.   Ficklin's employment with Okemo.

4   You produced all those documents?

5        A.   Yes, we have.

6        Q.   Duties and obligations of Okemo employers

7   while skiing on employer-provided ski pass as

8   benefit of employment.   You've produced all

9   documents related to that?

10        A.   Yes.

11        Q.   Any discipline imposed on Curtis Ficklin

12   as a result of collision or the manner in which he

13   skied while skiing on employer-provided ski pass as

14   benefit of employment.   You provided any and all

15   documents related to that?

16        A.   Yes.

17        Q.   All information or materials provided to

18   Curtis by Okemo in the course of hiring, employment,

19   including any and all Okemo handbooks, rules,

20   regulations, ski passes for employees for 2017.   You

21   provided all of that?

22        A.   Yes.

23        Q.   And last one is any documentation

24   concerning the utilization of staff to monitor

1    and/or enforce safety rules at busy trail

2    intersections.

3         A.    Yes.

4         Q.    Are you aware of any documents related to

5    that item?  Because I don't think I've seen any.

6         A.    I'm not aware of anything that we might

7    have.

8         Q.    Okay.

9              MR. GFELLER:  Let me just add one

10   thing.

11             MR. FAXON:  Yeah.

12             MR. GFELLER:  With respect to --

13             MR. FAXON:  I have seen photos of

14   signs, but we're talking about utilizing staff.

15   That's why I asked.

16             MR. GFELLER:  With respect to

17   paragraph 1H asking for information and materials

18   provided to Curtis Ficklin in the course of hiring

19   and employment, et cetera, you've identified one

20   video that you haven't seen.

21             MR. FAXON:  Right.

22             MR. GFELLER:  And to the extent that

23   he had been hired several years before, I'm not sure

24   we produced necessarily documents relating to, you

Volume I, Page No.                    81

1   know, handbooks, et cetera, from that time period.

2   And I'm not sure that I have any intention of doing

3   that because it's so far removed from the date of

4   this incident, but you have the materials from the

5   season before, the season of, and the season after

6   this incident.

7                  MR. FAXON:  I'm comfortable with

8   that.

9                  The only other thing I would like, if

10  I can get it, is the 2016 to 2017 season pass waiver

11  document, which I couldn't find online.  Somebody

12  must have that.  Although, if you look at your

13  website from -- this can be off the record.

14                 (A discussion was held off the record.)

15                 MR. FAXON:  I have no further

16  questions for the witness.

17                 MR. GFELLER:  Let's take a quick

18  break.

19                 (Break taken from 12:44 p.m. to 12:51 p.m.)

20                      CROSS-EXAMINATION

21  BY MR. GFELLER:

22       Q.    Bruce, are you aware of any other

23  collisions that Curtis Ficklin was involved in at

24  Okemo or any place else either before or after the

Volume I, Page No.          82

1   incident with Mr. Rivard-Pedigo?

2          A.   No.

3          Q.   Did you or Okemo have any reason to

4   believe that Curtis Ficklin presented any type of

5   different or higher risk as a skier with respect to

6   skier-skier collision than any other skier on the

7   mountain?

8          A.   No, because his job didn't require him to

9   ski.

10                MR. GFELLER:   Thank you.   I don't

11  have any other questions.

12                (Deposition concluded at 12:52 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

Volume I, Page No.                    83

1          I have carefully read the foregoing transcript of

2     my deposition given on May 14, 2018, and the answers

3     made by me are true.

4

5     DATE: _____          _____

6                                 BRUCE SCHMIDT

7

8     STATE OF VERMONT

9     COUNTY OF _____

10

11

12          At _____, in said county, this _____ day of

13     _____ 2018, personally appeared before me the

14     above-named BRUCE SCHMIDT, and made oath that the

15     foregoing answers subscribed by him are true.

16

17     Before me: _____

18     Commission Expires: _____

19

20

21

22

23

24

Volume I, Page No.        84

1                    C E R T I F I C A T E

2          I, DINEEN SQUILLANTE, Registered Professional

3    Reporter and Notary Public, do hereby certify that the

4    foregoing pages, numbered page 4 through page 82,

5    inclusive, are a true and accurate transcript of my

6    stenographic notes of the deposition of BRUCE SCHMIDT,

7    taken before me on May 14, 2018, at 11:01 a.m., for use

8    in the matter of STACIE RIVARD-PEDIGO, -VS- OKEMO

9    LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT.

10

11

12

13

14

15

16

17

18                              DINEEN SQUILLANTE
                                Commission Expires 02/10/19
19

20

21

22

23

24

**BY MR. FAXON: [8]** 4/4
23/15 31/22 46/11 47/5
60/4 75/23 78/3
**BY MR. GFELLER: [1]**
81/20
**MR. FAXON: [12]** 9/18
23/12 46/6 47/1 60/1
71/3 77/24 80/10 80/12
80/20 81/6 81/14
**MR. GFELLER: [15]**
9/16 34/13 35/2 59/18
60/3 61/5 61/7 70/23
71/4 80/8 80/11 80/15
80/21 81/16 82/9

**'**
'15 [1] 23/4
'15-'16 [1] 23/4
'16 [9] 22/14 22/16 23/4
23/4 23/17 46/17 47/10
47/18 52/14
'16-'17 [5] 22/14 23/4
46/17 47/10 52/14
'17 [9] 20/16 22/14
22/17 23/4 46/8 46/17
47/10 47/19 52/14

**-**
-VS [1] 84/8

**0**
00568 [1] 1/3
02/10/19 [1] 84/19
05250 [1] 1/22
06107 [1] 1/19
06510 [1] 1/16

**1**
10 [2] 75/23 76/2
10/16/2017 [1] 65/23
10:00 [1] 48/17
11:01 [2] 1/11 84/7
12 [1] 63/5
12:44 [1] 81/19
12:51 [1] 81/19
12:52 [1] 82/12
13 [2] 2/16 64/19
14 [2] 83/2 84/7
14th [1] 1/11
15 [3] 7/9 10/12 14/9
16 [4] 16/1 16/15 78/20
78/20
17 [2] 47/21 60/23
19 [2] 68/21 84/19
1978 [1] 13/15
1999 [1] 57/15
1H [1] 80/17

**2**
2/18 to [1] 50/24
2/24 [1] 50/24
20 [2] 50/20 68/21
200 [2] 1/19 63/6
2015 [1] 53/9
2015-'16 [2] 22/16 23/17

2015-2016 [3] 2/9 2/11
22/13
2016 [5] 2/9 2/11 6/23
22/13 81/10
2016-'17 [3] 20/16 22/17
46/8
2016-2017 [6] 2/9 2/10
2/24 46/10 47/4 53/4
2017 [21] 2/9 2/10 2/15
2/16 2/17 2/24 16/2
16/15 19/14 19/24 20/16
37/23 46/10 47/4 53/4
54/6 65/23 68/17 78/20
79/20 81/10
2017-2018 [2] 2/12
52/16
2018 [6] 1/11 2/12 52/16
83/2 83/13 84/7
2018-2019 [3] 2/13
52/22 53/10
2019 [3] 2/13 52/22
53/10
205 [1] 23/18
20th of [1] 68/17
21 [3] 22/9 23/11 68/21
2105 [1] 2/14
219 [1] 33/19
22 [1] 68/21
220 [1] 37/15
233 [2] 44/19 45/3
24 [1] 50/24
25 [1] 73/1
27 [2] 74/12 74/13
276 [3] 47/22 60/14
60/24
278 [1] 50/21
27th of [1] 65/4
28 [4] 74/11 74/12 74/13
75/4
2800 [1] 43/14
29 [2] 2/15 2/17
2900 [1] 43/14
29th [1] 65/6
2:20 [1] 73/7

**3**
30 [1] 65/18
30th full-time [1] 13/9
32 hours [1] 21/2
342-7199 [1] 1/22
35 [1] 33/18
36 [1] 37/14
3:17-cv-00568 [1] 1/3

**4**
40 [1] 13/8
40 hours [1] 21/2
49 [1] 45/3
4A [2] 51/10 51/10
4B [2] 52/13 52/18
4C [1] 52/24

**5**
51 [1] 1/11
59 [1] 1/15

**6**
6:59 [1] 73/8

**7**
7199 [1] 1/22
781 [1] 1/21

**8**
802 [1] 1/22
82 [1] 84/4
8:11 [2] 73/8 73/21

**9**
977 [1] 1/18

**A**
a.m [2] 1/11 84/7
abide [1] 63/13
abides [1] 63/2
ability [2] 32/11 33/7
able [13] 26/2 28/14
29/2 29/13 34/7 52/14
53/5 53/24 63/17 64/2
68/19 69/11 74/15
about [56] 8/13 9/5
12/24 15/18 16/1 16/4
17/14 19/3 26/9 26/10
26/10 28/19 30/24 31/8
32/24 35/23 36/18 37/21
38/2 38/6 38/7 38/19
40/17 43/10 43/14 50/21
52/9 54/17 58/10 58/12
58/16 58/17 58/18 59/12
59/21 60/1 60/13 60/16
60/20 60/22 61/12 61/14
63/15 64/11 70/20 71/6
71/24 72/1 72/17 72/19
76/9 77/1 77/7 78/6
78/24 80/14
above [3] 13/19 50/2
83/14
above-named [1] 83/14
accident [6] 5/11 7/10
9/4 9/23 11/5 27/24
accidents [1] 38/2
accomplished [1] 55/8
accurate [1] 84/5
acquiring [1] 53/17
Act [1] 57/21
acting [1] 27/15
activities [2] 26/10 38/14
activity [2] 28/13 70/17
actually [5] 28/10 28/22
44/19 44/23 51/9
add [1] 80/9
added [1] 15/6
addition [1] 63/7
additional [2] 72/4 74/14
adequate [1] 68/13
adhere [1] 24/15
adjustments [1] 15/14
administration [2] 32/6
32/8
administrative [1] 67/3
admitted [1] 71/10
adopted [1] 35/5

after [10] 27/24 29/21
41/2 54/11 65/9 69/6
69/6 71/18 81/5 81/24
aftermath [1] 44/4
afternoon [1] 71/19
again [5] 18/8 35/5 37/9
45/23 76/15
against [1] 10/21
ago [7] 5/5 6/22 7/6 7/9
10/12 10/12 14/9
agree [14] 18/24 25/7
27/11 27/16 33/21 34/13
36/17 46/20 51/17 52/17
53/3 53/7 53/20 56/6
agreed [2] 3/2 45/19
agreement [6] 2/12 2/13
2/14 51/14 51/16 52/1
ahead [2] 34/1 36/14
Aicher [1] 11/17
aid [1] 68/13
airbag [5] 5/11 5/15 5/16
7/6 10/12
akin [1] 39/24
all [36] 3/8 3/12 3/17 5/3
7/2 9/15 11/4 11/22 22/1
26/23 27/13 33/1 46/7
47/15 47/21 52/15 53/9
62/17 63/20 64/9 66/23
70/17 72/24 75/13 75/21
77/20 78/10 78/15 78/18
78/21 79/4 79/8 79/14
79/17 79/19 79/21
allow [3] 29/15 43/12
77/13
allows [1] 36/3
almost [2] 50/12 63/6
along [1] 37/7
also [18] 15/5 27/7 32/12
33/18 36/10 36/18 38/22
44/18 47/16 48/8 48/11
48/15 49/6 54/13 55/12
56/2 59/23 75/8
Although [1] 81/12
always [5] 10/3 34/7
42/11 66/19 66/21
am [4] 38/1 45/2 46/24
79/2
ambassador [12] 24/21
25/1 25/5 25/9 25/18
25/21 26/17 27/4 47/24
48/2 58/18 60/15
ambassadors [31] 48/21
49/19 58/1 58/15 58/16
58/21 58/22 58/24 59/5
59/17 60/9 60/12 60/16
60/21 60/22 60/23 61/17
61/20 61/23 61/24 62/1
62/4 62/9 62/11 62/17
62/20 62/20 62/22 63/18
63/19 64/4
and/or [3] 21/5 55/7 80/1
another [7] 52/5 52/9
52/19 53/1 53/6 67/7
76/8
answer [17] 4/17 18/3
28/14 29/2 29/7 33/2

39/5 49/8 49/9 54/11
57/8 60/4 62/5 64/8 65/6
67/7 69/12
answered [1] 65/4
answering [1] 5/15
answers [3] 65/14 83/2
83/15
anticipate [1] 4/18
any [67] 3/13 3/16 5/17
7/5 9/2 10/10 10/18
10/19 10/20 11/15 12/22
17/8 22/15 22/17 22/22
23/3 23/3 24/13 27/14
28/12 29/24 30/22 37/3
39/8 39/18 40/4 40/10
40/13 42/18 43/3 44/3
44/10 44/17 44/21 45/10
46/24 50/11 53/16 53/19
59/16 60/8 60/8 62/8
62/11 67/14 67/15 70/13
71/1 72/3 72/4 72/18
73/9 75/4 78/1 79/11
79/14 79/19 79/23 80/4
80/5 81/2 81/22 81/24
82/3 82/4 82/6 82/11
anybody [3] 44/2 44/8
60/3
anymore [1] 72/10
anyone [3] 25/21 34/19
72/19
anything [15] 4/8 36/21
37/11 39/24 40/22 45/1
49/11 52/9 57/23 60/17
70/16 71/24 72/1 79/1
80/6
anywhere [3] 31/1 73/20
73/21
APPEARANCES [1]
1/14
appeared [1] 83/13
appears [3] 21/8 56/7
74/5
applicable [1] 10/19
applications [1] 66/24
apply [2] 34/6 34/21
appointment [1] 73/14
Approved [1] 65/22
approximately [2] 6/22
68/21
April [1] 67/23
are [73] 3/9 3/10 3/13
7/5 10/17 10/19 10/20
10/24 11/1 11/16 16/3
22/1 22/17 22/19 23/3
23/6 23/22 24/14 28/4
29/24 30/3 30/11 31/24
35/16 35/17 36/2 38/2
38/24 40/4 40/10 40/13
40/23 41/8 41/18 42/2
42/2 42/8 42/12 44/2
45/14 48/5 48/13 48/22
49/19 52/8 53/16 55/3
55/8 55/8 58/4 58/16
59/1 59/5 59/10 59/13
60/21 60/23 62/13 63/23
65/16 68/1 68/1 68/2

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

**A**

are... [10] 68/20 70/13 71/20 76/4 76/7 80/4 81/22 83/3 83/15 84/5
area [8] 16/15 30/11 38/18 48/5 54/20 54/22 69/7 78/19
areas [19] 35/7 36/2 36/4 36/8 36/10 40/17 54/18 55/4 55/20 55/21 56/11 56/13 56/17 56/18 56/22 59/10 59/13 63/23 63/23
aren't [1] 48/21
Arlington [1] 1/22
around [6] 7/4 44/8 44/9 49/6 57/16 59/7
arrangement [1] 68/3
as [70] 3/4 3/7 3/12 4/2 7/24 9/24 12/14 15/7 15/12 17/6 17/9 17/11 21/15 22/6 23/4 25/9 25/13 26/4 26/16 26/17 29/11 33/19 34/6 35/13 37/1 37/17 37/17 37/22 37/24 38/15 38/19 39/23 41/21 41/21 41/23 41/23 45/9 45/12 45/21 46/8 46/13 46/19 46/20 47/2 47/7 48/5 50/3 51/22 52/15 53/1 54/2 54/8 55/11 58/20 61/9 61/18 63/5 64/10 66/2 66/5 67/8 67/19 68/9 68/10 70/9 75/21 79/7 79/12 79/13 82/5
Aside [3] 9/1 10/17 46/4
ask [16] 4/8 9/17 19/4 23/2 24/6 42/20 46/14 51/10 57/6 59/3 62/23 66/10 72/3 73/13 77/20 78/5
asked [4] 25/22 58/17 78/6 80/15
asking [7] 4/7 4/18 23/22 59/21 60/2 71/5 80/17
aspects [1] 37/5
asserted [1] 12/14
assistant [1] 10/7
Association [2] 35/7 40/17
assume [7] 19/9 21/12 31/13 52/14 65/7 67/10 68/12
assuming [1] 69/5
assumption [2] 42/6 51/15
at-will [1] 45/4
attached [1] 69/15
attention [1] 50/13
attorneys [1] 3/3
authorizations [1] 66/24
available [1] 36/11
Avenue [1] 1/19
avoid [2] 34/8 36/16
award [1] 57/19

award-winning [1] 57/19
aware [26] 10/18 10/19 10/20 22/17 22/22 29/24 31/2 36/21 36/23 40/9 40/11 41/11 44/2 44/17 45/1 53/16 56/1 64/24 70/13 70/18 71/21 78/21 79/1 80/4 80/6 81/22
awareness [3] 37/17 39/14 40/24

**B**

back [11] 19/8 19/14 19/24 23/24 28/24 29/15 31/15 31/22 44/19 73/1 74/7
background [1] 18/1
ballpark [2] 6/22 7/2
base [3] 48/8 48/9 48/11
based [5] 22/5 26/15 30/19 36/17 37/9
basically [5] 23/20 27/8 40/24 46/22 68/8
Bates [3] 23/11 23/18 65/18
became [1] 13/10
because [28] 10/1 19/5 19/6 20/17 23/7 23/10 29/5 29/14 30/23 34/5 34/17 38/11 42/1 42/7 43/17 51/7 53/8 55/6 58/11 66/17 69/5 72/6 77/12 77/15 77/22 80/5 81/3 82/8
become [1] 58/9
becomes [1] 43/16
been [42] 4/1 4/22 7/8 9/2 11/8 11/12 12/14 14/6 14/7 15/5 15/13 18/21 19/22 19/24 20/19 20/20 20/21 27/18 30/1 41/2 41/14 42/11 46/13 47/7 47/17 55/21 56/17 57/16 58/11 58/11 58/23 64/10 65/1 65/7 66/2 66/14 66/15 69/2 74/22 75/18 76/16 80/23
before [12] 3/16 4/7 4/23 13/10 29/11 51/11 80/23 81/5 81/24 83/13 83/17 84/7
beginner [3] 55/12 55/21 56/18
beginning [1] 74/18
behalf [2] 1/16 1/19
behavior [1] 63/4
being [4] 14/24 44/13 58/13 74/15
believe [15] 5/21 9/22 9/24 11/4 11/11 23/6 37/4 49/14 54/4 55/2 62/13 67/21 70/1 77/6 82/4
benchmark [1] 57/19
benefit [7] 4/15 17/6 17/11 21/15 74/14 79/8

79/14
benefits [2] 21/24 22/24
best [2] 16/17 55/24
between [5] 3/2 22/16 22/18 23/3 71/12
bike [1] 17/23
bit [4] 26/3 34/23 48/14 71/21
Black [1] 13/17
blends [1] 9/15
blind [1] 50/1
blog [2] 2/15 57/12
boards [1] 39/11
booth [1] 48/12
boss [1] 13/21
both [1] 29/13
bottom [3] 12/20 65/19 70/16
bottoms [1] 39/10
Box [1] 1/21
brand [1] 12/5
brand-new [1] 12/5
Brattleboro [1] 1/12
break [2] 81/18 81/19
breath [1] 4/17
bring [1] 78/6
broad [2] 59/5 59/12
BRUCE [10] 1/10 2/3 3/6 3/16 4/1 32/6 81/22 83/6
83/14 84/6
buffet [1] 36/8
building [1] 48/11
busiest [3] 41/16 41/16 42/13
busy [5] 17/14 41/21 41/22 41/23 80/1
Butte [1] 35/9
buy [2] 19/6 36/7

**C**

cafeteria [1] 31/9
call [1] 44/3
called [7] 27/7 34/17 40/23 58/22 66/22 74/20 74/21
can [27] 4/17 12/22 13/1 15/24 28/19 36/7 36/9 42/18 63/21 72/10
cannot [1] 29/7
capacity [1] 43/19
car [1] 9/4
card [7] 32/2 32/3 32/4 32/14 32/24 74/6 74/22
care [2] 9/3 9/5
carefully [1] 83/1
carry [1] 26/20
cars [1] 43/13
case [23] 1/3 5/6 5/8 5/13 5/18 6/2 6/4 6/10 6/20 7/12 7/18 8/2 9/21

10/13 10/21 11/9 11/13 11/16 11/23 12/1 14/8 15/21 44/11
cases [5] 10/17 10/18 10/20 11/1 12/22
casually [1] 67/18
category [1] 50/5
Center [1] 1/18
certain [4] 36/9 37/5 55/3 59/21
certify [1] 84/3
cetera [2] 80/19 81/1
chain [1] 13/24
chair [1] 48/14
changed [1] 40/19
changes [3] 15/12 22/23 46/24
charge [1] 58/24
CHARLES [1] 1/18
Charlie [3] 77/18 77/19 77/21
checked [2] 76/20 77/23
Chris [9] 17/15 30/16 59/3 59/13 59/24 63/17 66/14 66/15 69/11
Chris Lancaster [1] 30/16
Christmas [2] 42/4 50/22
circumstance [1] 36/18
circumstances [2] 29/9 30/3
claim [2] 12/14 37/11
clarification [1] 19/5
clarify [1] 62/19
classification [3] 20/15 20/17 21/20
classifications [2] 20/18 21/23
clause [1] 57/7
clear [2] 14/12 72/6
clearer [1] 40/12
Cleary [2] 7/23 10/13
Cleary's [1] 11/20
client [3] 20/3 24/4 33/23
74/21
clocked [1] 24/3
Close [1] 14/2
closed [3] 30/9 67/22 69/7
clothing [1] 62/12
Clouseau [2] 76/6 76/22
coat [4] 19/10 49/12 49/12 49/13
code [20] 16/12 24/15 33/15 33/22 34/4 34/9 34/11 34/17 34/21 34/24 35/10 36/14 37/3 37/12 39/10 39/12 40/6 57/22 63/3 78/16
collision [27] 12/19 16/16 17/9 28/3 29/6 29/12 29/21 37/8 43/24 44/4 44/4 52/5 52/9 52/18 52/24 53/6 54/21 67/11 69/6 70/15 71/9 71/11 71/12 71/18 78/20

79/12 82/6
collisions [3] 41/10 41/13 81/23
color [2] 62/18 74/21
Colorado [1] 57/21
ccme [4] 38/12 49/22 68/23 72/12
comes [1] 14/15
comfortable [1] 81/7
coming [5] 48/5 48/13 64/5 64/5 66/8
commented [1] 61/12
comments [2] 58/12 58/12
Commission [2] 83/18 84/19
committed [1] 57/20
committee [12] 37/15 37/21 37/24 38/1 38/22 39/1 39/8 39/9 39/13 39/16 39/23 39/24
common [1] 54/14
company [4] 1/4 15/13 39/19 84/9
compensation [2] 68/8 68/9
complaining [1] 31/8
complaint [1] 16/3
complaints [1] 31/4
complete [1] 4/20
completed [1] 13/9
completely [1] 4/16
concentrated [1] 63/22
concerning [3] 16/8 78/12 79/24
concluded [1] 82/12
conditions [1] 27/15
conduct [3] 45/5 45/8 45/9
confines [1] 78/23
congested [2] 55/21 56/18
congestion [2] 55/7 56/2
CONNECTICUT [3] 1/1 1/15 1/19
connection [3] 53/17 70/5 70/7
consecutive [2] 75/9 75/10
consider [2] 24/8 24/11
consideration [1] 45/11
considered [5] 20/13 20/22 24/20 68/2 68/5
contains [2] 54/9 54/13
content [2] 46/20 67/15
contest [1] 41/1
control [6] 16/8 24/18 34/1 34/7 57/1 78/12
conversation [1] 63/7
conversations [4] 70/22 71/2 72/15 72/18
corner [1] 65/24
correct [77] 8/18 13/12 18/17 19/13 19/15 19/16 21/18 22/2 22/3 22/8 23/21 24/4 24/5 25/5

C
correct... [63] 25/9 26/5 26/13 26/18 27/5 27/6 27/9 27/10 28/9 28/11 32/18 32/21 32/22 33/13 33/15 34/9 34/22 35/4 35/11 35/12 35/14 36/1 36/5 36/6 36/11 36/22 38/16 41/17 42/14 46/6 46/17 46/18 47/12 47/20 49/18 51/20 51/21 51/24 52/2 52/3 52/10 53/10 53/14 53/15 54/15 54/16 54/19 55/4 55/5 55/22 56/8 56/13 56/22 56/23 61/1 67/5 67/12 67/13 67/24 68/11 69/23 75/17 77/3
Costello [1] 1/11
could [9] 19/2 19/6 21/12 23/2 27/4 33/16 54/5 59/21 77/19
couldn't [2] 10/1 81/11
counsel [2] 2/20 3/18
county [2] 83/9 83/12
couple [6] 5/2 58/10 61/4 64/10 65/17 78/5
course [2] 79/18 80/18
court [5] 1/1 4/15 6/5 8/21 12/8
courtesy [2] 54/14 56/16
Crested [1] 35/8
CROSS [2] 2/2 81/20
CROSS-EXAMINATION [1] 81/20
crossed [1] 75/4
crossings [2] 55/13 56/2
culinary [2] 15/11 26/11
culvert [1] 7/15
Curtis [32] 2/18 17/1 17/9 19/14 20/2 20/15 24/2 24/20 26/22 31/14 32/19 32/20 33/22 34/8 36/18 44/6 45/12 45/18 47/17 69/22 69/24 70/7 70/14 71/14 71/24 72/19 75/22 79/11 79/18 80/18 81/23 82/4
Curtis Ficklin [2] 17/9 33/22
Curtis's [5] 21/20 23/5 45/8 57/6 64/17
customer [1] 50/17
cut [2] 30/14 50/12
cutoff [1] 42/17
cv [1] 1/3

D
D/B/A [2] 1/5 84/9
dangerous [1] 27/15
data [1] 26/6
date [5] 20/3 53/21 66/9 81/3 83/5
dates [1] 22/20
Dave [4] 7/23 20/1 20/5 73/18

Dave Thompson [1] 73/18
day [18] 1/11 24/3 24/3 28/1 28/8 28/10 29/20 31/18 31/18 32/20 46/5 50/24 59/2 69/7 72/10 72/13 73/10 83/12
days [2] 21/10 36/9
deals [2] 30/16 30/23
December [2] 2/16 12/4
decided [1] 33/11
Defendant [1] 1/19
defense [1] 8/11
define [2] 25/17 55/11
defined [2] 49/2 52/8
defines [2] 52/1 55/20
definitely [2] 41/23 70/6
definition [2] 52/17 53/8
delivered [1] 32/1
department [4] 15/11 15/12 18/7 38/7
departments [1] 76/13
dependents [4] 75/3 75/5 75/5 75/10
Depends [1] 9/19
depict [1] 44/23
deposed [3] 8/12 10/4 11/12
deposes [1] 4/2
deposition [13] 3/13 3/15 4/22 6/19 8/16 9/7 15/19 15/20 15/21 59/22 82/12 83/2 84/6
depositions [4] 3/8 7/5 9/1 9/2
describe [1] 66/23
described [1] 63/11
description [3] 2/8 2/23 66/11
design [1] 12/16
designate [1] 25/8
designated [4] 16/4 30/11 55/3 63/5
designed [2] 55/21 56/17
desire [1] 56/11
desk [1] 48/9
detailed [1] 75/13
determination [1] 20/24
determine [2] 31/12 69/9
determines [1] 59/14
develop [1] 37/17
developed [1] 15/12
Dewar [1] 67/17
did [40] 6/15 6/16 6/18 6/21 7/21 7/23 8/2 8/3 8/9 8/10 8/17 9/10 9/12 13/13 13/16 15/3 19/17 19/18 20/15 28/21 28/22 28/23 34/2 36/22 37/4 37/11 43/23 58/9 64/18 65/2 70/4 71/24 72/3 72/9 72/11 72/12 73/13 73/14 78/22 82/3
didn't [7] 10/4 15/9 21/11 23/10 33/3 75/4 82/8
difference [2] 22/16 33/7

differences [3] 22/17 22/20 23/3
different [10] 10/4 15/7 15/8 21/23 21/23 30/15 32/15 59/13 63/16 82/5
differently [2] 24/13 37/6
DINEEN [2] 84/2 84/19
direct [8] 2/2 4/4 19/21 19/23 25/22 48/10 49/7 59/6
direction [3] 48/7 48/15 71/3
director [3] 14/19 16/18 17/17
disagree [1] 35/20
discipline [2] 17/8 79/11
discount [3] 32/12 32/13 74/5
discounted [1] 75/19
Discover [1] 2/17
discovery [6] 2/15 2/16 65/6 65/14 67/7 69/15
discuss [2] 37/16 38/22
discussed [2] 54/10 58/17
discussion [6] 23/15 31/21 39/4 70/14 71/17 81/14
discussions [2] 39/6 71/6
distinctive [1] 62/12
DISTRICT [2] 1/1 1/1
division [1] 65/22
divorce [1] 9/4
doctor's [1] 73/14
document [12] 2/24 25/5 28/22 47/11 51/19 53/4 53/12 54/7 54/9 66/17 67/6 81/11
documentation [1] 79/23
documented [1] 60/12
documents [10] 24/21 42/8 53/16 65/16 78/6 79/4 79/9 79/15 80/4 80/24
does [27] 6/1 17/20 17/21 17/22 20/7 20/8 25/18 37/10 38/22 39/1 41/9 52/5 52/8 52/12 52/18 52/20 52/24 53/2 53/5 57/23 63/10 66/11 67/2 74/15 74/19 75/2 76/3
doesn't [5] 29/14 39/15 68/24 69/15 72/14
doing [5] 9/7 9/22 10/15 13/1 81/2
don't [59] 4/9 5/20 9/3 9/6 9/14 9/16 10/15 12/12 20/10 20/21 22/15 23/6 24/13 25/10 26/20 26/22 29/9 29/15 33/4 34/6 35/15 36/24 37/1 37/4 38/17 40/19 42/8 43/12 43/22 44/5 47/15 48/17 55/23 58/1 60/18 61/21 63/16 64/20 65/8

65/15 66/18 66/22 67/16 68/7 70/1 70/8 70/11 72/17 72/21 73/11 73/15 73/19 73/24 74/3 76/14 77/4 78/1 80/5 82/10
done [4] 15/7 28/12 45/11 46/1
DOUBLE [1] 1/21
down [12] 7/13 9/10 10/9 31/1 32/5 39/2 45/5 49/3 56/10 56/21 65/19 70/16
downhill [2] 9/23 34/20
dropped [1] 43/8
duly [1] 4/1
during [6] 20/16 27/24 47/17 48/3 51/2 72/15
duties [2] 17/4 79/6
duty [6] 38/24 45/14 45/15 45/24 71/8 72/7

E
each [1] 26/15
earlier [7] 14/5 50/21 54/10 58/17 60/13 61/12 61/19
ears [1] 24/8
Eb [1] 18/14
edge [1] 7/14
education [1] 57/20
eight [1] 17/13
either [4] 15/13 19/7 36/7 81/24
eligible [1] 32/7
Elm [1] 1/15
else [9] 6/8 11/10 15/6 39/4 60/17 73/20 73/22 79/1 81/24
employed [2] 47/18 66/2
employee [43] 2/9 2/10 17/18 19/1 21/16 22/2 22/4 22/7 24/6 24/24 25/8 25/13 26/2 26/15 27/2 27/19 30/7 30/8 31/24 32/15 32/23 33/8 33/9 33/10 38/3 45/6 45/22 46/10 46/22 47/4 47/12 64/22 65/1 65/4 65/7 69/3 69/21 71/9 72/7 74/15 74/19 75/2 76/3
employee's [1] 30/5
employees [17] 17/5 20/12 20/19 23/19 24/14 26/5 27/9 31/4 38/24 44/16 45/14 50/3 68/2 68/5 68/6 68/7 79/20
employer [5] 17/5 17/11 24/7 79/7 79/13
employer-provided [5] 17/5 17/11 24/7 79/7 79/13
employers [1] 79/6
employment [12] 17/2 17/6 17/11 21/15 24/1 45/4 64/17 79/3 79/8 79/14 79/18 80/19

encourage [2] 49/9 77/15
end [3] 41/13 56/16 74/4
endanger [1] 45/6
endangered [1] 45/9
enforce [2] 61/20 80/1
enforced [1] 35/10
enforcement [1] 57/20
enforcing [1] 63/4
engage [1] 63/7
enhance [1] 27/4
enjoyable [1] 27/13
enough [4] 4/12 4/13 13/3 64/9
entail [1] 15/3
entity [2] 35/5 39/18
environment [3] 38/19 38/20 38/23
Epic [3] 35/23 36/3 36/7
equipment [1] 48/7
equivalent [2] 61/16 61/18
ergonomic [1] 38/13
ESQUIRE [2] 1/15 1/18
estimating [1] 18/5
et [2] 80/19 81/1
Even [2] 4/17 33/2
evening [1] 71/20
ever [9] 18/21 27/22 41/12 42/21 49/20 69/24 70/4 70/19 72/18
every [14] 21/16 24/24 25/8 25/11 27/1 27/3 33/9 34/5 47/12 63/1
everybody [2] 38/12 77/14
everything [2] 26/11 78/8
evidence [1] 3/14
exactly [1] 42/9
EXAMINATION [2] 4/4 81/20
example [4] 32/16 35/8 36/24 44/24
examples [1] 30/18
except [3] 3/12 15/4 46/17
Excerpt [1] 2/14
excuse [1] 52/5
exhibit [40] 22/10 22/12 23/17 33/18 45/4 46/11 46/14 46/16 46/16 46/20 47/3 47/5 47/8 47/10 47/16 51/9 51/10 52/4 52/18 52/24 54/3 54/4 55/16 55/19 56/7 57/11 57/12 59/2 60/13 60/14 60/24 62/24 64/11 65/13 68/21 73/1 74/4 75/21 75/23 76/2
Exhibit 1 [6] 22/10 22/12 23/17 33/18 45/4 46/16
Exhibit 10 [1] 76/2
Exhibit 2 [4] 46/14 46/16 46/20 52/4
Exhibit 3 [7] 47/3 47/8

E

Exhibit 3... [5] 47/10
47/16 60/13 60/14 60/24
Exhibit 4 [1] 51/9
Exhibit 4A [1] 51/10
Exhibit 4B [1] 52/18
Exhibit 4C [1] 52/24
Exhibit 5 [4] 54/3 54/4
55/19 56/7
Exhibit 6 [4] 57/11 57/12
59/2 62/24
Exhibit 7 [1] 64/11
Exhibit 8 [1] 65/13
Exhibit 9 [2] 68/21 73/1
exhibits [3] 2/7 2/20 3/17
exit [1] 9/18
expect [5] 19/2 19/11
24/17 25/15 26/20
expectation [1] 26/16
expected [1] 24/15
experience [3] 27/5
27/13 42/11
expert [1] 61/9
Expires [2] 83/18 84/19
explain [1] 74/19
explained [1] 74/17
expressed [1] 51/15
extent [3] 49/1 71/1
80/22
external [8] 27/5 32/17
39/3 39/20 40/1 40/6
40/14 53/13
extinguishers [1] 77/1
eye [1] 73/20
eyes [1] 24/8

F

facilities [3] 15/11 26/8
34/20
facility [1] 77/11
fact [1] 45/18
factually [1] 60/2
failure [1] 57/2
fair [22] 4/12 4/13 13/3
20/11 30/20 30/21 35/1
37/12 37/13 39/16 39/17
42/5 42/5 45/17 45/22
48/23 48/24 49/17 55/10
62/18 64/9 66/3
fall [2] 50/5 66/3
falls [1] 38/9
familiar [3] 33/14 58/4
58/9
familiarity [1] 16/19
far [2] 10/11 81/3
Farmington [1] 1/19
fast [1] 30/11
fault [2] 29/6 72/1
FAXON [3] 1/15 1/15 4/6
February [6] 16/1 16/15
43/15 68/17 78/20 78/20
February 16 [3] 16/1
16/15 78/20
federal [2] 6/5 12/8
felt [1] 12/17
Ficklin [14] 2/18 17/9

20/15 29/17 32/20 33/22
37/8 45/14 47/17 75/22
79/11 80/18 81/23 82/4
Ficklin's [4] 17/1 27/12
27/22 79/3
fifth [1] 45/5
filed [1] 7/18
fill [2] 75/6 75/7
filled [1] 74/22
find [6] 21/12 53/5 54/6
77/12 77/19 81/11
fine [2] 7/2 71/4
finish [1] 4/16
fire [1] 77/1
firm [3] 1/15 1/18 11/20
first [5] 19/19 22/10 54/5
68/13 75/11
first-aid [1] 68/13
five [2] 17/1 21/9
flow [2] 56/11 56/22
focus [3] 38/8 40/11
40/13
focuses [1] 39/19
focusing [1] 64/19
fold [1] 54/7
following [1] 27/11
follows [2] 3/4 4/3
food [2] 13/24 32/12
foregoing [3] 83/1 83/15
84/4
form [6] 3/13 32/5 34/14
35/3 61/6 66/5
formal [1] 60/11
formalities [1] 3/8
forms [1] 66/24
found [1] 29/6
four [1] 16/14
fractured [1] 12/17
free [1] 75/19
front [2] 19/7 30/14
full [10] 13/9 13/11 20/22
21/1 21/13 22/6 23/19
36/7 46/22 75/11
full-time [8] 13/11 20/22
21/1 21/13 22/6 23/19
46/22 75/11
further [2] 43/7 81/15

G

gave [1] 6/19
gear [1] 19/1
general [6] 10/8 13/5
13/20 14/24 15/2 15/9
generally [1] 5/12
Gentry [1] 1/11
germane [1] 44/24
get [17] 10/4 23/20
25/22 32/3 32/10 33/3
33/6 39/1 51/22 52/23
53/14 68/8 74/20 75/11
75/12 77/20 81/10
gets [5] 31/24 33/10
36/8 74/15 75/19
getting [2] 56/4 74/24
GFELLER [2] 1/18 1/18
give [6] 28/22 28/23 48/7

48/15 48/17 49/16
given [10] 12/23 15/5
28/24 30/19 31/14 32/11
32/15 32/16 45/11 83/2
giving [1] 57/17
go [26] 6/15 8/2 9/10
10/1 13/16 19/6 23/7
23/13 29/15 29/15 32/9
35/8 35/9 44/19 44/21
49/2 54/24 56/10 56/12
56/21 59/15 63/15 65/17
66/21 67/1 73/14
goal [2] 63/14 63/15
going [24] 4/7 6/10 7/13
23/2 23/7 34/20 35/10
43/2 50/7 50/13 52/14
54/24 55/9 55/9 56/1
57/8 59/11 59/23 60/1
61/10 64/7 68/23 74/7
77/6
good [3] 4/6 25/13 50/19
got [9] 5/16 14/23 15/16
15/16 44/22 65/21 69/17
69/18 76/19
gotten [4] 52/22 76/5
76/5 78/8
great [1] 63/14
green [1] 74/21
greet [1] 48/6
groomed [1] 7/14
group [4] 1/15 39/19
49/3 63/11
groups [2] 40/10 40/13
guess [10] 8/14 13/21
19/4 25/20 33/2 60/18
62/19 72/14 73/17 76/13
guessing [3] 7/1 18/5
69/8
guest [42] 5/14 6/7 7/13
12/16 18/24 19/2 19/11
24/11 24/12 24/21 25/1
25/4 25/9 25/14 25/17
25/20 25/21 26/3 26/17
27/3 27/5 27/8 28/3 30/7
30/8 32/17 39/20 40/1
40/6 44/12 45/23 49/24
50/11 53/13 58/12 58/17
59/9 71/10 76/14 76/20
77/4 77/7
guests [12] 24/16 25/3
27/13 28/4 39/3 40/14
48/6 48/13 48/16 57/17
59/7 71/13
guide [5] 2/11 26/5
26/14 47/4 47/10
guy [1] 66/21
guys [1] 44/21

H

had [22] 5/16 8/23 12/17
14/6 15/8 22/4 24/2
26/22 31/6 44/21 53/21
61/2 61/12 61/14 69/7
70/23 71/6 71/18 72/9
72/18 75/20 80/23
hair [1] 41/2

hand [1] 74/24
handbook [12] 2/9 2/10
20/18 22/2 22/4 22/13
22/14 22/17 23/4 23/4
23/17 46/10
handbooks [2] 79/19
81/1
handle [2] 43/13 43/14
handling [2] 31/4 58/14
happen [2] 31/12 49/22
happened [3] 29/1 44/15
45/15
happens [2] 49/24 59/7
Hartford [2] 1/18 1/19
has [18] 19/7 26/5 26/8
26/9 26/9 26/10 27/18
32/11 32/12 35/14 42/11
42/21 43/20 61/14 66/23
68/3 78/9 78/15
have [144]
Haven [1] 1/15
haven't [5] 11/12 52/22
62/7 76/8 80/20
having [2] 4/1 64/20
hazard [2] 24/19 38/15
hazmat [1] 77/1
He'll [1] 69/13
he's [11] 7/24 11/20
17/17 18/18 20/6 61/9
61/10 66/8 66/21 71/5
76/19
head [3] 38/7 40/24 41/4
heard [3] 29/22 58/5
58/10
heart [1] 59/24
held [3] 23/15 31/21
81/14
helmet [3] 40/24 41/3
41/4
helmets [1] 41/6
help [4] 28/7 48/6 59/6
77/18
helping [2] 57/17 59/9
her [4] 29/19 29/20 30/1
44/7
here [12] 15/23 22/9
42/17 46/8 50/2 51/7
61/9 63/11 63/23 74/6
74/9 78/2
hereby [2] 3/2 84/3
hereto [1] 3/4
hey [3] 50/1 50/11 74/24
high [3] 13/14 13/16
13/17
higher [1] 82/5
him [17] 18/3 19/17
19/19 19/20 28/19 28/24
45/21 46/5 67/18 70/4
70/12 70/23 71/7 72/9
73/12 82/8 83/15
hired [1] 80/23
hiring [2] 79/18 80/18
his [24] 17/16 18/1 18/14
19/21 19/23 20/17 21/6
24/22 26/23 27/24 28/7
28/12 28/23 31/14 46/5

57/9 61/10 66/10 66/19
72/12 73/17 76/15 76/19
82/8
holder [1] 51/20
holiday [1] 48/4
holidays [1] 21/5
home [3] 73/12 73/13
73/14
honest [1] 43/21
Hopefully [1] 52/23
hour [2] 73/8 73/10
hours [2] 21/2 21/2
house [1] 44/23
how [24] 5/1 8/12 13/6
13/13 18/18 20/24 25/17
25/22 28/21 32/1 32/1
32/3 43/13 48/18 58/13
59/4 63/18 63/23 65/4
66/22 68/1 69/9 72/12
74/18
hum [9] 7/11 10/6 26/22
31/10 38/5 40/22 41/7
43/4 50/14

I

I'd [1] 54/23
I'll [4] 4/11 22/10 33/2
78/7
I'm [46] 4/7 4/18 6/24
7/2 9/16 13/5 14/3 14/3
14/21 16/17 19/3 22/19
22/22 23/7 31/2 33/16
34/4 36/23 38/18 40/9
41/11 44/17 44/18 52/14
53/19 54/6 54/24 55/19
56/4 57/8 60/2 64/7
64/18 66/4 67/9 69/5
70/18 73/22 74/24 76/9
77/6 77/18 80/6 80/23
81/2 81/7
I've [17] 13/8 15/7 15/13
16/21 26/15 30/23 35/19
41/14 46/19 54/2 58/10
76/5 76/5 76/18 77/4
78/8 80/5
i.e [1] 70/9
icon [3] 73/20 73/21
73/23
ID [4] 32/23 33/8 33/10
33/10
idea [3] 48/17 73/9 74/3
identification [4] 3/18
46/11 47/5 75/23
identified [2] 50/22 80/19
implying [1] 44/20
important [7] 21/22
26/19 30/6 34/16 43/15
45/13 50/3
imposed [2] 17/8 79/11
in-house [1] 44/23
in-kind [1] 68/8
inappropriately [1] 27/16
incident [12] 16/2 32/21
45/12 60/9 67/11 70/5
70/8 70/20 72/20 81/4
81/6 82/1

(4) Exhibit 3... - incident

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

(WITNESSNAME)
May 14, 2018

I
include [4] 44/10 52/18
52/24 53/5
included [2] 21/19 69/21
includes [1] 34/18
including [2] 20/12 79/19
inclusive [1] 84/5
incorporate [1] 44/10
incorporated [1] 33/1
increase [1] 37/16
indicated [1] 59/1
indirectly [1] 18/8
industry [3] 40/10 40/13
58/12
information [15] 22/6
26/9 26/9 26/10 27/1
27/3 40/16 48/9 48/12
49/16 57/17 78/15 78/18
79/17 80/17
informed [1] 51/15
inherent [5] 52/2 52/8
52/17 53/1 53/8
injured [20] 5/14 5/19
5/20 7/16 20/3 24/4 28/4
29/14 29/17 29/21 31/14
38/3 44/7 44/13 45/10
45/18 49/24 53/22 59/18
59/18
injuries [1] 38/10
injury [2] 59/2 59/8
inside [2] 39/19 48/8
Inspector [2] 76/6 76/22
instead [1] 74/23
instituted [1] 61/15
instructed [1] 44/17
intention [1] 81/2
interested [1] 58/13
interject [1] 59/19
internal [2] 27/8 31/3
intersections [1] 80/2
interviewed [1] 70/16
introduce [1] 49/4
introduced [1] 4/7
investigation [7] 28/12
28/15 45/11 45/21 45/24
70/13 72/4
invite [1] 74/15
involved [24] 4/22 5/13
5/15 5/18 7/8 7/9 9/2
9/22 9/23 11/16 14/6
28/15 29/4 29/7 29/12
30/12 38/3 39/2 41/14
44/10 57/9 71/9 71/10
81/23
involvement [1] 8/14
involves [1] 11/5
involving [5] 5/6 5/11 7/6
10/12 71/7
Island [2] 6/9 7/7
isn't [8] 19/11 21/16 25/1
38/18 51/2 54/10 66/19
66/20
issue [3] 24/18 30/13
67/14
issues [1] 38/23
it's [52] 6/13 9/20 11/9

11/11 12/5 12/6 12/14
21/22 25/6 25/10 26/19
30/6 32/4 34/16 35/5
35/20 36/15 39/13 40/18
40/19 40/20 40/24 41/23
42/7 42/24 43/15 45/13
46/17 48/18 49/14 49/24
50/2 50/17 51/9 51/14
52/15 53/3 54/5 55/17
58/2 73/1 74/21 74/21
74/22 75/4 77/6 77/8
77/8 77/8 77/9 77/21
81/3
item [3] 16/9 45/5 80/5
itself [1] 49/17

J
jacket [3] 61/3 61/13
61/15
jackets [6] 57/16 57/24
58/7 59/1 63/12 63/17
Jersey [5] 9/7 9/10 9/13
9/15 10/14
job [7] 8/12 24/22 26/17
27/12 50/2 66/11 82/8
jobs [1] 15/7
JOEL [2] 1/15 4/6
John [1] 5/21
jumping [2] 5/14 59/11
June [3] 2/15 2/17 65/6
June 29th [1] 65/6
junior [1] 13/14
jury [2] 8/17 8/19
just [44] 4/9 4/19 5/12
6/24 9/15 12/6 13/9
13/18 15/24 22/13 24/16
36/13 40/11 43/18 44/18
44/19 46/7 48/18 48/19
49/9 50/1 50/10 52/21
54/3 54/8 56/4 59/19
60/2 61/8 64/16 65/16
65/17 67/3 67/9 70/24
71/7 71/11 74/23 77/22
78/2 78/5 78/7 78/7 80/9

K
keep [4] 41/9 54/8 68/22
74/7
keeping [1] 57/18
kind [3] 68/8 72/4 74/5
King [2] 42/4 50/23
Kinney [1] 18/14
knew [1] 8/13
knoll [1] 50/1
know [121]
knowledge [5] 32/19
42/23 61/3 63/10 78/13
knowledgeable [2] 16/3
17/13
known [1] 33/18
knows [2] 60/3 63/1

L
Lancaster [17] 17/15
18/16 28/18 28/23 30/16
39/7 43/23 59/3 59/24

62/5 64/7 66/14 66/15
69/11 70/20 71/7 71/14
Lancaster's [2] 17/24
18/7
lane [2] 12/16 12/18
large [1] 39/11
last [11] 9/24 44/19
58/10 61/3 64/18 64/21
65/1 65/4 65/8 66/2
79/23
last-minute [1] 9/24
lastly [1] 52/21
lasts [1] 48/18
late [1] 12/3
later [2] 28/19 28/24
Laurie [1] 1/18
Law [1] 1/15
lawsuit [1] 45/1
lawyer [1] 72/19
lawyers [3] 5/18 11/15
78/10
least [9] 7/8 12/14 21/8
22/5 34/6 37/22 45/20
46/19 76/19
leave [1] 48/17
leeway [1] 62/1
leg [1] 12/17
let [28] 20/13 22/13 24/6
34/23 40/11 42/20 46/13
47/7 51/10 52/6 52/13
52/16 52/21 54/2 57/6
57/10 59/19 61/8 62/23
64/9 65/13 66/10 67/6
70/24 76/2 78/2 78/5
80/9
let's [14] 18/1 19/9 23/13
44/3 44/19 46/7 47/2
47/21 51/9 62/7 64/16
65/17 75/21 81/17
level [2] 18/15 58/2
LIABILITY [2] 1/4 84/9
lift [11] 20/6 20/20 21/14
24/22 24/23 26/1 30/13
49/9 66/12 69/14 69/20
lifting [1] 38/10
lifts [2] 39/10 48/14
like [37] 3/10 10/3 24/16
24/19 30/14 30/18 31/7
32/13 38/10 40/2 40/20
45/1 48/22 49/7 49/11
49/15 49/24 50/10 50/15
50/18 55/15 61/21 63/11
64/4 67/1 68/14 68/16
70/16 71/12 72/1 73/4
73/20 76/3 77/2 77/7
77/22 81/9
likely [4] 21/2 30/9 53/4
66/19
likewise [1] 53/5
limit [1] 36/10
limited [5] 1/4 22/6 42/21
42/24 84/9
list [3] 15/17 64/6 64/17
listed [4] 15/23 22/1 51/7
58/21
literature [1] 42/1

little [7] 26/2 34/23 41/1
43/16 48/14 71/20 73/20
LLC [1] 1/15
loaded [1] 33/10
locate [1] 52/14
location [3] 48/8 54/20
59/17
lodge [1] 48/8
long [4] 8/24 13/6 18/18
48/18
look [23] 23/11 24/23
31/11 32/8 33/18 37/14
45/3 50/20 51/9 52/4
52/7 52/19 54/3 54/23
57/11 62/24 64/1 64/16
65/18 73/7 78/2 78/7
81/12
looked [6] 22/4 22/15
46/19 54/11 55/9 68/22
looking [9] 7/2 23/18
36/13 44/18 48/14 65/3
67/9 68/18 70/11
looks [4] 73/4 73/20 76/2
76/19
loper [1] 66/11
losing [1] 46/5
lost [1] 72/12
lot [6] 26/6 43/7 52/23
55/7 55/7 70/3
lots [1] 43/17
Ludlow [1] 13/17
Luther [2] 42/4 50/23

M
made [5] 15/13 47/1
77/9 83/3 83/14
maintaining [2] 16/8
78/12
make [10] 4/11 4/15
4/20 14/12 20/24 40/12
55/24 68/13 70/24 78/8
management [1] 18/15
manager [16] 10/8 13/5
13/20 14/16 14/24 15/2
15/9 20/6 32/5 38/7
65/22 66/19 73/12 73/17
74/23 76/16
managerial [1] 18/6
managers [1] 77/13
manner [4] 3/10 17/10
45/19 79/12
manual [4] 24/24 25/11
69/14 75/14
many [7] 5/1 33/4 36/2
36/2 43/13 63/18 63/23
map [3] 30/12 54/23
64/1
maps [1] 39/12
mark [3] 46/8 47/2 75/21
marked [8] 2/8 46/11
46/13 47/5 47/7 54/2
64/10 75/23
Martin [2] 42/3 50/23
material [2] 31/22 35/18
materials [3] 79/17 80/17
81/4

matter [2] 72/15 84/8
matters [1] 3/12
maximum [2] 42/15
43/19
may [24] 1/11 3/6 3/15
3/18 15/14 16/18 29/12
37/5 45/5 45/6 48/16
49/6 49/7 49/8 55/12
59/8 63/15 65/5 65/14
65/15 67/8 77/15 83/2
84/7
maybe [2] 33/2 49/5
me [65] 4/9 5/12 14/5
14/16 14/22 15/15 18/11
18/24 20/13 22/13 23/2
23/22 24/6 25/17 28/7
30/19 33/21 34/23 36/17
37/21 40/11 42/20 46/13
46/20 47/7 47/8 47/24
50/12 51/10 51/17 52/6
52/6 52/13 52/16 52/17
52/21 53/3 53/20 54/2
54/24 56/6 57/6 57/10
59/19 61/8 62/23 64/9
65/13 66/10 67/7 70/22
70/24 71/7 71/8 71/20
72/22 76/2 76/3 78/2
78/5 80/9 83/3 83/13
83/17 84/7
mean [8] 13/21 25/19
28/22 38/17 53/23 66/11
70/8 73/23
Meaning [2] 24/9 64/4
meant [1] 14/16
media [1] 44/22
medical [1] 14/13
meet [1] 38/1
meets [1] 37/15
member [2] 18/21 40/15
merges [1] 17/14
met [2] 19/19 19/20
midweek [1] 21/2
might [21] 25/11 25/15
25/23 25/24 26/1 26/2
31/12 48/19 49/21 49/22
49/23 50/1 50/10 50/11
59/10 59/11 59/15 71/21
76/14 76/16 80/6
mind [2] 46/8 54/8
minute [3] 9/24 28/7
57/11
misconduct [3] 30/5
30/19 31/4
moment [1] 31/13
Monday [3] 31/14 41/21
73/7
monitor [2] 17/14 79/24
month [2] 40/20 65/8
more [14] 15/14 21/1
21/2 26/3 38/2 38/9
39/13 42/18 43/3 43/16
55/9 58/13 62/1 75/11
morning [2] 4/6 63/6
most [8] 5/3 16/3 17/13
21/2 30/9 30/16 38/13
66/19

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

(WITNESSNAME)
May 14, 2018

**M**

mostly [4] 21/3 48/3
48/10 50/17
Mount [1] 35/9
mountain [41] 1/5 14/22
15/10 18/9 18/10 18/12
19/3 19/10 24/7 38/15
38/18 39/3 42/16 42/22
48/12 48/15 48/16 48/22
49/2 49/4 49/7 49/17
49/20 54/21 57/17 57/18
57/18 58/24 59/6 61/23
62/15 62/20 63/3 66/21
68/9 70/8 70/15 70/17
71/15 82/7 84/9
Moving [1] 57/10
Mr [1] 28/23
Mr. [19] 10/13 11/20
17/24 18/7 18/16 27/22
28/18 28/23 29/17 37/8
39/7 43/23 45/14 62/5
64/7 70/20 71/7 71/14
82/1
Mr. Cleary [1] 10/13
Mr. Cleary's [1] 11/20
Mr. Ficklin [3] 29/17 37/8
45/14
Mr. Ficklin's [1] 27/22
Mr. Lancaster [10] 18/16
28/18 28/23 39/7 43/23
62/5 64/7 70/20 71/7
71/14
Mr. Lancaster's [2] 17/24
18/7
Mr. Rivard-Pedigo [1]
82/1
much [1] 68/10
multiple [1] 36/4
must [2] 66/2 81/12
my [18] 4/6 4/16 8/12
8/14 10/7 13/9 13/21
20/3 24/3 32/9 33/23
44/7 60/21 71/2 71/2
74/24 83/2 84/5
myself [1] 4/7

**N**

name [5] 4/6 5/10 18/14
32/9 76/19
named [1] 83/14
names [1] 5/17
National [2] 35/7 40/17
nationwide [2] 34/12
34/24
nature [3] 7/11 9/21
12/13
near [1] 12/2
necessarily [1] 80/24
need [4] 22/11 50/12
53/24 55/9
negative [1] 61/5
Neil [1] 67/17
never [4] 29/22 41/14
43/2 44/12
new [9] 1/15 9/7 9/10
9/13 9/15 10/13 12/5

48/19 50/23
New Year's [1] 50/23
next [3] 13/20 73/21
76/19
nice [2] 25/3 25/16
no [23] 1/3 7/23 17/15
30/2 33/6 39/5 39/9
39/12 40/3 42/19 45/21
45/24 46/2 46/3 53/23
58/20 61/22 65/16 72/6
74/3 81/15 82/2 82/8
none [3] 13/1 30/23 31/2
not [101]
Notary [2] 3/16 84/3
note [8] 21/22 26/19
30/6 34/16 43/15 43/18
45/13 50/3
noted [1] 76/4
notes [1] 84/6
nothing [4] 72/22 77/8
77/9 77/21
notice [6] 3/7 3/9 15/19
15/20 15/20 59/23
now [9] 10/22 15/4 15/4
33/14 35/13 37/14 42/15
44/18 57/19
nowhere [2] 52/4 52/8
number [20] 2/8 16/1
16/6 16/11 16/14 17/1
17/4 17/13 36/9 36/10
36/13 36/19 42/15 42/17
42/21 46/9 54/7 63/16
74/11 75/4
Number 2 [2] 36/13
36/19
Number 28 [2] 74/11
75/4
Number eight [1] 17/13
Number five [1] 17/1
Number four [1] 16/14
Number six [1] 17/4
Number three [1] 16/11
Number two [1] 16/6
numbered [1] 84/4
numbers [1] 26/12

**O**

oath [1] 83/14
object [2] 61/8 71/1
objection [4] 34/14 35/3
59/20 61/6
objections [1] 3/12
objects [1] 34/8
obligations [2] 17/4 79/6
observe [1] 57/2
obviously [5] 14/7 25/14
37/4 45/8 56/13
occasion [1] 27/18
occasions [1] 5/1
occurred [2] 54/21 71/2
off [16] 71/14 23/13 23/15
31/21 43/8 45/15 45/24
48/13 50/12 66/8 66/17
67/1 71/8 72/7 81/13
81/14
off-duty [2] 71/8 72/7

offered [4] 3/14 3/17
47/13 47/17
office [5] 1/11 32/6 32/8
66/20 77/8
okay [158]
OKEMO [117]
Okemo-provided [1]
19/10
on-mountain [1] 70/17
one [36] 5/3 6/19 7/6 7/8
7/9 11/2 11/5 16/1 16/17
18/15 23/8 23/14 28/8
31/6 31/18 33/1 34/5
34/7 36/4 41/14 41/15
49/4 49/6 54/5 54/7
65/11 65/15 75/12 76/8
76/16 76/22 76/24 77/8
79/23 80/9 80/19
one's [1] 65/21
ones [5] 15/24 52/15
58/20 58/22 77/14
ongoing [1] 39/18
online [2] 53/5 81/11
only [8] 4/14 8/23 9/5
49/21 64/10 73/9 76/12
81/9
open [1] 25/23
opening [1] 26/8
operation [1] 69/21
operations [9] 14/22
15/10 18/9 18/10 18/13
20/6 24/22 24/24 69/14
operator [3] 20/21 21/14
66/12
opinion [1] 61/10
opposed [2] 38/15 38/19
ops [1] 66/21
orange [1] 49/12
order [2] 3/8 3/9
orientation [3] 2/18
75/22 76/3
oriented [1] 50/16
other [33] 4/14 7/5 7/5
7/8 9/2 10/1 10/10 10/10
10/20 12/22 12/23 14/4
16/7 28/5 29/13 29/15
32/13 34/8 40/5 40/6
45/6 45/7 52/15 59/22
60/12 60/12 72/19 74/2
74/15 81/9 81/22 82/6
82/11
others [4] 14/3 37/5 63/9
78/2
our [11] 17/23 22/23
22/23 28/2 37/15 39/21
42/9 61/17 63/18 63/19
63/19
out [23] 21/12 24/3
24/18 25/24 27/14 29/15
35/19 42/17 43/5 43/17
48/13 55/10 57/1 63/4
63/20 72/22 73/22 74/22
75/4 75/18 77/12 77/18
77/19
out-of-control [1] 57/1
outfit [1] 62/12

over [3] 14/7 14/11 18/7
oversaw [3] 8/13 14/10
15/10
oversee [2] 14/18 15/9
oversees [1] 14/19
oversight [3] 14/6 14/10
14/15
overview [1] 48/18
overzealous [1] 58/13
own [1] 72/7
owner [1] 13/21

**P**

p.m [3] 81/19 81/19
82/12
P.O [1] 1/21
page [16] 2/23 22/9
23/11 33/18 37/14 44/19
45/3 47/21 50/20 54/4
56/7 60/23 62/24 64/16
84/4 84/4
page 17 [2] 47/21 60/23
page 20 [1] 50/20
page 21 [2] 22/9 23/11
page 233 [1] 44/19
page 35 [1] 33/18
page 36 [1] 37/14
page 49 [1] 45/3
page 8 [1] 64/16
pages [2] 68/21 84/4
paid [1] 68/3
paperwork [2] 66/20
70/11
paragraph [5] 52/7 56/15
59/22 59/24 80/17
park [1] 17/23
parking [4] 42/24 43/5
43/10 43/17
part [15] 3/13 20/22 21/3
26/4 26/17 27/12 28/10
38/18 40/18 40/23 41/8
46/4 51/17 52/1 54/17
part-time [2] 20/22 21/3
particular [1] 49/11
particularly [1] 37/10
parties [3] 3/3 3/9 29/13
partner [1] 35/19
partnered [2] 35/14
35/16
party [4] 5/19 5/21 29/13
29/15
pass [51] 2/11 2/12 2/13
2/24 17/6 17/11 21/16
23/21 24/7 27/19 27/22
28/1 28/3 28/6 28/8
28/23 29/5 29/19 30/4
30/5 30/10 30/24 31/15
31/24 32/7 32/10 32/11
32/16 32/20 33/3 35/17
35/24 36/3 36/4 36/7
46/5 46/21 50/8 51/14
51/19 51/23 53/14 57/6
57/9 74/6 74/20 74/24
75/1 79/7 79/13 81/10
passes [1] 79/20
past [1] 27/18

patrol [16] 8/12 8/13
14/6 14/10 14/11 14/16
14/19 16/18 17/17 18/22
39/21 39/24 59/8 63/19
67/19 70/10
patroller [1] 49/23
patrollers [2] 68/1 68/4
paying [1] 50/12
payroll [2] 66/22 66/23
peak [4] 42/3 50/21
50/22 51/2
PEDIGO [6] 1/2 45/10
53/17 59/17 82/1 84/8
Pedigo's [1] 59/2
pending [5] 10/18 10/21
11/1 11/9 12/7
people [31] 13/7 15/15
25/2 25/15 25/16 26/20
27/15 33/4 34/1 34/8
36/14 41/1 42/17 42/22
43/7 44/10 48/5 48/10
49/3 49/8 49/16 55/7
55/8 56/1 56/12 57/15
63/7 70/3 70/9 70/14
74/15
people's [1] 61/21
perhaps [5] 33/24 48/6
55/12 59/13 74/17
period [4] 19/23 51/2
65/8 81/1
periods [4] 42/12 48/4
50/21 50/22
person [10] 6/8 7/7 7/16
16/3 17/13 19/2 19/12
26/23 28/5 28/16
person's [3] 26/1 28/3
28/5
personally [2] 20/2 83/13
personnel [2] 15/18
48/22
persons [3] 20/13 45/6
45/7
Phone [1] 26/12
photos [8] 44/3 44/8
44/12 44/22 68/20 69/1
78/22 80/13
picture [1] 68/22
pictures [7] 16/21 16/22
41/1 44/21 69/6 69/10
78/24
pile [1] 42/8
place [5] 28/21 39/4 39/7
63/21 81/24
plaintiff [3] 1/16 11/23
12/10
plaintiff's [4] 16/2 46/11
47/5 75/23
play [1] 38/12
plaza [1] 48/5
please [2] 47/9 54/4
pocket [5] 2/11 26/5
26/14 47/4 47/10
point [1] 12/24
points [1] 59/22
policies [5] 16/7 22/23
37/18 40/4 78/11

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

(WITNESSNAME)
May 14, 2018

| | | | | |
|---|---|---|---|---|
| **P** | provide [5] 25/13 26/2 26/4 27/12 61/11 | recited [1] 10/11 | resolved [1] 6/13 | role [1] 50/15 |
| policy [2] 28/2 30/23 | provided [15] 17/5 17/11 | reckless [1] 57/1 | resort [4] 1/5 25/12 48/6 | room [1] 13/15 |
| portion [1] 24/3 | 19/10 21/9 24/7 26/14 | recognize [3] 46/14 | 84/9 | roster [3] 2/19 64/3 |
| portions [1] 34/3 | 27/19 47/11 69/20 79/7 | 46/15 64/12 | respect [3] 80/12 80/16 | 75/22 |
| position [6] 10/7 15/1 | 79/13 79/14 79/17 79/21 | recommended [1] 66/13 | 82/5 | round [1] 17/20 |
| 17/16 20/5 23/5 37/2 | 80/18 | record [8] 3/3 6/24 23/13 | respective [1] 3/3 | rule [2] 30/22 57/7 |
| positioned [1] 49/19 | provision [2] 34/9 46/21 | 23/15 31/21 71/1 81/13 | respond [1] 43/23 | rules [7] 16/6 54/10 57/2 |
| positive [1] 61/4 | public [3] 3/16 39/14 | 81/14 | Responses [3] 2/16 2/17 | 61/20 78/11 79/19 80/1 |
| Post [1] 2/15 | 84/3 | records [2] 24/2 68/18 | 2/18 | run [3] 43/17 49/4 49/6 |
| posted [2] 16/14 78/19 | pull [1] 61/21 | RECROSS [1] 2/2 | responsibilities [1] 15/4 | running [2] 43/5 50/24 |
| potentially [2] 45/8 46/4 | punched [1] 75/18 | red [3] 49/12 49/14 | responsibility [24] 16/12 | runout [1] 12/18 |
| practices [4] 39/2 39/20 | punishment [4] 45/21 | 62/13 | 18/7 24/15 33/15 33/22 | runs [2] 49/3 63/5 |
| 40/1 40/14 | 46/2 46/3 72/4 | REDIRECT [1] 2/2 | 34/2 34/4 34/9 34/11 | Rutland [3] 5/23 5/24 |
| predated [1] 54/6 | purchased [2] 5/16 77/9 | refer [1] 60/16 | 34/17 34/21 34/24 35/10 | 7/24 |
| premarked [2] 22/11 | purpose [1] 49/15 | referenced [2] 2/8 60/23 | 36/14 36/15 37/2 37/12 | Ryan [2] 6/1 7/21 |
| 22/12 | purposes [1] 49/20 | regard [2] 35/14 66/3 | 39/10 39/11 40/6 54/9 | **S** |
| premises [1] 45/19 | pursuant [1] 3/7 | regarding [1] 78/16 | 57/21 63/3 78/16 | sad [1] 44/15 |
| premium [1] 51/3 | put [4] 39/9 39/11 50/19 | Registered [1] 84/2 | responsible [2] 12/18 | safe [11] 39/2 39/15 |
| prepares [1] 53/12 | 62/7 | regulation [1] 30/22 | 63/4 | 39/20 40/1 40/5 40/14 |
| presence [1] 71/2 | Putney [1] 1/11 | regulations [4] 16/7 57/3 | rest [1] 72/13 | 40/17 40/20 41/5 45/20 |
| present [1] 13/3 | puts [1] 63/8 | 78/11 79/20 | restate [1] 34/23 | 57/18 |
| presentation [2] 76/21 | putting [2] 46/8 63/6 | rehire [1] 66/13 | restrooms [1] 48/10 | safety [54] 34/12 35/1 |
| 76/22 | **Q** | relate [5] 23/5 40/7 | result [4] 8/4 17/9 45/12 | 37/15 37/17 37/17 37/21 |
| presented [1] 82/4 | Quad [1] 48/11 | 45/16 59/21 77/16 | 79/12 | 37/24 38/1 38/11 38/15 |
| presently [5] 10/18 10/20 | qualified [1] 22/5 | related [12] 9/3 14/8 | retail [1] 32/12 | 38/22 38/23 39/1 39/24 |
| 14/11 14/18 64/22 | qualify [1] 45/9 | 16/9 38/13 38/14 38/23 | retained [2] 2/20 3/18 | 40/4 41/12 48/22 49/20 |
| president [9] 13/5 13/20 | quarter [2] 73/8 73/10 | 40/5 60/11 62/8 79/9 | revert [1] 76/15 | 50/15 54/9 54/14 56/16 |
| 14/18 14/22 15/5 15/10 | question [11] 4/16 16/9 | 79/15 80/4 | review [2] 37/9 41/12 | 57/18 57/21 58/1 58/22 |
| 18/9 18/10 18/12 | 23/1 40/12 44/7 44/20 | relates [3] 34/6 37/22 | reviewed [2] 67/9 67/10 | 58/23 59/5 59/16 60/8 |
| President's [4] 41/15 | 60/6 60/7 60/19 60/21 | 46/21 | revocation [1] 30/24 | 60/12 60/16 60/20 60/21 |
| 41/20 42/3 50/24 | 64/19 | relating [1] 80/24 | revoke [1] 56/24 | 61/7 61/17 61/20 61/20 |
| press [2] 35/18 35/20 | questions [8] 4/8 5/15 | relative [2] 60/9 78/18 | revoked [14] 27/20 | 61/24 62/1 62/4 62/8 |
| presumably [4] 26/16 | 49/8 49/10 78/2 78/5 | release [2] 35/18 35/21 | 27/23 28/1 28/8 29/5 | 62/11 62/20 63/3 63/11 |
| 47/17 55/6 68/22 | 81/16 82/11 | remainder [1] 31/18 | 29/8 29/10 29/19 29/21 | 63/18 63/19 63/19 76/7 |
| Prevailed [2] 8/7 8/8 | quick [4] 48/18 54/3 78/3 | remember [4] 5/9 8/5 | 30/1 30/4 30/5 30/10 | 76/20 76/24 77/14 80/1 |
| prevent [1] 38/8 | 81/17 | 8/19 65/15 | 57/6 | said [12] 3/16 14/9 29/11 |
| previously [1] 36/20 | quite [1] 60/18 | removal [3] 66/5 66/6 | RFID [4] 32/2 32/4 32/14 | 36/20 37/24 43/2 61/2 |
| price [1] 51/3 | **R** | 66/24 | 32/23 | 61/19 61/22 61/22 62/21 |
| principally [1] 49/16 | ranks [1] 13/19 | removed [2] 14/21 81/3 | Rhode [2] 6/9 7/7 | 83/12 |
| principles [1] 63/2 | reach [1] 25/24 | replacement [1] 9/24 | rider [3] 16/11 63/1 | same [14] 4/19 15/3 |
| printout [1] 56/7 | read [8] 23/8 23/10 25/6 | report [5] 18/16 50/4 | 78/16 | 16/9 16/22 24/15 33/3 |
| prior [2] 14/24 53/13 | 26/15 31/22 37/6 52/10 | 59/14 67/11 67/11 | riding [3] 25/24 49/8 | 33/6 35/9 46/23 52/15 |
| privileges [2] 29/20 | 83/1 | reported [1] 14/16 | 63/8 | 53/9 58/16 60/22 62/17 |
| 33/11 | reading [1] 54/8 | reporter [2] 4/15 84/3 | right [50] 5/3 10/21 | sanction [1] 72/5 |
| probably [12] 4/18 7/9 | ready [1] 32/9 | reporting [3] 1/21 15/8 | 11/20 11/22 13/22 14/14 | Saturday [4] 41/18 41/22 |
| 8/23 16/22 21/11 21/13 | real [2] 22/15 78/3 | 15/15 | 18/6 19/9 22/1 22/7 | 41/23 64/5 |
| 36/10 38/9 43/21 71/19 | realize [1] 66/4 | reports [5] 14/21 15/14 | 24/23 25/4 25/17 26/12 | saw [4] 38/11 51/8 71/14 |
| 76/15 77/21 | really [2] 39/12 72/6 | 18/8 18/10 60/8 | 26/23 30/1 33/5 36/15 | 76/20 |
| procedure [2] 31/1 31/3 | reason [7] 19/5 29/24 | represent [3] 6/1 7/21 | 38/21 43/7 43/11 44/6 | say [37] 7/4 18/8 19/5 |
| procedures [2] 16/7 | 53/23 54/6 66/16 73/19 | 10/9 | 44/8 44/9 44/14 45/17 | 24/9 24/11 24/13 24/17 |
| 78/11 | 82/3 | representative [3] 8/11 | 46/7 47/21 49/18 54/18 | 25/2 25/6 25/12 25/20 |
| proceeding [1] 9/4 | reasonable [1] 19/11 | 10/1 37/1 | 54/20 54/22 55/16 56/24 | 27/17 28/4 29/13 32/6 |
| process [1] 73/11 | reasons [1] 30/15 | represented [4] 5/19 | 60/20 63/22 64/9 64/14 | 32/9 33/24 34/2 34/10 |
| PRODUCE [1] 2/22 | recall [14] 5/4 5/17 9/6 | 5/20 5/21 10/13 | 65/19 65/23 72/13 72/24 | 34/15 35/16 38/17 41/18 |
| produced [4] 78/10 79/4 | 9/13 9/14 9/16 10/15 | represents [3] 11/18 | 74/7 74/8 74/9 75/13 | 42/2 43/9 45/17 50/1 |
| 79/8 80/24 | 12/12 12/22 13/1 24/1 | 11/19 11/23 | 75/15 75/21 78/23 80/21 | 52/5 52/8 54/12 55/24 |
| Professional [1] 84/2 | 58/20 72/2 72/21 | reprimand [1] 50/7 | rightly [1] 4/18 | 61/17 63/13 65/3 68/24 |
| program [18] 26/11 40/7 | receive [3] 21/23 40/16 | REQUEST [1] 2/22 | risk [5] 51/15 53/1 53/9 | 71/24 76/13 |
| 48/1 48/2 57/19 58/3 | 68/8 | requested [1] 31/22 | 63/9 82/5 | saying [4] 34/4 62/19 |
| 58/4 58/5 59/12 60/11 | received [5] 15/19 21/16 | require [1] 82/8 | risks [3] 52/2 52/8 52/17 | 72/21 74/24 |
| 60/15 61/3 61/5 61/5 | 22/14 76/18 78/24 | requirement [2] 51/22 | RIVARD [4] 1/2 45/10 | says [22] 4/2 22/9 23/19 |
| 61/13 61/15 62/3 62/8 | recent [1] 5/3 | 76/3 | 82/1 84/8 | 23/20 24/24 36/14 37/15 |
| promote [1] 41/5 | recite [1] 33/16 | research [4] 9/23 10/16 | RIVARD-PEDIGO [3] | 42/17 45/4 55/20 56/10 |
| promoted [2] 14/7 15/13 | | 13/2 64/20 | 1/2 45/10 84/8 | 56/17 56/21 57/15 63/1 |
| promulgates [1] 35/6 | | reserve [1] 56/24 | River [1] 13/17 | 65/22 66/10 73/7 75/2 |
| property [1] 45/7 | | reserved [1] 3/13 | road [3] 1/12 9/19 43/10 | |

**S**

says... [3] 75/2 75/8 75/18
scanned [1] 32/2
SCHMIDT [10] 1/10 2/3 3/6 3/16 4/1 32/6 65/22 83/6 83/14 84/6
school [3] 13/14 13/16 13/17
season [15] 2/11 2/12 2/13 2/24 20/16 23/21 35/17 47/18 48/3 51/19 65/2 81/5 81/5 81/5 81/10
season's [8] 21/16 32/7 32/16 35/17 51/14 51/22 53/14 74/6
seasonal [1] 20/20
seasonally [1] 19/22
seasons [1] 13/8
second [4] 23/14 56/7 56/15 62/24
section [1] 54/13
see [20] 10/2 12/19 22/15 24/9 34/19 37/19 37/20 50/3 51/1 56/14 56/19 57/4 57/5 63/8 65/23 73/19 73/22 76/16 77/21 77/22
seemed [1] 37/6
seen [15] 15/20 16/21 16/23 21/6 30/23 35/19 51/11 60/8 62/8 67/8 76/8 77/4 80/5 80/13 80/20
sees [2] 19/1 24/12
Seiger [1] 1/18
selection [1] 51/15
sell [1] 43/3
selling [2] 35/17 43/6
send [1] 32/5
sending [1] 73/12
seniority [1] 13/19
sense [1] 54/14
sent [1] 73/13
separate [2] 32/23 74/6
served [1] 12/3
service [15] 24/21 25/1 25/5 25/9 25/14 25/18 25/20 26/3 26/17 27/4 50/17 76/14 76/21 77/5 77/7
settled [1] 6/17
seven [2] 17/8 63/2
several [2] 15/23 80/23
sharing [1] 35/16
sheet [2] 64/5 73/2
sheets [2] 21/6 21/8
shop [1] 19/6
short [1] 39/5
Shortly [1] 71/18
should [8] 14/12 24/9 24/12 43/22 50/4 72/3 73/4 74/17
show [15] 6/24 22/10 22/13 46/13 47/7 51/10

52/13 52/16 52/21 54/2 57/10 64/9 65/13 67/7 76/2
showed [1] 75/18
showing [3] 54/6 55/19 74/23
shown [1] 76/16
side [1] 43/18
sides [1] 43/10
sign [3] 53/13 64/4 67/1
sign-up [1] 64/4
signature [1] 65/21
signatures [1] 3/10
signed [6] 3/15 53/17 53/19 64/14 65/15 66/16
signs [5] 16/14 51/20 63/6 78/19 80/14
similar [9] 30/7 46/16 57/23 58/24 59/4 62/14 63/11 63/15 63/20
similarly [1] 35/13
Since [1] 57/15
single [1] 34/5
situation [1] 75/3
situations [2] 30/17 77/15
six [2] 17/4 21/9
ski [67] 8/12 8/13 14/6 14/10 14/11 14/15 17/6 17/11 17/17 18/21 19/6 20/16 23/20 26/8 27/19 27/22 28/1 28/5 28/8 28/23 29/5 29/14 29/20 29/23 30/1 32/12 33/3 33/4 33/7 35/7 36/2 36/4 36/8 36/10 38/15 38/17 39/21 39/24 40/17 42/22 46/5 46/21 48/19 49/6 53/21 53/24 54/13 56/15 57/21 59/8 61/7 63/19 65/1 67/19 68/1 68/4 68/9 69/6 70/10 72/10 72/13 74/5 74/16 79/7 79/13 79/20 82/9
ski/snowboard [1] 23/20
skied [2] 17/10 79/13
skier [22] 16/11 19/9 30/8 34/3 34/11 35/1 41/10 41/10 41/13 41/13 52/5 52/9 52/19 53/1 53/6 54/9 63/1 78/16 82/5 82/6 82/6 82/6
skier-on-skier [2] 41/10 41/13
skier-skier [1] 82/6
skier/snowboarder [1] 35/1
skiers [6] 34/12 34/18 42/15 55/8 55/12 56/3
skiing [50] 7/9 7/13 9/23 16/8 17/5 17/10 19/10 24/12 24/18 27/13 27/14 27/15 29/16 30/8 30/10 30/11 30/20 31/5 32/20 33/11 33/15 34/20 37/7 38/20 38/23 39/2 39/15

39/20 40/1 40/5 40/14 40/18 40/20 45/20 45/23 52/2 53/1 54/17 54/22 55/4 55/20 56/12 56/17 57/1 57/16 59/6 63/8 78/12 79/7 79/13
slips [1] 38/9
slow [13] 30/11 37/10 54/17 54/22 55/3 55/20 56/10 56/12 56/17 56/21 63/5 63/22 63/23
slower [2] 55/11 56/3
slowly [2] 55/9 56/12
small [1] 22/19
smart [1] 40/7
Smith [2] 6/1 7/21
snow [4] 11/6 43/16 52/23 62/21
snowboard [3] 23/20 54/14 56/16
snowboarder [1] 35/1
snowboarders [1] 34/18
snowboardiing [1] 40/8
snowboarding [1] 57/2
so [105]
social [1] 44/22
some [30] 4/8 10/16 13/1 15/14 16/19 19/4 22/11 22/11 22/19 30/13 34/3 34/5 35/14 35/18 42/1 42/7 48/4 49/3 55/13 56/1 58/11 59/7 59/11 61/2 61/14 66/3 68/12 74/5 76/13 77/15 somebody [7] 12/20 25/24 30/14 31/7 43/20 74/1 81/11
somebody's [1] 30/4
someone [5] 23/5 24/17 29/12 31/8 50/11
someone's [1] 50/8
someplace [1] 25/22
something [15] 10/3 15/6 24/9 24/10 24/12 24/13 24/17 24/19 25/23 30/14 44/24 50/4 59/10 61/10
somewhere [5] 6/8 11/10 48/4 66/17 66/18
sorry [1] 9/16
sort [1] 76/3
sound [2] 22/7 22/8
sounds [3] 30/18 49/15 50/18
space [1] 43/17
speak [4] 16/4 50/11 70/3 70/4
speaking [3] 5/12 30/24 58/15
specific [1] 72/23
specifically [3] 60/1 71/6 72/21
spoke [2] 50/21 70/7
spoken [3] 69/24 70/12

70/19
spouse [1] 75/12
square [1] 59/23
SQUILLANTE [2] 84/2 84/19
STACIE [14] 1/2 24/4 31/14 33/23 36/22 37/2 37/11 44/7 45/10 45/18 53/17 59/2 59/17 84/8
Stacie Pedigo [1] 53/17
Stacie's [1] 29/19
staff [4] 17/14 57/19 79/24 80/14
stamp [1] 65/18
stand [3] 48/5 48/13 50/2
standard [2] 34/12 35/1
standards [1] 45/20
stands [1] 72/22
stars [1] 62/21
start [3] 13/13 18/2 32/4
started [2] 12/6 20/9
starting [1] 69/15
state [6] 6/4 11/10 11/11 12/8 23/2 83/8
statement [16] 27/12 27/16 27/17 30/20 30/21 35/2 37/12 37/13 39/16 39/17 45/22 48/23 48/24 49/17 55/10 66/3
STATES [1] 1/1
statistic [1] 43/20
statistics [1] 41/9
status [1] 12/1
stay [2] 34/1 34/7
stenographic [1] 84/6
sticker [1] 46/9
stickers [1] 22/12
still [4] 6/10 14/10 20/7 67/19
stipulated [1] 3/2
stipulation [1] 3/10
stop [2] 34/7 43/6
Street [1] 1/15
strike [8] 10/19 11/8 20/11 20/13 27/2 51/18 52/6 62/16
striking [1] 7/15
strong [1] 43/9
struck [2] 33/23 44/7
structures [1] 15/8
style [1] 40/7
subject [1] 16/2
subscribe [1] 36/3
subscribed [1] 83/15
subscribes [1] 40/15
subsequent [1] 70/14
subsequently [1] 22/14
substantial [2] 22/16 23/3
substantive [1] 22/23
such [1] 39/23
sued [1] 9/8
Suite [1] 1/19
summer [3] 5/11 17/22 26/10

Sunapee [1] 35/9
Sunday [4] 41/18 41/22 41/24 64/6
superior [1] 8/21
supervisor [3] 19/21 19/23 59/14
sure [20] 4/15 4/20 4/21 14/3 14/4 16/17 22/19 33/16 56/5 56/15 66/4 68/13 70/4 74/18 77/17 77/18 77/24 78/8 80/23 81/2
surface [1] 7/14
sworn [2] 4/1 10/10

**T**

table [1] 8/12
take [17] 3/8 4/16 28/3 28/5 28/21 37/1 39/6 41/1 44/12 47/15 49/3 50/8 52/10 54/3 67/14 78/22 81/17
taken [9] 1/11 3/7 3/7 31/18 44/23 69/6 70/16 81/19 84/7
takes [1] 39/4
taking [1] 57/9
talk [7] 15/18 16/1 28/19 38/1 38/6 38/6 64/11
talked [3] 12/24 60/13 78/24
talking [10] 19/3 32/24 35/23 38/19 58/18 60/15 60/20 60/22 76/9 80/14
talks [4] 40/17 54/17 77/1 77/7
task [1] 67/3
tell [15] 4/9 5/12 13/7 14/5 25/17 37/21 47/8 47/15 47/24 59/4 63/18 64/2 68/19 70/22 72/9
telling [1] 54/24
tells [2] 71/20 75/10
ten [1] 13/10
tenure [1] 18/1
term [1] 25/18
terminating [1] 45/12
termination [1] 45/4
terminology [2] 25/4 27/7
terms [3] 18/1 59/5 59/12
testified [4] 8/16 9/6 14/5 14/9
testify [7] 4/2 8/9 8/10 8/17 9/11 60/1 61/9
testimony [3] 3/6 10/10 12/23
than [13] 7/5 10/11 10/21 12/23 21/1 40/5 40/6 59/22 60/12 60/13 72/19 74/2 82/6
Thank [1] 82/10
that [417]
that's [39] 7/2 10/21 18/17 27/1 27/3 29/12 30/21 32/15 32/16 34/19

Double D Reporting
(802) 342-7199 • ddrvt@comcast.net
(8) says... – that's

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

[WITNESSNAME}
May 14, 2018

**T**

that's... [29]  36/6 37/13 39/17 42/5 42/5 43/18 47/11 47/20 48/24 50/4 50/19 51/7 51/21 55/5 55/6 56/11 61/4 61/22 63/14 64/17 65/11 67/3 67/6 69/14 69/20 71/4 75/13 77/20 80/15
their [19]  26/17 30/9 30/10 32/2 33/8 33/11 35/17 41/2 41/3 48/7 49/15 50/2 50/15 51/22 57/13 58/24 66/24 72/7 74/20
them [28]  22/18 24/8 24/11 24/17 25/16 25/22 26/20 32/1 33/12 34/21 36/16 47/13 48/7 48/17 49/3 49/4 49/9 59/9 68/13 68/23 74/16 74/22 75/6 75/7 76/11 76/12 77/15 77/16
themselves [2]  41/2 63/9
then [15]  4/17 7/4 7/14 15/12 15/14 18/10 32/7 48/8 48/10 48/15 54/24 56/21 74/23 75/1 75/17
there [82]  8/24 9/3 10/5 11/2 12/19 12/21 15/6 18/2 22/19 23/3 23/6 25/7 25/10 26/11 27/18 28/12 28/22 30/22 31/1 31/3 35/10 36/2 37/7 38/8 39/7 39/9 39/12 39/18 40/2 40/4 40/10 40/13 41/12 42/2 42/15 42/16 44/6 45/10 45/21 45/24 48/8 48/13 50/12 51/3 55/3 55/12 56/17 58/21 58/21 58/23 59/7 59/11 59/16 60/3 60/11 60/17 62/3 62/21 62/24 63/4 63/21 63/23 64/3 64/4 65/2 66/16 69/18 71/8 72/3 73/19 74/4 74/8 74/8 75/1 76/4 76/4 76/7 76/7 76/7 76/11 76/17 78/21
there's [32]  4/8 14/3 14/4 15/23 18/15 19/9 20/18 24/18 25/14 28/2 28/4 30/15 32/14 33/4 33/6 34/5 37/5 39/11 40/18 40/20 40/23 43/16 48/11 50/22 56/1 58/11 58/11 64/10 65/18 68/12 68/15 76/11
thereafter [1]  67/10
thereof [1]  3/14
these [13]  22/11 22/11 48/13 52/15 56/11 56/22 63/2 64/3 65/16 65/17 66/23 68/22 77/14
they [73]  6/3 7/17 8/23 23/20 24/9 24/9 24/12

24/14 25/23 26/1 26/2 26/16 29/14 29/22 30/9 30/10 30/12 30/13 31/8 32/3 32/4 32/8 33/6 33/11 33/11 38/12 39/22 39/22 39/23 44/22 47/15 48/4 48/9 48/13 48/15 48/21 49/2 49/6 49/7 49/8 49/11 49/12 49/22 49/22 50/1 50/5 50/10 51/6 53/14 57/12 58/14 58/16 58/20 58/21 59/6 59/10 59/12 59/14 59/14 62/13 63/17 63/22 64/6 68/2 68/2 68/7 68/8 68/13 72/7 74/20 74/24 75/20 77/13
they'll [1]  49/3
they're [12]  15/18 24/14 25/24 26/21 31/5 49/1 50/7 59/11 63/20 66/5 68/5 68/7
they've [2]  41/2 55/20
thing [3]  4/14 80/10 81/9
things [18]  15/17 15/24 32/13 34/6 38/10 38/14 41/8 44/21 55/15 61/21 64/11 65/18 67/1 67/12 68/14 71/20 75/18 77/2
think [28]  10/8 14/12 21/22 26/19 30/6 34/16 36/12 36/20 37/5 42/5 45/13 50/2 50/18 50/19 51/7 55/11 59/20 59/23 60/14 61/4 64/14 65/14 67/6 69/11 76/4 77/4 78/1 80/5
this [78]  3/10 10/21 11/5 12/24 15/21 23/8 24/6 27/24 27/24 30/24 32/9 32/23 36/18 37/10 40/11 42/8 42/21 43/9 44/11 44/15 44/24 45/12 45/13 45/15 46/15 47/2 51/19 53/11 53/12 54/7 54/8 54/8 54/8 54/21 55/16 55/19 56/4 58/2 58/4 58/5 60/9 62/7 62/23 63/5 65/1 65/5 65/15 65/21 65/23 66/5 66/10 66/17 69/15 70/5 70/8 70/20 71/17 71/21 72/20 73/19 73/20 74/4 74/6 74/11 74/17 74/21 74/21 74/24 75/1 75/2 75/3 75/21 76/14 78/7 81/4 81/6 81/13 83/12
Thompson [2]  20/1 73/18
Thompson's [1]  20/5
those [19]  9/1 10/17 10/24 11/1 22/1 26/14 30/16 31/6 39/6 41/8 42/12 49/19 51/5 67/11 67/15 69/5 69/9 75/17 79/4

though [1]  4/17
thought [5]  10/4 22/5 44/20 61/19 73/11
thoughts [1]  61/14
three [11]  10/17 16/11 42/2 42/12 50/22 51/5 58/21 72/16 76/4 76/7 76/19
through [12]  13/19 22/15 23/7 30/11 40/19 52/4 52/7 52/10 52/19 65/17 78/2 84/4
throughout [1]  37/16
ticket [7]  50/8 51/3 53/18 53/21 54/1 57/1 74/5
tickets [5]  43/3 43/6 61/21 75/19 75/19
tighter [1]  43/16
time [36]  3/19 8/24 10/8 13/9 13/11 15/8 19/19 19/23 20/22 20/22 21/1 21/3 21/6 21/8 21/13 22/6 23/10 23/19 25/23 42/12 44/6 44/9 44/9 46/22 49/21 52/10 53/13 59/18 63/21 67/22 70/15 72/8 72/20 73/1 75/11 81/1
times [2]  25/14 26/8
title [3]  13/3 15/5 24/22
toboggan [1]  59/9
today [3]  4/8 61/11 79/1
together [3]  9/15 28/4 78/7
told [2]  71/8 72/9
Tom [1]  11/17
too [1]  28/6
took [5]  44/2 44/8 68/20 68/24 69/9
top [4]  13/24 48/11 49/7 57/15
tour [1]  48/16
tours [1]  48/16
towards [1]  42/9
town [1]  43/9
trail [10]  7/13 17/14 30/9 30/12 39/12 54/23 55/13 56/1 64/1 80/1
training [3]  14/13 68/14 68/15
transcript [3]  4/20 83/1 84/5
tray [1]  13/14
treat [3]  24/13 30/7 31/7
treated [2]  3/7 68/1
treating [1]  71/11
trial [11]  3/19 6/15 8/2 8/4 8/9 8/10 8/17 8/19 8/23 9/7 12/2
true [9]  21/11 21/17 23/24 25/1 27/17 54/10 83/3 83/15 84/5
truth [1]  4/2
try [5]  4/11 33/2 49/4 74/18 77/14
trying [2]  30/13 73/22

tubing [5]  11/5 11/6 12/16 12/18 26/9
Tuesday [1]  31/15
turn [2]  47/21 72/24
two [17]  5/5 6/22 7/6 9/1 10/11 16/6 22/18 28/4 42/12 45/20 48/14 54/7 71/12 76/5 76/9 76/12 76/18
two-fold [1]  54/7
type [7]  30/13 30/16 32/10 33/3 41/8 59/8 82/4
types [1]  32/13

**U**

ultimately [1]  8/17
Um [9]  7/11 10/6 26/22 31/10 38/5 40/22 41/7 43/4 50/14
Um-hum [9]  7/11 10/6 26/22 31/10 38/5 40/22 41/7 43/4 50/14
unable [1]  29/23
unaware [2]  46/24 53/19
under [7]  24/20 29/9 30/4 33/24 36/4 56/15 57/7
underneath [2]  18/15 58/22
understand [12]  4/9 4/11 14/17 20/12 35/13 44/5 59/20 60/6 60/7 60/18 73/23 77/10
understanding [3]  12/15 31/17 61/13
Understood [5]  12/7 32/14 33/9 38/11 77/17
uniforms [1]  62/12
UNITED [1]  1/1
unrelated [1]  9/5
unsafe [3]  45/5 45/9 50/4
until [5]  3/13 3/18 4/16 63/1 67/22
unusual [2]  27/14 71/22
up [10]  13/19 25/24 32/9 49/2 63/6 64/4 65/23 66/9 67/22 74/23
uphill [1]  43/19
upon [1]  49/22
us [2]  43/10 72/16
USB [1]  76/11
use [10]  26/16 27/4 33/12 35/15 41/5 54/14 55/24 56/2 56/16 84/7
used [3]  49/22 59/13 75/20
uses [1]  35/19
using [2]  34/19 66/5
usually [3]  6/1 9/17 71/20
utilization [1]  79/24
utilizing [2]  17/14 80/14

**V**

Vail [7]  2/15 35/14 57/12 57/16 57/18 63/1 63/3
Vail's [1]  63/4
Valente [1]  1/11
various [1]  20/18
Vermont [10]  1/12 1/22 6/2 6/2 6/8 7/18 11/2 11/10 11/11 83/8
very [6]  8/24 36/12 43/9 46/16 53/3 55/8
vest [2]  19/7 19/7
vetting [1]  68/12
vice [9]  13/5 13/20 14/18 14/22 15/5 15/10 18/9 18/10 18/12
vice-president [9]  13/5 13/20 14/18 14/22 15/5 15/10 18/9 18/10 18/12
video [16]  2/24 38/12 44/3 44/9 44/22 76/6 76/6 76/7 76/14 76/20 76/21 76/21 76/22 76/24 77/5 80/20
videos [3]  76/4 76/5 76/18
violated [7]  33/22 34/3 34/5 34/8 36/19 37/2 37/11
violates [1]  45/20
virtue [1]  43/5
VOLUME [1]  1/7
volunteer [1]  68/5
volunteers [3]  48/3 68/2 70/9
VP [1]  14/24

**W**

wait [1]  4/15
waived [2]  3/9 3/11
waiver [3]  2/24 51/14 81/10
walk [2]  32/7 43/7
walks [1]  74/19
want [15]  4/19 6/24 15/24 25/2 36/11 48/19 55/24 62/5 63/14 63/15 64/11 68/10 71/21 72/17 78/8
wanted [2]  15/18 33/12
wants [1]  25/12
warnings [2]  16/15 78/19
wasn't [3]  29/7 52/13 74/18
watch [1]  27/14
wavelength [1]  4/19
way [10]  13/18 36/15 37/3 42/9 42/21 50/19 53/9 62/7 63/8 63/16
ways [2]  37/16 38/8
we [77]  4/19 5/16 5/16 9/16 11/4 12/3 12/17 15/13 15/17 21/9 24/11 24/13 24/16 25/2 25/10 25/11 25/15 26/19 28/5 28/19 29/11 29/14 30/7

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT

(WITNESSNAME)
May 14, 2018

W

we... [54] 31/6 31/6 31/6
31/7 31/11 35/16 35/17
37/24 38/1 38/6 38/6
38/24 39/9 39/11 40/16
40/23 41/8 42/17 42/18
43/2 43/12 43/14 44/12
44/16 45/19 48/2 49/9
52/22 54/10 55/24 56/2
56/24 58/1 58/16 60/13
63/5 63/7 63/8 63/13
63/13 63/14 63/14 63/15
65/4 77/8 77/9 77/13
77/13 77/14 77/18 78/7
79/5 80/6 80/24
we'll [3] 42/9 52/23
57/11
we're [7] 4/19 23/24
32/24 43/2 60/15 60/20
80/14
we've [4] 12/23 16/22
78/24 78/24
wear [3] 49/11 62/11
62/17
wearing [6] 19/1 20/3
41/3 72/20 72/22 72/23
weather [1] 68/16
website [6] 2/14 54/5
56/4 56/8 57/13 81/13
week [5] 21/10 40/20
40/21 50/23 50/24
weekend [4] 41/15 41/16
41/20 50/23
weekends [4] 21/3 42/2
42/3 48/4
weeks [1] 51/5
well [14] 7/24 14/1 15/7
29/11 30/6 36/12 37/17
40/16 41/21 65/3 66/4
67/8 67/22 72/14
went [4] 9/24 10/5 10/9
37/22
were [22] 7/17 9/16 12/3
12/17 21/9 29/14 29/20
29/22 30/10 30/12 30/13
31/8 44/24 46/24 53/19
58/14 58/20 58/21 58/22
59/16 69/5 72/7
weren't [1] 44/23
West [2] 1/18 1/19
what [65] 4/18 5/8 5/12
7/11 8/4 8/13 9/21 10/11
12/1 12/13 12/23 13/3
13/7 13/19 14/5 14/8
15/1 17/16 17/22 17/24
20/2 20/5 20/15 20/17
20/19 25/18 25/23 26/15
28/24 30/3 31/12 35/5
35/23 36/17 37/6 37/22
42/20 43/19 47/8 47/24
48/2 51/13 54/2 58/2
59/4 59/12 59/20 59/24
60/13 60/15 61/22 62/21
66/4 66/11 68/16 70/22
72/19 73/23 74/20 75/2
75/9 77/5 77/12 77/12

77/22
what's [8] 13/20 40/23
46/13 47/7 50/13 64/10
66/22 68/3
whatever [1] 21/20
when [30] 5/3 5/16 5/16
14/15 15/9 19/19 20/9
24/14 25/13 25/14 25/24
26/20 28/2 29/11 31/24
33/23 38/12 41/2 43/16
45/15 58/9 58/17 60/16
64/17 64/18 64/20 64/24
65/8 71/17 74/19
where [39] 6/7 8/19 9/8
9/13 9/16 10/12 10/24
10/24 11/1 11/9 11/9
12/10 13/16 14/9 14/9
27/19 29/12 30/13 33/24
39/6 41/1 42/9 44/6
44/22 48/19 49/9 49/23
52/7 54/21 55/12 56/1
56/14 59/8 59/10 59/14
59/17 59/20 62/21 75/17
65/8 71/17 74/19
which [34] 9/18 9/19
10/11 15/24 17/10 22/10
23/11 23/17 26/5 27/8
29/9 30/4 30/11 37/14
45/3 45/5 45/9 47/21
48/9 48/12 50/20 52/22
53/4 59/24 65/13 67/7
68/9 73/1 75/3 75/20
76/2 76/16 79/12 81/11
while [13] 16/8 17/5
17/10 24/6 27/13 30/19
31/4 31/8 38/3 49/8
78/12 79/7 79/13
who [26] 5/18 5/20 11/22
14/19 18/12 19/21 19/23
28/16 38/3 38/24 45/14
45/23 49/24 55/8 55/8
55/9 58/18 68/20 68/24
69/9 70/7 70/9 70/12
72/1 73/16 74/1
whoever [1] 75/1
whole [2] 23/11 36/8
whose [1] 57/19
why [4] 10/8 73/9 73/21
80/15
will [10] 4/18 26/16 43/9
45/4 48/15 53/3 59/6
67/1 69/11 77/18
winning [1] 57/19
winter [5] 20/23 22/7
23/19 46/22 47/18
within [1] 78/23
without [7] 9/6 9/22
10/15 13/1 64/20 68/18
70/11
withstanding [1] 45/18
witness [3] 2/2 61/9
81/16
woman [1] 75/1
Woodstock [1] 8/20
word [6] 33/16 33/17
35/15 35/19 55/23 56/2
work [14] 9/3 17/20 20/7

21/1 21/2 38/13 38/14
38/18 38/19 42/9 48/3
64/18 65/2 70/9
work-related [1] 38/14
worked [13] 13/6 13/7
13/8 13/10 13/18 18/18
19/14 19/22 24/2 64/21
65/9 66/9 73/9
working [10] 21/9 21/13
24/14 25/13 25/15 26/21
31/8 38/4 49/23 59/9
workplace [1] 38/2
works [4] 17/23 19/2
19/12 67/19
would [141]
wouldn't [5] 28/14 34/12
35/20 35/22 68/18
written [5] 25/10 31/1
40/4 62/3 62/8
wrong [2] 36/22 37/11
WWE [1] 1/3
www.ddreporting.com [1]
1/23

Y

yeah [20] 7/4 8/1 8/14
13/18 14/3 22/21 30/21
43/21 51/1 51/4 54/12
55/17 55/23 67/24 69/19
71/23 73/4 74/12 77/24
80/11
year [6] 13/9 17/20
37/16 41/13 46/17 75/11
Year's [1] 50/23
year-round [1] 17/20
yearly [1] 68/15
years [15] 5/5 6/22 7/6
7/9 10/11 10/12 13/10
14/7 14/9 40/19 58/11
61/4 75/9 75/10 80/23
yellow [11] 49/12 57/16
57/24 58/7 59/1 61/3
61/13 61/15 63/6 63/12
63/16
Yep [1] 64/15
yes [44] 6/18 7/17 9/9
10/23 11/7 11/21 16/5
16/10 16/13 16/24 17/3
17/7 17/12 21/21 23/23
23/24 25/2 26/7 27/21
31/19 33/16 34/2 34/10
34/15 36/20 51/6 53/11
53/23 54/12 55/18 56/9
56/20 58/6 58/8 69/4
70/21 74/10 78/14 78/17
79/5 79/10 79/16 79/22
80/3
yet [1] 52/22
you'll [2] 53/20 68/23
you're [24] 13/24 25/13
30/24 32/9 33/14 35/23
36/21 40/11 45/1 48/19
54/8 54/24 58/15 58/18
59/21 60/22 64/5 64/5
64/24 66/4 75/2 75/11
75/17 79/1

you've [13] 9/2 10/11
12/23 14/7 15/4 30/19
51/11 54/11 67/9 67/10
70/23 79/8 80/19
your [30] 12/14 13/3
13/18 15/1 20/17 22/1
24/21 26/4 31/17 32/19
34/17 36/15 37/9 39/9
39/11 42/22 51/19 52/10
56/24 57/21 59/22 61/13
63/10 65/21 72/19 75/10
75/12 78/10 78/12 81/12

Z

Zawistowski [1] 5/21
zone [1] 37/10
zones [1] 63/5

1

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF CONNECTICUT
 2
      STACIE RIVARD-PEDIGO,              )
 3                                       )Case No.:
              - vs -                     )3:17-cv-00568(WWE)
 4                                       )
      OKEMO LIMITED LIABILITY COMPANY    )
 5    D/B/A OKEMO MOUNTAIN RESORT.       )

 6

 7                            VOLUME I

 8                    D E P O S I T I O N

 9                            of

10                       BRUCE  SCHMIDT

11          taken on the 14th day of May, 2018, at 11:01 a.m.
         at the office of Costello, Valente & Gentry, 51 Putney
12       Road, Brattleboro, Vermont.
         _____

13

14    APPEARANCES:

15          JOEL T. FAXON, ESQUIRE, of the firm of Faxon Law
            Group, LLC, 59 Elm Street, New Haven, Connecticut
16          06510, on behalf of the Plaintiff.

17

18          CHARLES F. GFELLER, ESQUIRE, of the firm of Seiger
            Gfeller Laurie, West Hartford Center, 977
19          Farmington Avenue Suite 200, West Hartford,
            Connecticut 06107, on behalf of the Defendant.
20

21                       DOUBLE D REPORTING
                            P.O. Box 781
22                     Arlington, Vermont  05250
                          (802) 342-7199
23                       www.ddreporting.com

24
```

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                        Page 2

```
 1                    I N D E X
 2   Witness           DIRECT   CROSS   REDIRECT   RECROSS
 3   Bruce Schmidt
 4     By Mr. Faxon         4
       By Mr. Gfeller                81
 5
 6
 7                      EXHIBITS
 8   Number        Description        Marked   Referenced
 9   Exhibit 1    2015-2016 Handbook              22
     Exhibit 2    2016-2017 Okemo Employee   46
10                 Handbook
     Exhibit 3    2016-2017 Okemo Employee   47
11                 Pocket Guide
     Exhibit 4A   2015-2016 Season Pass          51
12                 Agreement
     Exhibit 4B   2017-2018 Season Pass          52
13                 Agreement
     Exhibit 4C   2018-2019 Season Pass          52
14                 Agreement
     Exhibit 5    2105 Website Excerpt           54
15   Exhibit 6    Vail Blog Post                 57
     Exhibit 7    June 29, 2017 Discovery        64
16                 Responses
     Exhibit 8    December 13, 2017, Discovery   65
17                 Responses
     Exhibit 9    June 29, 2017, Discover        67
18                 Responses
     Exhibit 10   Curtis Ficklin Orientation  76
19                 Roster
20              (Exhibits retained by counsel.)
21
22                 REQUEST TO PRODUCE
23   Description                              Page
24   Video                                     77
```

Volume I, Page No.                                        Page 3

```
 1         S T I P U L A T I O N S
 2        It is hereby stipulated and agreed by and between
 3   the attorneys of record for the respective parties
 4   hereto as follows:
 5
 6        1.   THAT the testimony of BRUCE SCHMIDT may be
 7   taken and treated as if taken pursuant to notice and
 8   order to take depositions and that all formalities of
 9   notice and order are waived by the parties, and the
10   signatures to this stipulation are in like manner
11   waived;
12        2.   THAT all objections except as to matters of
13   form are reserved until the deposition or any part
14   thereof is offered in evidence;
15        3.   THAT the deposition may be signed by the
16   said BRUCE SCHMIDT before any Notary Public;
17        4.   THAT all exhibits offered for
18   identification may be retained by counsel until the
19   time of trial.
20
21
22
23
24
```

Volume I, Page No.                                        Page 4

```
 1          BRUCE SCHMIDT, having been duly sworn
 2   to testify to the truth, deposes and says as
 3   follows:
 4          DIRECT EXAMINATION
 5   BY MR. FAXON:
 6     Q.   Good morning.  My name is Joel Faxon.  I
 7   introduced myself before.  I'm going to be asking
 8   you some questions today.  If there's anything I ask
 9   you that you don't understand, just tell me.
10     A.   Okay.
11     Q.   And I'll try to make it so you understand.
12   Fair enough?
13     A.   Okay.  Fair enough.
14     Q.   And the only other thing is, for the
15   benefit of the court reporter, make sure you wait
16   until I completely finish my question, take a
17   breath, and then you can answer.  Even though you
18   will probably rightly anticipate what I'm asking you
19   and we're on the same wavelength, we just want to
20   make sure the transcript is complete.
21     A.   Sure.
22     Q.   Have you been involved in a deposition
23   before?
24     A.   I have.
```

Volume I, Page No.                                        Page 5

```
 1     Q.   Okay.  On how many occasions?
 2     A.   A couple.
 3     Q.   All right.  When was the most recent one,
 4   do you recall?
 5     A.   Two years ago.
 6     Q.   Was it for a case involving Okemo?
 7     A.   It was.
 8     Q.   Okay.  What was that case, do you
 9   remember?
10     A.   It was -- I do not know the name.  It was
11   a summer accident involving an airbag.
12     Q.   So tell me, just generally speaking, what
13   that case involved.
14     A.   A guest was injured jumping into an
15   airbag, and I was involved answering questions of
16   when we got the airbag and when we had purchased it.
17     Q.   Okay.  Do you recall the names of any of
18   the lawyers involved in that case?  Do you know who
19   represented the injured party?
20     A.   I don't know who represented the injured
21   party, but I believe John Zawistowski represented
22   Okemo.
23     Q.   From Rutland?
24     A.   From Rutland.
```

Volume I, Page No.                                          Page 6

1    Q. Does Ryan Smith usually represent Okemo in
2    Vermont, in a case in Vermont?
3    A. They do.
4    Q. Do you know if that case was in the state
5    or federal court?
6    A. I do not know.
7    Q. Do you know where the guest was from? Was
8    it a person from Vermont or somewhere else?
9    A. He was from Rhode Island.
10   Q. Do you know if that case is still going
11   on?
12   A. It is not.
13   Q. It's resolved?
14   A. It is.
15   Q. Did it go to trial?
16   A. It did not.
17   Q. Okay. Do you know if it settled?
18   A. Yes, it did.
19   Q. Okay. So you gave one deposition in that
20   case?
21   A. I did.
22   Q. Approximately two years ago, ballpark
23   2016?
24   A. I just want the record to show that I'm

Volume I, Page No.                                          Page 7

1    guessing.
2    Q. That's fine. Ballpark is all I'm looking
3    for.
4    A. Yeah, I would say around then.
5    Q. Any other depositions are other than the
6    one two years ago involving the airbag with the
7    person from Rhode Island?
8    A. I have been involved in at least one other
9    one involved probably 15 years ago with a skiing
10   accident.
11   Q. Um-hum. And what was the nature of that
12   case?
13   A. It was a guest skiing down a trail going
14   off the edge of the groomed surface and then
15   striking a culvert.
16   Q. Okay. And the person was injured?
17   A. Yes, they were.
18   Q. Was that case filed in Vermont, do you
19   know?
20   A. It was.
21   Q. Was -- did Ryan Smith represent Okemo in
22   that?
23   A. No. Dave Cleary did.
24   Q. Okay. So he's from Rutland as well?

Volume I, Page No.                                          Page 8

1    A. Yeah.
2    Q. Did that case go to trial?
3    A. It did.
4    Q. And what was the result of that trial, do
5    you remember?
6    A. Okemo was --
7    Q. Prevailed?
8    A. Prevailed.
9    Q. Okay. Did you testify in the trial?
10   A. I did not testify in the trial. I was a
11   representative for Okemo so I was at the defense
12   table. I was deposed in my job of how ski patrol, I
13   oversaw ski patrol, and what I knew about that.
14   And, yeah, I guess that was my involvement with
15   that.
16   Q. So you testified in a deposition but you
17   did not testify ultimately at the jury trial.
18   A. Correct.
19   Q. Where was the jury trial, do you remember?
20   A. Woodstock.
21   Q. Okay. So it was in the superior court.
22   A. Okay.
23   Q. That was probably the only trial they had
24   there in a very long time.

Volume I, Page No.                                          Page 9

1         Okay. Aside from those two depositions,
2    any other depositions you've been involved in
3    related to work? I don't care if there was a
4    divorce proceeding or a car accident that was
5    unrelated. I only care about Okemo.
6    A. I don't recall. I have testified without
7    doing a deposition in a trial in New Jersey.
8    Q. Where Okemo was sued?
9    A. Yes.
10   Q. So did you go down to New Jersey and
11   testify?
12   A. I did.
13   Q. Okay. Do you recall where in New Jersey?
14   A. I don't recall.
15   Q. New Jersey all just blends together.
16   A. I'm sorry. I don't recall where we were.
17        MR. GFELLER: Usually you have to ask
18   which exit.
19        MR. FAXON: Depends on which road
20   it's on.
21   Q. What was the nature of that case?
22   A. It involved, I believe, without doing
23   research, it involved a downhill skiing accident.
24   And I believe I went as a last-minute replacement

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

**Volume I, Page No.** Page 10

1　because the other Okemo representative couldn't go.
2　　Q.  I see.
3　　A.  Or something like that.  But I always
4　thought it was different that I didn't get deposed
5　and I went there.
6　　Q.  Um-hum.
7　　A.  But in my position, I was the assistant
8　general manager at the time, so I think that was why
9　I went down to represent Okemo.
10　　Q.  Okay.  Any other sworn testimony other
11　than what you've recited so far, which is two years
12　ago involving the airbag, 15 years ago where Okemo
13　was represented by Mr. Cleary, and the case in New
14　Jersey?
15　　A.  I don't recall without doing, you know,
16　some research.
17　　Q.  Okay.  Aside from those three cases, are
18　you aware of any cases presently pending, if
19　applicable, but are you aware of any -- strike that.
20　　　　Are you aware of any cases presently other
21　than this case that's pending against Okemo right
22　now?
23　　A.  Yes.
24　　Q.  Okay.  And where are those?  Where is that

**Volume I, Page No.** Page 11

1　or where are those cases pending, do you know?
2　　A.  There is one in Vermont.
3　　Q.  Okay.
4　　A.  And I believe that is all that we have.
5　And this one involves a tubing accident.
6　　Q.  Snow tubing?
7　　A.  Yes.
8　　Q.  Have you been -- strike that.  Do you know
9　where that case is -- where it's pending?  Is it in
10　the state of Vermont or somewhere else?
11　　A.  I believe it's in the state of Vermont.
12　　Q.  And have you -- you haven't been deposed
13　in that case?
14　　A.  I have not.
15　　Q.  Okay.  And do you know any of the lawyers
16　that are involved in that case?
17　　A.  Tom Aicher.
18　　Q.  He represents you?
19　　A.  Represents Okemo.
20　　Q.  He's at Mr. Cleary's firm; right?
21　　A.  Yes, he is.
22　　Q.  All right.  Okay.  And do you know who
23　represents the plaintiff in that case?
24　　A.  I do not.

**Volume I, Page No.** Page 12

1　　Q.  Do you know what the status of that case
2　is?  Is it near trial?
3　　A.  It is not.  We were served on that in late
4　December.
5　　Q.  Okay.  So it's brand-new.
6　　A.  So it's just started.
7　　Q.  Understood.  Is that pending in the
8　federal or state court, do you know?
9　　A.  I do not know.
10　　Q.  And where is the plaintiff from, do you
11　know?
12　　A.  I don't recall.
13　　Q.  Okay.  And what is the nature of that
14　claim?  At least as it's been asserted to your
15　understanding.
16　　A.  A design of the tubing lane.  The guest
17　had a fractured leg and felt that we were
18　responsible for the runout of the tubing lane.
19　　Q.  I see.  Was there a collision with
20　somebody at the bottom?
21　　A.  There was not.
22　　Q.  Okay.  Any other cases that you can recall
23　that you've given testimony in other than what we've
24　talked about to this point?

**Volume I, Page No.** Page 13

1　　A.  None that I can recall without doing some
2　research.
3　　Q.  Fair enough.  What is your present title
4　at Okemo?
5　　A.  I'm vice-president and general manager.
6　　Q.  And how long have you worked for Okemo?
7　　A.  I have worked for -- what I tell people is
8　I've worked for Okemo for 40 seasons.  And I have
9　just completed my 30th full-time year.
10　　Q.  So you worked ten years before you became
11　full-time?
12　　A.  Correct.
13　　Q.  How did you start?
14　　A.  I was in junior high school in the tray
15　room at Okemo in 1978.
16　　Q.  Okay.  Where did you go to high school?
17　　A.  Black River High School in Ludlow.
18　　Q.  Yeah.  Okay.  And you just worked your way
19　up through the ranks, seniority.  And what is above
20　vice-president, general manager?  What's next?
21　　A.  I guess, I mean, my boss is the owner.
22　　Q.  Right.
23　　A.  So, you know.
24　　Q.  You're at the top of the food chain.

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 14

1    A.  Well --
2    Q.  Close to it.
3    A.  -- I'm sure there's others, yeah, but I'm
4    sure there's other.
5    Q.  Tell me what -- you testified earlier that
6    you had been involved in oversight of ski patrol so
7    obviously you've been promoted over the years at
8    Okemo.  What -- and that was related to the case
9    where you said you testified 15 years ago where you
10   oversaw ski patrol.  Do you still have oversight
11   over ski patrol presently?
12   A.  I think I should make it clear that I do
13   not have medical training --
14   Q.  Right.
15   A.  -- and when it comes to oversight of ski
16   patrol, it meant that the manager reported to me.
17   Q.  I understand.
18   A.  So presently I oversee the vice-president
19   who oversees the patrol director.
20   Q.  Okay.
21   A.  So I'm removed, but I -- but he reports to
22   me, the vice-president of mountain operations.
23   Q.  Got you.
24       So prior to being VP and general manager,

Volume I, Page No.                                    Page 15

1    what was your position?
2    A.  I was general manager.
3    Q.  Okay.  And did that entail the same
4    responsibilities that you have now except you've now
5    also been given the title vice-president?  Or is
6    there something else that was added?
7    A.  Well, as I have done different jobs, I've
8    had different reporting structures.  So at the time
9    when I was the general manager, I didn't oversee the
10   vice-president of mountain operations.  I oversaw
11   the culinary department and the facilities
12   department.  And then as changes developed in the
13   company and either I've been promoted or we made
14   some adjustments, then I may have more reports,
15   people reporting to me.
16   Q.  Got you.  Got you.
17       Okay.  So we have a list of things that I
18   wanted to talk to Okemo personnel about, and they're
19   on the notice of deposition.  Have you received the
20   notice of deposition or seen the notice of
21   deposition in this case?
22   A.  I have.
23   Q.  Okay.  And there's listed on here several
24   things, and I just want to know which ones you can

Volume I, Page No.                                    Page 16

1    talk about.  And so number one is the February 16,
2    2017, incident that is the subject of plaintiff's
3    complaint.  Are you the person most knowledgeable at
4    Okemo designated by Okemo to speak about that?
5    A.  Yes.
6    Q.  Okay.  Number two is Okemo rules,
7    regulations, policies, and other procedures
8    concerning maintaining control while skiing.
9        Same question related to that item.
10   A.  Yes.
11   Q.  Number three is the Okemo skier and rider
12   responsibility code.
13   A.  Yes.
14   Q.  Number four is Okemo posted signs and
15   warnings in the area of the February 16, 2017,
16   collision.
17   A.  I'm not sure I would be the best one for
18   that.  That may be the patrol director.
19   Q.  Okay.  But you have some familiarity with
20   it?
21   A.  I've seen pictures.
22   Q.  Okay.  Probably the same pictures we've
23   seen.
24   A.  Yes.

Volume I, Page No.                                    Page 17

1    Q.  Okay.  Number five is Curtis Ficklin's
2    employment with Okemo.
3    A.  Yes.
4    Q.  Number six is duties and obligations of
5    Okemo employees while skiing on employer-provided
6    ski pass as benefit of employment.
7    A.  Yes.
8    Q.  Seven is any discipline imposed on
9    Curtis Ficklin as a result of the collision or the
10   manner in which he skied while skiing on
11   employer-provided ski pass as benefit of employment.
12   A.  Yes.
13   Q.  Number eight is person most knowledgeable
14   about utilizing staff to monitor busy trail merges.
15   A.  No.  That would be Chris Lancaster.
16   Q.  Okay.  And what is his position?
17   A.  He's the ski patrol director.
18   Q.  Is he an employee of Okemo?
19   A.  He is.
20   Q.  Does he work year-round?
21   A.  He does.
22   Q.  What does he do in the summer?
23   A.  He works in our bike park.
24   Q.  Okay.  And what is Mr. Lancaster's

Volume I, Page No.                                    Page 18

1  background in terms of his tenure with Okemo?  Let's
2  start there.
3      A.  I would have to have him answer that.
4      Q.  Okay.
5      A.  I would be estimating or guessing.
6      Q.  Right.  Do you have managerial
7  responsibility over Mr. Lancaster's department?
8      A.  I would say indirectly.  Again, he reports
9  to the vice-president of mountain operations and
10  then vice-president of mountain operations reports
11  to me.
12     Q.  Who is the vice-president of mountain
13  operations?
14     A.  His name is Eb Kinney.
15     Q.  There's one level of management underneath
16  you that Mr. Lancaster would report to?
17     A.  That's correct.
18     Q.  And do you know how long he's worked at
19  Okemo?
20     A.  I do not.
21     Q.  Have you ever been a member of the ski
22  patrol at Okemo?
23     A.  I have not.
24     Q.  Would you agree with me that if a guest

Volume I, Page No.                                    Page 20

1      A.  Dave Thompson.
2      Q.  So do you personally know what Curtis was
3  wearing on the date that my client was injured?
4      A.  I do not.
5      Q.  Okay.  What is Dave Thompson's position?
6      A.  He's the lift operations manager.
7      Q.  Okay.  Does he still work at Okemo?
8      A.  He does.
9      Q.  Do you know when he started?
10     A.  I don't.
11     Q.  Is it fair -- so strike that.
12         I understand that employees, including
13  persons that would be considered -- let me strike
14  that.
15         What classification did Curtis Ficklin
16  have in 2017 -- during the 2016-'17 ski season?
17  What was his classification?  Because I know in your
18  handbook there's various classifications of
19  employees.  What would he have been?
20     A.  He would have been a seasonal lift
21  operator.  I don't know if he would have been -- if
22  he was considered part-time or full-time in the
23  winter.
24     Q.  How do you make that determination?

Volume I, Page No.                                    Page 19

1  sees an employee of Okemo wearing Okemo gear, that
2  the guest could expect that that person works for
3  Okemo?  On the mountain, I'm talking about.
4      A.  I guess I would have to ask for some
5  clarification because -- and the reason I say that
6  is because you could go into the ski shop and buy a
7  vest that has Okemo on the vest, either on the front
8  or on the back, so.
9      Q.  Right.  Let's assume that there's a skier
10  on the mountain skiing with an Okemo-provided coat
11  on.  Isn't it reasonable for the guest to expect
12  that that person works for Okemo?
13     A.  Correct.
14     Q.  Curtis worked for Okemo back in 2017;
15  correct?
16     A.  Correct.
17     Q.  Did you know him?
18     A.  I did not.
19     Q.  When was the first time you met him?
20     A.  I have not met him.
21     Q.  Okay.  Who would his direct supervisor
22  have been?  I know he worked at Okemo seasonally for
23  a period of time.  Who would his direct supervisor
24  have been back in 2017?

Volume I, Page No.                                    Page 21

1      A.  Full-time, that you would work more than
2  32 hours.  Most likely 40 hours.  More midweek work.
3  And part-time would be mostly weekends.
4      Q.  Okay.
5      A.  And/or so holidays.
6      Q.  Have you seen his time sheets?
7      A.  I have.
8      Q.  It appears, at least from the time sheets
9  that we were provided, that he was working five, six
10  days a week.
11     A.  That is probably true.  I didn't -- I
12  could find that out, and I would have to assume that
13  he probably was working, you know, was a full-time,
14  you know, lift operator.
15     Q.  Okay.  So as a benefit of employment,
16  every employee received a season's pass; isn't that
17  true?
18     A.  That is correct.
19     Q.  Okay.  And that would have included
20  Curtis's classification, whatever it was?
21     A.  Yes.
22         I think it's important to note that
23  different classifications receive different
24  benefits.

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 22

1    Q. Right. And those are all listed in your
2  employee handbook; correct?
3    A. Correct.
4    Q. I had looked at the employee handbook and
5  I thought that he qualified, based at least on the
6  limited information that I have, as a full-time
7  winter employee. Would that sound right to you?
8    A. That would sound correct.
9    Q. Okay. And it says in here at page 21, and
10  I'll show you Exhibit 1 which was the first -- and I
11  premarked some of these. Some of these I need
12  stickers on, but I premarked Exhibit 1 -- is the
13  2015-2016 handbook. Let me just show you that. I
14  subsequently received the '16-'17 handbook and I
15  looked through that and I don't see any real
16  substantial difference between the 2015-'16 and the
17  2016-'17 handbook. Are you aware of any differences
18  between the two of them?
19    A. I'm sure that there are some small
20  differences with dates --
21    Q. Yeah.
22    A. -- and but I'm not aware of any
23  substantive changes in our policies or in our
24  benefits.

Volume I, Page No.                                    Page 23

1    Q. Okay. That was the question that I was
2  going to ask you. If you could state for me, if
3  there are any, any substantial differences between
4  the '15-'16 handbook and the '16-'17 handbook as it
5  would relate to someone in Curtis's position.
6    A. I don't believe that there are.
7    Q. Okay. Because I'm going to go through
8  this, the one that I have read.
9    A. Okay.
10    Q. Because I didn't have time to read the
11  whole -- so if you look at page 21 which is Bates
12  Okemo --
13           MR. FAXON: Let's go off the record
14  for one second.
15           (A discussion was held off the record.)
16  BY MR. FAXON:
17    Q. Exhibit 1, which is the 2015-'16 handbook,
18  and I was looking at Bates 205.
19           So it says "Full-time winter employees."
20  And it says that basically they get a ski/snowboard
21  pass for the season; correct?
22    A. Are you asking me?
23    Q. Yes.
24    A. Okay. We're back on? Yes. True.

Volume I, Page No.                                    Page 24

1    Q. Okay. And if I recall from the employment
2  records, Curtis had worked on the clock for a
3  portion of the day and clocked out, the day that my
4  client, Stacie, was injured; correct?
5    A. Correct.
6    Q. Let me ask you this: While the employee
7  is on the mountain with the employer-provided pass,
8  do you consider them the eyes and ears of Okemo?
9  Meaning if they see something, they should say
10  something?
11    A. I would say that we consider them a guest
12  skiing. So if a guest sees something, they should
13  say something. So we don't treat any differently
14  employees when they're not working. They are
15  expected to adhere to the same responsibility code,
16  and, you know, just like, you know, guests, we would
17  expect them to say something. So if someone is
18  skiing out of control, there's an issue of, you
19  know, hazard or something like that.
20    Q. Okay. And Curtis was considered, under
21  your documents, a guest service ambassador.
22    A. His job title was lift operations.
23    Q. Right. But if you look in the lift
24  operations manual, it says "Every employee of Okemo

Volume I, Page No.                                    Page 25

1  is a guest service ambassador"; isn't that true?
2    A. Yes. I would say we would want people to
3  be nice to guests and.
4    Q. Right. But that terminology, "guest
5  service ambassador," is in the document; correct?
6    A. I have not read that, but if you say it's
7  there, I would agree with you.
8    Q. And you designate every employee of Okemo
9  as a guest service ambassador; correct?
10    A. We -- if it's written in there, I don't
11  know if that is in every manual that we might have,
12  but I would say that Okemo is a resort that wants to
13  provide, when you're working as an employee, a good
14  guest service. And there's obviously times when
15  people might not be working, and we would expect
16  them to be nice to people.
17    Q. Right. So tell me how you define guest
18  service ambassador at Okemo. What does that term
19  mean?
20    A. I guess I would say guest service
21  ambassador would be that if a guest -- if anyone
22  asked how do I get someplace, you would direct them.
23  Or do you know what time something might open. They
24  might reach out to somebody when they're riding up a

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 26

1  lift. You know, they might not know the person's an
2  employee and they might be able to provide a little
3  bit more guest service.
4      Q. And as part of that, you provide your
5  employees with a pocket guide; correct, which has a
6  lot of data in it?
7      A. Yes.
8      Q. It has opening times for ski facilities,
9  it has information about tubing, it has information
10  about summer activities, it has information about
11  the culinary program. Everything is in there.
12  Phone numbers; right?
13      A. Correct.
14      Q. And those -- that pocket guide is provided
15  to each employee, based on what I've read, with the
16  expectation that they will use that presumably as
17  part of their job as guest service ambassador.
18      A. Correct.
19          I think it's important to note that we
20  don't expect people to carry that with them when
21  they're not working.
22      Q. Um-hum. But you don't know if Curtis had
23  it on his person at all; right?
24      A. I do not.

Volume I, Page No.                                    Page 27

1      Q. Okay. But that's information that every
2  employee -- strike that.
3          That's information that every Okemo guest
4  service ambassador could use to enhance the
5  experience of the external guest; correct?
6      A. Correct.
7      Q. And you also have terminology called
8  "internal guest," which would be basically Okemo
9  employees; correct?
10      A. Correct.
11      Q. Okay. Would you agree with the following
12  statement: Part of Ficklin's job was to provide an
13  enjoyable skiing experience to all guests, and while
14  he was skiing, he was to watch out for any unusual
15  or dangerous conditions or people acting or skiing
16  inappropriately. Do you agree with that statement?
17      A. I would say that that statement is true.
18      Q. Okay. Has there been occasion in the past
19  where a ski pass provided to an employee was
20  revoked?
21      A. Yes.
22      Q. Okay. And was Mr. Ficklin's ski pass ever
23  revoked?
24      A. During this -- after this accident, his

Volume I, Page No.                                    Page 28

1  ski pass was revoked that day.
2          Our policy is to, when there's a
3  collision, to take a person's pass if a guest is
4  injured. Say two guests are together and there's --
5  the other person can't ski. We take that person's
6  pass too.
7      Q. Help me with that for a minute. So his
8  ski pass was revoked for one day or --
9      A. Correct.
10      Q. -- part of a day actually.
11      A. Correct.
12      Q. Was there any investigation done of his
13  activity?
14      A. I wouldn't be able to answer that. I was
15  not involved in an investigation.
16      Q. Okay. Who would be the person that would
17  do that?
18      A. Mr. Lancaster.
19      Q. Okay. So we can talk to him later about
20  that.
21          Was he -- how did that take place? I
22  mean, was there -- did he actually give a document
23  to Mr. -- did he give his ski pass to Mr. Lancaster
24  and it was later given back to him? Or what

Volume I, Page No.                                    Page 29

1  happened?
2      A. I would not be able to answer that.
3      Q. Okay.
4      A. I was not involved.
5      Q. And was that ski pass revoked because it
6  was found that he was at fault for the collision?
7      A. I cannot answer that. I wasn't involved.
8      Q. Okay. But you know it was revoked but you
9  don't know the circumstances under which it was
10  revoked?
11      A. Well, as I said before, when we have a
12  collision that's involved where someone may not be
13  able to -- so say both parties and the other party
14  doesn't -- can't ski because they were injured. We
15  don't allow the other party to go back out and go
16  skiing.
17      Q. Was Mr. Ficklin injured?
18      A. I do not know that.
19      Q. Was Stacie's pass revoked? Or was her --
20  were her privileges to ski on the day she was
21  injured revoked after the collision?
22      A. I never heard that they were, but she was
23  unable to ski.
24      Q. Okay. Are you aware of any reason that

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                          Page 30

1    her right to ski would have been revoked?
2        A.  No.
3        Q.  Okay.  And what are the circumstances
4    under which somebody's pass is revoked, an
5    employee's pass is revoked?  For misconduct?
6        A.  Well, I think it's important to note that
7    we would treat the employee and the guest similar.
8    So if a guest or employee or a skier was skiing a
9    closed trail, they would most likely have their, you
10   know, have their pass revoked.  If they were skiing
11   fast through a slow skiing area which are designated
12   on the trail map.  If they were involved, you know,
13   in some type of lift issue where they were trying to
14   cut in front of somebody or something like that.
15   There's different reasons.  And, you know,
16   Chris Lancaster deals with most of those type of
17   situations.
18       Q.  Okay.  So it sounds like the examples
19   you've given me would be based on misconduct while
20   skiing.  Is that a fair statement?
21       A.  Yeah, that's a fair statement.
22       Q.  Okay.  And is there any rule or regulation
23   or policy, because I've seen none, that deals with
24   this pass revocation that you're speaking about?  Is

Volume I, Page No.                                          Page 31

1    there a procedure for that written down anywhere?
2        A.  None that I'm aware.
3        Q.  Is there an internal procedure for
4    handling complaints of misconduct of employees while
5    they're skiing?
6        A.  We would -- if we had one of those, we
7    would treat it like we would if somebody was
8    complaining about someone while they were working in
9    the cafeteria.
10       Q.  Um-hum.
11       A.  We would, you know, look into it and, you
12   know, determine what might happen.
13       Q.  Okay.  If you assume for a moment that
14   Stacie was injured on a Monday, was Curtis given his
15   pass back on a Tuesday?
16       A.  I do not know that.
17       Q.  But your understanding is that it was
18   taken for one day or the remainder of that day?
19       A.  Yes.
20       Q.  Okay.
21            (A discussion was held off the record.)
22            (The requested material was read back.)
23   BY MR. FAXON:
24       Q.  So when the employee gets the pass, are --

Volume I, Page No.                                          Page 32

1    how is that -- how is that delivered to them?  Is it
2    an RFID card, or is it scanned on to their Okemo
3    card?  How do they get it?
4        A.  It's an RFID card.  So they would start --
5    the manager would send a form down to the
6    administration office and it would say Bruce Schmidt
7    is eligible for a season's pass.  I would then walk
8    into the administration office and they would look
9    my name up and say, okay, you're ready to go.  This
10   is the type of pass you get so that it would be, you
11   know, given.  So on that pass it has the ability to
12   ski, but it also has the discount for food, retail
13   discount, other types of things like that.
14       Q.  Understood.  So there's an RFID card
15   that's given to an employee that would be different
16   from, for example, the season's pass that's given to
17   the external guest?
18       A.  Correct.
19       Q.  Okay.  And, to your knowledge, Curtis was,
20   Curtis Ficklin was skiing on that pass the day of
21   the incident; correct?
22       A.  Correct.
23       Q.  Is the employee ID separate from this RFID
24   card that we're talking about?  Or is it

Volume I, Page No.                                          Page 33

1    incorporated on to it?  Is it all one?
2        A.  I guess maybe I'll try to answer.  Even if
3    you didn't ski, you would get the same type of pass.
4    So there's many people that don't ski.
5        Q.  Right.
6        A.  But they would get the same.  There's no
7    difference.  It would have the ability to ski on it.
8    It would be their employee ID.
9        Q.  Understood.  So every employee at Okemo
10   gets an employee ID and loaded on to that ID would
11   be their skiing privileges if they decided they
12   wanted to use them.
13       A.  Correct.
14       Q.  Now, you're familiar with the
15   responsibility code of skiing; correct?
16       A.  Yes.  I'm not sure I could recite it word
17   for word.
18       Q.  Look at page 35 of Exhibit 1, also known
19   as Okemo 219.
20       A.  Okay.  I have it.
21       Q.  And would you agree with me that
22   Curtis Ficklin violated that responsibility code
23   when he struck my client, Stacie?
24       A.  I would say where, you know, perhaps under

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 34

1   the stay in control or people ahead of you
2   responsibility, I would say yes, he did.
3       Q.  So he violated some portions of the skier
4   responsibility code.  I'm not saying that he
5   violated every single one because there's some
6   things that don't apply.  But at least as it relates
7   to one, always stay in control and be able to stop
8   or avoid other people or objects, Curtis violated
9   that provision of the responsibility code; correct?
10      A.  I would say yes.
11      Q.  And the skier responsibility code is a
12  nationwide safety standard for skiers.  Wouldn't you
13  agree with that?
14          MR. GFELLER:  Objection to form.
15      A.  I would say yes.
16      I do think it's important to note that it
17  is called Your Responsibility Code because it
18  includes skiers and snowboarders.
19      Q.  Okay.  I see that.  So anyone that's using
20  the skiing facilities going downhill, the
21  responsibility code would apply to them?
22      A.  Correct.
23      Q.  So let me restate it a little bit.  So the
24  responsibility code is a nationwide

Volume I, Page No.                                    Page 35

1   skier/snowboarder safety standard.  Is that a fair
2   statement?
3          MR. GFELLER:  Objection to form.
4       A.  Correct.
5       Q.  And it's adopted by what entity again that
6   promulgates it?
7       A.  National Ski Areas Association.
8       Q.  So, for example, if you go to Crested
9   Butte or if you go to Mount Sunapee, that same
10  responsibility code is going to be enforced there;
11  correct?
12      A.  Correct.
13      Q.  And similarly now, as I understand, Okemo
14  has partnered in some regard with Vail; correct?
15      A.  I don't know if I would use the word
16  "partnered."  I would say that we are sharing
17  season -- we are selling their season's pass.
18      Q.  Okay.  Some of the press release material
19  that I've seen out of Okemo uses the word "partner."
20  You wouldn't disagree with that if it's in the press
21  release?
22      A.  I wouldn't.
23      Q.  What you're talking about is the Epic
24  Pass?

Volume I, Page No.                                    Page 36

1       A.  Correct.
2       Q.  So there are many, many ski areas that
3   subscribe to the Epic Pass, and that allows you to
4   ski at multiple areas under one pass; is that
5   correct?
6       A.  That's correct.
7       Q.  And you can buy either a full Epic Pass,
8   it gets you the whole buffet of ski areas, or you
9   can have a certain number of days or you can
10  probably also limit the number of ski areas that you
11  want to have available to you; correct?
12      A.  I think you know that very well.
13      Q.  Okay.  Just looking at Number 2 of the
14  responsibility code.  It says "People ahead of you
15  have the right of way.  It's your responsibility to
16  avoid them."
17      Would you agree with me, based on what you
18  know about this circumstance, that Curtis also
19  violated Number 2?
20      A.  Yes.  I think I said that previously.
21      Q.  Okay.  You're not aware of anything that
22  Stacie did wrong; correct?
23      A.  I'm not aware.
24      Q.  Okay.  For example, you don't -- Okemo,

Volume I, Page No.                                    Page 37

1   you as the representative of Okemo, don't take the
2   position that Stacie violated the responsibility
3   code in any way, do you?
4       A.  I don't believe she did.  Obviously
5   there's certain aspects, and others may think
6   differently, but from what I read, she seemed to be,
7   you know, skiing along and, you know, there was a
8   collision with Mr. Ficklin.
9       Q.  Okay.  But, again, based on your review of
10  that, particularly in this slow zone, Okemo does not
11  claim that Stacie did anything wrong and violated
12  the responsibility code.  Is that a fair statement?
13      A.  That's a fair statement.
14      Q.  Okay.  Now, if you look on page 36, which
15  is Okemo 220, it says "Our safety committee meets
16  throughout the year to discuss ways to increase
17  safety awareness as well as develop safety
18  policies."
19      Do you see that?
20      A.  I do see that.
21      Q.  Tell me about the safety committee at
22  Okemo, at least as it relates to what went on in
23  2017.
24      A.  The safety committee, as it said, we do

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                              Page 38

1   meet, and I am on the safety committee. We talk
2   about accidents that are more workplace, you know,
3   or involved an employee who is injured while
4   working.
5       Q. Um-hum.
6       A. So we would talk about it. We would talk
7   about it with the department head, with the manager.
8   Is there ways to prevent it, focus on, you know,
9   more on, you know, probably slips and falls or
10  lifting injuries, things like that.
11      Q. Understood. Because I saw the safety
12  video that you play for everybody when they come to
13  work, and most of that is related to ergonomic
14  activities and things that would be a work-related
15  hazard as opposed to safety on the ski mountain.
16      A. Correct.
17      Q. And I don't mean to say that the ski
18  mountain isn't part of the work area, but I'm
19  talking about in the work environment as opposed to
20  the skiing environment.
21      A. Right.
22      Q. Does the safety committee also discuss
23  safety issues related to the skiing environment?
24      A. We would for employees who are on duty.

Volume I, Page No.                              Page 39

1       Q. Okay. Does the safety committee get
2   involved with safe skiing practices down the
3   mountain for external guests? Or is that a
4   discussion that takes place somewhere else?
5       A. That -- the short answer is no.
6       Q. Okay. Where would those discussions take
7   place? Would that be Mr. Lancaster? And is there
8   any committee?
9       A. There is no committee. We put the Your
10  Responsibility Code on the bottoms of the lifts.
11  There's large boards. We put Your Responsibility
12  Code in the trail maps. So there really is no
13  committee, you know, for that. It's more of a
14  public awareness.
15      Q. Okay. So Okemo doesn't have a safe skiing
16  committee; is that a fair statement?
17      A. That's a fair statement.
18      Q. Okay. Is there any ongoing entity or
19  group at Okemo inside the company that focuses on
20  safe skiing practices for the external guest?
21      A. That would be in our ski patrol.
22      Q. Okay. And do they have -- do they have a
23  committee as such? Or is it -- do they have
24  anything akin to a safety committee, the ski patrol,

Volume I, Page No.                              Page 40

1   for the external guest safe skiing practices? Is
2   there anything like that?
3       A. No.
4       Q. Are there any written safety policies
5   other than the -- for safe skiing related to the
6   external guest other than the responsibility code or
7   the smart style program that would relate to
8   snowboardiing?
9       A. Not that I'm aware.
10      Q. Okay. Are there any industry groups that
11  focus on this that you're aware of? Let me just
12  make the question clearer.
13          Are there any industry groups that focus
14  on safe skiing practices for external guests that
15  Okemo subscribes to or is a member of?
16      A. Well, we receive information from the
17  National Ski Areas Association that talks about safe
18  skiing. Okemo is part of -- there's a -- it's
19  changed through the years. I don't know if it's a
20  month or it's a week, but there's like a safe skiing
21  week.
22      Q. Um-hum.
23      A. There's -- we are part of what's called,
24  you know, helmet head awareness. Basically, it's a

Volume I, Page No.                              Page 41

1   little contest where people take pictures of
2   themselves when their hair -- after they've been
3   wearing their helmet.
4       Q. Helmet head.
5       A. So, you know, to promote safe use of
6   helmets.
7       Q. Um-hum.
8       A. Those type of things we are part of.
9       Q. Does Okemo keep statistics for
10  skier-on-skier collisions?
11      A. Not that I'm aware of.
12      Q. Okay. Is there ever a safety review at
13  the end of the year for skier-on-skier collisions?
14      A. I've never been involved in one.
15      Q. Okay. So President's Weekend is one of
16  the busiest, if not the busiest, weekend at Okemo;
17  correct?
18      A. I would say the Saturday and Sunday are --
19      Q. Okay.
20      A. -- of President's Weekend.
21      Q. Okay. Is Monday busy as well, but not as
22  busy Saturday and Sunday?
23      A. It's definitely not as busy as Saturday
24  and Sunday.

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 42

1     Q.  Okay.  Because in some of the literature
2  that you say there are three weekends that are the
3  peak weekends, and that would be President's, Martin
4  Luther King, and Christmas.
5     A.  I think that's a fair -- that's a fair
6  assumption.
7     Q.  Okay.  Because it's in some of the
8  documents that are in this pile.  I don't know
9  exactly where it is, but we'll work our way towards
10  that.
11           But has that always been the experience at
12  Okemo?  That those two, three time periods are the
13  busiest?
14     A.  Correct.
15     Q.  Now, is there a maximum number of skiers
16  that Okemo can have on the mountain?  Is there a
17  cutoff that says we have X number of people out here
18  and we can't have any more?
19     A.  No.
20     Q.  Okay.  Do you know what the -- let me ask
21  it this way:  Has Okemo ever limited the number of
22  people that can ski on the mountain, to your
23  knowledge?
24     A.  It's limited by parking.

Volume I, Page No.                                    Page 43

1     Q.  Okay.
2     A.  So we have never said we're not going to
3  sell any more tickets.
4     Q.  Um-hum.
5     A.  But by virtue of running out of parking,
6  you stop selling tickets.
7     Q.  Right.  Or people walk a lot further or
8  dropped off.
9     A.  Or I will say this town is very strong
10  about us parking on the sides of road.
11     Q.  Right.
12     A.  So we don't allow it.
13     Q.  How many cars can you handle?
14     A.  We can handle about 2800 to 2900.
15           It's important to note that in February
16  when there's more snow, it becomes a little tighter
17  because you run out of space in the parking lots,
18  but that's just a side note.
19     Q.  What is the maximum uphill capacity of
20  Okemo?  Somebody has that statistic.
21     A.  Yeah.  To be honest with you, I probably
22  should know it but I don't know it.
23     Q.  Did Mr. Lancaster respond to the
24  collision?

Volume I, Page No.                                    Page 44

1     A.  I do not know.
2     Q.  Okay.  Are you aware of anybody that took
3  any photos or video of the, let's call it, the
4  aftermath of the collision or the collision?
5     A.  I don't know if I understand.
6     Q.  Right.  So there was a time where Curtis
7  struck Stacie and injured her.  My question is:  Do
8  you know if anybody that took photos right around
9  that time or video right around that time that would
10  incorporate or include any of the people involved in
11  this case?
12     A.  We would never take photos of a guest
13  being injured.
14     Q.  Right.
15     A.  It was so sad that this happened.  And so
16  we would not -- Okemo employees would not be
17  instructed to do that, and I'm not aware of any.
18     Q.  Okay.  I'm just looking also now on
19  page 233.  Actually, let's just go back to the last
20  question that was implying that I thought that you
21  guys had any pictures, but sometimes things go on
22  social media where they got photos or video that
23  weren't actually taken in-house that would depict
24  something that were germane, for example, to this

Volume I, Page No.                                    Page 45

1  lawsuit.  You're not aware of anything like that?
2     A.  I am not.
3     Q.  So if you look at 233, which is page 49 on
4  Exhibit 1, it says "Employment at-will termination."
5  The fifth item down is "Unsafe conduct which may or
6  may not endanger the employee, other persons, or the
7  property of other persons."
8           Obviously -- potentially, Curtis's conduct
9  would qualify as unsafe conduct which endangered and
10  injured Stacie Rivard-Pedigo.  Was there any
11  investigation done or consideration given to
12  terminating Curtis as a result of this incident?
13     A.  I think it's important to note that this
14  is for employees who are on duty.  Mr. Ficklin was
15  off duty when that happened, so this would not
16  relate to that.
17     Q.  Right.  So is it fair to say that not
18  withstanding the fact that Curtis injured Stacie on
19  Okemo premises in a manner that we have agreed at
20  least violates two of the safe standards for skiing,
21  there was no investigation or punishment of him as
22  an employee of Okemo?  Is that a fair statement?
23     A.  Again, he was a guest who was skiing.  He
24  was off duty, so there was no investigation that was

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 46

1    done.
2       Q.  Okay.  And no punishment?
3       A.  And no punishment.
4       Q.  Okay.  Aside from potentially part of the
5    day him losing his ski pass.
6       A.  Correct.
7             MR. FAXON: All right.  Let's just
8    mark as 2, 2016-'17, here.  Do you mind putting a
9    sticker on that, Number 2.
10            (2016-2017 Okemo Employee Handbook was
11    marked Plaintiff's Exhibit 2 for identification.)
12   BY MR. FAXON:
13      Q.  Let me show you what's been marked as
14   Exhibit 2 and ask you if you recognize that.
15      A.  I do recognize this.
16      Q.  And Exhibit 2 is very similar to Exhibit 1
17   except it's the year '16-'17; correct?
18      A.  Correct.
19      Q.  And at least as I've looked at it, would
20   you agree with me that the content of Exhibit 2, as
21   it relates to the provision of a ski pass to a
22   full-time winter employee, would be basically the
23   same?
24      A.  I am unaware of any changes that were

Volume I, Page No.                                    Page 48

1    program is?
2       A.  So what the ambassador program is is we
3    have volunteers that work during the season, mostly
4    weekends, sometimes some holiday periods.  So they
5    would stand in the plaza area as people are coming
6    into the resort and greet guests and perhaps help
7    them with their equipment and give direction.  And
8    then there is also a location inside the base lodge
9    which is the base information desk.  They would
10   direct people mostly to the restrooms.  And then
11   there's also a building at the top of Base Quad A
12   and B which is the mountain information booth.  So
13   they stand out there and guests are coming off these
14   two chair lifts and looking for a little bit of
15   direction.  And then they will also give mountain
16   tours to guests that, okay, the mountain tour may
17   leave at 10:00 and give them an idea.  I don't know
18   how long it lasts, but it's just a quick overview of
19   where you might want to ski if you're just new to
20   Okemo.
21      Q.  Okay.  So they aren't -- the ambassadors
22   are not like safety personnel on the mountain.  Is
23   that a fair statement?
24      A.  That's a fair statement.

Volume I, Page No.                                    Page 47

1    made.
2             MR. FAXON: Okay.  Let's mark this as
3    Exhibit 3.
4             (2016-2017 Okemo Employee Pocket Guide was
5    marked Plaintiff's Exhibit 3 for identification.)
6    BY MR. FAXON:
7       Q.  So let me show you what's been marked as
8    Exhibit 3.  And if you can tell me what that is,
9    please.
10      A.  Exhibit 3 is the '16-'17 pocket guide.
11      Q.  And that's a document that is provided to
12   every employee at Okemo; correct?
13      A.  It is offered to them.
14      Q.  Okay.
15      A.  I can tell you they don't all take it.
16      Q.  Okay.  So Exhibit 3 would have also
17   presumably been offered to Curtis Ficklin during the
18   winter season that he was employed at Okemo '16 to
19   '17?
20      A.  That's correct.
21      Q.  All right.  Let's turn to page 17, which
22   is Okemo 276.
23      A.  Okay.
24      Q.  Can you tell me what the ambassador

Volume I, Page No.                                    Page 49

1       Q.  So to the extent that they're on the
2    mountain, it would be they go up with a defined
3    group of people and they'll take them down some runs
4    to try to introduce them to the mountain or one run
5    maybe.
6       A.  Or one run.  They also may ski around the
7    mountain and they may be like at the top and direct
8    people.  They may answer questions while riding the
9    lift where we just encourage them to answer
10   questions.
11      Q.  Do they wear anything in particular?  Like
12   do they have an orange coat a red coat or yellow
13   coat?
14      A.  I believe it's red.
15      Q.  So their purpose, it sounds like, is
16   principally to give people information on the
17   mountain itself.  Is that a fair statement?
18      A.  Right.  Correct.
19      Q.  Okay.  Are those ambassadors positioned on
20   the mountain ever for safety purposes?
21      A.  The only time I, you know, might -- that
22   they might be used is if they happen to come upon
23   where a patroller might be working on, you know, a
24   guest who happens to be injured and it's like a

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 50

1  blind knoll. They might say, hey, can you just
2  stand above here. But their job, I think it's
3  important to note, as Okemo employees, if you see
4  something that's unsafe, you should report it. So
5  they would fall into that category.
6     Q. Okay.
7     A. But they're not going to reprimand, you
8  know, take someone's ticket or pass.
9     Q. Okay.
10    A. You know, but they might -- and just like
11  any guest. You might speak to someone of, hey, you
12  almost cut me off there. You need to be paying
13  attention to what's going on.
14    Q. Um-hum.
15    A. Like that. But their role is not safety
16  oriented.
17    Q. Okay. So it's mostly customer service, I
18  think it sounds like.
19    A. I think that's a good way to put it.
20    Q. So if you look at page 20, which is Okemo
21  278, I spoke earlier about the peak periods. So
22  there's three peak periods identified, Christmas and
23  New Year's week, Martin Luther King weekend, and
24  President's Day and week running from 2/18 to 2/24.

Volume I, Page No.                                    Page 51

1     A. Yeah. I see that.
2     Q. Okay. So during the peak period, isn't
3  there a premium price on the ticket --
4     A. Yeah.
5     Q. -- for those three weeks?
6     A. Yes, they would be.
7     Q. Because I think that's listed in here
8  somewhere. I know I saw that.
9         Let's look at Exhibit 4. It's actually
10  4A. Let me show you Exhibit 4A and ask you if
11  you've seen that before.
12    A. I have.
13    Q. What is that?
14    A. It's the waiver season's pass agreement,
15  expressed assumption of risk, informed selection
16  agreement.
17    Q. And would you agree with me that part of
18  that -- strike that.
19        This is a document that your season pass
20  holder signs; correct?
21    A. That's correct.
22    Q. As a requirement to get their season's
23  pass.
24    A. Correct.

Volume I, Page No.                                    Page 52

1     Q. And part of the agreement defines the
2  inherent risks of skiing; correct?
3     A. Correct.
4     Q. And if you look through Exhibit 2, nowhere
5  does it say collision with another skier -- excuse
6  me. Let me strike that.
7         If you look through paragraph 2 where
8  inherent risks are defined, nowhere does it say
9  anything about collision with another skier;
10  correct? And you can take your time to read through
11  that.
12    A. It does not.
13    Q. Okay. And let me show you 4B. I wasn't
14  able to locate the '16-'17, but I'm going to assume
15  it's the same as all these other ones.
16        Let me show you 2017-2018. And would you
17  agree with me that the definition of inherent risks
18  in Exhibit 4B does not include collision with
19  another skier? And you can look through that.
20    A. It does not.
21    Q. Okay. And, lastly, let me just show you
22  2018-2019, which we haven't gotten to yet.
23  Hopefully we'll get a lot of snow. But that is
24  Exhibit 4C. And that does not include collision

Volume I, Page No.                                    Page 53

1  with another skier as an inherent risk of skiing?
2     A. It does not.
3     Q. Will you agree with me that it's very
4  likely that the 2016-2017 document, which I was not
5  able to find online, likewise does not include the
6  collision with another skier?
7     A. I would agree with you.
8     Q. Okay. Because the definition of inherent
9  risk is the same from 2015 all the way to the
10  2018-2019; correct?
11    A. It is on this, yes.
12    Q. And this is a document that Okemo prepares
13  to have the external guest sign prior to the time
14  that they get a season's pass; correct?
15    A. Correct.
16    Q. Are you aware of any documents that
17  Stacie Pedigo signed in connection with acquiring a
18  ticket?
19    A. I'm unaware of any that were signed.
20    Q. Okay. And you'll agree with me that she
21  had a ticket to ski on the date that she was
22  injured?
23    A. Yes. I have no reason -- I mean, she
24  would have to be able to ski. She would need a

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 54

1   ticket.
2       Q.  Let me show you what I've marked as
3   Exhibit 5. And just take a quick look at that, if
4   you would, please. I believe Exhibit 5 is a page
5   from the Okemo website. It's the first one I could
6   find that predated 2017. And the reason I'm showing
7   you that is two-fold. Number one, is this document,
8   just keep this in mind as you're reading this, this
9   document contains the skier responsibility safety
10  rules that we discussed earlier; isn't that true?
11  And you can answer that after you've looked at it.
12      A.  Yeah. I would say yes.
13      Q.  And it also contains a section on ski and
14  snowboard safety, use, courtesy, and common sense;
15  correct?
16      A.  Correct.
17      Q.  And part of that talks about slow skiing
18  areas; right?
19      A.  Correct.
20      Q.  Right. And the area in the location on
21  the mountain where this collision occurred was a
22  slow skiing area; right?
23      A.  I'd have to look at a trail map. But if
24  you're telling me it is, then I'm going to go with

Volume I, Page No.                                    Page 55

1   you.
2       Q.  I believe it is.
3           And there are certain designated slow
4   skiing areas on Okemo; correct?
5       A.  That's correct.
6       Q.  And that's because presumably you have
7   congestion and a lot of people and/or a lot of
8   people who are not very accomplished skiers who are
9   going to be going more slowly who need to be looked
10  out for. Is that a fair statement?
11      A.  I think I would define it as slower,
12  perhaps beginner skiers, but also where there may be
13  some trail crossings.
14      Q.  Okay.
15      A.  And things like that.
16      Q.  Right. And this Exhibit 5 -- is it 5?
17  Yeah, it's 5.
18      A.  Yes, it is 5.
19      Q.  This Exhibit 5 that I'm showing you
20  defines the slow skiing areas and says that they've
21  been designed for beginner and congested areas;
22  correct?
23      A.  Yeah. I don't know if that word is the
24  best use, but I would say that we want to make

Volume I, Page No.                                    Page 56

1   people aware where there's going to be some trail
2   crossings. We use the word "congestion" but also
3   slower skiers.
4       Q.  I'm just getting this from the website.
5       A.  Sure.
6       Q.  And you would agree with me that the
7   second page of Exhibit 5 appears to be a printout
8   from the Okemo website; correct?
9       A.  Yes, it is.
10      Q.  Okay. And it says "Slow down and go with
11  the flow in these areas." That's the desire of
12  Okemo, to have people go slowly in the slow skiing
13  areas; correct, obviously?
14      A.  Where do you see that?
15      Q.  Sure. The second paragraph under "Ski and
16  Snowboard Safety Use and Courtesy." At the end
17  there it says "Slow skiing areas have been designed
18  for beginner and congested areas."
19          Do you see that?
20      A.  Yes, I do.
21      Q.  And then it says "Slow down and go with
22  the flow in these areas"; correct?
23      A.  Correct.
24      Q.  "We reserve the right to revoke your

Volume I, Page No.                                    Page 57

1   ticket for reckless or out-of-control skiing and
2   snowboarding or failure to observe rules and
3   regulations."
4           Do you see that?
5       A.  I do see that.
6       Q.  Let me ask you, was Curtis's pass revoked
7   under that clause of the rule?
8       A.  I'm not going to answer that. I was not
9   involved in the taking of his pass.
10      Q.  Moving on. Okay. Let me show you
11  Exhibit 6. We'll look at that for a minute.
12  Exhibit 6 is from Vail, the blog that they have on
13  their website.
14      A.  Okay.
15      Q.  And it says at the top "Since 1999, people
16  in yellow jackets have been skiing around Vail
17  Mountain giving information, helping guests, and
18  keeping the mountain safe. Vail Mountain safety is
19  now an award-winning benchmark program whose staff
20  is committed to education, enforcement of the
21  Colorado Ski Safety Act, and Your Responsibility
22  Code."
23          Does Okemo have anything similar to the
24  yellow jackets?

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                                    Page 58

1      A.  We do have safety ambassadors, but I don't
2   know if it's to the level of, you know, what this
3   program is.
4      Q.  Okay.  Are you familiar with this program?
5   Have you heard of this program?
6      A.  Yes, I have.
7      Q.  The yellow jackets?
8      A.  Yes, I have.
9      Q.  When did you become familiar with that?
10     A.  I've heard about it in the last couple of
11  years because there's been some -- there's been
12  comments in the industry or guest comments about
13  being more overzealous, so I was interested on how
14  they were handling that.
15     Q.  The ambassadors that you're speaking
16  about, are they the same ambassadors that we
17  discussed earlier when I asked you about the guest
18  ambassador?  Is that who you're talking about at
19  Okemo?
20     A.  No.  They were the ones -- as you recall,
21  there were three ambassadors listed there, so they
22  were the ones underneath called safety ambassadors.
23     Q.  So would there have been safety
24  ambassadors on the mountain similar in their charge

Volume I, Page No.                                                    Page 59

1   to the yellow jackets that are indicated on
2   Exhibit 6 on the day of Stacie Pedigo's injury?
3      A.  I would have to have ask Chris Lancaster
4   what -- how that would be similar.  I can tell you
5   in broad terms that the safety ambassadors are
6   skiing on the mountain.  They will help direct
7   guests around if there happens to be, you know, some
8   type of, you know, injury where ski patrol may be
9   working on a guest.  Helping them into a toboggan or
10  something.  They might be in areas that are -- where
11  there might be some jumping going on or they're --
12  in broad terms what I know about the program, they
13  are used at different areas that perhaps Chris or a
14  supervisor that they report to determines where they
15  might go.
16     Q.  Do you know if there were any safety
17  ambassadors at the location where Stacie Pedigo was
18  injured at the time she was injured?
19          MR. GFELLER:  Let me just interject
20  an objection.  I think I understand where what
21  you're asking about could relate to certain of the
22  points other than paragraph 8 in your deposition
23  notice, but I also think it is going square in the
24  heart of paragraph 8 which is what Chris Lancaster

Volume I, Page No.                                                    Page 60

1   is going to testify about specifically.
2          MR. FAXON:  I'm just asking factually
3   if he knows if anybody was there.
4          MR. GFELLER:  You can answer.
5   BY MR. FAXON:
6      Q.  Do you understand the question?
7      A.  I understand the question.  I do not know.
8      Q.  Have you seen any reports from any safety
9   ambassadors relative to this incident?
10     A.  I have not.
11     Q.  Is there a formal program related to
12  safety ambassadors other than documented -- other
13  than what we talked about earlier on Exhibit 3?  I
14  think it was 3.  3.  Exhibit 3, Okemo 276,
15  ambassador program.  Is that what we're talking
16  about when you refer to a safety ambassadors?  Is
17  there anything else?
18     A.  I guess I don't quite understand the
19  question.
20     Q.  Right.  We're talking about safety
21  ambassadors.  And my question is:  Are the safety
22  ambassadors that you're talking about the same
23  ambassadors that are referenced on page 17 of
24  Exhibit 3 on Okemo 276?

Volume I, Page No.                                                    Page 61

1      A.  Correct.
2      Q.  Okay.  So you said that you had some
3   knowledge of the yellow jacket program for the last
4   couple of years.  Do you think that's a positive
5   program or a negative program --
6          MR. GFELLER:  Objection, form.
7      Q.  -- for ski safety?
8          MR. GFELLER:  Let me just object.
9   He's not here to testify as an expert witness, so
10  his opinion is not something that he's going to
11  provide today.
12     Q.  Okay.  You had commented earlier about
13  your understanding of the yellow jacket program, and
14  you had some thoughts about it.  Has Okemo
15  instituted a yellow jacket program or the
16  equivalent?
17     A.  I would say that our safety ambassadors is
18  as the equivalent.
19     Q.  Okay.  But I thought you said earlier that
20  the safety ambassadors do not enforce safety rules,
21  don't pull people's tickets, and things like that?
22     A.  No, that's not what I said.  I said the
23  mountain ambassadors do not do that.
24     Q.  But safety ambassadors do?

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.               Page 62

1    A. Safety ambassadors have more leeway to do
2  that.
3    Q. Okay. And is there a written program for
4  safety ambassadors?
5    A. I would want to have Mr. Lancaster answer
6  that. I do not know.
7    Q. Okay. Let's put it this way: You haven't
8  seen any written program related to safety
9  ambassadors.
10    A. I have not.
11    Q. Okay. Do the safety ambassadors wear any
12  distinctive uniforms, clothing, outfit?
13    A. I believe they are red.
14    Q. Okay. Similar to the --
15    A. Mountain.
16    Q. Strike that.
17    All of the ambassadors wear the same
18  color. Is that a fair --
19    A. I guess I would clarify by saying the
20  safety ambassadors and the mountain ambassadors do.
21  What was in there, where it said snow stars
22  ambassadors, do not.
23    Q. Okay. Let me ask you if you know this.
24  If you look at Exhibit 6 on the second page there.

Volume I, Page No.               Page 63

1  It says "Until every skier and rider on Vail knows
2  and abides by these seven principles," that would be
3  the responsibility code, "Vail Mountain safety is
4  out there enforcing responsible behavior on Vail's
5  12 runs designated as slow zones. We do this by
6  putting up almost 200 yellow signs every morning.
7  In addition, we engage in conversation with people
8  we see skiing or riding in a way that puts
9  themselves or others at risk."
10    Does Okemo, to your knowledge, have a
11  similar safety group like is described here, the
12  yellow jackets?
13    A. I would say that we -- we would abide and
14  we would want -- that's a great goal, and we would
15  want to have a similar goal. We may go about it in
16  a different way. I don't know the number of yellow
17  jackets that they have. And Chris would be able to
18  tell you how many safety ambassadors. But our
19  safety -- our ski patrol and our safety ambassadors
20  all do, you know, a similar, you know, they're out
21  there. But you can't be every place at every time.
22    Q. Right. They have concentrated in the slow
23  areas here. How many slow areas are there on Okemo?
24  Do you know?

Volume I, Page No.               Page 64

1    A. I would have to look at a trail map to be
2  able to tell you that.
3    Q. Would there be a roster for these
4  ambassadors? Meaning, is there like a sign-up
5  sheet? You're coming Saturday; you're coming
6  Sunday? Do they have a list?
7    A. I'm going to have to have Mr. Lancaster
8  answer that.
9    Q. All right. Fair enough. Let me show you
10  what's been marked as 7. There's only a couple of
11  things I want to talk to you about. So Exhibit 7.
12  Do you recognize that?
13    A. I do.
14    Q. I think you signed that; right?
15    A. Yep.
16    Q. Okay. So let's just look at page 8.
17  That's Curtis's employment list. When was he --
18  when did he last work for Okemo? Do you know? I'm
19  focusing on question 13.
20    A. I don't without having to research when he
21  last worked.
22    Q. Is he presently an employee?
23    A. He is not.
24    Q. Okay. When is it that you're aware he was

Volume I, Page No.               Page 65

1  last an employee? Would it have been this ski
2  season did he work there?
3    A. Well, I would say that looking at this,
4  how we answered, he was last employee on the 27th of
5  May.
6    Q. Okay. The discovery answer is June 29th,
7  so I assume he would have been an employee for a
8  month in that last period. But you don't know when
9  after that he worked?
10    A. I do not.
11    Q. That's it for that one.
12    A. Okay.
13    Q. Let me show you Exhibit 8, which is
14  answers to discovery. I think you may have -- you
15  may not have signed this one. I don't remember.
16  No, these are just documents.
17    Let's just go through a couple of these
18  things. Look at Okemo 30. There's a Bates stamp
19  down on the bottom right.
20    A. Okay. I have it.
21    Q. And this one's got your signature on it.
22  It says "Approved by division manager B. Schmidt."
23  This is 10/16/2017. Do you see that up in the right
24  corner?

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                     Page 66

1    A. I do.
2    Q. So he must have been employed as of last
3  fall in some regard. Is that a fair statement?
4    A. Well, what you're -- I'm sure you realize
5  that this is a removal form. They're using it as a
6  removal.
7    Q. Okay.
8    A. So he's coming off. I do not know if he
9  worked up to that date.
10   Q. Okay. Let me ask you this: It says his
11 job description is loper. What does that mean?
12   A. Lift operator.
13   Q. Okay. And he was recommended for rehire.
14 Would that have been by you or by Chris Lancaster?
15   A. That would have been by Chris Lancaster.
16   Q. Okay. Is there a reason that you signed
17 off on this document? Because sometimes you do;
18 sometimes you don't?
19   A. Most likely his manager isn't always in
20 the office. And, you know, paperwork isn't
21 always -- he's a mountain ops guy, so I would go
22 into what's called payroll or -- I don't know how to
23 describe it, but it has all these payroll
24 authorizations, removal forms, their applications,

Volume I, Page No.                                     Page 67

1  and things like that. And I will go in and sign off
2  for it.
3    Q. So that's just an administrative task that
4  you have?
5    A. Correct.
6    Q. I think that's it on that document. Let
7  me show you 9, which is another discovery answer
8  that you may have seen that as well.
9         You've reviewed -- I'm just looking at
10 Okemo 1 and thereafter. You've reviewed, I assume,
11 the incident report, the collision report, and those
12 things; correct?
13   A. Correct.
14   Q. Okay. Do you take any issue with the
15 content of any of those?
16   A. I don't.
17   Q. Do you know Neil Dewar?
18   A. I know of him casually.
19   Q. And he still works as a ski patrol at
20 Okemo?
21   A. I believe he does.
22   Q. Well, up until the time you closed in
23 April?
24   A. Correct. Yeah.

Volume I, Page No.                                     Page 68

1    Q. How are the ski patrollers treated? Are
2  they considered employees or volunteers? Are they
3  paid? What's the arrangement that Okemo has with
4  ski patrollers?
5    A. They're considered employees, volunteer
6  employees.
7    Q. So they're employees, but they don't
8  receive compensation. They basically get in-kind
9  compensation which is you can ski on the mountain as
10 much as you want.
11   A. Correct.
12   Q. Okay. And I assume there's some vetting
13 of them to make sure they have adequate first-aid
14 training and things like that?
15   A. There's yearly training.
16   Q. Do you know what the weather was like on
17 the 20th of February, 2017?
18   A. Without looking at records, I wouldn't be
19 able to tell you.
20   Q. Who took the photos, do you know, that are
21 in Exhibit 9, approximately pages 19, 20, 21, 22?
22 These picture that you presumably looked at. Keep
23 going. You'll come to them.
24   A. It doesn't say, so I do not know who took

Volume I, Page No.                                     Page 69

1  the photos.
2    Q. Okay. Would it have been an Okemo
3  employee?
4    A. Yes, it would have.
5    Q. Because I'm assuming -- were those
6  pictures taken after the collision? After the ski
7  area had closed for the day?
8    A. I would be guessing. I do not know.
9    Q. Okay. How do you determine who took those
10 pictures?
11   A. I think Chris Lancaster will be able to
12 answer that.
13   Q. He'll know. Okay.
14         So the lift operations manual that's
15 attached to this discovery starting at -- it doesn't
16 have --
17   A. I got it.
18   Q. You got it there?
19   A. Yeah.
20   Q. Okay. That's provided to every lift
21 operation employee, so it would have included
22 Curtis?
23   A. Correct.
24   Q. Okay. Have you ever spoken to Curtis?

Volume I, Page No.                                           Page 70

1    A.  I don't believe I have.
2    Q.  Okay.
3    A.  But, you know, I speak to a lot of people.
4    Q.  Sure.  Did you ever speak to him in
5    connection with this incident?
6    A.  Definitely not.
7    Q.  Who at Okemo spoke to Curtis in connection
8    with this incident?  I don't mean at the mountain
9    but people who work at Okemo or as volunteers, i.e.,
10   ski patrol?
11   A.  Without looking at the paperwork, I don't
12   know who would have spoken to him.
13   Q.  Are you aware of any investigation or
14   discussion with Curtis by people at Okemo subsequent
15   in time to the collision on the mountain?  Was he
16   taken down to the bottom, interviewed, anything like
17   that?  Or was it all on-mountain activity?
18   A.  I'm not aware.  I do not know.
19   Q.  Okay.  Have you ever spoken to
20   Mr. Lancaster about this incident?
21   A.  Yes.
22   Q.  Okay.  And tell me what conversations
23   you've had with him.
24           MR. GFELLER:  Let me just make for

Volume I, Page No.                                           Page 71

1    the record object to the extent that any
2    conversations occurred in my presence at my
3    direction.
4           MR. FAXON:  That's fine.
5           MR. GFELLER:  So he's asking
6    specifically about discussions you had with
7    Mr. Lancaster, just you and him, not involving me.
8    A.  He told me that there was an off-duty
9    employee that was involved in a collision with a
10   guest.  And he admitted that he was involved in the
11   collision, and, you know, he was treating it just
12   like, you know, a collision would be between two
13   guests.
14   Q.  Do you know if Mr. Lancaster saw Curtis on
15   the mountain?
16   A.  I do not know.
17   Q.  Okay.  When was this discussion that you
18   had?  Shortly after the collision?
19   A.  It was probably that afternoon.  That
20   evening.  He usually tells me if things are a little
21   bit -- might want to be aware of this.
22   Q.  Unusual?
23   A.  Yeah.
24   Q.  Okay.  Did he say anything about Curtis or

Volume I, Page No.                                           Page 72

1    about who was at fault or anything like that?
2    A.  Not that I recall.
3    Q.  Did he ask you if there should be any
4    additional investigation or punishment or any kind
5    of sanction?
6    A.  No.  Because it was really clear that it
7    was an off-duty employee and they were on their own
8    time.
9    Q.  Did he tell you that he had told him he
10   can't ski anymore for the day?
11   A.  He did not.
12   Q.  How did you come to know that he lost his
13   right to ski for the rest of the day?
14   A.  Well, that was -- I guess it doesn't
15   matter.  That was during conversations with the
16   three of us.
17   Q.  Okay.  I don't want to know about that.
18           Have you ever had any conversations with
19   anyone, other than your lawyer, about what Curtis
20   was wearing at the time of this incident?
21   A.  I don't recall specifically saying he was
22   wearing -- nothing stands out to me that he was
23   wearing something specific.
24   Q.  Okay.  All right.  Can you turn to the

Volume I, Page No.                                           Page 73

1    back of Exhibit 9, which is Okemo 25?  It's time
2    sheet.
3    A.  Okay.
4    Q.  Yeah.  It should be 9.  It looks like
5    that.
6    A.  Okay.  I have it.
7    Q.  So if you look at Monday, 2:20, it says
8    "6:59 to 8:11, hour and a quarter."
9           Do you have any idea why he only worked an
10   hour and a quarter on that day?
11   A.  I don't know the thought process by the
12   manager sending him home.
13   Q.  Okay.  Was he sent home, or did you ask to
14   go home?  Did he have a doctor's appointment?
15   A.  I don't.  I do not know.
16   Q.  Okay.  Who would know that at Okemo?
17   A.  I guess, you know, his manager,
18   Dave Thompson.
19   Q.  There is a reason, and I don't see this
20   anywhere else, this little icon looks like an eye.
21   Why is that icon next to the 8:11 and not anywhere
22   else on the out?  Do you see that?  I'm trying to
23   understand that.  What does that mean, that icon?
24   A.  I do not -- I don't know.

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                    Page 74

1    Q.  Okay.  Who would know that?  Somebody
2    other than you?
3    A.  I -- I don't -- I have no idea.
4    Q.  Okay.  At the end of this exhibit there
5    appears to be some kind of a ski ticket discount
6    card here.  This is separate from the season's pass;
7    right, that you have?  Keep going to the back.
8    There it is right there.
9    A.  Right here?
10   Q.  Yes.
11   A.  This would be Number 28.
12   Q.  Yeah.  27 and 28.
13   A.  Okay.  27 and 28.
14   Q.  Is that the additional benefit that the
15   employee gets of being able to invite other people
16   to ski with them?
17   A.  So perhaps I should have explained this in
18   the beginning, but I wasn't sure how I would try to
19   explain it.  But so when the employee walks in to
20   get their pass, they would have what is called --
21   and this is -- it's this color.  It's called a green
22   card.  So it's been filled out by them and the
23   manager.  So then instead of just showing up and
24   saying, hey, I'm getting my pass, they hand this to

Volume I, Page No.                                    Page 75

1    the woman or whoever is there.  So then this pass,
2    what this does, it says you're an employee.  It says
3    if you have dependents, which in this situation on
4    Number 28 it's crossed out.  He didn't have any
5    dependents.  But if you have dependents, you would
6    fill them in.
7    Q.  You would fill them in.
8    A.  It also says, you know, if you have
9    consecutive years.  So what that does is the
10   consecutive years tells you if your dependents, you
11   get more.  The first year, if you're a full-time,
12   you get one for your spouse.
13   Q.  Right.  And that's all detailed in the
14   manual.
15   A.  Right.  Okay.
16   Q.  Okay.
17   A.  And then you're correct.  Where those
18   things have been punched out, it says that showed
19   that he gets free tickets or the discounted tickets
20   in which they had not used.
21   Q.  All right.  Let's mark this as an exhibit.
22        (Curtis Ficklin Orientation Roster was
23   marked Plaintiff's Exhibit 10 for identification.)
24

Volume I, Page No.                                    Page 76

1    BY MR. FAXON:
2    Q.  Let me show you Exhibit 10, which looks to
3    me like sort of an employee orientation requirement.
4    And there are three videos noted there.  I think
5    I've gotten two of the videos.  I've gotten the
6    video with Inspector Clouseau and the video -- the
7    safety video, but there are three there.  Is there
8    another one that I haven't seen?  Do you know the
9    two I'm talking about?
10   A.  I do.
11   Q.  I have them there on the USB, but there's
12   only two of them.
13   A.  I guess I would say that some departments
14   might do this guest service video.  I don't know.
15   Again, I would have to probably revert to his
16   manager to see which one might have been shown
17   there.
18   Q.  Okay.  So I've received two videos.  It
19   looks, at least next to his name, he's got three
20   checked that he saw; the safety video, the guest
21   service video, and the presentation video.  Is the
22   presentation video the one with Inspector Clouseau?
23   A.  It is.
24   Q.  Okay.  And the safety video is the one

Volume I, Page No.                                    Page 77

1    that talks about hazmat, fire extinguishers, and
2    things like that?
3    A.  Correct.
4    Q.  So I don't think I've seen the guest
5    service video.  Do you know what that is?
6    A.  It's -- I believe, and I'm going -- it
7    talks about guest, you know, service in a -- like an
8    office or -- it's not -- it's nothing.  It's one we
9    purchased.  It's nothing we made.
10   Q.  Okay.  I understand.  But you have it
11   somewhere in the facility.
12   A.  I would to find out what -- because what
13   we do is we allow managers, you know, they do the
14   safety ones.  Not everybody does these, but we try
15   to encourage them because in some situations it may
16   not relate to them.
17   Q.  Sure.  Understood.
18   A.  But I'm sure Charlie will help out.  We
19   could find out for Charlie.
20   Q.  That's all I would ask you to get it to
21   Charlie so I can see it.  It's probably nothing, but
22   I would just like to see what it is because he
23   checked it.
24   A.  Yeah.  Sure.

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                        Page 78

1         MR. FAXON: I don't think I have any
2    others questions. Let me just look through here
3    real quick. Okay.
4    BY MR. FAXON:
5         Q.   Let me just ask you a couple of questions
6    about the documents that I asked you to bring, and
7    I'll just -- we can just look on this together. I
8    want to make sure I've gotten everything from you
9    that Okemo has.
10        Have you produced to your lawyers all
11   rules, regulations, policies, or procedures
12   concerning maintaining control while skiing, to your
13   knowledge?
14        A.   Yes.
15        Q.   Okay. All information that Okemo has
16   regarding the skier and rider responsibility code?
17        A.   Yes.
18        Q.   All information that -- relative to the
19   Okemo posted signs and warnings in the area of
20   February 16 -- of the February 16, 2017, collision?
21        A.   All that I was aware of. I was not there
22   and I did not take photos.
23        Q.   Right. But within the confines of Okemo,
24   we've received the pictures that we've talked about

Volume I, Page No.                                        Page 80

1    and/or enforce safety rules at busy trail
2    intersections.
3         A.   Yes.
4         Q.   Are you aware of any documents related to
5    that item? Because I don't think I've seen any.
6         A.   I'm not aware of anything that we might
7    have.
8         Q.   Okay.
9         MR. GFELLER: Let me just add one
10   thing.
11        MR. FAXON: Yeah.
12        MR. GFELLER: With respect to --
13        MR. FAXON: I have seen photos of
14   signs, but we're talking about utilizing staff.
15   That's why I asked.
16        MR. GFELLER: With respect to
17   paragraph 1H asking for information and materials
18   provided to Curtis Ficklin in the course of hiring
19   and employment, et cetera, you've identified one
20   video that you haven't seen.
21        MR. FAXON: Right.
22        MR. GFELLER: And to the extent that
23   he had been hired several years before, I'm not sure
24   we produced necessarily documents relating to, you

Volume I, Page No.                                        Page 79

1    today. You're not aware of anything else?
2         A.   I am not.
3         Q.   Okay. Ficklin's employment with Okemo.
4    You produced all those documents?
5         A.   Yes, we have.
6         Q.   Duties and obligations of Okemo employers
7    while skiing on employer-provided ski pass as
8    benefit of employment. You've produced all
9    documents related to that?
10        A.   Yes.
11        Q.   Any discipline imposed on Curtis Ficklin
12   as a result of collision or the manner in which he
13   skied while skiing on employer-provided ski pass as
14   benefit of employment. You provided any and all
15   documents related to that?
16        A.   Yes.
17        Q.   All information or materials provided to
18   Curtis by Okemo in the course of hiring, employment,
19   including any and all Okemo handbooks, rules,
20   regulations, ski passes for employees for 2017. You
21   provided all of that?
22        A.   Yes.
23        Q.   And last one is any documentation
24   concerning the utilization of staff to monitor

Volume I, Page No.                                        Page 81

1    know, handbooks, et cetera, from that time period.
2    And I'm not sure that I have any intention of doing
3    that because it's so far removed from the date of
4    this incident, but you have the materials from the
5    season before, the season of, and the season after
6    this incident.
7         MR. FAXON: I'm comfortable with
8    that.
9         The only other thing I would like, if
10   I can get it, is the 2016 to 2017 season pass waiver
11   document, which I couldn't find online. Somebody
12   must have that. Although, if you look at your
13   website from -- this can be off the record.
14        (A discussion was held off the record.)
15        MR. FAXON: I have no further
16   questions for the witness.
17        MR. GFELLER: Let's take a quick
18   break.
19        (Break taken from 12:44 p.m. to 12:51 p.m.)
20        CROSS-EXAMINATION
21   BY MR. GFELLER:
22        Q.   Bruce, are you aware of any other
23   collisions that Curtis Ficklin was involved in at
24   Okemo or any place else either before or after the

STACIE RIVARD-PEDIGO v.
OKEMO LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RE

Bruce Schmidt
May 14, 2018

Volume I, Page No.                                     Page 82

1   incident with Mr. Rivard-Pedigo?
2       A.  No.
3       Q.  Did you or Okemo have any reason to
4   believe that Curtis Ficklin presented any type of
5   different or higher risk as a skier with respect to
6   skier-skier collision than any other skier on the
7   mountain?
8       A.  No, because his job didn't require him to
9   ski.
10              MR. GFELLER: Thank you.  I don't
11  have any other questions.
12              (Deposition concluded at 12:52 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Volume I, Page No.                                     Page 83

1           I have carefully read the foregoing transcript of
2   my deposition given on May 14, 2018, and the answers
3   made by me are true.
4
5   DATE: _____  _____
6              BRUCE SCHMIDT
7
8   STATE OF VERMONT
9   COUNTY OF _____
10
11
12      At _____, in said county, this _____ day of
13  _____ 2018, personally appeared before me the
14  above-named BRUCE SCHMIDT, and made oath that the
15  foregoing answers subscribed by him are true.
16
17  Before me: _____
18  Commission Expires: _____
19
20      .
21
22
23
24

Volume I, Page No.                                     Page 84

1                   C E R T I F I C A T E
2       I, DINEEN SQUILLANTE, Registered Professional
3   Reporter and Notary Public, do hereby certify that the
4   foregoing pages, numbered page 4 through page 82,
5   inclusive, are a true and accurate transcript of my
6   stenographic notes of the deposition of BRUCE SCHMIDT,
7   taken before me on May 14, 2018, at 11:01 a.m., for use
8   in the matter of STACIE RIVARD-PEDIGO, -VS- OKEMO
9   LIMITED LIABILITY COMPANY D/B/A OKEMO MOUNTAIN RESORT.
10
11
12
13
14
15
16
17          Dineen Squillante
18          _____
19                          DINEEN SQUILLANTE
20                  Commission Expires 02/10/19
21
22
23
24